Manfred P. Muecke (SBN 222893)
**Manfred APC**
4225 Executive Square
Suite 600-6051
La Jolla, CA 92037
Tel: (619) 550-4005
Fax: (619) 550-4006
mmuecke@manfredapc.com

*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

Ryan Dixon on Behalf of Himself and All Others Similarly Situated,

Plaintiff,

vs.

KEURIG GREEN MOUNTAIN, INC.

Defendant.

**Case No.** 3:26-cv-02172-LL-BJW

**FIRST AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

# CLASS ACTION COMPLAINT

Plaintiff Ryan Dixon ("Plaintiff"), by and through his attorneys, brings this action on behalf of himself and all others similarly situated against Keurig Green Mountain, Inc. ("Defendant")[1]. Plaintiff hereby alleges, on information and belief, except for information based on personal knowledge, which allegations are likely to have evidentiary support after further investigation and discovery, as follows:

## INTRODUCTION

1. Defendant markets and sells plastic single-serve coffee pods ("K-Cup pods" or "Products") nationwide in retail stores and online stores such as Amazon. Defendant deceptively labels and advertises its K-Cup single-use beverage pods as "recyclable," despite the fact that a vast majority of consumers are unable to recycle K-Cup pods. Most recycling centers in the United States, including those based in California, do not recycle K-Cups due to their small size, irregular shape, multi-material construction, frequent contamination issues, and unfavorable economic factors.

2. Despite these facts, Keurig promotes its K-Cup pods as "recyclable" because they are made from polypropylene #5 plastic. However, the company relies on a purely theoretical definition of recyclability that ignores the fundamental principles outlined in the FTC's Green Guides [2], does not and cannot comport with

---

[1] Keurig Dr. Pepper, Inc. was previously named as Defendant in Plaintiff's initial complaint but upon information and belief, the proper Defendant in this matter is Keurig Green Mountain, Inc.
[2] 16 CFR Part 260

the capabilities and function of virtually any recycling facility and does not align with consumer understanding. This deceptive marketing strategy allows Keurig to exploit consumer demand for environmentally responsible products.

3. Plaintiff purchased the Products in reliance on Defendant's false representations that the Products are recyclable. Plaintiff viewed Defendant's false representations on the labels and other marketing materials for the Products. If Plaintiff had known that the Products were not recyclable, Plaintiff would not have purchased the Products and would have instead sought out single-serve pods or other coffee products that are otherwise compostable, recyclable, or reusable. At a minimum, Plaintiff would not have paid as much as he did if he had known the Products could not be recycled.

4. Defendant's misrepresentations concerning the Products are unfair, unlawful, and fraudulent, and have the tendency or capacity to deceive or confuse reasonable consumers. As such, Defendant's practices violate certain California consumer protection statutes as discussed herein.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), as the amount in controversy exceeds $5 million, exclusive of interests and costs; it is a class action of over 100 members; and Plaintiff is a citizen of a state different from Defendant.

6. This Court has personal jurisdiction over Defendant by way of the

sufficient minimum contacts Defendant has with the state of California. Defendant purposefully availed itself, and continues to avail itself, of the jurisdiction of this California through the privilege of conducting its business ventures in the state of California, thus rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper in this district under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district, as Defendant does business throughout this district, and Plaintiff made his purchase of K-Cup pods from a retail store in this district within the class period and the Products he purchased were delivered to, and used, in this district.

**PARTIES**

8. Plaintiff is a natural person and a citizen of San Diego County, California. Plaintiff purchased the Products from a Ralphs grocery store on or around June 2025. Before his purchase, Plaintiff saw and reviewed Defendant's packaging. Plaintiff reasonably believed that the Products he purchased were recyclable and could simply place them in his recycling bin with other recyclable materials. Plaintiff was not aware that the Product could not be recycled. Had Plaintiff known that the Products were not recyclable, he would not have purchased the Products or alternatively, would have paid significantly less than the price he paid for the Products.

9. Plaintiff specifically relied upon representations made by Defendant.

Plaintiff did not receive the promised benefits or the total value of his purchase. Plaintiff would purchase the Products again if he was assured the Products were not falsely advertised.

10. Defendant Keurig Green Mountain Inc. ("Keurig"), is incorporated in Delaware with its corporate headquarters located at 53 South Avenue, Burlington, MA 01803. Keurig manufactures, distributes and sells the Products.

11. Defendant has labeled, advertised, distributed, and sold the Class Products for sale at numerous locations throughout California during the statute of limitations period under several of its brand names.

12. Defendant manufactures, markets, advertises, and distributes the Products throughout the United States. Defendant created and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling of its Products.

## FACTUAL ALLEGATIONS

### A. Background

13. Keurig has been aware for years that consumers are increasingly concerned about the environmental impact of their consumption habits and that such concerns materially influence purchasing decisions. As early as 2016, Keurig's own research showed that consumer worries about the environmental impact of K-Cup pods affected purchasing behavior, and the company publicly recognized the business risk of failing to address sustainability and recyclability concerns. In public filings, Keurig warned investors that consumer focus on sustainability—particularly the

recyclability of packaging and reduction of single-use plastics—could negatively impact sales if unmet.

14. In response, Keurig announced that it had redesigned its K-Cup pods to use polypropylene (#5) plastic instead of #7 plastic and pledged that 100 percent of its K-Cup pods would be "recyclable" by the end of 2020. Keurig thereafter made recyclability a central focus of its marketing strategy, emphasizing that consumers would be able to easily identify recyclable pods through on-package messaging, recycling instructions, and the #5 symbol on the pod. By 2019, Keurig assured investors that it was on track to meet its recyclability goal and represented that it had conducted extensive testing with municipal recycling facilities to validate that K-Cup pods could be effectively recycled. In 2020, Keurig claimed that it had achieved this goal and that all K-Cup pods sold in the United States were recyclable.

15. Keurig did not disclose, however, that two of the largest recycling companies in the United States—together operating more than one-third of U.S. recycling facilities—had raised serious concerns regarding the recyclability of K-Cup pods and informed Keurig that they did not intend to accept them. These omissions resulted in an enforcement action by the U.S. Securities and Exchange Commission for failing to disclose that some of the largest recyclers in the country do not accept K-cup pods, which concluded with Keurig agreeing to a cease-and-desist order and a $1.5 million civil penalty.

16. Keurig's recyclability representations have also been the subject of prior

litigation and regulatory action. Between 2018 and 2020, federal class actions alleged that Keurig misled consumers into believing K-Cup pods were recyclable; those actions were settled in early 2023, with Keurig agreeing to pay $10 million and make only minor modifications to its recyclability labels. Similar concerns arose internationally, and in 2022, Keurig Canada agreed to pay a $3 million penalty and modify its marketing to resolve claims by Canada's Competition Bureau regarding misleading recyclability representations.

17. Despite this record, Keurig has continued to market K-Cup pods as recyclable, as the demand for single-serve beverage pods continues to grow and K-Cup sales remain strong, accounting for a significant portion of net sales of Keurig's coffee systems business segment.

**B. Keurig Deceptively Markets The Recyclability of K-Cup Pods**

18. Keurig promotes the purported recyclability of its K-Cup pods across multiple channels, including product packaging, its website, online retail listings, and social media. On packaging and in digital media, Keurig prominently displays the words "Recyclable K-Cup® Pods" alongside the chasing arrows recycling symbol, often on a conspicuous green banner designed to attract consumer attention.

19. Any qualifying language, such as instructions to "check locally" or disclosures that K-Cup pods are "not recycled in many communities," appears in fine print that is visually separated from the primary recyclability claim and blends into the background, making it difficult to notice or read. The following are just a few

examples:










20. Keurig's marketing materials repeatedly convey the message that consumers can place K-Cup pods in curbside recycling bins and that the pods will be recycled. A few examples:







### C. Consumers' Understanding of These Marketing Messages

22. Consumer demand for environmentally friendly products is increasing, and a majority of U.S. consumers prefer such products and are willing to pay more for them. At the same time, consumers generally lack the ability to independently

verify the accuracy of environmental marketing claims at the point of purchase and therefore rely on representations made by manufacturers.

23. Research shows that reasonable consumers understand the term "recyclable," particularly when paired with the chasing arrows symbol, to mean that a product will in fact be recycled if placed in a recycling bin. Experts in visual perception and consumer behavior have explained that consumers will rarely notice the asterisk accompanying the recyclability claim or even be able to read the fine print. Most assume the symbol, along with the word "Recyclable," informs them that the Product is recyclable.




24. Keurig has highlighted its recyclable message to consumers while downplaying important qualifying instructions and disclaimers. As a result, Keurig's marketing emphasizes a clear message to consumers that K-Cup pods will be recycled if placed in curbside recycling bins.

**D. K-Cups Pods Are Virtually Non-Recyclable**

**(a) Company's Own Statements**

25. In practice, K-Cup pods are not typically recycled and overwhelmingly end up in landfills. Keurig itself implicitly acknowledges this reality by conceding that K-Cup pods are not accepted in many communities and by promoting its proprietary K-Cycle mail-back program for business customers, which requires paid shipping and specialized handling because K-Cup pods cannot be reliably recycled through ordinary curbside systems.

**(b) Expert Findings on K-Cup Recyclability**

26. A number of studies and expert evaluations of the recyclability of K-Cup pods have been undertaken and have all come to the same underlying general conclusion: K-Cup pods are unable to be recycled.

27. Greenpeace, a well-known global campaigning network, released a nationwide assessment in 2025 about whether different categories of plastic products can be marketed as "recyclable" under the FTC Green Guides by determining the percentage of the products that are accepted by U.S. Material Recovery Facilities (MRFs), the percentage of the population with access to municipal collection of the product, whether there is an actual recycling or reprocessing capacity for those facilities, and whether those products satisfy the legal or practical definition of

"recyclable."[3] In their report, 0% of P P#5 coffee pods were found to be accepted by material recycling facilities, 0% of the United States population had access to municipal collection of the product and there was 0% maximum national recycling processing capacity. [4] In California, an additional test was added which calculated the percentage of products that failed to reach the recyclability threshold because they were too small for sorting. PP #5 pods failed this test as well because the pods were too small for sorting. In all aspects, PP#5 pods did not meet the threshold to be labeled as "recyclable," or get even close.

28. GreenBlue is an environmental nonprofit that created the How2Recycling labeling system, the most recognized on-package recycling labeling system in the United States.[5] GreenBlue additionally developed the extensive How2Recycle Decision Matrix, a public framework that evaluates the recyclability of packaging materials. As of July 2025, single use pods were decisively determined to not yet be recyclable in the United States and remain in that category as of the last update in February 2026.

29. To evaluate the real-world recyclability of K-Cup pods, TINA.org engaged the services of SCS Engineers, a nationally recognized environmental

---

[3] *Plastic Merchants of Myth: Circular Claims Lay Flat*, Greenpeace (2025), https://www.greenpeace.org/static/planet4-usa-stateless/2025/12/b05908fc-plastic-merchants-of-myth.pdf.

[4] *Id.*, at 31

[5] *How2Recycle Decision Matrix*, GreenBlue (February 2026), https://greenblue.org/h2r-decision-matrix/#matrix.

consulting firm that specializes in waste management solutions and recycling feasibility.[6] Between March and June 2025, SCS surveyed recycling industry representatives in major metropolitan areas across the ten most populous U.S. states, including California, Florida, Georgia, Illinois, Michigan, New York, North Carolina, Ohio, Pennsylvania, and Texas.

27. SCS based its findings on those survey responses, a review of published industry reports, expert consultations, and an analysis of state waste characterization data. SCS determined that K-Cup pods are not typically accepted for recycling in municipal recycling programs in the United States. SCS identified several factors that limit or prevent the recycling of K-Cup pods, including:

- **Size.** K-Cup pods measure approximately two inches by two inches and are frequently too small to be captured by the mechanical sorting equipment used in many materials recovery facilities ("MRFs"). As a result, the K-Cup pods frequently fall through sorting screens and are routed for disposal with residual waste rather than recovered for recycling.

- **Shape and design.** K-Cup pods consist of multiple materials, including plastic, paper filters, aluminum foil, and coffee grounds. SCS found that this multi-material design, combined with the pods' low weight and irregular shape, interferes

---

[6] *Keurig Serves Up a K-Cup of Deception*, Truth in Advertising (Jan. 27, 2026), https://truthinadvertising.org/articles/keurig-serves-up-a-k-cup-of-deception/

with automated sorting systems, including optical sorters and robotic sorting equipment. K-Cup pods are frequently not emptied or disassembled by consumers, and they may break during sorting, releasing contaminants that cause the material to end up as landfill disposal.

• **Contamination.** Residual coffee grounds and liquids commonly contaminate the plastic and aluminum components of K-Cup pods. Many recycling facilities lack the ability to adequately clean or separate these materials and therefore do not accept K-Cup pods for processing.

• **Economic feasibility.** SCS found that the market value of materials recovered from K-Cup pods is generally insufficient to justify the labor or equipment costs required to process them. Facility operators reported that mixed plastics recovered from similar products often generate negative economic returns, including circumstances in which operators must pay brokers to remove such material.

28. Based on these findings, SCS concluded that municipal recycling programs serving a substantial majority of U.S. consumers—***at least*** 60 percent—do not accept K-Cup pods for recycling and that representations describing K-Cup pods as "recyclable" do not reflect typical real-world disposal outcomes. Although some recycling programs accept #5 plastic, SCS determined that K-Cup pods are generally not recyclable in practice due to the factors described above.

**(c) Recycling Facilities Generally Don't Accept K-Cup Pods**

29. Recycling facilities, municipalities, and waste management authorities across the United States uniformly identify K-Cup pods as non-recyclable and direct them to disposal rather than recycling—even when labeled "recyclable."

30. Publicly available recycling guidance from waste management companies and local governments serving tens of millions of residents in numerous states—including California, Colorado, Connecticut, Illinois, Maryland, Massachusetts, Minnesota, Nebraska, Oregon, Pennsylvania, Texas, Vermont, and Washington—expressly instructs residents to place single-serve coffee pods, including K-Cup pods, in the trash.

31. These sources consistently explain that K-Cup pods are rejected from recycling streams due to their small size, multi-material construction, contamination from coffee grounds and liquids, and incompatibility with automated sorting equipment. Several jurisdictions further caution that recyclability labels do not reflect local acceptance and that products labeled "recyclable" may nonetheless be considered contamination.

32. These facility statements corroborate the findings of SCS Engineers and confirm that, in real-world municipal recycling systems, K-Cup pods are not typically recycled.

**E. Defendant's Campaign Violates the Green Guides**

33. The Federal Trade Commission's Guides for the Use of Environmental Marketing Claims ("Green Guides") provide that a product should not be marketed as "recyclable" unless it can be collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing. The Green Guides also offer pragmatic marketing messaging for products that may not be recycled in most communities, such as the K-Cup pods at issue herein. The California Environmental Marketing Claims Act ("EMCA") at California Business and Professions Code § 17580.5 makes it "unlawful for any person to make any untruthful, deceptive, or misleading environmental marketing claim, whether explicit or implied." In accordance with that section, the term "environmental marketing claim" includes any claim contained in the Guides for use of Environmental Marketing Claims published by the Federal Trade Commission (the "Green Guides").

34. As described above, SCS Engineers determined that municipal recycling programs serving at least 60 percent of U.S. consumers do not accept K-Cup pods for recycling. The Green Guides also caution that a recyclable claim is deceptive where a product is made from recyclable material but, due to its size, shape, or other attributes, is not accepted in recycling programs. K-Cup pods exhibit these characteristics.

35. Keurig includes qualifying language on K-Cup pod packaging and other marketing materials—such as instructions to "check locally" and statements that the

pods are "not recycled in many communities"—but these disclosures do not clearly convey the limited recyclability of K-Cup pods. The qualifying statements appear in fine print that is visually separated from the primary recyclability claim and is unlikely to be noticed in the context of routine, low-cost purchasing decisions.

36. The Green Guides further advise that vague or general qualifications may be insufficient where recycling availability is limited. Instructions to "check locally" do not inform consumers whether K-Cup pods are accepted in their communities and may lead consumers to incorrect conclusions where local programs accept #5 plastic generally, but not K-Cup pods specifically. In addition, SCS Engineers found that many municipalities and recycling facilities do not readily provide item-specific recyclability information, especially as to whether K-Cup pods are specifically welcomed as recyclable products. As such, the 60% of facilities that pointedly don't recycle K-Cup pods may severely understate the recycling facilities that cannot and do not actually recycle K-Cup pods.

37. Similarly, statements that K-Cup pods are not recycled in "many communities" do not convey the scope of the nationwide limitations on their recyclability or provide meaningful guidance to consumers. The Green Guides explain that, where recycling facilities are available only to a few consumers, marketers should use more explicit disclosures indicating that recyclability is limited to a small number of communities.

**F. FED. R. CIV. P. 9(b) ALLEGATIONS**

38. Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

(a) **WHO**: Defendant Keurig Green Mountain, Inc.

(b) **WHAT**: Defendant's conduct was, and continues to be, deceptive because it is deceiving consumers into believing that the Products are recyclable when the Products are not recyclable. Defendant failed to accurately inform Plaintiff that the Products were not recyclable. Defendant knew or should have known, as the manufacturer and marketer of the Products with superior knowledge of the composition of its Products, that this information is material to reasonable consumers. Yet Defendant misrepresented, on the labeling and advertising of its Products, that the Products were recyclable. Defendant knew or should have known that the Products were not recyclable because Defendant is the manufacturer of the Products and has quality control testing protocols set in place that should have alerted Defendant to the lacking nature of the Products' recyclability.

(c) **WHEN**: Defendant engaged in this deceptive conduct continuously throughout the applicable statutory periods, including at the point of sale. Defendant's false and misleading recyclability representations were printed prominently on the front of the Product packaging conspicuously for consumers to view and rely on.

(d) **WHERE**: Defendant's misrepresentations were made on the Product's label on the front package and were thus viewed by every purchaser, including Plaintiff, at the point of sale in every transaction. The Products are sold in brick-and-mortar stores and online in California and nationwide. Defendant's failed obligations occurred in Defendant's manufacturing facilities.

(e) **HOW**: Defendant misrepresented on the Products' label that the K-Cup pods were recyclable when they are not. And as discussed in detail throughout the Complaint, Plaintiff and Class Members read and relied on Defendant's misrepresentations regarding the Product's recyclability before purchasing the Products and in choosing to purchase the Products.

(f) **WHY**: Defendant misrepresented the recyclability of its Products. These representations were material because they induced consumers like Plaintiff to purchase the Products for their purported environmental benefits while charging a price premium. Accordingly, due to the recyclability representations, Plaintiff and Class Members paid a price premium for the Products that they would not have, or would have paid substantially less for, had the Products not been, or risked not being,

recyclable, contrary to Defendant's express representations. As such, Defendant unlawfully profited by selling the Products to thousands of consumers throughout California and nationwide, including Plaintiff and the Class Members.

(g) **INJURY**: Plaintiff and Class Members were injured by Defendant's conduct in that they would not have purchased Defendant's Products or would not have purchased them on the same terms, had they known that Defendant's Products were not recyclable.

## CLASS ACTION ALLEGATIONS

39. Plaintiff brings this action on behalf of himself and the following Classes pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

> **National Class:** All persons in the United States who purchased the Products during the applicable statute of limitations after the Effective Date of settlement in *Smith v. Keurig Green Mountain, Inc.* through the date notice of class certification is disseminated (the "Class Period").

In the alternative, Plaintiff brings this action on behalf of the following State class.

> **California Sub-Class**: All persons in the State of California who purchased the Products during the applicable statute of limitations after the Effective Date of settlement in *Smith v. Keurig Green Mountain, Inc.* through the date notice of class certification is disseminated (the "Class Period").

**40.** Excluded from the Classes are (a) any person who purchased the Products for resale and not for personal or household use, (b) any person who signed

a valid release of any Defendants in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant have a controlling interest, (d) any legal counsel or employee of legal counsel for any Defendants, and (e) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members, and (f) all persons who purchased the Products during the period June 8, 2016 through August 8, 2022 and who did not validly opt out of the class in Smith v. Keurig Green Mountain, Inc. ("2022 Settlement").

41. Plaintiff reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

42. **Numerosity and Ascertainability**: Plaintiff does not know the exact number of members of the putative classes. Due to Plaintiff's initial investigation, however, Plaintiff is informed and believes that the total number of Class members is at least in the tens of thousands, and that members of the Class are numerous and geographically dispersed throughout California, and the United States. While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, including Defendants' records, either manually or through computerized searches.

43. **Typicality and Adequacy**: Plaintiff's claims are typical of those of the proposed Class, and Plaintiff will fairly and adequately represent and protect the

interests of the proposed Class. Plaintiff does not have any interests that are antagonistic to those of the proposed Class. Plaintiff has retained counsel competent and experienced in the prosecution of this type of litigation.

44. **Commonality**: The questions of law and fact common to the Class members, some of which are set out below, predominate over any questions affecting only individual Class members:

a. whether Defendant advertises and markets the Products as recyclable;

b. whether the Products are recyclable, practically or otherwise;

c. whether Defendant's conduct constitutes the violations of laws alleged herein;

d. whether Defendant's labeling, sale and advertising set herein are unlawful, untrue, or are misleading, or likely to deceive a reasonable consumer;

e. whether Defendant knew or should have known that the Products cannot be recycled;

f. whether Defendant knew or should have known that the representations were false or misleading;

g. whether Defendant's representations regarding the recyclability of the Products are in compliance with the Green Guides;

h. whether Defendant knowingly concealed or misrepresented material facts for the purpose of inducing consumers into spending money on the Product;

i. whether Defendant's representations, concealments and non-disclosures concerning the Product are likely to deceive a reasonable consumer;

j. whether Plaintiff and the Class are entitled to restitution and damages.

45. **Predominance and Superiority**: Common questions, some of which are set out above, predominate over any questions affecting only individual Class members. A class action is the superior method for the fair and just adjudication of this controversy. The expense and burden of individual suits make it impossible and impracticable for members of the proposed Class to prosecute their claims individually and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents the possibility of inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a. The complexity of issues involved in this action and the expense of litigating the claims mean that, few, if any, Class members could afford to seek legal redress individually for the wrongs that Defendant committed against them, and absent Class members have no substantial interest in individually controlling the prosecution of individual actions;

b. When Defendant's liability has been adjudicated, claims of all Class

members can be determined by the Court;

c. This action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort and expense, and ensure uniformity of decisions; and

d. Without a class action, many Class members would continue to suffer injury, and Defendant's violations of law will continue without redress while Defendant continues to reap and retain the substantial proceeds of their wrongful conduct.

46. **Manageability**: The trial and litigation of Plaintiff's and the proposed Class claims are manageable. Defendant has acted and refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

47. Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS

### COUNT I

**Violation of the Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**
**(On behalf of the California Subclass)**

48. Plaintiff incorporates by reference the allegations contained in the previous paragraphs herein.

49. The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

50. The unlawful prong of the UCL prohibits any unlawful business practices.

51. Defendant is a "business" as defined under the UCL.

52. Defendant's conduct was unlawful, in violation of the UCL, because Defendant's conduct described in this complaint constitutes a violation of the EMCA at Cal. Bus. & Prof. Code §17580, *et. seq*., California's False Advertising Law, and the California Consumers Legal Remedies Act ("CLRA") (as alleged in this Complaint) and all constitute separate and cumulative violations of the unlawful prong of the UCL.

53. The fraudulent prong of the UCL prohibits business practices that are likely to deceive the public.

54. The material misstatements and omissions alleged herein constitute deceptive and unfair trade practices, in that they were intended to and did deceive Plaintiff and the general public into believing that Defendant's Products are recyclable when they are not.

55. Defendant's conduct is fraudulent in violation of the UCL because it is likely to deceive a reasonable consumer:

- Defendant promoted and sold Products that were falsely advertised, despite knowing that consumers would expect the Products to be recyclable;
- Defendant represented through advertising, product packaging, and other sources that the Product possessed particular qualities that were inconsistent with Defendant's actual knowledge of the Products.

56. Plaintiff and Class Members would not have purchased the Products, or would not have purchased the Products at the prices they did had the Products not been advertised as recyclable.

57. Defendant was under a duty to properly advertise the Products because of its exclusive knowledge, because the misrepresentations resulted in material and unreasonable impairment to the Product.

58. Plaintiff and Class Members were unaware of Defendant's practices. Had Defendant not marketed the Products as recyclable, Plaintiff and Class Members would have been aware of the true nature of the Products and would not have purchased the Products, and would have paid substantially less for the Products.

59. The unfair prong of UCL prohibits unfair business practices that either offend an established public policy or that are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

60. Defendant repeatedly and misleadingly, inaccurately, and deceptively advertised and marketed its Products to consumers—and Defendant continues to do so. These practices offend an established public policy or are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

61. Defendant also acted in an unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner with respect to Plaintiff and the Class Members by engaging in unfair and anticompetitive business practices that harmed consumer welfare. Defendant engaged in unfair business practices and acts in at least the following respects:

- Defendant promoted and sold Products advertised as recyclable, despite knowing the Products were not;
- Defendant represented through advertising, product packaging, press releases, and other sources that the Products possessed particular qualities that were inconsistent with Defendant's actual knowledge of the Product.

62. These are practices and uniform courses of conduct that offend an established public policy or that are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

63. The harm to consumers, competition, and the general public substantially outweighs any legitimate purpose or benefit of Defendant's conduct. There is no legitimate reason why Defendant should be allowed to sell the Products without providing its customers the opportunity to make fully informed purchases. There is

no legitimate reason why Defendant should be allowed to deceive its customers about the recyclability of its Product.

64. Absent Defendant's unlawful, unfair and fraudulent conduct, Plaintiff and Class Members would not have purchased the Products or would have paid substantially less for them.

65. Plaintiff and Class Members accordingly seek appropriate relief, including: (1) restitution under the UCL; and (2) such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair, unlawful, and fraudulent practices. Plaintiff also respectfully seeks reasonable attorneys' fees and costs under applicable law, including under California Code of Civil Procedure Section 1021.5.

**COUNT II**
**California False Advertising Law**
**Cal. Bus. & Prof. Code § 17500**
**(On behalf of the California Subclass)**

66. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs in this complaint.

67. Defendant violated Cal. Bus. & Prof. Code section 17500 by using false and misleading statements, and material omissions, to promote the sale of the Products and otherwise "concerning any circumstance or matter of fact connected with the proposed performance or disposition of services."

68. The Products do not possess the level of quality or value that Defendant promised.

69. Defendant made uniform representations and material omissions that communicated to Plaintiff and Class Members that the Products were recyclable, despite knowing the Products were not.

70. Had Plaintiff and Class Members known that the Products were not recyclable, they would not have purchased the Products in the first place.

71. Defendant omitted the material fact that the Products were not recyclable. Defendant had a duty to disclose the truthful nature of the Products.

72. Defendant knew, or in the exercise of reasonable diligence should have known, that its representations and omissions were false and misleading at the time it made them. Defendant deliberately provided false representations and omissions to prevent customers from learning the true nature of the Products and further inducing its customers to purchase the Products.

73. Defendant's false and misleading advertising statements deceived the general public.

74. As a direct and proximate result of Defendant's misleading and false advertising, Plaintiff and Class Members have suffered injury-in-fact and have lost money and property.

75. Plaintiff and Class Members reasonably relied to their detriment on Defendant's material misrepresentations and omissions regarding its Products.

76. Plaintiff and Class Members seek to enjoin, under Bus. & Prof. Code section 17535, the violations described herein and to require Defendant to issue a recall and refund.

77. Defendant's false advertising will continue to harm consumers unless and until it is enjoined.

78. Plaintiff and Class Members therefore seek an order requiring Defendant to cease their false advertising and unlawful practices, provide full restitution of all monies Defendant derived from its false advertising, interest at the highest rate allowable by law, and for an award of reasonable attorney's fees and costs under applicable law, including Code of Civil Procedure section 1021.5.

**COUNT III**
**Violation of the California Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code § 1770(a)(5), *et seq*.**
**(On behalf of the California Subclass)**

79. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

80. Cal. Civ. Code section 1770(a)(5) of the CLRA prohibits representing that a seller's goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have.

81. Cal. Civ. Code section 1770(a)(7) of the CLRA prohibits representing that its goods or services are of a particular standard, quality, or grade, if they are of another.

82. Cal. Civ. Code section 1770(a)(9) of the CLRA prohibits advertising goods and services with the intent not to sell them as advertised.

83. Defendant violated Cal. Civ. Code sections 1770(a)(5) and 1770(a)(7) of the CLRA by representing that the Products were recyclable when, at the point of sale, Defendant knew or should have known that the Products were not recyclable.

84. Defendant violated Cal. Civ. Code section 1770(a)(9) of the CLRA when it advertised the Products as recyclable with the intent not to sell them as advertised.

85. As a result of these violations of certain sections of the CLRA, Plaintiff incurred damages in the form of purchasing the Products at issue that lost all value as recyclable products.

86. As a result of this violation, Plaintiff and Class Members have been deprived of the recyclability of the Products which Defendant represented they were purchasing. Had Plaintiff and Class Members known the true nature of the Products, Plaintiff and Class Members would have paid less for the Products, or would not have purchased the Products at all.

87. Under Cal Civ. Code section 1781(a), any consumer who suffers damage as a result of a violation of this section may bring a class action on behalf of himself and all those similarly situated.

88. As required by Cal. Civ. Code §1782(a), Plaintiff has sent a letter to Defendant requesting corrective actions be taken within 30 days of the receipt of the demand letter. Defendant has failed to take any corrective action in response to

Plaintiff's demand letter. As such, in accordance with Cal. Civ. Code § 1780(a), Plaintiff and the Class seek all available actual, punitive, and statutory damages as well as injunctive and equitable relief for Defendant's CLRA violations.

89. Plaintiff has no adequate remedy at law because he is currently unable to determine whether he will be able to use the Products in the future, and he is uncertain whether Defendant will correct the issue or provide other remedies. Unless the Court enjoins further unlawful acts by Defendant, Plaintiff and Class Members face uncertainty as to which of these choices would minimize their damage. Defendant benefitted substantially from Plaintiff's purchases because Defendant received the majority of the revenue from the purchases.

90. Therefore, Plaintiff and the Class are entitled to injunctive relief, actual damages, punitive and statutory damages, and all other relief that the court deems proper, including costs and attorney's fees, under Cal. Civ. Code § 1780.

**COUNT IV**
**Negligent Misrepresentation**

91. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs in this complaint.

92. Defendant had a duty to Plaintiff and the Class to truthfully represent the Products, which it breached.

93. This duty was non-delegable, based on Defendant's position, holding itself out as having special knowledge and experience in this area, a manufacturer of K-Cup pods and well-versed in what can be truthfully advertised as recyclable.

94. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

95. The representations took advantage of consumer's cognitive shortcuts made at the point-of-sale and their trust in Defendant.

96. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, his purchase of the Products.

**COUNT V**
**Unjust Enrichment**

97. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs in this complaint.

98. Plaintiff brings this cause of action on behalf of himself and on behalf of the Class.

99. Plaintiff and Class members conferred a benefit on Defendant by purchasing the falsely advertised Products.

100. Defendant received the monies paid by Plaintiff and Class members and thus knew of the benefit conferred upon them.

101. Defendant accepted and retained the benefit in the amount of the profits they earned from Defendant's Product sales paid by Plaintiff and Class members.

102. Defendant has profited from their unlawful, unfair, misleading, and deceptive practices and advertising at the expense of Plaintiff and Class members,

under circumstances in which it would be unjust for Defendant to be permitted to retain the benefit.

103. Plaintiff does not have an adequate remedy at law against Defendant.

104. Plaintiff and Class members are entitled to restitution of the amount paid for the Products and disgorgement of the profits Defendant derived from their deceptively advertised Product sales.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Classes defined above, prays for relief as follows:

A. Determination that the claims alleged herein may be maintained as a class action under Federal Rule of Civil Procedure 23, enter an order certifying the Classes defined above, and appointing Plaintiff's counsel as Class Counsel and Plaintiff as the representative of the Class;

B. Directing that Defendant bear the costs of any notice sent to the Class(es);

C. Declaring that Defendant must disgorge, for the benefit of the Class(es), all or part of the ill-gotten profits they received from the sale of the Product, or order Defendant to make full restitution to Plaintiff and the members of the Class(es);

D. Awarding restitution and other appropriate equitable relief;

E. Granting an injunction against Defendant to enjoin it from conducting their business through the unlawful, unfair and fraudulent acts or practices set forth herein;

F. Granting an Order requiring Defendant to fully and appropriately recall the Product;

G. Ordering a jury trial and damages according to proof;

H. Enjoining Defendant from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

I. Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class(es);

J. Awarding civil penalties, prejudgment interest and punitive damages as permitted by law; and

K. Ordering such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all issues triable as of right.

DATED: July 6, 2026

Respectfully Submitted,

**Manfred, APC**

*/s/ Manfred Muecke*
Manfred Muecke (SBN: 222893)
4225 Executive Square
Suite 600-6051
La Jolla, CA 92101-3370

mmuecke@manfredapc.com
Phone: 619-550-4005
Fax: 619-550-4006