Willis Wagner (SBN 310900)
Tamara Wiesebron (SBN 338967)
Patrick Fortelka (SBN 364167)
GREENBERG TRAURIG, LLP
400 Capitol Mall, Suite 2400
Sacramento, California 95814
Telephone: 916.442.1111
Facsimile: 916.448.1709
Will.Wagner@gtlaw.com
Tamara.Wiesebron@gtlaw.com
Patrick.Fortelka@gtlaw.com

Attorneys for Defendant
KEURIG GREEN MOUNTAIN, INC.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RYAN DIXON, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>KEURIG GREEN MOUNTAIN, INC.<br><br>Defendant. | CASE NO. 3:26-cv-02172-LL-BJW<br><br>*Hon. Linda Lopez*<br><br>**PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT.**<br><br>**DEFENDANT KEURIG GREEN MOUNTAIN INC.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>*[Filed concurrently with Notice of Motion and Motion to Dismiss; Declaration of Tamara Wiesebron; and Defendant's Corporate Disclosure Statement]*<br><br>Date: September 22, 2026<br>Courtroom: 14B<br><br>Complaint Filed: April 7, 2026<br>First Amended Complaint Filed: July 6, 2026 |

**TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:**

In accordance with Rule 201 of the Federal Rules of Evidence, Defendant Keurig Green Mountain, Inc. ("Keurig"), by and through its attorneys, respectfully requests that the Court take judicial notice of Exhibits A through G, attached hereto, which are filed in support of Keurig's Motion to Dismiss:

1. Attached as **Exhibit A** is a true and correct copy of the Order Granting Final Approval of Class Action Settlement, filed February 27, 2023, in *Smith v. Keurig Green Mountain, Inc.*, Case No. 4:18-cv-06690-HSG (N.D. Cal.) (Dkt. No. 166).

2. Attached as **Exhibit B** is a true and correct copy of the Stipulation of Settlement, filed February 24, 2022, in *Smith v. Keurig Green Mountain, Inc.*, Case No. 4:18-cv-06690-HSG (N.D. Cal.) (Dkt. No. 128-1).

3. Attached as **Exhibit C** is a true and correct copy of the Order Re: Settlement Notice, Administration and Approval Schedule; As Modified, dated July 18, 2022, in *Smith v. Keurig Green Mountain, Inc.*, Case No. 4:18-cv-06690-HSG (N.D. Cal.) (Dkt. No. 143).

4. Attached as **Exhibit D** is a true and correct copy of the Declaration of Scott Fenwick in Connection with Joint Status Report, filed February 8, 2023, in *Smith v. Keurig Green Mountain, Inc.*, Case No. 4:18-cv-06690-HSG (N.D. Cal.) (Dkt. No. 165-1).

5. Attached as **Exhibit E** is a true and correct copy of the Companion Guide to the How2Recycle Decision Matrix, published by How2Recycle in February 2026, available at https://greenblue.org/wp-content/uploads/2026/02/Companion-Guide-to-the-How2Recycle-Matrix_updatedFeb2026.pdf (Last accessed July 24, 2026).

6. Attached as **Exhibit F** is a true and correct copy of the SCS Engineers report titled "K-Cup Recycling Claims," published September 30, 2025 and available at https://truthinadvertising.org/wp-content/uploads/2026/01/9_30_25-SCS-Engineers-Expert-Report.pdf (Last accessed July 24, 2026).

7. Attached as **Exhibit G** is a true and correct copy of "Plastic Merchants of Myth: Circular Claims Fall Flat," published by GreenPeace in December 2025 and

available at https://www.greenpeace.org/static/planet4-usa-stateless/2025/12/b05908fc-plastic-merchants-of-myth.pdf (Last visited July 24, 2026).

8. Attached as **Exhibit H** is a true and correct copy of the How2Recycle Decision Matrix, published February 2026 and available at https://greenblue.org/h2r-decision-matrix/ (Last accessed July 24, 2026).

9. Attached as **Exhibit I** is a true and correct copy of the Senate Floor Analyses of SB 343 (Allen), prepared by the California Senate Rules Committee, Office of Senate Floor Analyses (September 9, 2021).

10. Attached as **Exhibit J** is a true and correct copy of the SB 343 Material Characterization Study Final Findings 2023/2024, published by the California Department of Resources Recycling and Recovery (CalRecycle) in April 2025 (Publication No. DRRR-2025-1750).

11. Attached as **Exhibit K** is a true and correct copy of a screenshot of the CalRecycle webpage titled "Accurate Recycling Labels," available at https://calrecycle.ca.gov/wcs/recyclinglabels/, captured on June 15, 2026.

12. Attached as **Exhibit L** is a true and correct copy of the First Amended Complaint, filed May 29, 2025, in *Bhotiwihok v. Fairlife, LLC*, 2:25-CV-01650-ODW (AGRX), 2026 WL 413749 (C.D. Cal. Feb. 13, 2026) (Dkt. No. 45).

## JUDICIAL NOTICE IS WARRANTED

This Court "may judicially notice a fact that is not subject to reasonable dispute" where it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). A court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

Exhibits A through D and L are court records filed in *Smith v. Keurig Green Mountain, Inc.*, Case No. 4:18-cv-06690-HSG (N.D. Cal.). Courts routinely take judicial notice of "court filings and other matters of public record." *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006); *see also Lee v. City of Los Angeles*,

250 F.3d 668, 688 (9th Cir. 2001) (*overruled on other grounds* by *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002)). These exhibits are public records whose accuracy cannot reasonably be questioned, and the Court should take judicial notice of them.

Exhibit E through H are publications relied on by Plaintiff which form the basis of his claim. The Court may consider their actual contents on this motion under the incorporation-by-reference doctrine, which "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims". *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). A court may decline to accept conclusory allegations that are contradicted by documents incorporated in the complaint, and may consider those documents where a plaintiff "inaccurately characterize[s] the contents of those documents." *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 896 (N.D. Cal. 2022). Keurig does not ask the Court to resolve any factual dispute or accept the truth of the matter asserted. The point is narrower and appears on the face of the very sources Plaintiff cites: none supports the allegation that the Products cannot be recycled, and each confirms that recyclability is real but geographically limited.

Exhibit I is the California Senate Floor Analyses of SB 343, which is legislative history. Courts "may properly take judicial notice of legislative history, including committee reports." *Stone v. Sysco Corp.*, 16-CV-01145-DAD-JLT, 2016 WL 6582598, *4 (E.D. Cal. Nov. 7, 2016) (*citing Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 945 n.2 (9th Cir. 2013)); *see also Sonoma Cty. Ass'n of Retired Emps. v. Sonoma Cty.*, 708 F.3d 1109, 1120 n.8 (9th Cir. 2013).

Exhibit J is a report published by the California Department of Resources Recycling and Recovery (CalRecycle), a state government agency. Government reports and publications maintained by governmental agencies are proper subjects of judicial notice as matters of public record. *See United States v. 14.02 Acres of Land More or Less*, 547 F.3d 943, 955 (9th Cir. 2008).

Exhibit K is a screenshot of a webpage maintained by CalRecycle, a California state government agency. Courts routinely take judicial notice of information published on government agency websites. The Ninth Circuit has held that it is appropriate to take judicial notice of information "made publicly available by government entities." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). District courts in the Ninth Circuit, including this Court, have likewise recognized that courts may take judicial notice of "public records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies." *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015); *see also Romero v. Securus Techs., Inc.*, 216 F. Supp. 3d 1078, 1084 n. 1 (S.D. Cal. 2016). Because CalRecycle is an official California state agency and the webpage is publicly accessible on its government website, its contents are capable of accurate and ready determination from a source whose accuracy cannot reasonably be questioned, and the Court should take judicial notice of Exhibit K.

**CONCLUSION**

For the foregoing reasons, Keurig respectfully requests that the Court take judicial notice of Exhibits A through L.

DATED: July 28, 2026 GREENBERG TRAURIG, LLP

By: *<u>/s/Willis Wagner</u>*
Willis Wagner
Tamara Wiesebron
Patrick Fortelka

Attorneys for Defendant
KEURIG GREEN MOUNTAIN, INC.

# EXHIBIT A

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KATHLEEN SMITH,

Plaintiff,

v.

KEURIG GREEN MOUNTAIN, INC.,

Defendant.

Case No. 18-cv-06690-HSG

**ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES**

Re: Dkt. Nos. 146, 155

Before the Court are Plaintiffs' motions for final approval of a class action settlement and attorneys' fees, costs, and incentive award. Dkt. Nos. 146, 155.[1] The Court held a final fairness hearing on December 8, 2022. *See* Dkt. No. 157. The Court **GRANTS** Plaintiffs' motions.

## I. BACKGROUND

### A. Factual Background

Plaintiff Smith brings this consumer class action against Defendant Keurig Green Mountain, Inc., alleging that Defendant's "recyclable" labeling on its plastic single-serve coffee pods (the "Products") is false and misleading. *See generally* Dkt. No. 141 ("SAC"). Plaintiff alleges that despite the fact that "Defendant advertises, markets and sells the Products as recyclable," *id.* ¶ 21, municipal recycling facilities are not properly equipped to handle the pods, which are small and "inevitably contaminated with foil and food waste," *id.* ¶¶ 2, 27. And Plaintiff alleges that "even to the extent facilities exist that are capable of segregating the Products . . . and then cleaning any contamination . . . the Products often end up in landfills anyway as there are limited markets to reuse the Products or convert them into a material that can be reused." *Id.*

[1] For ease of reference, the Court refers to the PDF pagination unless otherwise noted.

¶ 2. Plaintiff contends that if she had known that the Products were not recyclable, she would not have purchased them, or would have paid less for them. *Id.* ¶ 4.

Based on those facts, the complaint asserts the following causes of action: violations of Massachusetts' Consumer Protection Act, Mass. Gen. Laws ch. 93A; breach of express warranty; unjust enrichment; misrepresentation; declaratory relief; violations of the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*; and violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq*. *See* SAC ¶¶ 64–149.

**B. Procedural History**

Plaintiff Smith initially filed this action in Alameda Superior Court in September 2018, but Defendant removed the case to this Court. *See* Dkt. No. 1, Ex. B. After Defendant moved to dismiss the complaint, *see* Dkt. No. 18, Plaintiff filed a First Amended Complaint, *see* Dkt. No. 20. Defendant moved to dismiss the First Amended Complaint, and the Court denied the motion in June 2019. *See* Dkt. Nos. 26, 50. On September 21, 2020, the Court granted Plaintiffs' motion for class certification, certifying a class of persons who purchased the Product for personal, family, or household purposes in California. *See* Dkt. No. 96. In the fall of 2020, Defendant unsuccessfully petitioned the Ninth Circuit for permission to appeal the Court's certification order. *See* Dkt. Nos. 98, 104.

While Plaintiff Smith's case was ongoing, Plaintiff Downing filed a class action complaint in federal court in Massachusetts on September 9, 2020, alleging that Defendant violated the Massachusetts Consumer Protection Act when it advertised its pods as recyclable. *See Downing v. Keurig Green Mountain, Inc.*, No. 1:20-cv-11673-IT (D. Mass.). While Plaintiff Downing's claims on behalf of a Massachusetts class of consumers survived Defendant's motion to dismiss, the Massachusetts court struck his allegations proposing a nationwide class. *See* Dkt. No. 155 at 19 n.6. Plaintiff Downing's petition for permission to appeal that ruling remains pending in the First Circuit, but has been stayed pending approval of this settlement. *See id.*

Since the inception of Plaintiff Smith's case, the parties have engaged in periodic settlement negotiations, including two full-day mediation sessions with the Hon. Morton Denlow (Ret.). *See id.* at 16, 22. The last of these full-day mediation sessions occurred in September



United States District Court
Northern District of California

2021, and the parties executed a settlement term sheet in October 2021. *See id.* at 9. On February 24, 2022, Plaintiff Smith moved for preliminary approval of the settlement and for leave to file a second amended complaint. *See* Dkt. No. 128. The Court granted the motion on July 8, 2022, and Plaintiff Smith filed a Second Amended Complaint. *See* Dkt. Nos. 140, 141. Consistent with the proposed settlement, the Second Amended Complaint incorporated a nationwide class, violations of Massachusetts law, and Plaintiff Downing. *See* SAC ¶¶ 7, 53, 64–76.

Plaintiffs now seek final approval of the class action settlement and attorneys' fees, costs, and incentive award. *See* Dkt. Nos. 146, 155.

**C. Settlement Agreement**

The key terms of Settlement Agreement, Dkt. No. 128-1, Ex. 1 ("Settlement Agreement" or "SA"), are as follows:

Class Definition: The Settlement Class is defined as "all Persons in the United States who purchased Keurig's Pods for personal, family or household purposes within the Class Period." SA § I.A.12. The Class Period is from June 8, 2016 to the date Class notice was first published. *Id.* § I.A.16. Specifically excluded from the Class are (a) Defendant, (b) Defendant's Affiliates, (c) the officers, directors, or employees of Defendant and its Affiliates and their immediate family members, (d) any legal representative, heir, or assign of Defendant, (e) all federal court judges who have presided over this Action and their immediate family members; (f) the Hon. Morton Denlow (Ret.) and his immediate family members; (g) all persons who submit a valid and timely Request for Exclusion from the Class; and (h) those who purchased the Challenged Products for the purpose of resale. *Id.* § I.A.12.

Settlement Benefits: Defendant will make a $10,000,000 non-reversionary payment to a Cash Payment Account, which will cover payments to Class Members, settlement administration expenses,[2] incentive awards, and attorneys' fees and costs. *Id.* §§ I.A.4; III.B. Class Members who submit a claim without proof of payment will recover $5.00. *Id.* § III.B.4. Class Members

[2] Notice and administration costs have increased substantially from the parties' initial estimate. *See* Dkt. Nos. 160, 161, 165 at 1, 165-1 ("Fenwick Decl.") ¶ 7. The Court **GRANTS** the request for approval of additional notice and administration costs, which shall not exceed $1,150,000.



United States District Court
Northern District of California

United States District Court
Northern District of California

who submit a claim with proof of payment will receive $0.35 for every ten pods purchased, with a minimum payment of $6.00, regardless of quantity purchased, and a maximum payment of $36.00. *Id*. Each household may only submit one claim. *Id*.

Defendant will also qualify its claims about pod recyclability with the disclaimer "Check Locally – Not Recycled in Many Communities." *Id.* § III.A.1. Defendant will include this qualifying statement whenever it represents that the pods are recyclable, including on boxes and cartons, in electronic advertising and promotional materials, in video content, on its website, and in publicly available corporate responsibility and sustainability reports. *Id.* § III.A.7. The Settlement Agreement sets minimum standards to ensure the visibility of the qualifying statement. *Id.* For example, if a box or carton markets the pods as recyclable, then the qualifying statement must be in close proximity to, and in a font size no smaller than 55% of the font size of, the recycling representation. *Id.*

<u>*Cy Pres* Distribution</u>: Settlement proceeds that are unclaimed will be donated to the Ocean Conservancy, a nonprofit environmental advocacy organization (75% of unclaimed funds), and Consumer Reports, Inc., a nonprofit consumer protection organization (25% of unclaimed funds). *Id*. § III.B.6.

<u>Release</u>: All Class Members will release:

> all Released Parties from any and all claims, demands, rights, causes of action, suits, petitions, complaints, damages of any kind, liabilities, debts, punitive or statutory damages, penalties, losses, and issues of any kind or nature whatsoever, asserted or unasserted, known or unknown, suspected or unsuspected (including, but not limited to, any and all claims relating to or alleging deceptive or unfair business practices, false or misleading advertising, intentional or negligent misrepresentation, negligence, concealment, omission, unfair competition, promise without intent to perform, unsuitability, unjust enrichment, and any and all claims or causes of action arising under or based upon any statute, act, ordinance, or regulation governing or applying to business practices generally), existing now or in the future, arising out of or related to (1) Recycling Representations made with respect to the Challenged Products prior to the Graphics Transition End Date and/or (2) Settlement Recycling Representations made with respect to the Challenged Products, provided, however, that this release shall not apply to claims or causes of action arising from a final determination or regulation made by a governmental entity pursuant to statute (such as

> California S.B. 343) that the Challenged Products, polypropylene products, or polypropylene products of the Challenged Products' dimensions (with such dimensions specified by such governmental entity) are not recyclable under such statute and are not otherwise permitted to make a qualified statement substantially similar to the Settlement Recycling Representation. For the purposes of this paragraph, a Recycling Representation shall be considered to have been "made," with respect to printed materials, as of the date of printing.

*Id.* § IV.A.

The Released Parties are Defendant and its Affiliates, Partner Brands, licensors, suppliers, distributors, wholesalers, and retailers and all of their affiliated and subsidiary companies. *Id.* § I.40. "For the avoidance of doubt, Released Parties shall include all Persons in the stream of commerce for the labeling, marketing, sale, and/or distribution of the Challenged Products." *Id.*

The Released Parties agree to release Class Representatives, Class Members, and Class Counsel from:

> [A]ny and all claims of abuse of process, malicious prosecution, or any other claims arising out of the initiation, prosecution, or resolution of the Action, including, but not limited to, claims for attorneys' fees, costs of suit or sanctions of any kind, or any claims arising out of the allocation or distribution of any of the consideration distributed pursuant to this Stipulation of Settlement.

*Id.* § IV.E.

<u>Class Notice</u>: The Claim Administrator implemented a digital media campaign per the Notice Plan, which included publication in People magazine, the California edition of USA Today, PR Newswire, and internet and mobile media conduits, such as Twitter and Facebook. *See* Dkt. No. 155-1, Ex. 1 ("Ballard Decl.") ¶ 10; *Id.* Ex. 2 ("Finegan Decl.") ¶¶ 6–13. The Claim Administrator also sent an email to the last known email addresses of all Class Members who purchased Products from Defendant's website during the Class Period. *See* Ballard Decl. ¶ 9. The parties provided additional notice to those who had not yet submitted a Claim Form or unsubscribed from receiving emails. *See* Dkt. Nos. 152, 153; Ballard Decl. ¶ 11. After the parties discovered that the emails of roughly 140,000 Class Members had been inadvertently omitted from the notice list, the Claim Administrator sent email notice to the omitted Class Members. *See* Dkt. Nos. 160, 161, 165, 165-1 ("Fenwick Decl."). The original deadline to submit claims was

United States District Court
Northern District of California

January 9, 2023, but the deadline was extended to January 30, 2023 for those who did not receive the original notice. *See* Fenwick Decl. ¶ 3.

Opt-Out Procedure: To opt out of the settlement, Class Members had to file Requests for Exclusion with the Claim Administrator no later than October 24, 2022 (45 days before the Final Approval Hearing date). *See* Dkt. No. 143 at 2; SA § VI.D. The opt out and objection deadline was extended to January 30, 2023 for Class Members who did not receive the original notice. *See* Fenwick Decl. ¶ 3.

Incentive Award: The named Plaintiffs applied for incentive awards of $5,000 for Plaintiff Smith and $1,000 for Plaintiff Downing. Dkt. No. 146 at 8; SA § VIII.B.

Attorneys' Fees and Costs: Class Counsel applied for attorneys' fees of $3,000,000 and $568,180 in costs. *See* Dkt. No. 146; SA § VIII.A.2.

## II. DISCUSSION

### A. Final Settlement Approval

#### i. Class Certification

Final approval of a class action settlement requires, as a threshold matter, an assessment of whether the class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and (b). *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019–22 (9th Cir. 1998). Because no facts that would affect these requirements have changed since the Court preliminarily approved the class on July 8, 2022, this order incorporates by reference the Court's prior analysis under Rules 23(a) and (b) as set forth in the order granting preliminary approval. *See* Dkt. No. 140 at 6–11.

#### ii. The Settlement

"The claims, issues, or defenses of a certified class may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). The Court may finally approve a class settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Where the parties reach a class action settlement prior to class certification, the Ninth Circuit has cautioned that such settlement agreements "'must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair.'" *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035,



United States District Court
Northern District of California

United States District Court
Northern District of California

1048–49 (9th Cir. 2019) (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)). A more "exacting review is warranted to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Id*. (quotations omitted). Here, because the settlement expands the California class to a national class, the Court applies the higher standard.

The Ninth Circuit has identified several "subtle signs" the Court should consider to determine whether "class counsel have allowed pursuit of their own self-interests to infect the negotiations." *Roes*, 944 F.3d at 1043. These include: (1) "when counsel receive[s] a disproportionate distribution of the settlement; (2) when the parties negotiate a clear-sailing arrangement, under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a kicker or reverter clause that returns unawarded fees to the defendant, rather than the class." *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 607–08 (9th Cir. 2021) (quotation omitted).

To assess whether a proposed settlement comports with Rule 23(e), the Court may also consider some or all of the following factors: (1) the strength of Plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the Class Members to the proposed settlement. *See id.* at 609. In addition, "[a]dequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon*, 150 F.3d at 1025.

As discussed below, the Court finds that the proposed settlement is fair, adequate, and reasonable, and that Class Members received adequate notice.

**a. Adequacy of Notice**

Under Federal Rule of Civil Procedure 23(e), the Court "must direct notice in a reasonable manner to all Class Members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The notice

United States District Court
Northern District of California

must "clearly and concisely state in plain, easily understood language" the nature of the action, the class definition, and the Class Members' right to exclude themselves from the class. Fed. R. Civ. P. 23(c)(2)(B). Although Rule 23 requires that reasonable efforts be made to reach all Class Members, it does not require that each Class Member actually receive notice. *See Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (noting that the standard for class notice is "best practicable" notice, not "actually received" notice).

The Court finds that the notice plan previously approved by the Court was implemented and complies with Rule 23(c)(2)(B). *See* Dkt. No. 140 at 17–18; Dkt. No. 155 at 12–14; Dkt. No. 165 at 2–3; Ballard Decl. ¶¶ 3–13; Fenwick Decl. ¶¶ 1–3. The Court notes that the parties have demonstrated diligence throughout the notice process, requesting and implementing two rounds of additional notice beyond the original plan to address deficiencies. *See* Dkt. Nos. 152–53, 160–61; Ballard Decl. ¶ 11; Fenwick Decl. ¶ 2. By February 8, 2023, Kroll Settlement Administration LLC had (1) implemented the original notice plan, which included a digital media campaign and email notice to 1.7 million people who purchased products from Defendant's website, Ballard Decl. ¶¶ 3–13; Finegan Decl. ¶¶ 6–13, (2) sent a follow-up email notice to 1.4 million people who had not yet submitted claims, Ballard Decl. ¶ 11, and (3) sent additional notice to 140,000 Class Members inadvertently left off the original list, Fenwick Decl. ¶ 2.

Given these facts, the Court finds that the parties have sufficiently provided the best practicable notice to the Class Members.

**b. Fairness, Adequacy, and Reasonableness**

Having found the notice procedures adequate under Rule 23(e), the Court next considers whether the entire settlement comports with Rule 23(e).

In deciding the motion for preliminary approval, the Court considered all three signs of collusion that the Ninth Circuit has identified. *See* Dkt. No. 140 at 12–17; *see also McKinney-Drobnis*, 16 F.4th at 607–08. Nothing in the record changes the Court's preliminary conclusion regarding these factors. The proposed settlement is non-reversionary, does not contain a clear sailing agreement, and the Court still scrutinizes the requests for attorneys' fees and incentive awards to ensure Class Members' interests are protected under the settlement. *See* Section II.B

below. The Court finds that other factors also indicate that the proposed settlement is fair, adequate, and reasonable.

### 1. Strength of Plaintiffs' Case, Litigation Risk, and Risk of Maintaining Class Action Status

Approval of a class settlement is appropriate when plaintiffs must overcome significant barriers to make their case. *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 851 (N.D. Cal. 2010). Difficulties and risks in litigating weigh in favor of approving a class settlement. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009). "Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Ching v. Siemens Indus., Inc.*, No. 11-cv-04838-MEJ, 2014 WL 2926210, at *4 (N.D. Cal. June 27, 2014) (quotations omitted).

The Court finds that the $10 million offered in settlement is reasonable given the complexity of this litigation and the substantial risk Plaintiffs would face in litigating the case. Defendant strongly disputes that Plaintiffs would be able to prove liability or entitlement to injunctive or monetary relief. *See* Dkt. No. 155-1 ¶ 11. Plaintiffs note that the legal issues regarding purportedly false recyclability representations are relatively novel and cite several unfavorable recent decisions in similar cases. *See id.*; Dkt. No. 155 at 18–19; Dkt. No. 156 ¶ 8. Defendant vigorously defended itself from the beginning of this case, and continued litigation in both this and the *Downing* case would undoubtedly present significant risk and years of delay in any recovery for the Class. The Court also notes that Defendant sought review of the Court's class certification decision—albeit unsuccessfully—and if litigation were to continue, Plaintiff would need to move for certification of a national class. *See* Dkt. No. 155-1 ¶ 14. By settling, Plaintiffs avoid the need to clear that hurdle and the risk inherent in maintaining class action status throughout litigation. In reaching a settlement, Plaintiffs have ensured a favorable recovery for the class. *See Rodriguez*, 563 F.3d at 966 (finding litigation risks weigh in favor of approving class settlement). Accordingly, these factors also weigh in favor of approving the settlement. *See Ching*, 2014 WL 2926210, at *4 (favoring settlement to protracted litigation).

**2. Settlement Amount**

The amount offered in the settlement is another factor that weighs in favor of approval. Based on the facts in the record and the parties' arguments at the final fairness hearing, the Court finds that the $10 million settlement amount falls "within the range of reasonableness" given the risks and costs of litigation. *See* Dkt. No. 155 at 20–22; *see also Villanueva v. Morpho Detection, Inc.*, No. 13-cv-05390-HSG, 2016 WL 1070523 *4 (N.D. Cal. March 18, 2016) (citing cases).

Plaintiffs' counsel represents that the settlement amount constitutes more than 10% of the maximum alleged actual damages. Dkt. No. 155 at 20. Plaintiffs argue that the average recovery a Settlement Class Member would have recovered at trial would be $0.10 per 10 pods. *Id.* at 21–22; *see also* Dkt. No. 155-1 ¶ 6. Under the settlement, each Settlement Class Member who submits a claim with proof of purchase will recover more per pod than the average expected to be recovered at trial, at $0.35 per 10 pods with proof of purchase. *See* Dkt. No. 155 at 22. Those who submit a claim with proof of purchase will receive at least $6.00 and a maximum of $36.00. *See id.* at 11.

The claims process has gone better than expected, resulting in a higher anticipated distribution than the parties predicted. The deadline to submit claims was January 9, 2023. *See* Ballard Decl. ¶ 12. For those Class Members who were inadvertently omitted from the original notice list, the deadline to submit claims was January 30, 2023. *See* Fenwick Decl. ¶ 3. As of February 8, 2023, the Claim Administrator had received 623,000 claims that appear to be valid pending final review for a total anticipated distribution to Class Members of $3.5 million.[3] *See* Dkt. No. 165 at 2. Further, the Settlement provides significant injunctive relief that gets at the heart of Plaintiffs' complaint by requiring Defendant to change its labeling and advertising nationwide and on its website. *See* Dkt. No. 155-1 ¶¶ 4–5.

---

[3] In the motion for final approval, Plaintiffs predicted 450,000 valid claims yielding $2.5 million for the Class Members. *See* Dkt. No. 155 at 13. Given the updated numbers, it no longer appears that more money will go to the *cy pres* recipients than the class, which was one of the Court's concerns at the final fairness hearing. *See* Dkt. No. 163 at 7.

Finally, any residual funds will be distributed to two *cy pres* recipients, the Ocean Conservancy[4] and Consumer Reports, Inc. SA § III.B.6. Where a class action settlement contains a cy pres award provision, the "cy pres award must be guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent Class Members, and must not benefit a group too remote from the plaintiff class." *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012) (internal quotations omitted). The Court finds that the proposed entities share the interests of the settlement Class Members, who purchased products marketed as recyclable, in preventing consumer fraud in the context of labeling recyclable plastics. Accordingly, the Court finds that the *cy pres* distribution to the Ocean Conservancy and Consumer Reports, Inc. satisfies the Ninth Circuit's requirements. *See* Dkt. No. 140 at 13.

In sum, the Court finds that the recovery is significant, especially when weighed against the litigation risks in this case. In any event, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Officers for Justice v. Civil Serv. Comm'n of City & County of S.F.*, 688 F.2d 615, 628 (9th Cir. 1982). The Court finds under the circumstances that this factor weighs in favor of approval.

**3. Extent of Discovery Completed and Stage of Proceedings**

The Court finds that Class Counsel had sufficient information to make an informed decision about the merits of the case. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). The parties settled only after significant litigation, including class certification, and extensive discovery. *See* Dkt. No. 155 at 22; Dkt. No. 155-1 ¶ 3. The parties engaged in periodic settlement negotiations, including two full-day mediation sessions. *See* Dkt. No. 155 at 9.

[4] Since 2021, Keurig Dr. Pepper Inc. has paid $15,000 a year to be a member of the Trash Free Seas Alliance, an initiative of the Ocean Conservancy. Dkt. No. 138. According to the company's Director of Sustainability, as part of its membership Keurig Dr. Pepper Inc. works towards the goal of reducing plastic waste in the ocean, "provides technical advice to the Alliance and shares knowledge from the company's sustainability programs, but does not engage in setting policy for the Alliance and has no role directing the Alliance's activities." *Id.* Based on the limited relationship Keurig Dr. Pepper Inc. has with the Trash Free Seas Alliance, the Court finds no evidence in the record to suggest that the Ocean Conservancy is an improper *cy pres* recipient.

United States District Court
Northern District of California

Thus, the Court is persuaded that Class Counsel entered settlement discussions with a substantial understanding of the factual and legal issues and could properly assess the likelihood of success on the merits. This factor weighs in favor of approval.

**4. Reaction of Class Members**

The reaction of the Class Members supports final approval. "[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the Class Members." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528–29 (C.D. Cal. 2004); *In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015) ("A low number of opt-outs and objections in comparison to class size is typically a factor that supports settlement approval.").

As noted above, the Claim Administrator has received 623,000 apparently valid filed claims for a total anticipated distribution to Class Members of $3.5 million, which is more than anticipated. As of February 7, 2023, the Claim Administrator had received twelve requests for exclusion. *See* Fenwick Decl. ¶ 5, Ex. B. Two Class Members submitted letters to the Court objecting to the settlement. *See* Dkt. Nos. 144, 154. The first stated, without explanation, that the author believed the settlement was frivolous. *See* Dkt. No. 144. The second reasoned it was impossible for all Class Members to provide proof of purchase. *See* Dkt. No. 154. But as Class Counsel points out, Class Members may receive $5.00 without proof of purchase. Having considered the objections, the Court finds they do not require rejecting the settlement.

The Court finds that the minimal number of objections and opt-outs in comparison to the reach of the notice and submitted claims indicates support among the Class Members and weighs in favor of approval of the settlement. *See, e.g., Churchill Village LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming settlement where 45 of approximately 90,000 Class Members objected); *Rodriguez v. West Publ. Corp.*, Case No. CV05–3222 R, 2007 WL 2827379, at *10 (C.D. Cal. Sept. 10, 2007) (finding favorable class reaction where 54 of 376,301 Class Members objected).

*  *  *

United States District Court
Northern District of California

After considering and weighing the above factors, the Court finds that the settlement agreement is fair, adequate, and reasonable, and that the settlement Class Members received adequate notice. Accordingly, Plaintiffs' motion for final approval of the class action settlement is **GRANTED**.

**B. Attorneys' Fees, Costs, and Service Award**

In its unopposed motion and consistent with the Settlement Agreement, Class Counsel asks the Court to approve an award of $3,000,000 in attorneys' fees and $568,180 in costs. Dkt. No. 146 at 8; *see also* Dkt. No. 163. Class Counsel also seeks an incentive award of $5,000 for Plaintiff Kathleen Smith and $1,000 for Plaintiff Matthew Downing.[5] *See id.*

**i. Attorneys' Fees & Costs**

**a. Legal Standard**

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). In a state law action—like this one—state law also governs the calculation of attorneys' fees. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002). Nevertheless, the Court may still look to federal authority for guidance in awarding attorneys' fees. *See Apple Computer, Inc. v. Superior Court*, 126 Cal. App. 4th 1253, 1264 n.4 (2005) ("California courts may look to federal authority for guidance on matters involving class action procedures."). Here, California fee-shifting statutes also permit an award of attorneys' fees. *See* Cal. Civ. Code § 1780(e); Cal. Code Civ. P. § 1021.5.

[5] In supplemental briefing, Plaintiffs assert that the Court may apply California or Massachusetts law to the fee analysis. *See* Dkt. No. 163 at 9. The Court will apply California law. "Subject to constitutional limitations and the forum state's choice-of-law rules, a court adjudicating a multistate class action is free to apply the substantive law of a single state to the entire class." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 561 (9th Cir. 2019). No party has suggested that applying California law gives rise to constitutional problems, and no objector has raised choice-of-law issues. *See id.* at 561–62 (holding that district courts do not need to address choice-of-law issues "beyond those raised by the objectors"). By default, California law applies "unless a party litigant timely invokes the law of a foreign state," in which case that party "shoulder[s] the burden of demonstrating that foreign law" should apply. *Id.* Here, Plaintiffs agree that the Court can presume that California law applies. *See* Dkt. No. 163 at 9–10.



United States District Court
Northern District of California

Under California law, the "percentage of fund method" is proper in class actions. *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 506 (2016). In addition, "trial courts have discretion to conduct a lodestar cross-check on a percentage fee." *Id.* The "lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941 (citing *Staton v. Boeing Co.*, 327 F.3d 938, 965 (9th Cir. 2003)). Trial courts "also retain the discretion to forgo a lodestar cross-check and use other means to evaluate the reasonableness of a requested percentage fee." *Laffitte*, 1 Cal. 5th at 506. Class Counsel is also entitled to recover "those out-of-pocket expenses that would normally be charged to a fee paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (quotations omitted).

**b. Discussion**

Class Counsel seeks $3 million in attorneys' fees and $568,180 in costs. *See* Dkt. No. 146 at 8. Class Counsel urges that its requested fees are below its lodestar, represent 30% of the $10 million settlement, and are appropriate under either the "percentage of the fund" or lodestar method. *See* Dkt. No. 146 at 17–24; Dkt. No. 163 at 18.

**1. Percentage of the Fund**

Using federal law for guidance, 25% of the common fund is the benchmark for attorney fee awards. *See*, *e.g.*, *In re Bluetooth*, 654 F.3d at 942 ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure."). The Court considers the reasonableness of the percentage requested in light of the factors enumerated by the Ninth Circuit, with the 25% award as a starting point. That court has identified several factors that a court should consider to determine whether to adjust a fee award from the benchmark: (1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiff; and (5) awards made in similar cases. *See Vizcaino*, 290 F.3d at 1048–50. The Court is cognizant of its obligations to review class fee awards with rigor:

United States District Court
Northern District of California

> Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage, courts have stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs. Accordingly, fee applications must be closely scrutinized. Rubber-stamp approval, even in the absence of objections, is improper.

*Vizcaino*, 290 F.3d at 1052 (quotation omitted).

The first and "most critical factor [in determining an attorneys' fee] is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). As previously discussed, Class Counsel has obtained a significant result for the class, including a $10 million settlement fund and meaningful changes to Defendant's labeling and advertising practices. The monetary benefit represents more than 10% of the potential aggregate class-wide damages, and class members with proof of purchase will recover more than their individual estimated actual damages. *See* Dkt. No. 146 at 12–14, 19–20. Class members have submitted more than 623,000 valid claims for a total anticipated distribution of $3.5 million. *See* Dkt. No. 165 at 2. Moreover, no class member objected to the adequacy of the settlement amount.

This recovery must also be considered in light of the significant risks that Plaintiffs would face in further litigating this case. The risk that further litigation might result in Plaintiffs not recovering at all is a significant factor in the award of fees. *See Vizcaino*, 290 F.3d at 1048. As Plaintiffs have noted, they would face considerable difficulty obtaining a similar recovery through litigation given the complexity of this case, the novel theory presented, and unfavorable recent decisions. *See, e.g.*, Dkt. No. 146 at 20 & n.6; Dkt. No. 156 ¶ 8 (citing two additional recent decisions rejecting consumer class actions challenging recyclability representations). As Class Counsel acknowledged, it would also need to file a new motion for class certification as to the nationwide class. *See* Dkt. No. 155 at 19–20.

Class Counsel also litigated this case skillfully and professionally. The risk that counsel took in litigating this case on a contingency fee basis for more than four years weighs in favor of a substantial attorneys' fee award. *See Vizcaino*, 290 F.3d at 1050. Further, Class Counsel engaged in substantial motion practice, including successfully moving for class certification, and extensive discovery practice. *See* Dkt. No. 146 at 9–12. Courts have found that the importance of assuring adequate representation for plaintiffs who could not otherwise afford competent attorneys justifies

providing those attorneys who accept matters on a contingent-fee basis a larger fee than if they were billing by the hour or as a flat fee. *See Vizcaino*, 290 F.3d at 1050. And here, counsel spent significant time on this case without any certainty that they would be compensated. *See* Dkt. No. 146 at 21–22.

Finally, courts have awarded similar fees in comparable cases, including in this Court. *See, e.g.*, *Schneider v. Chipotle Mexican Grill, Inc.*, 336 F.R.D. 588, 600–602 (N.D. Cal. 2020) (awarding 30% of the common fund in product labeling case).

Given all the above factors, especially the very large number of claims submitted, the Court finds that an increase above the 25% benchmark is warranted here, and that 30% of the common fund is appropriate under the circumstances.

**2. Lodestar Cross-check**

Class Counsel urges that the requested fees are below their lodestar, which also weighs in favor of finding them reasonable. *See* Dkt. No. 163 at 10–11. As a final check on the reasonableness of fees, the Court may compare the requested fees with counsel's bills under the lodestar analysis. *See, e.g.*, *Vizcaino*, 290 F.3d at 1050–51 ("Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award."). The Court must "exclude from this initial fee calculation hours that were not 'reasonably expended.'" *Hensley*, 461 U.S. at 434.

In addition to summary charts of time spent for various categories of work, *see* Dkt. Nos. 146-1, 146-4, Class Counsel has provided the Court with detailed, line-by-line billing records. Class Counsel states that as of December 31, 2022, it has incurred $3,035,250 in fees and spent more than 6,000 hours prosecuting this case. Class Counsel billed travel time at fifty percent and did not include fees from timekeepers that billed fewer than seven hours to the case.

After carefully reviewing the records, the Court finds that the hours spent on this case were reasonable given the posture of the case, the amount of substantive litigation, and the novelty of the legal issues. *See Edenborough v. ADT, LLC*, No. 16-cv-02233-JST, 2019 WL 4164731, at *4 (N.D. Cal. July 22, 2019) (finding reasonable Class Counsel's expenditure of 5,585 hours in a three-year-old class action resulting in $16 million common fund settlement); *Hendricks v.*



United States District Court
Northern District of California

*Starkist Co.*, No. 13-cv-00729-HSG, 2016 WL 5462423, at *12 (N.D. Cal. Sept. 29, 2016) (finding reasonable Class Counsel's expenditure of 3,366 hours in a three-year-old class action resulting in $12 million common fund settlement).

Regarding hourly rates, the rates requested are between $300 to $575 for associates and $720 to $925 for partners. *See* Dkt. Nos. 146-1 ¶ 37, 146-4 ¶ 21. The Court finds that the billing rates used to calculate the lodestar are in line with prevailing rates in this district for personnel of comparable experience, skill, and reputation. *See, e.g.*, *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 6619983, at *14 (N.D. Cal. Dec. 18, 2018) (rates from $650 to $1,250 for partners or senior counsel, $400 to $650 for associates).

Class Counsel is not seeking to recover the full lodestar amount. This negative multiplier suggests that the fee request is reasonable. *See, e.g.*, *Nexus 6P*, 2019 WL 6622842, at *13 (30% award was reasonable when the requested amount represented a negative lodestar multiplier); *Rosado v. Ebay Inc.*, No. 5:12-CV04005-EJD, 2016 WL 3401987, at *8 (N.D. Cal. June 21, 2016) (conducting a lodestar cross-check and finding that a negative multiplier "strongly suggests the reasonableness of the negotiated fee"); *Isquierdo v. W.G. Hall, LLC*, No. 15-CV-00335-BLF, 2017 WL 4390250, at *8 (N.D. Cal. Oct. 3, 2017) (fact that the requested amount constituted a reduction in the lodestar amount weighed in favor of its reasonableness).

An attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation costs from that fund. *See Harris*, 24 F.3d 16 at 19 (quotations omitted). Class Counsel is thus entitled to recover "those out-of-pocket expenses that would normally be charged to a fee paying client." *Id.* Class Counsel represent they have incurred $568,180 in costs. *See* Dkt. Nos. 146-1 ¶ 42–44, 146-4 ¶¶ 23–25. The Court finds that counsel's requested expenses are reasonable and grants the request.

* * *

The Court accordingly **GRANTS** the request for attorneys' fees and costs, and awards to Class Counsel $3,000,000 in attorneys' fees and $568,180 in costs, for a total of $3,568,180.

United States District Court
Northern District of California

### ii. Incentive Awards

Class Counsel requests an incentive award of $5,000 for Plaintiff Smith and $1,000 for Plaintiff Downing. *See* Dkt. No. 146 at 25. District courts have discretion to award incentive fees to named class representatives. *See In re Mego Fin. Corp. Secs. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000). "Service awards as high as $5,000 are presumptively reasonable in this judicial district." *See Wong v. Arlo Techs., Inc.*, No. 5:19-CV-00372-BLF, 2021 WL 1531171, at *12 (N.D. Cal. Apr. 19, 2021). The Court must "'evaluate the propriety of requested incentive payments' by considering, among other factors, 'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, the amount of time and effort the plaintiff expended in pursuing the litigation,' and any financial or reputational risks the plaintiff faced." *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 786 (9th Cir. 2022) (quoting *Roes*, 944 F.3d at 1057). The Ninth Circuit has cautioned that "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013). This is particularly true where "the proposed service fees greatly exceed the payments to absent class members." *Id.*

Class Counsel represents that the class representatives were instrumental in achieving this settlement. *See* Dkt. No. 146 at 25. Plaintiff Smith has been actively involved in the litigation since the case was filed in 2018. *See* Dkt. No. 146-2 ("Smith Decl.") ¶ 5. She consulted extensively with Class Counsel, attended two mediations and a deposition, gathered documents for discovery requests, and reviewed litigation documents. *See* Dkt. No. 146 at 26; Dkt. No. 146-1 ¶ 13; Smith Decl. ¶ 7. As an example, Class Counsel stated at the final fairness hearing that it was thanks to Plaintiff Smith that they discovered email addresses had been inadvertently omitted from the initial notice list. Plaintiff Smith also received unwanted press attention for her participation in this case. *See* Smith Decl. ¶ 9. Plaintiff Downing was also active in this litigation, but his complaint was filed in 2020 and the *Downing* case was stayed pending this settlement at an earlier stage. *See* Dkt. No. 146 at 25; Dkt. No. 146-3 ("Downing Decl.") ¶ 6.

Considering all the circumstances, the Court finds that the $5,000 award for Plaintiff Smith and $1,000 award for Plaintiff Downing are reasonable to compensate them for their efforts. The Court therefore **GRANTS** the request for an incentive award for a total amount of $6,000.

## III. CONCLUSION

Accordingly, the Court **GRANTS** the motion for final approval of class action settlement and **GRANTS** the motion for attorneys' fees and service award. Dkt. Nos. 146, 155. The Court awards attorneys' fees in the amount of $3,000,000; costs in the amount of $568,180; and service award to Plaintiffs Smith and Downing in the amount of $6,000.

The parties and settlement administrator are directed to implement this Final Order and the settlement agreement in accordance with the terms of the settlement agreement. The parties are further directed to file a short stipulated final judgment of two pages or less within 21 days from the date of this order. The judgment need not, and should not, repeat the analysis in this order.

**IT IS SO ORDERED.**

Dated: 2/27/2023

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

# EXHIBIT B

LEXINGTON LAW GROUP
Howard Hirsch, State Bar No. 213209
hhirsch@lexlawgroup.com
Ryan Berghoff, State Bar No. 308812
rberghoff@lexlawgroup.com
503 Divisadero Street
San Francisco, CA 94117
Telephone: (415) 913-7800
Facsimile: (415) 759-4112

Attorneys for Plaintiffs

(Additional counsel listed below)

DORSEY & WHITNEY LLP
Kent J. Schmidt, State Bar No. 195969
schmidt.kent@dorsey.com
Navdeep K. Singh, State Bar No. 284486
singh.navdeep@dorsey.com
600 Anton Boulevard, Suite 2000
Costa Mesa, CA 92626
Telephone: (714) 800-1400
Facsimile: (714) 800-1499

DORSEY & WHITNEY LLP
Creighton R. Magid (*admitted Pro Hac Vice*)
magid.chip@dorsey.com
1401 New York Avenue NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 442-3000
Facsimile: (202) 442-3199

Attorneys for Defendant
KEURIG GREEN MOUNTAIN, INC.

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KATHLEEN SMITH, on behalf of herself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KEURIG GREEN MOUNTAIN, INC.,<br><br>Defendant. | Case No. 4:18-cv-06690-HSG<br><br><u>CLASS ACTION</u><br><br>**STIPULATION OF SETTLEMENT**<br><br>Judge: Hon. Haywood S. Gilliam, Jr. |

## TABLE OF CONTENTS

**Page**


I. DEFINITIONS .......... 1
II. RECITALS .......... 5
III. SETTLEMENT RELIEF .......... 7
IV. RELEASES .......... 8
V. CLASS CERTIFICATION FOR SETTLEMENT PURPOSES ONLY .......... 12
VI. CLASS NOTICE AND COURT APPROVAL .......... 13
VII. CONDITIONS; TERMINATION .......... 15
VIII. COSTS, FEES AND EXPENSES .......... 16
IX. COVENANTS AND WARRANTIES .......... 17
X. MISCELLANEOUS .......... 18

This Stipulation of Settlement is made and entered into by Plaintiff Kathleen Smith, on behalf of herself, and all others similarly situated, and Defendant Keurig Green Mountain, Inc.

**I. DEFINITIONS**

A. As used in this Stipulation, the following capitalized terms have the meanings specified below:

1. "Action" means the case entitled *Smith v. Keurig Green Mountain, Inc*. removed from the Alameda County Superior Court on November 2, 2018, to the United States District Court for the Northern District of California and assigned Case No. 4:18-CV-06690-HSG.

2. "Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such Person. For purposes of the definition, "control" means (a) with respect to any corporation or other entity having voting shares or the equivalent and elected directors, managers, or Persons performing similar functions: (i) the ownership or power, directly or indirectly, to vote more than fifty percent (50%) of shares or the equivalent having the power to vote in the election of such directors, managers or Persons performing similar functions, or (ii) the ability, directly or indirectly, to direct its business and affairs, and (b) with respect to any other Person: the ability, directly or indirectly, to direct its business and affairs.

3. "Approved Claim(s)" means the claims of Class Members approved by the Claim Administrator.

4. "Cash Payment" means the $10 million to be paid by Defendant to be used for payment of the following: (1) Class Members' claims; (2) notice and administration costs, including expenses related to maintaining the Cash Payment Account (such as taxes that may be owed by the Cash Payment Account), if any; (3) attorneys' fees and costs; and (4) incentive awards to Plaintiffs. The Cash Payment Account shall be administered by the Claim Administrator.

5. "Cash Payment Account" means a bank account to be selected and administered by the Claim Administrator that shall hold the Cash Payment.

6. “Cash Payment Balance” means the balance of the Cash Payment at the end of the Claim Review Period, consisting of the $10 million paid as the Cash Payment minus: (i) up to $500,000 for Claim Administrator’s notice and administration costs, including expenses related to maintaining the Cash Payment (such as taxes that may be owed on the Cash Payment), if any; (ii) attorneys’ fees and costs; and (iii) incentive awards to Plaintiffs.

7. “Challenged Products” shall mean any and all single serve coffee pods designed for use in Keurig® single serve coffee makers or brewing systems that are (a) labeled as recyclable; (b) sold in the United States; and (c) produced, sold, or distributed by Defendant or its Affiliates or produced by Defendant or its Affiliates for third parties, a non-exhaustive list of which is provided in Exhibit I.

8. “Claim Administrator” means the independent company agreed upon by the Parties to provide the Class and Publication Notice and administer the claims process, the Request for Exclusion process, the Settlement Website, and other responsibilities as outlined herein. The Parties agree that Kroll Business Services will be retained as the Claim Administrator.

9. “Claim Form” means the form that is substantially in the form of Exhibit F hereto.

10. “Claim Review Period” means the three-month period beginning no later than 10 days after the Effective Date.

11. “Claim Submission Period” means the period beginning on the date notice to the Class is first published, and continuing until 30 days after the date of the Final Approval Hearing. Claim Forms must be postmarked via United States First Class Mail or submitted to the Settlement Website by 11:59 p.m. Pacific time on the last day of the Claim Submission Period to be considered timely.

12. “Class” and/or “Class Members” means all Persons in the United States who purchased the Challenged Products for personal, family or household purposes within the Class Period. Specifically excluded from the Class are (a) Defendant, (b) Defendant’s Affiliates, (c) the officers, directors, or employees of Defendant and its Affiliates and their immediate family

members, (d) any legal representative, heir, or assign of Defendant, (e) all federal court judges who have presided over this Action and their immediate family members; (f) the Hon. Morton Denlow (Ret.) and his immediate family members; (g) all persons who submit a valid and timely Request for Exclusion from the Class; and (h) those who purchased the Challenged Products for the purpose of resale.

13. "Class Counsel" means the attorneys of record for Plaintiffs in the Action.

14. "Class Notice" means the "Notice of Class Action Settlement" substantially in the same form as Exhibit E attached hereto.

15. "Class Notice Package" means the information as approved in form and content by Class Counsel and Defendant's Counsel and to be approved by the Court. Class Notice Packages will include (a) the Class Notice and (b) the Claim Form.

16. The "Class Period" is the period from June 8, 2016, to the date notice to the Class is first published.

17. "Court" means the U.S. District Court for the Northern District of California.

18. "Defendant" means Keurig Green Mountain, Inc., also referred to herein as "Keurig."

19. "Defendant's Counsel" or "Keurig's Counsel" means Creighton Magid and Kent Schmidt of Dorsey & Whitney, LLP.

20. "Distribution Plan" means a written declaration regarding the final accounting and plan of distribution prepared by the Claim Administrator, identifying (a) each claimant whose claim was approved, including the dollar amount of the payment awarded to each such claimant, and the dollar amount of any pro rata reduction required by Section III.B.5; (b) each claimant whose claim was rejected; (c) the average and median recovery per claimant and the largest and smallest amounts paid to claimants, (d) the number and value of checks not cashed, (e) the dollar amount of the Cash Payment Balance to be disbursed to the recipient(s) as provided in Section III.B.6; and (f) a final accounting of all administration fees and expenses incurred by the Claim Administrator.

21. "Downing" means Matthew Downing, plaintiff in the Massachusetts Action.

22. "Email Notice" means information as approved in form and content by Class Counsel and Defendant's Counsel and to be approved by the Court, substantially in the form of Exhibit C.

23. "Effective Date" means the date described in Section VII.A.

24. "Final Approval Hearing" means the hearing to be held by the Court to consider and determine whether the proposed settlement of the Action as contained in this Stipulation should be approved as fair, reasonable, and adequate, and whether the Final Settlement Order and Judgment approving the settlement contained in this Stipulation should be entered.

25. "Final Settlement Order and Judgment" means an order and judgment entered by the Court:

(a) Giving final approval to the terms of this Stipulation as fair, adequate, and reasonable;

(b) Providing for the orderly performance and enforcement of the terms and conditions of the Stipulation;

(c) Dismissing the Action with prejudice;

(d) Discharging the Released Parties of and from all further liability for the Released Claims to the Releasing Parties; and

(e) Permanently barring and enjoining the Releasing Parties from instituting, filing, commencing, prosecuting, maintaining, continuing to prosecute, directly or indirectly, as an individual or collectively, representatively, derivatively, or on behalf of them, or in any other capacity of any kind whatsoever, any action in the California Superior Courts, any other state court, any federal court, before any regulatory authority, or in any other court, tribunal, forum, or proceeding of any kind, against the Released Parties that asserts any Released Claims that would be released and discharged upon final approval of the Settlement as provided in Sections IV.A and B of this Stipulation.

(f) The actual form of the Final Settlement Order and Judgment entered by the Court will be substantially in the form attached hereto as Exhibit G.

26. "Household" means any number of Persons cohabitating and related by blood or marriage in the same dwelling unit or physical address.

27. "Massachusetts Action" means the case entitled *Downing v. Keurig Green Mountain, Inc.*, Case No. 1:20-cv-11673, filed in the United States District Court for the District of Massachusetts on September 9, 2020.

28. "Noncompliant Partner Brand" means a Partner Brand whose Challenged Products do not comply with Section III.A herein after the compliance dates set forth in said Section III.A.

29. "Noncompliant Partner Brand Products" means the Challenged Products of a Noncompliant Partner Brand.

30. "Notice Plan" or "Notice Program" means the plan for dissemination of the Publication Notice and Class Notice Package as described in Section VI developed by the Claims Administrator to notify the Class of the Settlement and to command the Class Members' attention about their rights under the Settlement.

31. "Parties" means Plaintiffs and Defendant.

32. "Partner Brand" means an entity (a) other than Defendant or an Affiliate of Defendant for whom Defendant or an Affiliate of Defendant manufactures Challenged Products but (b) that has a right to approve or disapprove package labeling for Challenged Products and that has rights to sell and/or distribute Challenged Products in one or more distribution channels.

33. "Person" means any natural person, corporation, partnership, business organization or association, or other type of legal entity.

34. "Plaintiff" means Kathleen Smith and, subject to the Court's approval of Section V herein, "Plaintiffs" means Kathleen Smith and Matthew Downing.

35. "Preliminary Approval Order" means the "Order Granting Preliminary Approval of Class Action Settlement," substantially in the form of Exhibit A, granting preliminary approval to this Settlement consistent with Rule 23(e)(1); approving Class Notice to

the Class Members as described herein; and setting a hearing to consider final approval of the Settlement and any objections thereto.

36. "Publication Notice" means information as approved in form and content by Class Counsel and Defendant's Counsel and to be approved by the Court, substantially in the form of Exhibit B.

37. "Recycling Representation" means any representation to any third party (in any labeling, marketing, advertising or otherwise) that the Challenged Products are recyclable (through use of the word "Recycling" or any variation thereof or through the conspicuous use of the Chasing Arrow symbol or any variation thereof).

38. "Rejected Claims" means all claims of Class Members rejected by the Claims Administrator.

39. "Released Claims" means those claims released pursuant to Section IV.A and B of this Stipulation.

40. "Released Parties" means Defendant, Defendant's Affiliates, Partner Brands, Defendant's licensors, suppliers, distributors, wholesalers, and retailers, and each of their parents, affiliated and subsidiary companies and all of their agents, employees, partners, predecessors, successors, assigns, insurers, attorneys, officers, directors, managers, members, shareholders, and insurers. For the avoidance of doubt, Released Parties shall include all Persons in the stream of commerce for the labeling, marketing, sale, and/or distribution of the Challenged Products.

41. "Releasing Parties" means Plaintiffs, individually and as representatives of all those similarly situated, and all Class Members other than those Class Members who properly and timely exclude themselves through a Request for Exclusion pursuant to Section VI.D., and including any Person claiming derivative rights of such a Releasing Party as their parent, child, heir, guardian, associate, co-owner, attorney, agent, administrator, executor, devisee, predecessor, successor, assignee, assigns, representative of any kind, shareholder, partner, director, employee or affiliate.

42. "Request for Exclusion Deadline" means 45 days prior to the Final Approval Hearing.

43. "Request for Exclusion" means a request by a Class Member to be excluded from this Settlement made on the Request for Exclusion Form and delivered to the Claims Administrator by the Request for Exclusion Deadline in accordance with the terms of this Stipulation.

44. "Request for Exclusion Form" means the form to be used for a Request for Exclusion in the form attached as Exhibit J.

45. "Settlement Recycling Representation" means any representation made to any third party (in any labeling, marketing, advertising or otherwise) in accordance with the terms set forth in Section III.A herein.

46. "Settlement Website" means the website established by the Claim Administrator that will contain documents relevant to the settlement, including the Class Notice Package. Claim Forms may be submitted by Class Members via the Settlement Website as provided in the Class Notice Package.

47. "Stipulation of Settlement,""Stipulation" and/or "Settlement" means this Stipulation of Settlement, including its attached exhibits (which are incorporated herein by reference), duly executed by Plaintiffs, Class Counsel, Defendant and Defendant's Counsel.

48. "United States" means all of the United States of America, including all states, the District of Columbia, and its territories and possessions.

B. Capitalized terms used in this Stipulation, but not defined above, shall have the meaning ascribed to them in this Stipulation and the exhibits attached hereto.

## II. RECITALS

A. On September 28, 2018, Plaintiff Smith filed an initial complaint in the Alameda County Superior Court. Smith alleged claims under California consumer protection statutes for injunctive and monetary relief on behalf of a class of similarly situated consumers who purchased the Challenged Products based on purported representations that such products were "recyclable" when they were allegedly not recyclable. Specifically, Plaintiff Smith's complaint alleged that

Keurig misleadingly represented the Challenged Products as recyclable in violation of: (1) the unlawful, unfair, and fraudulent prongs of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*; (2) the California Consumers Legal Remedies Act ("CLRA"), Cal. Civil Code §§ 1750 *et seq.*; (3) the express-warranty provisions of California's Commercial Code, Cal. Com. Code § 2313; and (4) California unjust enrichment law. Class Counsel confirm that before commencing the Action, they conducted an examination and evaluation of the relevant law and facts to assess the merits of the claims and to determine how to best serve the interests of the members of the Class.

B. On November 2, 2018, Defendant removed Plaintiff Smith's action to this Court.

C. On December 7, 2018, Defendant moved to dismiss Plaintiff Smith's complaint.

D. On December 28, 2018, Plaintiff Smith filed a First Amended Complaint to address some of the arguments raised in Defendant's initial motion to dismiss.

E. On January 28, 2019, Defendant moved to dismiss Plaintiff Smith's First Amended Complaint for lack of standing, for failure to state a claim, and on First Amendment grounds. Defendant also argued that Plaintiff Smith's class claims should be stricken. On June 28, 2019, the Court denied Defendant's motion in its entirety.

F. On September 21, 2020, the Court granted Plaintiff Smith's motion for class certification. The Court certified a class consisting of "All persons who purchased the [Challenged] Products for personal, family or household purposes in California (either directly or through an agent) from June 8, 2016 through the present." The Court's September 21, 2020, order granting class certification limited the types of damages that Plaintiff Smith and the Class could seek to recover in the Action, and specifically rejected certain of Plaintiff Smith's proposed methods for measuring damages and restitution.

G. In addition, on September 9, 2020, Downing filed a complaint in the United States District Court for the District of Massachusetts alleging violations of Massachusetts General Laws, Chapter 93A, Section 2 based on the same allegedly misleading recycling labels on the Challenged Products. Downing pled his complaint on behalf of a national class and a Massachusetts class.

H. On December 18, 2020, Defendant moved to dismiss Downing's complaint for lack of standing and for failure to state a claim. Defendant also argued that Downing's claims on behalf of a national class should be stricken, and that the case should be limited to Massachusetts purchasers of the Challenged Products. On June 11, 2021, the Court denied Defendant's motion as to standing and failure to state a claim, but granted Defendant's request to strike the claims to the extent they were asserted on behalf of a putative national class.

I. On June 25, 2021, Downing filed a Petition for Permission to Appear pursuant to Fed. R. Civ. P. 23(f) with the United States Court of Appeals for the First Circuit regarding the district court's decision to strike claims on behalf of a putative national class, which Defendant opposed. Downing's Petition has not yet been ruled upon by the First Circuit, but the First Circuit has granted the parties' joint motion to stay the review of that petition pending final approval of this Settlement.

J. In addition to the motion practice described above, the Parties conducted an extensive amount of discovery. The Plaintiffs served five sets of requests for production of documents (collectively comprising over one hundred separate requests), three sets of interrogatories and two sets of requests for admissions. Defendant served one set of requests for admissions and requests for production of documents and two sets of interrogatories. The Parties engaged in numerous meet and confer sessions, resulting in two discovery dispute letter submissions to the Court for resolution. Plaintiffs subpoenaed over a dozen third parties including materials recovery facilities, waste management companies, lobbying firms, and industry trade associations. Hundreds of thousands of documents were produced and reviewed by the Parties, and approximately seven depositions were conducted of Plaintiff Smith, senior Keurig personnel, and third parties.

K. Since the Action was filed, Keurig has made changes to some of the business practices at issue in the Action, including changing the design of the Challenged Products to make it easier for consumers to remove the foil lid prior to placing the remaining beverage pods in their recycling bin.

L. Since the Action was filed, the Parties have engaged in periodic settlement discussions, including participating in two full days of mediation with the Honorable Morton Denlow (Ret.) of JAMS on May 11 and September 21, 2021. Although full settlement was not reached in these mediation sessions, the Parties continued their negotiations and ultimately reached an agreement in principle to resolve the Action on October 26, 2021. At the time the parties reached an agreement in principal to resolve the Action, Plaintiff had yet to serve an expert report addressing the existence or non-existence of class-wide damages.

M. Keurig has denied and continues to deny each and all of the claims and contentions alleged by Plaintiffs. Keurig has expressly denied and continues to deny all charges of wrongdoing or liability against it arising out of any of the conduct, labels, statements, acts or omissions alleged, or that could have been alleged, in the Action, and denies that consumers suffered any harm or injury, and states that its labeling, advertising and marketing of the Challenged Products was not false or misleading.

N. Nonetheless, Keurig has concluded that further defense of the Action would be protracted and expensive, and that it is desirable that the Action be fully and finally settled in the manner and upon the terms and conditions set forth in the Stipulation. Defendant also has taken into account the uncertainty and risks inherent in any litigation. Keurig, therefore, has determined that it is desirable and beneficial to it that the Action be settled in the manner and upon the terms and conditions set forth in the Stipulation.

O. Class Counsel have concluded, after extensive litigation, investigation of the facts, consultation with their experts, extensive discovery, and careful consideration of the circumstances of the Action and the possible legal and factual defenses thereto, that it would be in the best interests of the Class to enter into this Stipulation to avoid the uncertainties of litigation and to assure that the benefits reflected herein are obtained for the Class herein defined. Class Counsel considers the Settlement set forth in this Stipulation to be fair, reasonable and adequate and in the best interests of the Class.

## III. SETTLEMENT RELIEF

In consideration of the covenants set forth herein, the Parties agree as follows:

A. Injunctive Relief

1. Keurig and its Affiliates shall not use a Recycling Representation without clearly and prominently including the qualifying statement, "Check Locally – Not Recycled in Many Communities." This obligation shall be subject to the terms detailed in Sections III.A.2-8 below and the other terms of this Stipulation.

2. Wherever on boxes or cartons of Challenged Products a Recycling Representation shall appear, the Recycling Representation shall be followed immediately by an asterisk, which asterisk shall reference the qualifying statement, "Check Locally – Not Recycled in Many Communities." The qualifying statement shall appear in close proximity to, and in a font size no smaller than 55% of the font size of, the Recycling Representation. The requirement of a qualifying statement shall not apply to a resin identification code (whether a number, a number within "chasing arrows," a number within a triangle, or otherwise) in an inconspicuous location (such as on the bottom of a package). A representative example of the new qualifying language and font size ratio compliant with this Section on a box of the Challenged Products is attached hereto as Exhibit H.

3. Notwithstanding Sections III.A.1. and IIII.A.2. above, Keurig, its Affiliates and its Partner Brands will be permitted to use the How2Recycle tile on the Challenged Products' packaging with such standard language as How2Recycle (part of GreenBlue, a 501(c)(3) nonprofit) shall direct for all products determined by How2Recycle to qualify for a "limited recycling" How2Recycle tile (currently "Check Locally") so long as such tile appears in an inconspicuous location (such as on the bottom of a package) and so long as the total height of the tile shall not exceed 0.85 inches on paperboard packaging or 1.0 inch on corrugate packaging. Nothing in this paragraph shall preclude Keurig, its Affiliates and its Partner Brands from complying with How2Recycle's Guidelines for Use as they may be modified from time to time.

4. Notwithstanding any other term of this Settlement, Keurig, its Affiliates and their Partner Brands, licensors, licensees, packaging suppliers, distributors, customers, wholesalers and retailers may continue to sell-through all remaining stock of existing Challenged Products, and their packaging and labels, and continue to produce the existing labeled products

until they begin printing the new labels as set forth in Section III.A.5 below, and continue to sell through then existing stock of the prior label after the printing transition dates in Section III.A.5. Nothing in this Stipulation shall require the withdrawal or destruction of any existing labels or recall of Challenged Products.

5. For boxes and cartons, the new qualification language and relative font sizes will be introduced as new packaging is introduced. The transition will be rolling across stock-keeping units ("SKUs"). The first SKU graphics with the new qualification language and fonts will be transmitted to Keurig's packaging printer no later than sixty (60) days after the Effective Date; all packaging for the first SKU printed after that date will utilize the new qualification language and fonts. SKUs that comprise at least twenty-five percent (25%) of the unit sales volume of the Challenged Products, excluding Noncompliant Partner Brand Products ("Phase 1 SKUs") will have graphics with the new qualification language and fonts transmitted to the printer no later than five (5) months after the Effective Date (the "25% Conversion Date"), and all packaging for the Phase 1 SKUs printed after the 25% Conversion Date will utilize the new qualification language and fonts. SKUs that comprise at least 50% of the unit sales volume of the Challenged Products, excluding Noncompliant Partner Brand Products ("Phase 2 SKUs") will have graphics with the new qualification language and fonts transmitted to the printer no later than nine (9) months after the Effective Date (the "50% Conversion Date"), and all packaging for Phase 2 SKUs printed after the 50% Conversion Date will utilize the new qualification language and fonts. SKUs that comprise at least 80% of the unit sales volume of the Challenged Products, excluding Noncompliant Partner Brand Products ("Phase 3 SKUs") will have graphics with the new qualification language and fonts transmitted to the printer no later than twelve (12) months after the Effective Date (the "80% Conversion Date"), and all packaging for Phase 3 SKUs printed after the 80% Conversion Date will utilize the new qualification language and fonts. All SKUs, excluding Noncompliant Partner Brand Products, will have graphics with the new qualification language and fonts transmitted to the printer no later than 15 months after the Effective Date (the "Graphics Transition End Date"), and all Challenged Product packaging printed after the Graphics Transition End Date will utilize the new qualification language and

fonts.

6. Nothing in this Settlement shall obligate Keurig or its Affiliates to destroy finished goods or existing packaging inventory.

7. Recycling Representations made by Keurig and its Affiliates in electronic advertising and promotional material for the Challenged Products that are directed to consumers (including website content) will include the revised qualifier no later than 90 days after the Effective Date or, with respect to images for individual SKUs offered for sale on Keurig.com, no later than 90 days after the date on which the packaging for such SKU is first printed with the revised qualifier. Recycling Representations made by Defendant and its Affiliates and Partner Brands in printed advertising and promotional material for the Challenged Products that are directed to consumers and printed after 90 days from the Effective Date will include the revised qualifier. In all of Keurig's and its Affiliates' written or printed promotional or advertising material for the Challenged Products that are directed to consumers, as well as in-store displays for the Challenged Products, the revised qualifier shall appear in close proximity to the Recycling Representation and in either (a) 26 point font or (b) a font size no smaller than 55% of the font size of the Recycling Representation, whichever is smaller. In any video content referencing the recyclability of the Challenged Products, the revised qualifier will appear at the same time as the Recycling Representations in such video content at the bottom of the screen, in a sufficiently large font, and for a sufficient duration, as to make it capable of being read by a reasonable viewer. For clarification, Keurig, its Affiliates and its Partner Brands shall not be obligated to modify or replace existing materials or content in the hands of third parties, but any new materials supplied thereafter by Keurig or its Affiliates shall comply with the above. Nothing in this paragraph shall apply to materials not directed at consumers, such as materials directed at recycling programs, material recovery facilities, recyclers, reclaimers, governmental entities, or commercial or non-profit entities; nor shall anything in this paragraph apply to text or footnotes in internal reports, white papers, regulatory filings, investor relations materials, annual reports, or securities filings of Keurig and its Affiliates. In Keurig's and its Affiliates' publicly-available corporate responsibility and sustainability reports, generic references to "RKCs" (using the

acronym) will not require qualifiers, but on any page containing a statement referring to the Challenged Products as recyclable, the first such statement on the page will require the qualifier described above to appear on the same page, which qualifier may be referenced by a footnote, an asterisk, or a similar reference mark.

8. No later than 90 days after the Effective Date, subject to Sections III.A.4 and III.A.5 above, Keurig will not make the following statements (or any substantially similar representations) in any of its labeling, advertising, or promotional material for the Challenged Products that are directed to consumers (including but not limited to its website), in the absence of the indicated qualifying statements:

(a) "Our new pods are made of polypropylene #5 plastic, which is accepted for recycling in the majority of communities across the United States." Must include the qualifying statement set forth in Section III.A.1. above, or context indicating that not all communities that accept #5 plastic currently accept coffee pods or small format items.

(b) "Recyclable K-Cup® pods can be recycled in communities that accept #5 plastics." Must include the qualifying statement set forth in Section III.A.1. above or context indicating that not all communities that accept #5 plastic currently accept coffee pods or small format items.

Nothing in this paragraph shall apply to materials not directed at consumers, such as materials directed at recycling programs, MRFs, recyclers/reclaimers, governmental entities, or commercial or non-profit entities.

9. At any point after the expiration of 24 months from the Effective Date, Keurig may seek to modify or eliminate the qualifying language set forth in Section III.A.1. above if (a) a material change in applicable law or Federal Trade Commission guidance (such as the Green Guides), as applicable to the Challenged Products, requires a different qualifier or no longer requires (explicitly or tacitly) qualifying language similar to the agreed language in Section III.A.1. above; or (b) if Keurig can demonstrate that recycling facilities serving at least 60% of American consumers or communities where the Challenged Products are sold accept for recycling (i) the Challenged Products, (ii) polypropylene single serving coffee pods, or (iii)

polypropylene items smaller than 2 inches in two dimensions. Prior to modifying or eliminating the qualifying language set forth in Section III.A.1. above, Keurig must inform Plaintiffs through counsel of the proposed modification or elimination. Plaintiffs, through Plaintiffs' counsel, shall within thirty (30) days either approve the proposed modification or elimination or require Keurig to submit proof that the conditions in (a) or (b) above have been met in an arbitration conducted by JAMS, pursuant to JAMS Comprehensive Arbitration Rules & Procedures (including the arbitrator selection process set forth in Rule 15 thereof). In the arbitration, Plaintiffs may submit any proof that the conditions in (a) or (b) have not been met. Unless approved by Plaintiffs through Plaintiffs' counsel or otherwise agreed by the Parties, the arbitrator will determine if Keurig may modify or eliminate the qualifying language set forth in Section III.A.1. above. The arbitration proceeding shall take place no more than 90 days after Keurig has submitted its proof that the conditions in (a) or (b) above have been met. Discovery in the arbitration shall be limited to understanding the methodology and veracity of the data presented by either Party. Keurig shall be responsible for the arbitration fees (both administrative fees and arbitrator fees), but the Parties shall otherwise be responsible for their own attorneys' fees and costs.

B. Monetary Payment

Keurig primarily sells the Challenged Products to retailers, not directly to consumers, and thus has no way to identify all individual Class Members. Additionally, an individual Class Member's recovery may be too small to make traditional methods of proof economically feasible. In order to assure that Class Members have access to the proceeds of this settlement, a Cash Payment Account is proposed to be established and administered as follows:

1. Keurig shall pay, as its sole, total, and exclusive financial obligation with respect to the Settlement (other than funds expended to comply with the Injunctive Relief in Section III.A. above), a total of $10 million in cash for payment of Class Member claims, attorneys' fees and costs in accordance with Section VIII.A below, Plaintiffs' incentive awards in accordance with Section VIII.B below, and for the payment of certain notice and administration costs and expenses, on the following schedule:

(a) Not more than 5 days after the Court's order granting Preliminary Approval, Keurig shall pay $500,000 to the Cash Payment Account to cover any notice and/or administration costs of the Class Administrator.

(b) Within 30 days after the Effective Date, Keurig shall pay the remaining $9.5 million into the Cash Payment Account.

2. The Cash Payment shall be applied as follows:

(a) To reimburse or pay up to, but not to exceed, $500,000 of the total costs reasonably and actually incurred by the Claim Administrator in connection with providing notice and administering claims submitted by the Class and pay for expenses associated with maintaining the Cash Payment Account (including taxes that may be owed by the Cash Payment Account);

(b) To pay attorneys' fees and costs in accordance with Section VIII.A;

(c) To pay incentive awards to Plaintiffs in accordance with Section VIII.B;

(d) To distribute to Class Members who submit Approved Claims to the Claim Administrator; and

(e) To distribute, as applicable pursuant to Section III.B.6 below, to the Ocean Conservancy (75%) and Consumer Reports, Inc. (25%).

Case 4:18-cv-06690-HSG Document 114-1 Filed 07/28/22 Page 37 of 258

3. Class Members shall have the opportunity to submit a claim to the Claim Administrator during the Claim Submission Period by mail or via a web form on the Settlement Website. Class Members must fill out a Claim Form substantially in the form of Exhibit F and submit it as described in Exhibits B and F. Class Members must submit the Claim Form under penalty of perjury and must provide the following information: (1) the identity and contact information for the claimant (including mailing address and, if submitted by means of the Settlement Website, email address); (2) the Challenged Product(s) and the approximate number of pods of the Challenged Products they purchased; (3) the approximate purchase date(s); and (4) if available, proof of purchase in the form of receipt(s) or email order, or shipping confirmation(s).

4. Class Members who properly and timely submit a valid and approved Claim Form are eligible to receive a cash payment as follows:

(a) For Class Members without proof of purchase: five dollars ($5.00) per Household;

(b) For Class Members with proof of purchase:

(1) Thirty-five cents ($0.35) per ten (10) pods (rounded up to the nearest ten (10) pod increment), up to thirty-six dollars ($36.00) maximum per Household; or

(2) If the amount in (b)(1) above does not exceed six dollars ($6.00), six dollars ($6.00) minimum per Household regardless of quantity purchased.

Only one claim shall be allowed per Household (whether with or without proof). If more than one claim is submitted per Household, all such claims shall be combined and treated as a single claim for purposes of the limits set forth herein.

5. If the cash amounts to be paid for Approved Claims from the Cash Payment Account under Section III.B.4 exceed the Cash Payment Balance, the cash payments for all Approved Claims will be reduced pro rata, based on the respective dollar amounts of the Approved Claims, until the total aggregate cash payments for all Approved Claims equals the Cash Payment Balance.

6. If the amounts to be paid for Approved Claims from the Cash Payment Account under Section III.B.4 do not equal or exceed the Cash Payment Balance, seventy-five percent (75%) of the remainder shall be distributed to the Ocean Conservancy and twenty-five percent (25%) of the remainder shall be distributed to Consumers Reports, Inc. for use in a manner that each of those entities determines will provide the next best use of compensation to the Class arising out of claims that have been made by Plaintiffs in the Action and as consideration for the extinguishment of those claims.

7. The claim process will be administered by the Claim Administrator, and neither Class Counsel nor Keurig shall participate in resolution of such claims.

8. All expenses of the Claim Administrator shall be paid as provided in Section III.B.2(a).

9. The Claim Administrator shall approve or reject all claims. The determination of claims shall occur during the Claim Review Period. The decision of the Claim Administrator shall be final and binding on Plaintiffs, Keurig and all Class Members submitting Claims, and neither Plaintiffs, Keurig nor such Class Members shall have the right to challenge or appeal the Claim Administrator's decision. Nothing in this Stipulation or the claims process hereunder creates a claim by any Person against Plaintiffs, Class Counsel, Defendant, Defendant's counsel, or the Claims Administrator based on any determination of the validity or invalidity or amount of any claims, distributions, or awards made in accordance with this Stipulation, and all relief shall be solely as provided in this Stipulation and by its Claims process. Neither Plaintiffs nor Defendant, nor their counsel, shall have any liability whatsoever for any act or omission of the Claim Administrator.

10. Within 15 days after conclusion of the Claim Review Period, the Claim Administrator shall provide to Keurig and Class Counsel the Distribution Plan. No sooner than 20 days, but not later than 45 days after delivering the Distribution Plan, the Claim Administrator shall disburse the remaining amounts in the Cash Payment Account according to the Distribution Plan and mail or email letters to all claimants with Rejected Claims explaining the rejection. In no event shall a Class Member's claim be paid until the conclusion of the Claim Review Period.

11. If any distribution checks mailed to Class Members are returned as non-deliverable, or are not cashed within 180 days, or are otherwise not payable, such checks shall no longer be negotiable and any such funds shall be disbursed to the recipients ordered by the Court as provided in Section III.B.6. Any Class Member whose check is returned as non-deliverable, is not cashed within 180 days, or is otherwise not payable, shall not be entitled to any further payment under this Settlement. The return or failure to cash checks shall have no effect on a Class Member's release of claims, obligations, representations, or warranties as provided herein, which shall remain in full effect.

12. No deductions for taxes will be taken from any amounts paid to Class Members for claims at the time of distribution. Class Members are responsible for paying all taxes due on such payments. All distribution checks to Class Members shall be deemed to be paid solely in the year in which payments are actually issued. The Parties do not purport to provide legal advice on tax matters to each other or Class Members. To the extent this Stipulation, or any of its exhibits or related materials, is interpreted to contain or constitute advice regarding any U.S. Federal or any state tax issue, such advice is not intended or written to be used, and cannot be used, by any Person for the purpose of avoiding penalties under the Internal Revenue Code or any state's tax laws.

13. No interest will accrue on amounts payable hereunder to Class Counsel for fees and expenses, for class representative awards, or for claim distribution amounts payable to Class Members.

## IV. RELEASES

A. As of the Effective Date, and except as to such rights or claims as may be created by this Stipulation, in consideration of the settlement obligations set forth herein, all Releasing Parties, whether individual, class, representative, legal, equitable, administrative, direct or indirect, or any other type or in any other capacity, release and forever discharge all Released Parties from any and all claims, demands, rights, causes of action, suits, petitions, complaints, damages of any kind, liabilities, debts, punitive or statutory damages, penalties, losses, and issues of any kind or nature whatsoever, asserted or unasserted, known or unknown, suspected or

unsuspected (including, but not limited to, any and all claims relating to or alleging deceptive or unfair business practices, false or misleading advertising, intentional or negligent misrepresentation, negligence, concealment, omission, unfair competition, promise without intent to perform, unsuitability, unjust enrichment, and any and all claims or causes of action arising under or based upon any statute, act, ordinance, or regulation governing or applying to business practices generally), existing now or in the future, arising out of or related to (1) Recycling Representations made with respect to the Challenged Products prior to the Graphics Transition End Date and/or (2) Settlement Recycling Representations made with respect to the Challenged Products, provided, however, that this release shall not apply to claims or causes of action arising from a final determination or regulation made by a governmental entity pursuant to statute (such as California S.B. 343) that the Challenged Products, polypropylene products, or polypropylene products of the Challenged Products' dimensions (with such dimensions specified by such governmental entity) are not recyclable under such statute and are not otherwise permitted to make a qualified statement substantially similar to the Settlement Recycling Representation. For the purposes of this paragraph, a Recycling Representation shall be considered to have been "made," with respect to printed materials, as of the date of printing.

B. No Released Party that complies with the terms set forth in Section III.A herein shall be liable for another party's failure to comply with such terms, nor shall the failure of any entity to comply with the terms set forth in Section III.A herein void or limit in any way the release provided to the Released Parties that comply with such terms. A Noncompliant Partner Brand shall be solely responsible for the failure of any Noncompliant Partner Brand Products to comply with the terms set forth in Section III.A herein, and Defendant's manufacture, sale or distribution of Noncompliant Partner Brand Products shall not be deemed noncompliance with the terms set forth in Section III.A herein and shall not void or limit in any way the release otherwise provided to Defendant and the other Released Parties.

C. With respect to the Released Claims, each Class Member shall be deemed to have waived and relinquished, to the fullest extent permitted by law, the provisions, rights and benefits conferred by any law of any state of the United States, or principle of common law or otherwise,

which is similar, comparable, or equivalent to section 1542 of the California Civil Code, which provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

The Class Members understand and acknowledge the significance of these waivers of California Civil Code section 1542 and any other applicable federal, state or other statute, case law, rule or regulation relating to limitations on releases. In connection with such waivers and relinquishment, the Class Members acknowledge that they are aware that they may hereafter discover facts in addition to, or different from, those facts that they now know or believe to be true with respect to the subject matter of the Settlement, but that it is their intention to release fully, finally, and forever all Released Claims with respect to the Released Parties, and in furtherance of such intention, the release of the Released Claims will be and remain in effect notwithstanding the discovery or existence of any such additional or different facts.

D. The Parties shall be deemed to have agreed that the release set forth herein will be and may be raised as a complete defense to and will preclude any action or proceeding against any of the Released Parties based on the Released Claims.

E. As of the Effective Date, by operation of entry of judgment, the Released Parties shall be deemed to have fully released and forever discharged Plaintiffs, all other Class Members and Class Counsel from any and all claims of abuse of process, malicious prosecution, or any other claims arising out of the initiation, prosecution, or resolution of the Action, including, but not limited to, claims for attorneys' fees, costs of suit or sanctions of any kind, or any claims arising out of the allocation or distribution of any of the consideration distributed pursuant to this Stipulation of Settlement.

## V. AMENDMENT AND CLASS CERTIFICATION FOR SETTLEMENT PURPOSES ONLY

On September 21, 2020, the Court granted Plaintiff Smith's motion for class certification, which certified a class of all Persons who purchased the Challenged Products for personal, family or household purposes in California during the Class Period. For purposes of this settlement only, the Parties agree to modify the Class to include all persons or entities in the United States who purchased the Challenged Products during the Class Period (the "Modified Class"), to add Downing as a representative Plaintiff in the Action, to add Downing's counsel as additional Class Counsel in the Action, and to certification of the Modified Class. Contemporaneously with the filing of the application to the Court for a Preliminary Approval Order as set forth in Section VI-A below, and solely for purposes of settlement, Plaintiff shall file, and Keurig will not oppose, a motion to amend the First Amended Complaint to (i) add Downing as a representative Plaintiff in this Action; (ii) add Downing's counsel as proposed additional Class Counsel; and (iii) seek certification of the Modified Class. Class Counsel shall request that the Court enter an order that, among other things, certifies the Class for settlement purposes as set forth in this paragraph. Keurig contends that certification of the alleged class (other than on a settlement basis) would not be possible absent this settlement because individual issues would predominate, Plaintiffs disagree with Keurig's contention in this regard.

In the event this Stipulation of Settlement and the settlement proposed herein is not finally approved, or is terminated, canceled, or fails to become effective for any reason whatsoever, the class certified for settlement purposes and the addition of Downing as a Plaintiff in the Action and Downing's counsel as additional Class Counsel in the Action, to which the parties have stipulated solely for the purpose of the settlement of the Action, shall be null and void and the Parties will revert to their respective positions in the Action immediately prior to the execution of this Stipulation of Settlement. The approval of this Stipulation of Settlement and the settlement proposed herein is not conditioned on the addition of Downing as an additional Plaintiff in the Action or the addition of Downing's counsel as additional class counsel in the Action, and neither Downing not being added as an additional Plaintiff in the Action or Downing's counsel not being

added as additional class counsel in the Action shall prevent the Stipulation of Settlement and the settlement proposed herein from becoming final and effective if all other aspects of the Stipulation of Settlement and the settlement proposed herein are approved. Under no circumstances may this Stipulation of Settlement, nor any negotiations, proceedings, documents prepared, or statements made in connection with this Stipulation, be used as an admission or as evidence for any purpose, including without limitation, concerning the appropriateness of class certification, in these or any other actions against Defendant or any other Released Party.

## VI. CLASS NOTICE AND COURT APPROVAL

A. Notice Order; Preliminary Approval

On or before February 24, 2022, the Parties shall apply to the Court for a Preliminary Approval Order substantially in the form and content of Exhibit A, conditionally certifying the Class for settlement purposes as defined in Section V, for preliminary approval of the settlement, for scheduling a final approval hearing, and for approving the contents and method of dissemination of the proposed Publication Notice and Class Notice Package. The Claim Administrator shall provide a declaration to the Court in support of Preliminary Approval attesting that the Notice Plan is the best notice that is practicable under the circumstances, including the reasons for selection of the methods of notice and computation of the expected notice reach.

B. The Notice Program

The notice program shall consist of both notice by publication and by direct email notice to all Class Members who purchased the Challenged Products during the Class Period directly from Keurig on its website (www.keurig.com). Class Counsel shall also place a link to the Settlement Website on the websites of the Lexington Law Group (www.lexlawgroup.com) and Shapiro Haber & Urmy (www.shulaw.com) for a period starting from the date the Publication Notice is published, and continuing no longer than the end of the Claim Submission Period. The cost associated with the Publication Notice, the Email Notice and Class Notice Package shall be paid from the Cash Payment Account as described in Section III.B.2(a), except those costs associated with posting and maintaining notice on Class Counsel's Internet websites. At least

fourteen (14) days prior to the Final Approval Hearing, the Claim Administrator shall provide a declaration stating that notice was provided as required herein.

1. Publication Notice

Commencing as soon as reasonably practicable after issuance of an order granting Preliminary Approval to the Settlement set forth herein, and at least 90 days before the Final Approval Hearing or some other date set by the Court, the Claim Administrator shall cause to be published the Publication Notice substantially in the form and content of Exhibit B, and pursuant to the Notice Plan described in Exhibit D, which generally describes the settlement and directs all interested parties to a detailed Class Notice available on the Settlement Website and, at the request of interested parties, by U.S. Mail.

2. Email Notice

Commencing as soon as reasonably practicable after issuance of an order granting Preliminary Approval to the Settlement set forth herein, and at least 90 days before the Final Approval Hearing or some other date set by the Court, the Claim Administrator shall send the Email Notice substantially in the form and content of Exhibit C to those Class Members who were direct purchasers from Keurig.com during the Class Period, and pursuant to the Notice Plan described in Exhibit D, which generally describes the settlement and directs all interested parties to a detailed Class Notice available on the Settlement Website and, at the request of interested parties, by U.S. Mail.

Within five (5) business days of the Court's issuance of an order granting Preliminary Approval of the Settlement, Keurig shall provide Class Counsel with the last known email addresses of all Class Members who purchased Challenged Products from Keurig.com during the Class Period. Class Counsel shall furnish the email addresses to the Claims Administrator solely for purposes of providing Email Notice pursuant to this paragraph, and neither Class Counsel nor the Claims Administrator may otherwise disseminate the email addresses or make any other use of the email addresses.

3. Class Notice Package

The Class Notice Package shall be available in electronic format on the Settlement Website and mailed as a hard copy by the Claim Administrator upon request. Each Class Notice Package shall contain a Class Notice substantially in the form of Exhibit E and the Claim Form substantially in the form of Exhibit F.

4. Notice of Deadlines and Objections

The Publication Notice, the Email Notice and the Class Notice shall inform Class Members of the dates by which they must file any objections with the Court and submit Requests for Exclusions and submit Claim Forms to the Claim Administrator.

C. Objections

Any Class Member, on his or her own, or through an attorney hired at his or her own expense, may object to the terms of the Settlement. Class Members must file any objections and related notices of intent to appear at the Final Approval Hearing with the Court no later than 45 days prior to the Final Approval Hearing (the "Objection Deadline"). All objections to the Settlement by members of the Class shall be heard by this Court, and any Class Member filing an objection must be willing to demonstrate their standing (i.e., membership in the Class) in order for their objection to be valid. To be effective, any such objection must be in writing and include the contents described below:

(a) A reference to this case, *Kathleen Smith. v. Keurig Green Mountain, Inc.*, Case No. 4:18-cv-06690-HSG (N.D. Cal.);

(b) The name, address, telephone number, and, if available, the email address of the Person objecting, and if represented by counsel, of his/her counsel;

(c) A written statement of all grounds for the Objection, accompanied by any legal support for such Objection;

(d) Whether he/she intends to appear at the Final Approval Hearing, either with or without counsel;

(e) A statement of his/her membership in the Class, including all information required by the Claim Form; and

(f) A detailed list of any other objections submitted by the Class Member, or his/her counsel, to any class actions submitted in any court, whether state or otherwise, in the United States in the previous five (5) years. If the Class Member or his/her counsel has not objected to any other class action settlement in any court in the United States in the previous five (5) years, he/she shall affirmatively state so in the written materials provided in connection with the Objection to this Settlement.

Any Class Member who fails to file with the Court a written objection by the Objection Deadline containing all of the information listed in items (a) through (f) of the previous paragraph shall not be permitted to object to the Settlement and shall be foreclosed from seeking any review of the Settlement or the terms of the Stipulation by any means, including but not limited to an appeal.

A Class Member who objects to the Settlement may also submit a Claim Form on or before the Claim Form Deadline, which shall be processed in the same way as all other Claim Forms. A Class Member shall not be entitled to an extension to the Claim Form Deadline merely because the Class Member has also submitted an Objection.

Any Party may seek Court approval, prior to the Final Approval Hearing, to take a deposition of any Class Member who submits a timely written Objection.

D. <u>Requests for Exclusion</u>

Class Members must file Requests for Exclusion on the Request for Exclusion Form, and any request to revoke such Request for Exclusion, with the Claim Administrator no later than the Request for Exclusion Deadline. If a Class Member submits both a Claim Form and a Request

for Exclusion, the Claim Form shall take precedence and be considered valid and binding, and the Request for Exclusion shall be deemed to have been sent by mistake and rejected. Class Members who file a Request for Exclusion from this Settlement shall not be permitted to file an Objection to this Settlement or to intervene. Copies of all Requests for Exclusion received by the Claim Administrator by the Request for Exclusion Deadline, together with copies of all written revocations of Requests for Exclusion received by the Request for Exclusion Deadline, shall be delivered to the Parties' counsel no later than 7 days after the Request for Exclusion Deadline, or at such other time as the Parties may mutually agree in writing. The Claim Administrator shall also prepare a list of the names of the persons who have filed a valid and timely Request for Exclusion, and Class Counsel shall file that list with the Court.

E. Final Approval Hearing

The Parties shall request that, after notice is given, the Court hold a Final Approval Hearing for the purpose of determining whether final approval of the settlement of the Action as set forth herein is fair, adequate, and reasonable to the Class Members and binding on all Class Members who have not excluded themselves as provided herein; ordering that the settlement relief be provided as set forth in this Stipulation; ordering the releases as set forth in this Stipulation; and entering a Final Settlement Order and Judgment dismissing the Action with prejudice substantially in the form and content of Exhibit G.

F. Parties' Duty to Defend

From the date of execution of this Stipulation, the Parties, via Class Counsel and Defendant's Counsel, shall take all reasonable steps to defend the terms of this Stipulation as fair, reasonable, and adequate, shall defend the proposed Class as meeting the requirements of Federal Rule of Civil Procedure 23 as applied to proposed settlement class, and shall defend the notice program set forth in the Stipulation as meeting the requirements of Federal Rule of Civil Procedure 23 and giving the best and most reasonable notice practicable under the circumstances.

G. Dismissal of Massachusetts Action.

Within three (3) business days of the occurrence of one of the events set forth in Section VII.A.4, Downing shall (a) file a stipulation with the United States District Court for the District of Massachusetts dismissing the Massachusetts Action with prejudice and without costs to either party, pursuant to pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), and (b) shall voluntarily dismiss his Rule 23(f) petition pending before United States Court of Appeals for the First Circuit.

## VII. CONDITIONS; TERMINATION

A. This Settlement shall become final on the first date after which all of the following events and conditions have been met or have occurred (the "Effective Date"):

1. The Court has preliminarily approved this Stipulation (including all attachments), the settlement set forth herein, and the method for providing notice to the Class;

2. The Court has entered a Final Settlement Order and Judgment in the Action;

3. The Massachusetts Action has been dismissed with prejudice; and

4. One of the following has occurred:

(a) The time to appeal from such orders has expired and no appeals have been timely filed;

(b) If any such appeal has been filed, it has finally been resolved and the appeal has resulted in an affirmation of the Final Settlement Order and Judgment and such affirmance is no longer subject to further appeal or review; or

(c) The Court, following the resolution of any such appeals, has entered a further order or orders approving the Settlement of the Action on the terms set forth in this Stipulation of Settlement, and either no further appeal has been taken from such order(s) or any such appeal has resulted in affirmation of such order(s).

Court approval of the attorneys' fees and costs award sought by Class Counsel and/or the incentive awards sought for Plaintiffs, or any denial, decrease or modification thereof by the Court or on appeal, shall not prevent this Settlement from becoming final and effective if all other

aspects of the final judgment have been approved, and the remainder of the terms of this Settlement shall remain in effect.

B. If the Settlement is not made final (per the provisions of Section VII.A), this entire Stipulation shall become null and void as set forth in Section V, except that the Parties shall have the option to agree in writing to waive the event or condition and proceed with this settlement, in which event the Stipulation of Settlement shall be deemed to have become final on the date of such written agreement.

## VIII. COSTS, FEES, AND EXPENSES

A. Attorneys' Fees and Expenses

1. The Parties agree that any award of attorneys' fees and expenses to Class Counsel must be approved by the Court as set forth herein.

2. Class Counsel intend to make an application for an award of attorneys' fees of up to $3,000,000, which is 30% of the value of the Cash Payment, plus costs. Keurig retains the right to object to Plaintiffs' entitlement to such an award, or to the amount of award sought by Plaintiffs. The Claim Administrator shall pay the award of Class Counsels' fees and expenses from the Cash Payment Account within 30 days after the entry of the Final Settlement Order and Judgment.

3. Attorneys' fees and expenses awarded by the Court shall be payable as set forth above, notwithstanding the existence of any timely filed objections thereto, or potential for appeal therefrom, or collateral attack on the settlement or any part thereof, subject to Class Counsel's obligation to make appropriate refunds or repayments to the Cash Payment Account, if and when, as a result of any appeal or further proceedings on remand, or successful collateral attack, the fee or award of expenses is reduced or reversed.

4. In the event the Judgment entered pursuant to this settlement does not become final or is ultimately overturned on appeal as set forth in Section VII, Class Counsel shall immediately return in full the amount of attorneys' fees and expenses paid to them pursuant to this provision.

5. In the event the amount of the attorneys' fees requested is decreased or denied by the Court or upon appeal, such denial or decrease in the requested fees shall have no effect on this Stipulation and shall not invalidate the settlement agreed to herein.

6. Subject to Court approval, Class Counsel, in their sole discretion, shall allocate and distribute the award of attorneys' fees and expenses among counsel for the class members (including both counsel for Plaintiff Smith and for Downing) . In the event that any Class Members object to any aspect of this Stipulation of Settlement, Keurig shall under no circumstances be obligated or required to pay attorneys' fees or costs claimed by or associated such objectors (if any).

B. Class Representative Awards

Plaintiffs will apply for class representative service awards to be paid out of the Cash Payment Account to Plaintiffs in an amount not to exceed $5,000 for Plaintiff Smith and $1,000 to Downing. Such awards shall be paid within 30 days after the Effective Date or within 30 days after the issuance of an order awarding such amount, whichever is later. In the event that a Class Member appeals the award of attorneys' fees and costs, or the class representative service awards, Keurig shall not take a position contrary to this Stipulation. In the event the amount of any of the class representative awards are decreased or denied by the Court or upon appeal, such denial or decrease in the requested award shall have no effect on this Stipulation and shall not invalidate the settlement agreed to herein.

C. Claim Administration Costs and Costs of Class Notice

The costs associated with the administration of the claim process and with notifying the Class of this proposed settlement shall be paid from the Cash Payment Account as described in Section III.

## IX. COVENANTS AND WARRANTIES

A. Authority to Enter Agreement

Plaintiffs and Defendant each covenant and warrant that they have the full power and authority to enter into this Stipulation of Settlement and to carry out its terms, and that they have not previously assigned, sold, or otherwise pledged or encumbered any right, title, or interest in

the claims released herein or their right, power, and authority to enter into this Stipulation of Settlement, and that that the Stipulation has been duly and validly executed and delivered by such Party and constitutes its legal, valid, and binding obligation. Any person signing this Stipulation of Settlement on behalf of any other person or entity represents and warrants that he or she has full power and authority to do so and that said other person or entity is bound hereby.

Class Counsel further represents and warrants that they are authorized to take all appropriate actions required or permitted to be taken by or on behalf of the Plaintiffs and the Class in order to effectuate the terms of this Stipulation and are also authorized to enter into appropriate modifications or amendments to this Stipulation on behalf of the Plaintiffs and the Class Members.

Plaintiffs further represent and warrant that they are entering into the Settlement on behalf of themselves individually and as representatives of the Class Members, of their own free will and without the receipt of any consideration other than what is provided in the Settlement or disclosed to, and authorized by, the Court. Plaintiffs represent and warrant that they have reviewed the terms of the Settlement in consultation with Class Counsel and believes them to be fair and reasonable, and covenants that she will not file a request to be excluded from the Class or object to the Settlement.

B. Represented by Counsel

In entering into this Stipulation of Settlement, the Parties represent that: they have relied upon the advice of attorneys of their own choice, concerning the legal consequences of this Stipulation of Settlement; the terms of this Stipulation of Settlement have been explained to them by their attorneys; and the terms of this Stipulation of Settlement are fully understood and voluntarily accepted by the Parties.

## X. MISCELLANEOUS

A. Governing Law

The interpretation and construction of this Stipulation of Settlement shall be governed by the laws of the State of California.

B. Counterparts

This Stipulation of Settlement may be executed in counterparts. All counterparts so executed shall constitute one agreement binding on all of the Parties hereto, notwithstanding that all Parties are not signatories to the original or the same counterpart. Signatures sent by email shall be deemed original signatures and shall be binding.

C. Arms-Length Negotiations; No Drafting Party

The determination of the terms and conditions contained herein and the drafting of the provisions of this Settlement have been by mutual understanding after negotiation, with consideration by, and participation of, the Parties hereto and their counsel and under the supervision of, and upon specific recommendations provided by, JAMS mediator the Honorable Morton Denlow (Ret.). Any statute or rule of construction that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Stipulation of Settlement, and the Parties agree that the drafting of this Stipulation has been a mutual undertaking.

D. Entire Agreement

All agreements, covenants, representations and warranties, express or implied, written or oral, of the Parties hereto concerning the subject matter hereof are contained in this Stipulation of Settlement and the exhibits hereto. Any and all prior or contemporaneous conversations, negotiations, drafts, terms sheets, possible or alleged agreements, covenants, representations and warranties concerning the subject matter of this Stipulation of Settlement are waived, merged herein, and superseded hereby.

E. Retained Jurisdiction

The Court shall retain jurisdiction with respect to the implementation and enforcement of the terms of this Stipulation, and all Parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing the settlement embodied in this Stipulation.

F. Cooperation

Each of the Parties hereto shall execute such additional pleadings and other documents and take such additional actions as are reasonably necessary to effectuate the purposes of this Stipulation of Settlement.

G. Amendments in Writing

This Stipulation of Settlement may only be amended in writing signed by the Parties and approved by the Court.

H. Binding Effect; Successors and Assigns

This Stipulation of Settlement shall inure to the benefit of, and shall be binding upon, the Parties hereto as well as the legal successors and assigns of the Parties hereto and each of them.

I. Construction

As used in this Stipulation of Settlement, the terms "herein" and "hereof" shall refer to this Stipulation in its entirety, including all exhibits and attachments, and not limited to any specific sections. Whenever appropriate in this Stipulation of Settlement, the singular shall be deemed to refer to the plural, and the plural to the singular, and pronouns of any gender shall be deemed to include both genders.

J. Waiver in Writing

No waiver of any right under this Stipulation of Settlement shall be valid unless in writing.

K. Computation of Time

All time periods set forth herein shall be computed in business days, if seven days or fewer, and calendar days, if eight days or more, unless otherwise expressly provided. In computing any period of time prescribed or allowed by this Stipulation or by order of the Court, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal or court holiday, or, when the act to be done is the filing of a paper in Court, a day in which weather or other conditions have made the office of the clerk of the Court inaccessible, in which event the period shall run until the end of the next day as not one of the

aforementioned days. As used in this subsection, "legal or court holiday" includes New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, Christmas Day, and any other day appointed as a holiday by the President or the Congress of the United States.

L. No Admission of Liability

Each of the Parties understands and agrees that he, she, or it has entered into this Stipulation of Settlement for purpose of purchasing peace and preventing the risks and costs of any further litigation or dispute. This settlement involves disputed claims; specifically, Keurig denies any wrongdoing, and the Parties understand and agree that neither this Stipulation of Settlement, nor the fact of this settlement, may be used as evidence or admission of any wrongdoing by Keurig. The Parties further agree that, to the fullest extent permitted by law, neither this Stipulation nor the Settlement, nor any act performed nor document executed pursuant to or in furtherance of this Stipulation or the Settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any claim or of any wrongdoing or liability of the Released Parties; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any Released Party or the appropriateness of class certification in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal. In addition, any failure of the Court to approve the Settlement and/or any objections or interventions may not be used as evidence in the Action, the Massachusetts Action, or any other proceeding for any purpose whatsoever. However, the Released Parties may file the Stipulation and/or the Final Settlement Order in any action or proceeding that may be brought against them in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar, or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

M. Stay Pending Court Approval.

Class Counsel and Defendant's Counsel agree to stay all proceedings, other than those proceedings necessary to carry out or enforce the terms and conditions of this Settlement, until

the Effective Date of the Settlement has occurred. If, despite the Parties' best efforts, this Settlement should fail to become effective, the Parties will return to their prior positions in the Actions as further set forth in this Agreement.

N. Protective Orders.

All orders, agreements and designations regarding the confidentiality of documents and information ("Protective Orders") remain in effect, and all Parties and counsel remain bound to comply with the Protective Orders.

O. Notice

Any notice to the Parties required by this Stipulation of Settlement shall be given in writing by first-class U.S. Mail and e-mail to:

For Plaintiffs:

Howard Hirsch
Lexington Law Group
503 Divisadero Street
San Francisco, CA 94117
hhirsch@lexlawgroup.com

Edward F. Haber
Shapiro Haber & Urmy
Seaport East
Two Seaport Lane
Boston, MA 02210
ehaber@shulaw.com

For Defendant:

Creighton R. Magid
Dorsey & Whitney LLP
1401 New York Avenue, NW, Suite 900
Washington, DC 20005
magid.chip@dorsey.com

Arthur C. Swanson
Gibson Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
acswanson@gibsondunn.com

IN WITNESS WHEREOF, the parties hereto have executed this Stipulation of Settlement as of the dates set forth below.

DATED: Feb. 23, 2022 ______________________ KATHLEEN SMITH

DATED: ____________, 2022 ______________________ MATTHEW DOWNING

DATED: ____________, 2022 KEURIG GREEN MOUNTAIN, INC.

______________________
BY: ANTHONEY SHOEMAKER
Chief Legal Officer, General Counsel and Secretary

DATED: ____________, 2022 LEXINGTON LAW GROUP

______________________
HOWARD HIRSCH
Attorneys for Plaintiffs and the Class

DATED: ____________, 2022 LAW OFFICE OF GIDEON KRACOV

______________________
GIDEON KRACOV
Attorneys for Plaintiffs and the Class

DATED: ____________, 2022 SHAPIRO HABER & URMY, LLP

______________________
EDWARD F. HABER
Attorneys for Plaintiffs and the Class

IN WITNESS WHEREOF, the parties hereto have executed this Stipulation of Settlement as of the dates set forth below.

DATED: ____________, 2022

KATHLEEN SMITH

DATED: 2-24-22, 2022

MATTHEW DOWNING

DATED: ____________, 2022

KEURIG GREEN MOUNTAIN, INC.

BY: ANTHONEY SHOEMAKER
Chief Legal Officer, General Counsel and Secretary

DATED: ____________, 2022

LEXINGTON LAW GROUP

HOWARD HIRSCH
Attorneys for Plaintiffs and the Class

DATED: __________, 2022

LAW OFFICE OF GIDEON KRACOV

GIDEON KRACOV
Attorneys for Plaintiffs and the Class

DATED: __________, 2022

SHAPIRO HABER & URMY, LLP

EDWARD F. HABER
Attorneys for Plaintiffs and the Class

DATED: ______________, 2022

KATHLEEN SMITH

DATED: ______________, 2022

MATTHEW DOWNING

DATED: Feb. 24, 2022

KEURIG GREEN MOUNTAIN, INC.

BY: ANTHONY SHOEMAKER
Chief Legal Officer and Secretary

DATED: ______________, 2022

LEXINGTON LAW GROUP

HOWARD HIRSCH
Attorneys for Plaintiffs and the Class

DATED: ___________, 2022

LAW OFFICE OF GIDEON KRACOV

GIDEON KRACOV
Attorneys for Plaintiffs and the Class

DATED: ___________, 2022

SHAPIRO HABER & URMY, LLP

EDWARD F. HABER
Attorneys for Plaintiffs and the Class

IN WITNESS WHEREOF, the parties hereto have executed this Stipulation of Settlement as of the dates set forth below.

DATED: ______________, 2022

______________________________
KATHLEEN SMITH

DATED: ______________, 2022

______________________________
MATTHEW DOWNING

DATED: ______________, 2022

KEURIG GREEN MOUNTAIN, INC.

______________________________
BY: ANTHONEY SHOEMAKER
Chief Legal Officer, General Counsel and Secretary

DATED: February 24, 2022

LEXINGTON LAW GROUP



______________________________
HOWARD HIRSCH
Attorneys for Plaintiffs and the Class

DATED: ___________, 2022

LAW OFFICE OF GIDEON KRACOV

______________________________
GIDEON KRACOV
Attorneys for Plaintiffs and the Class

DATED: ___________, 2022

SHAPIRO HABER & URMY, LLP

______________________________
EDWARD F. HABER
Attorneys for Plaintiffs and the Class

IN WITNESS WHEREOF, the parties hereto have executed this Stipulation of Settlement as of the dates set forth below.

DATED: ______________, 2022

______________________________
KATHLEEN SMITH

DATED: ______________, 2022

______________________________
MATTHEW DOWNING

DATED: ______________, 2022

KEURIG GREEN MOUNTAIN, INC.

______________________________
BY: ANTHONEY SHOEMAKER
Chief Legal Officer, General Counsel and Secretary

DATED: ______________, 2022

LEXINGTON LAW GROUP

______________________________
HOWARD HIRSCH
Attorneys for Plaintiffs and the Class

DATED: 2/23, 2022

LAW OFFICE OF GIDEON KRACOV

______________________________
GIDEON KRACOV
Attorneys for Plaintiffs and the Class

DATED: ______________, 2022

SHAPIRO HABER & URMY, LLP

______________________________
EDWARD F. HABER
Attorneys for Plaintiffs and the Class

IN WITNESS WHEREOF, the parties hereto have executed this Stipulation of Settlement as of the dates set forth below.

DATED: _______________, 2022

_______________________________________
KATHLEEN SMITH

DATED: _______________, 2022

_______________________________________
MATTHEW DOWNING

DATED: _______________, 2022

KEURIG GREEN MOUNTAIN, INC.

_______________________________________
BY: ANTHONEY SHOEMAKER
Chief Legal Officer, General Counsel and Secretary

DATED: _______________, 2022

LEXINGTON LAW GROUP

_______________________________________
HOWARD HIRSCH
Attorneys for Plaintiffs and the Class

DATED: ____________, 2022

LAW OFFICE OF GIDEON KRACOV

_______________________________________
GIDEON KRACOV
Attorneys for Plaintiffs and the Class

DATED: 2-24-22, 2022

SHAPIRO HABER & URMY, LLP

_______________________________________
EDWARD F. HABER
Attorneys for Plaintiffs and the Class

DATED: FEB 24, 2022

DORSEY & WHITNEY LLP

CREIGHTON R. MAGID
Attorneys for Defendant KEURIG GREEN MOUNTAIN, INC.

## LIST OF EXHIBITS

A. Order re: Preliminary Approval of Class Action Settlement

B. Publication Notice

C. Email Notice

D. Notice Plan

E. Notice of Class Action Settlement

F. Claim Form

G. Final Settlement Order and Judgment

H. Sample Product Label

I. Non-Exclusive Product List

J. Request for Exclusion Form

# Exhibit A

**EXHIBIT [A]**

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KATHLEEN SMITH, on behalf of herself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KEURIG GREEN MOUNTAIN, INC.,<br><br>Defendant. | Case No. 4:18-cv-06690-HSG<br><br><u>CLASS ACTION</u><br><br>[PROPOSED] ORDER PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT, CONDITIONALLY CERTIFYING THE SETTLEMENT CLASS, PROVIDING FOR NOTICE AND SCHEDULING ORDER |

WHEREAS, Plaintiff Kathleen Smith; Defendant Keurig Green Mountain, Inc.; and Matthew Downing, Plaintiff in the related matter of *Downing v. Keurig Green Mountain, Inc.*, Case No. 1:20-cv-11673, venued in the United States District Court for the District of Massachusetts, have entered into a Stipulation of Settlement, filed February 24, 2022, after arms-length settlement discussions conducted in good faith with the assistance of the Honorable Morton Denlow (Ret.);

WHEREAS, the Court has received and considered the Stipulation, including the accompanying exhibits;

WHEREAS, the Parties have made an application for an order preliminarily approving the settlement of this Action, conditionally certifying the settlement class, providing for notice and scheduling order, and for its dismissal with prejudice upon the terms and conditions set forth in the Stipulation; and

WHEREAS, the Court has reviewed the Parties' application for such order, and has found good cause for same.

NOW, THEREFORE, IT IS HEREBY ORDERED:

**A. The Settlement Class Is Conditionally Certified.**

1. Pursuant to Federal Rule of Civil Procedure 23, the Court, subject to this Court's final approval of the Settlement, hereby amends the class previously certified by order dated September 21, 2020 and certifies the following Class for settlement purposes only:

> All Persons in the United States who purchased the Challenged Products[1] for personal, family or household purposes within the Class Period. Specifically excluded from the Class are (a) Defendant, (b) Defendant's Affiliates, (c) the officers, directors, or employees of Defendant and its Affiliates and their immediate family members, (d) any legal representative, heir, or assign of Defendant, (e) all federal court judges who have presided over this Action and their immediate family members; (f) the Hon. Morton Denlow (Ret.) and his immediate family members; (g) all persons who submit a valid and timely Request for Exclusion from the Class; and (h) those who purchased the Challenged Products for the purpose of resale.

---

[1] All capitalized terms herein shall have the same meanings as set forth in the Stipulation unless otherwise specifically defined.

2. Keurig Green Mountain Inc., for settlement purposes only and subject to this Court's final approval of the Settlement, hereby consents to the addition of Matthew Downing as a Plaintiff in the Action.

3. With respect to the Class and for settlement purposes only, the Court preliminarily finds the prerequisites for a class action under Federal Rules of Civil Procedure 23(b)(2) and (b)(3) have been met, including: (a) numerosity; (b) commonality; (c) typicality; (d) adequacy of the class representatives and Class Counsel; (e) that Defendant has acted on grounds that apply generally to the Class, such that final injunctive relief is appropriate respecting the Class as a whole; (f) predominance of common questions of fact and law among the Class; and (g) superiority.

4. Pursuant to Federal Rule of Civil Procedure 23, the Court hereby appoints the Plaintiffs Kathleen Smith and Matthew Downing, as the class representatives.

5. Having considered the factors set forth in Federal Rule of Civil Procedure 23(g)(1), the Court hereby appoints, subject to this Court's final approval of the Settlement and for settlement purposes only, the Lexington Law Group and Shapiro Haber & Urmy as Class Counsel.

**B. The Stipulation Is Preliminarily Approved and Final Approval Schedule Set.**

6. The Court hereby preliminarily approves the Stipulation and the terms and conditions of settlement set forth therein, subject to further consideration at the Final Approval Hearing described below.

7. The Court has conducted a preliminary assessment of the fairness, reasonableness, and adequacy of the Stipulation, and hereby finds that the settlement falls within the range of reasonableness meriting possible final approval. The Court therefore preliminarily approves the proposed settlement as set forth in the Stipulation.

8. Pursuant to Federal Rule of Civil Procedure 23(e), the Court will hold a Final Approval Hearing on _______________, at ______ a.m./p.m., in the Courtroom of the Honorable Haywood S. Gilliam, Jr., United States District Court for the Northern District of California,

Oakland Courthouse, Courtroom 2 - 4th Floor, 1301 Clay Street, Oakland, CA 94612, or by telephone conference or Zoom, for the following purposes:

(a) finally determining whether the Class meets all applicable requirements of Federal Rule of Civil Procedure 23 and, thus, the Class should be certified for purposes of effectuating the settlement;

(b) determining whether the proposed settlement of the Action on the terms and conditions provided for in the Stipulation is fair, reasonable and adequate and should be approved by the Court;

(c) considering the application of Class Counsel for an award of attorneys' fees and reimbursement of expenses, as provided for under the Stipulation;

(d) considering the applications of Plaintiffs for class representative incentive awards, as provided for under the Stipulation;

(e) considering whether the Court should enter the [Proposed] Final Settlement Order and Judgment;

(f) considering whether the release of the Released Claims as set forth in the Stipulation should be provided; and

(g) ruling upon such other matters as the Court may deem just and appropriate.

9. The Court may adjourn the Final Approval Hearing and later reconvene such hearing without further notice to Class Members.

10. The Parties may further modify the Stipulation prior to the Final Approval Hearing so long as such modifications do not materially change the terms of the settlement provided thereunder. The Court may approve the Stipulation with such modifications as may be agreed to by the Parties, if appropriate, without further notice to Class Members.

11. Any application for an award of attorneys' fees and expenses and/or class representative incentive awards must be filed with the Court and served at least forty days prior to the Final Approval Hearing.

12. All papers in support of the settlement, other than the application for an award of attorneys' fees and expenses and/or class representative incentive awards, must be filed with the Court and served at least seven days prior to the Final Approval Hearing.

**C. The Court Approves the Form and Method of Class Notice.**

13. The Court approves, as to form and content, the proposed Publication Notice, Email Notice and Class Notice (collectively the "Notice"), which are Exhibits C, D and F, respectively, to the Stipulation.

14. The Court finds that the distribution of Notice substantially in the manner and form set forth in the Stipulation meets the requirements of Federal Rule of Civil Procedure 23 and due process, is the best notice practicable under the circumstances, and shall constitute due and sufficient notice to all persons entitled thereto.

15. The Court approves the designation of the Kroll Business Services to serve as the Court-appointed Claim Administrator for the settlement. The Claim Administrator shall cause the Publication Notice to be published, disseminate the Email Notice and Class Notice, and supervise and carry out the notice procedure, the processing of claims, and other administrative functions, and shall respond to Class Member inquiries, as set forth in the Stipulation and this Order under the direction and supervision of the Court.

16. The Court directs the Claim Administrator to establish a Settlement Website, making available copies of this Order, Class Notice, Claim Forms that may be downloaded and submitted online, by mail, or by facsimile, the Stipulation and all Exhibits thereto, a toll-free hotline, and such other information as may be of assistance to Class Members or required under the Stipulation. The Class Notice shall be made available to Class Members through the Settlement Website on the date Publication Notice is first published and continuously thereafter until the end of the Claim Submission Period. Class Counsel shall also place a link to the Settlement Website on Class Counsels' Internet websites for a period starting from the date the Publication Notice is published through no longer than the end of the Claim Submission Period.

17. The Claim Administrator is ordered to commence publication of the Publication Notice at least 90 days before the Final Approval Hearing.

18. The costs of Notice, processing of claims of Class Members, creating and maintaining the Settlement Website, and all other Claim Administrator and Notice expenses shall be paid from the Cash Payment Account in accordance with the applicable provisions of the Stipulation.

**D. Procedure for Class Members to Participate in the Settlement.**

19. The Court approves the Parties' proposed Claim Form. Any Class Member who wishes to participate in the settlement shall complete a Claim Form in accordance with the instructions contained therein and submit it to the Claim Administrator prior to the end of the Claim Submission Period, which date will be specifically identified in the Claim Form. Such deadline may be further extended without notice to the Class by written agreement of the Parties.

20. The Claim Administrator shall have the authority to accept or reject claims in accordance with the Stipulation.

21. Any Class Member may enter an appearance in the Action, at his or her own expense, individually or through counsel who is qualified to appear in the jurisdiction. All Class Members who do not enter an appearance will be represented by Class Counsel.

**E. Procedure for Requesting Exclusion from the Class.**

22. All Class Members who do not timely exclude themselves from the Class shall be bound by all determinations and judgments in the Action concerning the settlement, whether favorable or unfavorable to the Class.

23. Any person or entity falling within the definition of the Class may, upon his, her or its request, be excluded from the Class. Any such person or entity must submit a request for exclusion to the Class Action Administrator, with a copy to Class Counsel and Defendant's Counsel, postmarked or delivered no later than 30 days prior to the date of the Final Approval Hearing, the date for which will be specifically identified in the Publication Notice and Class

Notice. Requests for exclusion purportedly filed on behalf of groups of persons or entities are prohibited and will be deemed to be void.

24. Any Class Member who does not send a signed request for exclusion postmarked or delivered on or before the time period described above will be deemed to be a Class Member for all purposes and will be bound by all judgments and further orders of this Court related to the Stipulation of Settlement of this Action and by the terms of the Stipulation, if finally approved by the Court. The written request for exclusion must include all information required by the Request for Exclusion Form and be signed by the potential Class Member. All persons or entities who submit valid and timely requests for exclusion in the manner set forth in the Stipulation shall have no rights under the Stipulation and shall not be bound by the Stipulation or the Final Judgment and Order.

25. A list reflecting all requests for exclusions shall be filed with the Court by the parties at or before the Final Approval Hearing.

**F. Procedure for Objecting to the Settlement**

26. Any Class Member who desires to object either to the settlement, application for attorneys' fees and expenses, or class representative incentive awards must timely file with the Clerk of this Court and timely serve on the Parties' counsel and the Claim Administrator by hand or first-class mail a notice of the objection(s) and the grounds for such objections, together with all papers that the Class Member desires to submit to the Court no later than 45 days prior to the date of the Final Approval Hearing, the date for which will be specifically identified in the Publication Notice and Class Notice. The Court will consider such objection(s) and papers only if such papers are timely received by the Clerk of the Court and by Class Counsel and by Defendant's Counsel. All objections must: (a) reference the name of the Action, "Smith v. Keurig Green Mountain, Inc., Case No. 4:18-CV-06690," (b) include the Class Member's name, current postal address, current telephone number, and any email address; (b) demonstrate their standing (i.e. membership in the Class), including information required by the Claim Form; (c) include a written statement of all grounds for the Class Member's objection, along with any legal support

on which the objection is based or on which the person objecting intends to rely; (d) state whether the Class Member and/or the Class Member's lawyer intends to appear at the Final Approval Hearing and (e) a detailed list of any other objections submitted by the Class Member, or Class Member's counsel, to any class actions submitted in any court, whether state or otherwise, in the United States in the previous five (5) years. If the Class Member or Class Member's counsel has not objected to any other class action settlement in any court in the United States in the previous five (5) years, the Class Member shall affirmatively state so in the written materials provided in connection with the objection. Plaintiff or Defendant may seek the Court's approval, prior to the Final Approval Hearing, to take a deposition of any Class Member who submits a timely written objection.

27. Attendance at the Final Approval Hearing is not necessary; however, any Class Member wishing to be heard orally with respect to approval of the settlement, the applications for attorneys' fees and reimbursement of expenses, or the application for class representative incentive awards are required to provide written notice of their intention to appear at the Final Approval Hearing no later than 30 days prior to the date of the Final Approval Hearing, which date will be specifically identified in the Class Notice. Class Members who do not oppose the settlement, the applications for attorneys' fees and expenses, or class representative incentive awards need not take any action to indicate their approval. A Class Member's failure to submit a written objection in accordance with the procedure set forth in the Class Notice waives any right the Class Member may have to object to the settlement, attorneys' fees and expenses, or class representative incentive awards, to appear at the Final Approval Hearing, or to appeal or seek other review of the Final Judgment and Order.

IT IS SO ORDERED.

DATED: ______________________

______________________________
HONORABLE HAYWOOD S. GILLIAM, JR.
UNITED STATES DISTRICT COURT JUDGE

# Exhibit B

**EXHIBIT B**

# LEGAL NOTICE

## IF YOU PURCHASED K CUP® SINGLE SERVE COFFEE PODS LABELED AS RECYCLABLE Between June 8, 2016 and [Date of Publication Notice], 2022, You Could Get Money from a Settlement.

### What Is This Lawsuit About?

A proposed settlement has been reached in a lawsuit known as *Smith v. Keurig Green Mountain, Inc.* Case No. 4:18-CV-06690-HSG, in United States District Court for the Northern District of California (the "Action").

The Plaintiff in the lawsuit claims that K Cup® single serving coffee pods were labeled as being recyclable when they were not widely recyclable. Keurig denies any wrongdoing but has agreed to a settlement to avoid the expense of continued litigation.

### Who is a Settlement Class Member?

You are a Settlement Class Member if you purchased K Cup® single serving coffee pods labeled as recyclable in the United States for personal, family or household purposes between June 8, 2016 and [Date of Publication Notice], 2022. Excluded from eligible Class Members are (a) Keurig, (b) Keurig's Affiliates, (c) the officers, directors, or employees of Keurig and its Affiliates and their immediate family members, (d) any legal representative, heir, or assign of Keurig, (e) all federal court judges who have presided over this Action and their immediate family members; (f) the Hon. Morton Denlow (Ret.) and his immediate family members; (g) all persons who submit a valid and timely Request for Exclusion from the Class; and (h) those who purchased K Cup® single serving coffee pods labeled as recyclable for the purpose of resale.

### What does the Settlement Provide?

(1) The settlement provides $10 million to pay valid claims (along with claims administrator costs, attorney fees and costs, and class representative awards) as follows: With Proof of Purchase: You can get $3.50 per 100 pods, or $0.35 per 10 pods, up to $36.00 maximum per household, or you can get $6.00 minimum per household regardless of quantity purchased. Without Proof of Purchase: You can get $5.00 per household from the Settlement. In each case, you must submit a valid Claim Form by [**Month 00, 2022]**. The actual amount received may vary based on the total number of claims filed.

(2) Keurig also agrees to include the following qualifying statement, clearly and prominently, when it makes any recycling representation in connection with selling the pods: "Check Locally – Not Recycled in Many Communities."

### What are Your Rights?

**Do Nothing**: If you do nothing, you stay in the Settlement, but get no money, and you give up the right to sue over the claims in this settlement.

**File a Claim**: You must submit a valid Claim Form by [**Month 00, 2022]** to get money from the Settlement.

**Exclude Yourself:** You can exclude yourself from the Settlement and keep your right to sue about the claims in this lawsuit, but you will not get any money. Exclusion requests must be received by [**Month 00, 2022]**.

**Object:** You remain in the Settlement, but you tell the Court why you think the Settlement should not be approved. Objections must be submitted by [**Month 00, 2022**. Details on how to object are on the website.

A Final Approval Hearing will be held on [**Month 00, 2022]** at [**00:00 x.m.]** at Courtroom __ of the United States Courthouse, 1301 Clay Street, Oakland, California, to consider approval of the Settlement, a payment up to a total of $3,000,000 for Class Counsel for attorneys' fees, plus Class Counsel's expenses, and Class Representative

**EXHIBIT B**

incentive awards not to exceed $5,000 for Plaintiff Smith and $1,000 to Plaintiff Downing. All motions filed by Class Counsel will be available on the website. You may appear at the hearing, but you do not need to.

**This is only a summary.** More details about the Proposed Settlement and instructions on how to file a claim, object, or exclude yourself are available at **www.kcupsrecyclingsettlement.com** or by calling **1-000-000-0000.**

# Exhibit C

**EXHIBIT C**

TO:
FROM:
SUBJECT: Notice of K Cup® Single Serve Coffee Pods Settlement

---

**IF YOU PURCHASED K CUP® SINGLE SERVE COFFEE PODS LABELED AS RECYCLABLE Between June 8, 2016 and [Date of Publication Notice], 2022, You Could Get Money from a Settlement.**

**What Is This Lawsuit About?**
A proposed settlement has been reached in a lawsuit known as *Smith v. Keurig Green Mountain, Inc.* Case No. 4:18-CV-06690-HSG in United States District Court for the Northern District of California.

The Plaintiff in the lawsuit claims that K Cup® single serving coffee pods were labeled as being recyclable when they were not widely recyclable. Keurig denies any wrongdoing but has agreed to a settlement to avoid the expense of continued litigation.

**Who is a Settlement Class Member?**
You are a Settlement Class Member if you purchased K Cup® single serving coffee pods labeled as recyclable in the United States for personal, family or household purposes between June 8, 2016 and [Date of Publication Notice], 2022. Excluded from eligible Class Members are (a) Defendant Keurig, (b) Defendant Keurig's Affiliates, (c) the officers, directors, or employees of Defendant Keurig and its Affiliates and their immediate family members, (d) any legal representative, heir, or assign of Defendant Keurig, (e) all federal court judges who have presided over this Action and their immediate family members; (f) the Hon. Morton Denlow (Ret.) and his immediate family members; (g) all persons who submit a valid and timely Request for Exclusion from the Class; and (h) those who purchased K Cup® single serving coffee pods labeled as recyclable for the purpose of resale.

**What does the Settlement Provide?**

(1) The settlement provides $10 million to pay valid claims (along with claims administrator costs, attorney fees and costs, and class representative awards) as follows: With Proof of Purchase: You can get $3.50 per 100 pods, or $0.35 per 10 pods, up to $36.00 maximum per household, or you can get $6.00 minimum per household regardless of quantity purchased. Without Proof of Purchase: You can get $5.00 per household from the Settlement. In each case, you must submit a valid Claim Form by [**Month 00, 2022]**. The actual amount received may vary based on the total number of claims filed.

(2) Keurig also agrees to include the following qualifying statement, clearly and prominently, when it makes any recycling representation in connection with selling the pods: "Check Locally – Not Recycled in Many Communities."

**What are Your Rights?**
**Do Nothing**: If you do nothing, you stay in the Settlement, but get no money, and you give up the right to sue over the claims in this settlement.

**File a Claim**: You must submit a valid Claim Form by [**Month 00, 2022]** to get money from the Settlement.

**Exclude Yourself:** You can exclude yourself from the Settlement and keep your right to sue about the claims in this lawsuit, but you will not get any money. Exclusion request must be received by [**Month 00, 2022]**.

**Object:** You remain in the Settlement, but you tell the Court why you think the Settlement should not be approved. Objections must be submitted by [**Month 00, 2022]**.

**EXHIBIT C**

A Final Approval Hearing will be held on [**Month 00, 2022]** at [**00:00 x.m.]** at Courtroom __ of the United States Courthouse, 1301 Clay Street, Oakland, California, to consider approval of the Settlement, a payment up to a total of $3,000,000 for Class Counsel for attorneys' fees , plus Class Counsel's expenses, and Class Representative incentive awards not to exceed $5,000 for Plaintiff Smith and $1,000 to Plaintiff Downing. All motions filed by Class Counsel will be available on the website. You may appear at the hearing, but you do not need to.

**This is only a summary.** More details about the Proposed Settlement and instructions on how to file a claim, object, or exclude yourself are available at **www.WEBSITE.com** or by calling **1-000-000-0000.**

###

# Exhibit D

**EXHIBIT D**

**Notice Plan**

**1.** **Settlement Website:** A website regarding this action (www.kcupsrecyclingsettlement.com) will be established in February 2022 by the Claim Administrator to facilitate class claims and the disbursement of settlement funds. Within 30 days following entry of the Preliminary Approval Order, the following Settlement documents will be posted on the website: (1) the Publication Notice; (2) a list of frequently asked questions and answers; (3) key deadlines; (4) downloadable copies of orders of the Court and other pleadings pertaining to the settlement; (5) a downloadable copy of the Stipulation of Settlement; (6) a downloadable copy of the Class Notice and Claim Form; (7) information about how to contact the Claim Administrator via a toll-free number, via email and mail; and (8) other information required for Class Members to file a claim. The Settlement Website will be maintained until the end of the Claim Submission Period. The relevant settlement documents will also be posted on Class Counsel's websites (www.lexlawgroup.com and www.shulaw.com) until the end of the Claim Submission Period.

**2.** **Toll-Free Telephone Support:** Within 30 days following entry of the Preliminary Approval Order, a toll-free telephone support system will be established by the Claim Administrator that will provide Class Members with: (1) general information about the settlement; (2) frequently asked questions and answers, as agreed by the Parties; and (3) the ability to request a Class Notice and Claim Form. The toll-free telephone support system will also include the option to reach a live operator. The telephone support system will be maintained until 101 days after entry of Final Settlement Order and Judgment.

**3.** **CAFA Notice:** The Claim Administrator will provide notice of the terms of the Stipulation of Settlement and other information to the appropriate federal official and state official in each State within 10 days after the Stipulation of Settlement is filed with the Court for preliminary approval as required by the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (2005) ("CAFA").

**4.** **Published Notice:** As soon as reasonably practicable following entry of the Preliminary Approval Order, and at least 90 days before the Final Approval Hearing, the Claim Administrator will provide notice of the settlement by a full-page advertisement in the national edition of People magazine. The Claim Administrator will also publish a summary notice in a California edition of USA Today once a week for four weeks, in compliance with California's Consumer Legal Remedies Act, Civil Code § 1750, et seq. The notices will direct Class Members to the Settlement Website and the toll-free telephone number referenced above. The specific language of these notices will be substantially as set forth in Exhibit C to the Stipulation of Settlement.

**5.** **Email Notice.** At least 90 days before the Final Approval Hearing or some other date set by the Court, the Claim Administrator will provide Email Notice to those Class

Members who were direct purchasers of the Challenged Products from Keurig.com during the Class Period.

**6.** **PR Newswire Press Release:** Within thirty (30) days following entry of the Preliminary Approval Order, the Claim Administrator will issue via PR Newswire a press release in English and Spanish targeting potential Class Members. The press release will direct Class Members to the Settlement Website and the toll-free telephone number referenced above.

**7.** **Internet and Mobile Media Advertisements:** Within thirty (30) days following entry of the Preliminary Approval Order, the Claim Administrator will place internet advertisements in English and Spanish targeting potential Class Members on Multiple Inventory Exchanges, Google Ads, Facebook, Instagram, and Twitter. The advertisements will continue for a period of approximately thirty (30) days. The internet and mobile advertisements will direct Class Members to the Settlement Website and the toll-free telephone number referenced above.

# Exhibit E

**EXHIBIT E**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# IF YOU PURCHASED K CUP® SINGLE SERVE COFFEE PODS LABELED AS RECYCLABLE YOU MAY BE ENTITLED TO MONEY AND OTHER BENEFITS

THIS NOTICE AFFECTS YOUR RIGHTS.

*A Federal Court authorized this notice.*
*This is not a solicitation from a lawyer.*

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| SUBMIT A CLAIM FORM | The only way to get a cash payment. |
| EXCLUDE YOURSELF | Get no settlement benefits. Remove yourself from both the settlement and the lawsuit. |
| OBJECT | Write to the Court about why you don't like the settlement. |
| DO NOTHING | Get no cash payment. Give up your rights. |

Please read this entire Class Notice carefully.

Your rights and options – **and the deadlines to exercise them** – are explained in this Notice.

**WHAT IS THIS LAWSUIT ABOUT?**

A proposed settlement has been reached in a class action lawsuit about the labeling and advertising of K Cup® single serving coffee pods labeled as recyclable. The plaintiffs in the lawsuit assert that the packaging and advertising for these products misled consumers to believe that the Products were widely recyclable. Defendant Keurig Green Mountain, Inc. ("Keurig") denies all the plaintiffs' allegations and is entering into this settlement to avoid burdensome and costly litigation. The settlement is not an admission of wrongdoing. The court has not decided who is right and who is wrong.

**WHO IS INCLUDED IN THE SETTLEMENT CLASS?**

You may be a member of the Class if you purchased K Cup® single serving coffee pods labeled as recyclable in the United States for personal, family or household purposes during the time period from June 8, 2016 through the date the notice to the Class is first published. The K Cup® single serve coffee pods labeled as recyclable at issue in the litigation, are referred to as the "Challenged Products."

The following persons are excluded from the settlement class: (a) Keurig; (b) Keurig's Affiliates (as further defined in the Settlement), (c) the officers, directors, or employees of Keurig and its Affiliates and their immediate family; (d) any legal representative, heir, or assign of Keurig; (e) all federal court judges who have presided over this Action and their immediate family; (f) the Hon. Morton Denlow (Ret.) and his immediate family members; (g) all persons who submit a valid and timely Request for Exclusion from the Class; and (h) those who purchased the Challenged Products for the purpose of resale.

## THE SETTLEMENT BENEFITS – WHAT YOU MAY GET

INJUNCTIVE RELIEF

Keurig shall not represent that K Cup® pods are recyclable without clearly and prominently include the following qualifying statement: "Check Locally – Not Recycled in Many Communities." Keurig must also increase the font size of its qualifying statement on all labels and packaging.

CASH PAYMENTS AND COUPONS FROM THE CLAIM PROCESS

Keurig shall pay a total of $10 million in cash for payment of approved Class Member claims, certain notice and administrative costs, incentive awards to the named plaintiffs, and attorneys' fees and costs. If you purchased one or more Challenged Products, you are eligible to receive a cash payment. The amount to which you may be eligible will depend on the statements in your Claim Form. Details are provided below.

## HOW YOU GET SETTLEMENT BENEFITS – SUBMITTING A CLAIM FORM

HOW CAN I RECEIVE BENEFITS UNDER THE SETTLEMENT?

You must return a Claim Form to receive a cash payment under the settlement. A copy of the Claim Form is included in this Notice Package. Claim Forms are also available at www.kcupsrecyclingsettlement.com or by calling 1-800-xxx-xxxx.

HOW MUCH WILL I RECEIVE?

**Cash Payments**

**A. No Proof of Purchase – $5.00 per Household**

If you elect to receive the cash payment and do not have any proof of purchase, such as a receipt, you may be eligible to receive $5.00 per household.

**B. With Proof of Purchase – $36.00 Maximum Payment**

If you elect to receive the cash payment and have proof of purchase, you are eligible to receive $3.50 per 100 pods purchased (35 cents per 10 pods). The maximum cash payment is $36.00 per household and the minimum total payment is $6.00 if you have proof of purchase for your purchases.

## DO I NEED TO HAVE MY RECEIPTS TO PARTICIPATE IN THE SETTLEMENT?

You do **not** need to submit proof of purchase if you are submitting a claim for Challenged Products. However, you may be eligible to receive up to $31.00 more in cash than the $5.00 minimum if you have proof of purchase, such as receipts, email or order or shipping confirmations.

## HOW DO I SEND IN A CLAIM?

The Claim Forms are simple and easy to complete.

The Claim Form requires that you provide:

- Your name, mailing address, and other contact information; AND
- The approximate number of pods that you purchased, the particular pods you purchased, and the approximate date(s) within the class period when you purchased the pods; AND
- Your signature, under penalty of perjury, confirming that the information provided is true and correct; AND
- Provide a receipt or receipts showing each Challenged Product purchase on which the claim is based, or other similar documentation that reflects an eligible purchase (i.e., email order or shipping confirmations).

***Please return a Claim Form if you think that you have a claim. Returning a Claim Form is the only way to receive a payment from this settlement. No claimant or household may submit more than one Claim Form, and two or more claimants may not submit Claim Forms for the same alleged purchases or household.***

The Claim Administrator may request additional information if the Claim Form is insufficient to process your claim. Failure to provide any requested documentation may result in the denial of your claim and may limit the type of remedy you receive.

## WHEN IS THE CLAIM FORM DUE?

You must file your claim, so that it is postmarked or submitted online by 11:59 p.m. Pacific time, no later than [30 days after the Final Approval Hearing], 2022.

## WHO DECIDES MY CLAIM?

The Claim Forms will be reviewed by an independent Claim Administrator according to criteria agreed to by the parties.

The Claim Administrator may contact you or other persons listed in your Claim Form if he or she needs additional information or otherwise wants to verify information in your Claim Form.

The Claim Administrator's determination is final. Neither you nor Keurig can appeal or contest the decision of the Claim Administrator.

WHEN WOULD I GET MY PAYMENT?

The Court will hold a hearing on ________ to decide whether to approve the settlement. If the Court approves the settlement, after that there may be appeals. It is always uncertain how long these appeals will take to resolve, but resolving them can take more than a year. If there are no appeals or other delays, you should be sent your cash payment by the Claim Administrator in approximately ____________.

WHAT IF THE FUND IS TOO SMALL? TOO LARGE?

If the total amount of cash claims, certain notice and administrative costs, incentive awards to the named plaintiffs, and attorneys' fees and costs exceeds the cash balance, all approved claims for cash payments will be reduced pro rata, based on the respective dollar amounts of the approved claims, until the total aggregate of approved claims equals the cash balance.

If, after everyone sends in Claim Forms, the total of all approved claims, certain notice and administrative costs, incentive awards to the named plaintiffs, and attorneys' fees and costs are *less than* the cash balance, the unused money will be donated to the Ocean Conservancy (75%) and Consumer Reports, Inc. (25%), nonprofit foundations that will donate the funds to charitable organizations that best serve the needs of the Class. Such funds will not be returned to Keurig.

WHAT HAPPENS IF I DO NOTHING AT ALL?

You ***must*** return a Claim Form to receive any payment. If you do nothing, you will get no money from the settlement. But, unless you exclude yourself, you will not be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against Keurig or any affiliated entities about the legal issues in this case.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

HOW DO I GET OUT OF THE SETTLEMENT?

If you do not wish to be included in the Class and receive settlement benefits, you must send a written request stating that you want to be excluded from this lawsuit. In order for your exclusion request to be valid, it must: (1) contain your name, current postal address, current telephone number, any email address, and your original signature; (b) reference the name of the Action, "*Smith v. Keurig Green Mountain, Inc.*, Case No. 4:18-CV-06690-HSG;" and (c) be postmarked no later than 45 days prior to the Final Approval Hearing and mailed to:

**Keurig K Cup® Pods Class Settlement**
**Claims Administrator**
**XXX**
**P.O. Box XXXX**
**XXX**

If you asked to be excluded, you will not get any settlement payment, and you cannot object to the settlement. You will not be legally bound by anything that happens in this lawsuit. You may be able to sue (or continue to sue) Keurig or any affiliated entity in the future.

If you have a pending lawsuit against Keurig, speak to your lawyer immediately. You may need to exclude yourself from this lawsuit in order to continue your own lawsuit. Remember, the exclusion deadline is [45 days prior to Final Approval Hearing date].

## THE LAWYERS REPRESENTING YOU

DO I HAVE LAWYERS IN THIS CASE?

The Court appointed the Lexington Law Group [and Shapiro Haber & Urmy] to represent you and other Class Members. These lawyers are called Class Counsel. If you want to be represented by your own lawyer, you may hire one at your own expense.

HOW WILL THE LAWYERS BE PAID?

Class Counsel will ask the Court to award them attorneys' fees and expenses. Class Counsel will make an application to the Court for an amount up to $3,000,000 in attorneys' fees, plus their out-of-pocket expenses.

One of the named plaintiffs, Kathleen Smith, will also ask the Court to award her an amount not to exceed $5,000 for her extensive time and effort acting as plaintiff and for her willingness to bring this litigation and act on behalf of consumers. One of the named plaintiffs, Matthew Downing, will ask the Court to award him an amount not to exceed $1,000 for his time and effort acting as a plaintiff and for his willingness to bring this litigation and act on behalf of consumers. These amounts, if approved by the Court, will be paid from the Claim Fund.

The costs to administer the settlement, to review Claim Forms, and notify Class Members about this settlement will be paid out of the Claim Fund. These costs shall not exceed $500,000.

## OBJECTING TO THE SETTLEMENT

HOW DO I TELL THE COURT THAT I DO NOT LIKE THE SETTLEMENT?

If you are a Class Member, you can object to the settlement if you do not like any part of it and the Court will consider your views. In order for your objection to be valid, you must send a letter to the Court and the parties and it must (a) reference the name of the Action, "*Smith v. Keurig Green Mountain, Inc.*, Case No. 4:18-CV-06690-HSG (N.D. California)"; (b) your name, current postal address, current telephone number, and any email address; and if represented by counsel, the name and email address of your counsel; (c) a written statement of all grounds for the objection, accompanied by any legal support for such objection; (d) whether you intend to appear at the Final Approval Hearing, either with or without counsel; (e) contain *a statement under penalty of perjury that you purchased Keurig K Cup® Pods labeled as "Recyclable" that are at issue in the litigation in the United States during the during the time period of June 8, 2016 through [Date of Notice], including all other information required in a Claim Form*; and (f) a detailed list of any other objections submitted by you, or your counsel, to any class actions submitted in any court in the United States in the past five (5) years. If you or your counsel have not objected to any other class action settlement in the United States in the past five (5) years, you must state so. This objection ***must be postmarked*** no later than [45 days prior to the Final Approval Hearing date]. Send your objection to:

Clerk of the Court
United States District Court
Northern District of California (Oakland Division)
1301 Clay Street
Oakland, CA 94612

WHAT IS THE DIFFERENCE BETWEEN OBJECTING AND EXCLUDING?

Objecting is telling the Court that you do not like something about the settlement. You can object only if you stay in the Class. Excluding yourself is telling the Court that you do not want to be part of the Class or the lawsuit. You cannot request exclusion **and** object to the settlement. If you exclude yourself, you have no basis to object because the case no longer affects you.

## RELEASE OF CLASS MEMBERS' CLAIMS AND DISMISSAL OF LAWSUIT

### IN RETURN FOR THESE SETTLEMENT BENEFITS, WHAT AM I GIVING UP?

If the Court approves the proposed settlement and you do not request to be excluded from the Class, you must release (give up) all claims that are subject to the Released Claims, and the case will be dismissed on the merits and with prejudice. The Released Claims include all claims that were or could have been raised based on the facts alleged in the lawsuit. A copy of the release is attached to this notice as Exhibit 1. **If you remain in the Class, you may not assert any of those claims in any other lawsuit or proceeding. This includes any other lawsuit or proceeding already in progress.**

## THE FINAL APPROVAL HEARING

### WHEN AND WHERE WILL THE COURT DECIDE WHETHER TO APPROVE THE SETTLEMENT?

The Judge will hold a Final Approval Hearing at ___ on ______ at the United States District Court for the Northern District of California 1301 Clay Street, Oakland, CA 94612, in Courtroom 2 on the 4th Floor (but may be held by Zoom or teleconference). At this hearing, the Judge will consider whether the settlement is fair, reasonable and adequate. If there are objections, the Judge will consider them. The Judge will listen to Class Members who have asked to speak at the hearing. Any Class Member wishing to be heard orally with respect to approval of the settlement are required to provide written notice of their intention to appear at the Final Approval Hearing no later than [30 days prior to the date of the Final Approval Hearing.]

After the hearing, the Judge will decide whether to approve the settlement. We do not know how long this decision will take.

### DO I HAVE TO COME TO THE HEARING?

No. Class Counsel will answer questions the Judge may have. But, you are welcome to come at your own expense. If you submit an objection, you do not have to come to the Court to talk about it. As long as you delivered your written objection on time, the Judge will consider it. You may also pay your own lawyer to attend, but it is not necessary.

## GETTING MORE INFORMATION

### ARE THERE MORE DETAILS ABOUT THE SETTLEMENT?

This Notice summarizes the proposed settlement. More details are in the Stipulation of Settlement. You can get a copy of the Stipulation of Settlement by writing to **K Cup® Single Serve Coffee Pod Class Settlement, Claims Administrator, XXXX** or on the internet at www.kcupsrecyclingsettlement.com.

If you have questions about how to complete a Claim Form, you can call the Claim Administrator at ___________. You can also contact attorneys for the class at www.lexlawgroup.com.

| | |
|---|---|
| **PLEASE DO NOT CALL OR WRITE TO THE COURT FOR INFORMATION OR ADVICE.** | |
| DATED: ______________________________ | /s/ Hon. Haywood S. Gilliam, Jr. |
| | BY ORDER OF THE U.S. DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA |

**Exhibit 1 – Released Claims**

**[Excerpted from pages 19-21 of the Stipulation of Settlement]**

**RELEASES**

A. As of the Effective Date, and except as to such rights or claims as may be created by this Stipulation, in consideration of the settlement obligations set forth herein, all Releasing Parties, whether individual, class, representative, legal, equitable, administrative, direct or indirect, or any other type or in any other capacity, release and forever discharge all Released Parties from any and all claims, demands, rights, causes of action, suits, petitions, complaints, damages of any kind, liabilities, debts, punitive or statutory damages, penalties, losses, and issues of any kind or nature whatsoever, asserted or unasserted, known or unknown, suspected or unsuspected (including, but not limited to, any and all claims relating to or alleging deceptive or unfair business practices, false or misleading advertising, intentional or negligent misrepresentation, negligence, concealment, omission, unfair competition, promise without intent to perform, unsuitability, unjust enrichment, and any and all claims or causes of action arising under or based upon any statute, act, ordinance, or regulation governing or applying to business practices generally), existing now or in the future, arising out of or related to (1) Recycling Representations made with respect to the Challenged Products prior to the Graphics Transition End Date and/or (2) Settlement Recycling Representations made with respect to the Challenged Products, provided, however, that this release shall not apply to claims or causes of action arising from a final determination or regulation made by a governmental entity pursuant to statute (such as California S.B. 343) that the Challenged Products, polypropylene products, or polypropylene products of the Challenged Products' dimensions (with such dimensions specified by such governmental entity) are not recyclable under such statute and are not otherwise permitted to make a qualified statement substantially similar to the Settlement Recycling Representation. For the purposes of this paragraph, a Recycling Representation shall be considered to have been "made," with respect to printed materials, as of the date of printing.

B. No Released Party that complies with the terms set forth in Section III.A herein shall be liable for another party's failure to comply with such terms, nor shall the failure of any entity to comply with the terms set forth in Section III.A herein void or limit in any way the release provided to the Released Parties that comply with such terms. A Noncompliant Partner Brand shall be solely responsible for the failure of any Noncompliant Partner Brand Products to comply with the terms set forth in Section III.A herein, and Defendant's manufacture, sale or distribution of Noncompliant Partner Brand Products shall not be deemed

noncompliance with the terms set forth in Section III.A herein and shall not void or limit in any way the release otherwise provided to Defendant and the other Released Parties.

C. With respect to the Released Claims, each Class Member shall be deemed to have waived and relinquished, to the fullest extent permitted by law, the provisions, rights and benefits conferred by any law of any state of the United States, or principle of common law or otherwise, which is similar, comparable, or equivalent to section 1542 of the California Civil Code, which provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

The Class Members understand and acknowledge the significance of these waivers of California Civil Code section 1542 and any other applicable federal, state or other statute, case law, rule or regulation relating to limitations on releases. In connection with such waivers and relinquishment, the Class Members acknowledge that they are aware that they may hereafter discover facts in addition to, or different from, those facts that they now know or believe to be true with respect to the subject matter of the Settlement, but that it is their intention to release fully, finally, and forever all Released Claims with respect to the Released Parties, and in furtherance of such intention, the release of the Released Claims will be and remain in effect notwithstanding the discovery or existence of any such additional or different facts.

D. The Parties shall be deemed to have agreed that the release set forth herein will be and may be raised as a complete defense to and will preclude any action or proceeding against any of the Released Parties based on the Released Claims.

E. As of the Effective Date, by operation of entry of judgment, the Released Parties shall be deemed to have fully released and forever discharged Plaintiffs, all other Class Members and Class Counsel from any and all claims of abuse of process, malicious prosecution, or any other claims arising out of the initiation, prosecution, or resolution of the Action, including, but not limited to, claims for attorneys' fees, costs of suit or sanctions of any kind, or any claims arising out of the allocation or distribution of any of the consideration distributed pursuant to this Stipulation of Settlement.

# Exhibit F

# EXHIBIT F

**K CUP® SINGLE SERVE COFFEE PODS LABELED AS RECYCLABLE ("Challenged Products")**

**CLAIM FORM**

**You can also submit online at www.kcupsrecyclingsettlement.com.**

Use this Claim Form to claim refunds of a portion of the purchase price of one or more of the Challenged Products (up to a maximum of **$36 with proof of purchase** or **$5.00** if you do not have proof of purchase information). This Claim Form is only for claims concerning the purchase(s) of Challenged Products set out on the attached list and only for those purchases made in the United States during the time period of June 8, 2016 through the date notice to the class is first published. You cannot use this form to make a claim concerning the purchase(s) of any other products manufactured by Keurig Green Mountain, Inc. or another company. You may submit only one Claim Form per household. A "household" means any number of persons cohabitating and related by blood or marriage in the same dwelling unit or physical address. **All Claim Forms must be postmarked or submitted online by 11:59 p.m. Pacific Time [30 Days after Final Approval Hearing].** If mailing, please return this form to:

Keurig K Cup® Pods Class Settlement
Claims Administrator
XXX Claims Group
P.O. Box XXXX
XXX-XXX

**1. Class Member Information:**

NAME: ______________________________ TELEPHONE OR EMAIL: ______________________

ADDRESS: ____________________________________________________________

CITY: __________________________ STATE: ______________ ZIP CODE: ________________

**2. Payment Options (for more details, please consult the Class Notice, available on website):**

**If you have proof of purchase (in the form of receipts, email orders, or shipping confirmation(s)) for your Challenged Products purchased in the United States between June 8, 2016 through** the date notice to the class is first published**, please check the box below, identify the applicable purchases as noted below, and mail this form along with your proof of purchase to the address above.**

□ Eligible for up to $36 in cash per household with proof of purchase. (Actual amount will be based on $3.50 per 100 pods purchased (35 cents per 10 pods) with a $6.00 minimum).

**Purchases of Challenged Product(s)**:
Product(s):
Number of pods:
Purchase date(s):

---

**If you do *not* have proof of purchase, but purchased Challenged Products in the United States between June 8, 2016 through** the date notice to the class is first published**, please check the box below and mail this form to the address above:**

□ Eligible for up to $5.00 per household without receipts.

**Purchases of Challenged Product(s)**:
Product(s):
Approximate number of pods:
Approximate purchase date(s):

**3. You *must* sign below:**

**28 U.S.C. §1746 AFFIRMATION**

I UNDERSTAND THAT THE DECISION OF THE CLAIM ADMINISTRATOR IS FINAL AND BINDING ON ME AND ON KEURIG.

I SWEAR UNDER PENALTY OF PERJURY THAT THE INFORMATION ON THIS CLAIM FORM IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

SIGNATURE: ______________________________ DATE: ______________________

**CLAIM FORMS MUST BE POSTMARKED OR SUBMITTED ONLINE BY [30 Days prior to Final Hearing].**

**QUESTIONS? VISIT www.kcupsrecyclingsettlement.com OR CALL 1-800-XXX-XXXX.**

# Exhibit G

**EXHIBIT G**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KATHLEEN SMITH and MATTHEW DOWNING, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KEURIG GREEN MOUNTAIN, INC.,<br><br>Defendant. | Case No. 4:18-cv-06690-HSG<br><br><u>CLASS ACTION</u><br><br>**[PROPOSED] FINAL SETTLEMENT ORDER AND JUDGMENT**<br><br>Judge: Hon. Haywood S. Gilliam, Jr. |

IT IS HEREBY ADJUDGED AND DECREED THAT:

1. This Judgment incorporates by reference the definitions in the Stipulation of Settlement dated ____________, 2022 ("Stipulation"), attached as Exhibit A, and all capitalized terms used herein shall have the same meanings as set forth in the Stipulation unless set forth differently herein. The terms of the Stipulation are fully incorporated in this Judgment as if set forth fully here.

2. The Court has jurisdiction over the subject matter of this action and all Parties to the action, including all Class Members who do not timely and validly exclude themselves from the Class. The list of excluded Class Members is attached as Exhibit B.

3. Pursuant to Federal Rule of Civil Procedure 23(b)(3), the Court hereby amends the class previously certified by order dated September 21, 2020 by certifying the following Class:

> All Persons in the United States who purchased the Challenged Products for personal, family or household purposes within the Class Period. Specifically excluded from the Class are (a) Defendant, (b) Defendant's Affiliates, (c) the officers, directors, or employees of Defendant and its Affiliates and their immediate family members, (d) any legal representative, heir, or assign of Defendant, (e) all federal court judges who have presided over this Action and their immediate family members; (f) the Hon. Morton Denlow (Ret.) and his immediate family members; (g) all persons who submit a valid and timely Request for Exclusion from the Class; and (h) those who purchased the Challenged Products for the purpose of resale.

4. Pursuant to Federal Rule of Civil Procedure 23(c)(3), all such persons or entities who satisfy the Class definition above, except those Class Members who timely and validly excluded themselves from the Class, are Class Members bound by this Judgment.

5. For settlement purposes only, the Court finds:

(a) Pursuant to Federal Rule of Civil Procedure 23(a), Kathleen Smith and Matthew Downing are members of the Class, their claims are typical of the Class, and they fairly and adequately protected the interests of the Class throughout the proceedings in the Action. Accordingly, the Court hereby appoints Kathleen Smith and Matthew Downing as class representatives;

(b) The Class meets all of the requirements of Federal Rules of Civil Procedure 23(b)(2) and (b)(3) for certification of the class claims alleged in the First Amended Complaint filed by Kathleen Smith, including: ((a) numerosity; (b) commonality; (c) typicality; (d) adequacy of the class representatives and Class Counsel; (e) that Defendant has acted on grounds that apply generally to the Class, such that final injunctive relief is appropriate respecting the Class as a whole; (f) predominance of common questions of fact and law among the Class; and (g) superiority; and

(c) Having considered the factors set forth in Rule 23(g)(1) of the Federal Rules of Civil Procedure, Class Counsel have fairly and adequately represented the Class for purposes of entering into and implementing the settlement. Accordingly, the Court hereby appoints Class Counsel as counsel to represent Class Members.

6. Persons or entities that filed timely and valid exclusion requests are not bound by this Judgment or the terms of the Stipulation and may pursue their own individual remedies against Defendant. However, such excluded parties are not entitled to any rights or benefits provided to Class Members by the terms of the Stipulation. The list of persons and entities excluded from the Class because they filed timely and valid requests for exclusion is attached hereto as Exhibit B.

7. The Court directed that notice be given to Class members by publication and other means pursuant to the notice program proposed by the Parties in the Stipulation and approved by the Court. The Parties have demonstrated compliance with this Court's Preliminary Approval Order regarding class notice. The Class Notice advised Class members of the terms of the settlement; the Final Approval Hearing and their right to appear at such hearing; their rights to remain in or opt out of the Class and to object to the settlement; the procedures for exercising such rights; and the binding effect of this Judgment, whether favorable or unfavorable, to the Class.

8. The distribution of the notice to the Class constituted the best notice practicable under the circumstances, and fully satisfied the requirements of Federal Rule of Civil Procedure 23, the requirements of due process, 28 U.S.C. §1715 and any other applicable law.

9. Pursuant to Federal Rule of Civil Procedure 23(e)(2), the Court finds after a hearing and based upon all submissions of the Parties and other persons that the settlement proposed by the Parties is fair, reasonable, and adequate. The terms and provisions of the Stipulation are the product of arms-length negotiations conducted in good faith and with the assistance the Honorable Morton Denlow (Ret.). The Court has considered any timely and valid objections to the Settlement and finds that such objections are without merit and should be overruled. Approval of the Stipulation will result in substantial savings of time, money and effort to the Court and the Parties, and will further the interests of justice.

10. Upon the Effective Date, the named Plaintiffs and each Class Member other than those listed on Exhibit B shall be deemed to have, and by operation of this Final Settlement Order and Judgment shall have released, waived and discharged with prejudice Defendant and the other Released Parties from any and all Released Claims as set forth in Section IV of the Stipulation.

11. All Class Members who have not timely and validly submitted requests for exclusion are bound by this Judgment and by the terms of the Stipulation.

12. The Plaintiffs in the Action initiated this lawsuit, acted to protect the Class, and assisted their counsel. Their efforts have produced the Stipulation entered into in good faith that provides a fair, reasonable, adequate and certain result for the Class. Plaintiff Smith is entitled to an incentive award of $______. Plaintiff Downing is entitled to an incentive award of $_____. Class Counsel is entitled to reasonable attorneys' fees of $________ and reasonable expenses of $_______.

13. The Court hereby dismisses the Action with prejudice, and the Released Parties are hereby released from all further liability for the Released Claims.

14. Without affecting the finality of this Judgment, the Court reserves jurisdiction over the implementation, administration and enforcement of this Judgment and the Stipulation, and all matters ancillary thereto.

15. The Court finding that no reason exists for delay in ordering final judgment pursuant to Federal Rule of Civil Procedure 54(b), the clerk is hereby directed to enter this Judgment forthwith.

16. The Parties are hereby authorized without needing further approval from the Court to agree to and adopt such modifications and expansions of the Stipulation, including without limitation the claim review procedure, that are consistent with this Judgment and do not limit the rights of Class Members under the Stipulation.

**IT IS SO ORDERED.**

DATED: ______________________

______________________________
HONORABLE HAYWOOD GILLIAM, JR.
UNITED STATES DISTRICT COURT JUDGE

# Exhibit H

**EXHIBIT H**

Representative examples of the new qualifying language and font size ratio:






# Exhibit I

**EXHIBIT I**

Amazon Fresh
Wellsley Farms
Harris Teeter
Kirkland Signature
Kroger
Private Selection
Simple Truth
Market Basket
Bowl and Basket
Wholesome Pantry
Great Value
Executive Suite
Royal Cup
Java Roast
Shazam
Bigelow
Celestial Seasonings
Dunkin Donuts
illy
Cafe Bustelo
Folgers
Joffrey's Coffee & Tea Co.
Ethical Bean
Baileys
Gevalia
Hershey
Maxwell House
York Peppermint
Yuban
Lavazza
Seattle's Best Coffee
Starbucks
Peets
French Market
Luzianne
New England Coffee

Eight O'Clock
Lipton
Red Rose
Tazo Tea
Tim Hortons
Twinings
Barista Prima Coffeehouse
Café Escapes
Coffee People
Donut House Collection
Diedrich Coffee
The Original Donut Shop
Gloria Jean's
Green Mountain Coffee Roasters
Green Mountain Naturals
Revv
Timothy's
Tullys
Van Houtte
Motts
Snapple
Caribou
Cinnabon
Emeril's
Kahlua
Laughing Man
Krispy Kreme Doughnuts
McCafe
Newmans Own Organic
Panera
Swiss Miss Hot Cocoa

Case 4:18-cv-06619-JSW Document 12-2 Filed 07/28/26 Page 106 of 258

# Exhibit J

**EXHIBIT J**

**REQUEST FOR EXCLUSION FORM**

**Read the enclosed legal notice carefully before filling out this form.**

The undersigned has read the Notice of Class Action dated [DATE], and does NOT wish to remain a member of the certified Class in the case of *Smith v. Keurig Green Mountain, Inc*., Case No. 4:18-CV-06690-HSG, now pending before the United States District Court for the Northern District of California.

Date:
Signature:
Printed Name:
Mailing Address:
Telephone:

If you wish to exclude yourself from the Class, you must complete and return this form by first-class mail postmarked by [DATE] [45 days prior to the Final Approval Hearing].

[Name and Address of Claims Administrator]

# EXHIBIT C

LEXINGTON LAW GROUP
Howard Hirsch, State Bar No. 213209
Meredyth Merrow, State Bar No. 328337
503 Divisadero Street
San Francisco, CA 94117
Telephone: (415) 913-7800
Facsimile: (415) 759-4112
hhirsch@lexlawgroup.com
mmerrow@lexlawgroup.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

KATHLEEN SMITH and MATTHEW DOWNING, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

KEURIG GREEN MOUNTAIN, INC.,

Defendant.

Case No. 4:18-cv-06690-HSG
Assigned to Hon. Haywood S. Gilliam, Jr.

**ORDER RE: SETTLEMENT NOTICE, ADMINISTRATION AND APPROVAL SCHEDULE; AS MODIFIED**

**ORDER AS MODIFIED**

Having considered the parties' stipulation, the Court **SETS** the following schedule:

| **Event** | **Date** |
|---|---|
| Deadline for Settlement Administrator to commence notice (email, digital and publication) | August 8, 2022 |
| Filing deadline for attorneys' fees and costs motion | September 19, 2022 |
| Filing deadline for incentive payment motion | September 19, 2022 |
| Deadline for Class Members to opt-out or object to settlement and/or application for attorneys' fees and costs and incentive payment | October 24, 2022 |
| Filing deadline for final approval motion | November 3, 2022 |
| Final fairness hearing and hearing on motions | December 8, 2022 at 2:00 p.m. |

**IT IS SO ORDERED.**

Dated: July 18, 2022

Haywood S. Gilliam, Jr.

HAYWOOD S. GILLIAM, JR.
United States District Judge

# EXHIBIT D

LEXINGTON LAW GROUP
Howard Hirsch, State Bar No. 213209
Meredyth Merrow, State Bar No. 328337
503 Divisadero Street
San Francisco, CA 94117
Telephone: (415) 913-7800
Facsimile: (415) 759-4112
hhirsch@lexlawgroup.com
mmerrow@lexlawgroup.com

*Attorneys for Plaintiffs*

DORSEY & WHITNEY LLP
Kent J. Schmidt, State Bar No. 195969
Navdeep K. Singh, State Bar No. 284486
600 Anton Boulevard, Suite 2000
Costa Mesa, CA 92626
Telephone: (714) 800-1400
Facsimile: (714) 800-1499
schmidt.kent@dorsey.com
singh.navdeep@dorsey.com

DORSEY & WHITNEY LLP
Creighton R. Magid (*admitted Pro Hac Vice*)
1401 New York Avenue NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 442-3000
Facsimile: (202) 442-3199
magid.chip@dorsey.com

*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

KATHLEEN SMITH and MATTHEW DOWNING, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

KEURIG GREEN MOUNTAIN, INC.,

Defendant.

Case No. 4:18-cv-06690-HSG
Assigned to Hon. Haywood S. Gilliam, Jr.

**DECLARATION OF SCOTT M. FENWICK OF KROLL SETTLEMENT ADMINISTRATION LLC IN CONNECTION WITH JOINT STATUS REPORT RE: SETTLEMENT CLAIMS**

I, Scott M. Fenwick, declare as follows:

1. I am a Senior Director of Kroll Settlement Administration LLC ("Kroll"),[1] the Claim Administrator appointed in the above-captioned case,[2] whose principal office is located at 2000 Market Street, Suite 2700, Philadelphia, Pennsylvania 19103. I am over 21 years of age and am authorized to make this declaration on behalf of Kroll and myself. The following statements are based on my personal knowledge and information provided by other experienced Kroll employees working under my general supervision. This declaration is being filed to update the Court in connection with the Parties' Joint Status Report Regarding Settlement Claims, and supplements the *Declaration of Frank Ballard of Kroll Settlement Administration LLC in Connection with Final Approval of Settlement* filed on November 1, 2022 (the "Initial Declaration") [Docket No. 155-1].

2. Following the hearing before this Court on December 8, 2022, in accordance with the Court's subsequent *Order Re: Notice Issues for Certain Class Members Regarding Settlement*, dated December 21, 2022 [Docket No. 161] (the "December Order"), and as directed by Class Counsel, on December 16, 2022, Kroll caused the Email Notice to be sent to 139,667 additional Class Members who had not previously been served with the Email Notice and who purchased the Products directly from the Defendant on its website (the "Additional Class Members"). A true and correct copy of a complete exemplar Email Notice (including the subject line) is attached hereto as **Exhibit A**. Of the 139,667 emails attempted for delivery, 39,514 emails were rejected/bounced back as undeliverable, and 363 people unsubscribed from future emails.

3. The original deadline to submit Requests for Exclusion and objections was October 24, 2022. The original deadline to submit claims was January 9, 2023. Pursuant to the December Order, each of the foregoing deadlines was extended to January 30, 2023, for Additional Class Members.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Initial Declaration (as defined below).

[2] The Stipulation of Settlement and order granting preliminary approval of the Settlement [ECF No. 140] appoint "Kroll Business Services" as the Claim Administrator. Kroll Business Services is the name of the division of Kroll, LLC in which Kroll Settlement Administration LLC is a unit and is not a legal entity. Kroll Settlement Administration LLC is the actual Claim Administrator in this case.

4. As of February 7, 2023, Kroll has received a total of 2,519 Claim Forms through the mail and 1,124,765 Claim Forms have been received electronically through the Settlement Website. Kroll is still in the process of reviewing and validating the Claim Forms it has received. In determining whether a Claim Form is valid, Kroll is considering, among other things, the limitation of one claim per Household as described in the Stipulation of Settlement, a limitation of one claim per payment account (e.g., a specific Venmo or PayPal account), whether the information provided in the Claim Form contains any indicia of fraud, and whether the claim is duplicative of a valid Claim Form.

5. As of February 7, 2023, Kroll has received one (1) additional timely Request for Exclusion since filing its Initial Declaration. Therefore, Kroll has received a total of twelve (12) timely Requests for Exclusion, all of which Kroll delivered to the Parties' counsel in accordance with the Stipulation of Settlement, and no objections to the Settlement. A list of the Requests for Exclusion is attached hereto as **Exhibit B**.

6. On December 13, 2022, prior to the Parties' filing of a Joint Stipulation on December 16, 2022, Kroll provided Class Counsel an updated estimate for notice and administrative costs with a cap of $900,000 (the "Revised Estimate"). This Revised Estimate was approximately $400,000 greater than Kroll's initial estimate and assumed, based on (i) the claims filing rate at that time, (ii) the time remaining to file claims, and (iii) the addition of the Additional Class Members, that Kroll would receive approximately 705,000 Claim Forms. However, as of February 7, 2023, Kroll has received over 1,127,000 Claim Forms. Indeed, in January 2023, Kroll received more than 306,000 Claim Forms, and Kroll continues to receive paper Claim Forms through the mail. As a result, the costs of administering this case have increased.

7. As of February 7, 2023, Kroll has billed approximately $621,918 for services and fees incurred in the administration of this Settlement, which includes media costs. A true and correct copy of the invoices generated to date are attached hereto as **Exhibit C**. Taking into account the increased number of Claim Forms filed and discussed above, Kroll now estimates that approximately 1,128,000 Claim Forms will be received. Accordingly, Kroll estimates that the total

notice and administration costs will be approximately $1,150,000 and therefore seeks approval from the Court for additional notice and administration costs of up to $250,000.

I declare under penalty of perjury under the laws of the United States that the above is true and correct to the best of my knowledge and that this declaration was executed on February 8, 2023, in Woodbury, Minnesota.

Scott M. Fenwick

SCOTT M. FENWICK

# Exhibit A

**Subject:** [EXTERNAL] Notice of K Cup® Single Serve Coffee Pods Settlement

Class Member ID: [redacted]

# DID YOU PURCHASE KEURIG K CUP® SINGLE SERVE COFFEE PODS THAT WERE LABELED AS RECYCLABLE?

## YOU MIGHT BE ELIGILBE TO GET MONEY FROM A SETTLEMENT.

### What Is this About?

A proposed settlement has been reached in a lawsuit, *Smith v. Keurig Green Mountain, Inc.* Case No. 4:18-CV-06690, in which the Plaintiff claims that Keurig K Cup® single serve coffee pods labeled as being recyclable were not widely recyclable. Keurig denies any wrongdoing but has agreed to a settlement to avoid the expense of continued litigation.

### Who is Included?

You are included as a Settlement Class Member if you purchased, for personal use, K Cup® single serve coffee pods that were labeled as recyclable between June 8, 2016, and August 8, 2022.

### What can you get from the Settlement?

The Settlement provides $10 million to pay valid claims as follows:

1. **With Proof of Purchase:** You can get $3.50 per 100 pods, up to $36 maximum per Household, with a $6 minimum per Household regardless of quantity purchased.
2. **Without Proof of Purchase:** You can get $5 per Household from the Settlement.

In each case, you must submit a valid Claim Form by **January 30, 2023**. The actual amount may vary based on the total number of Claims filed.

### What are Your Rights?

- **Do Nothing:** If you do nothing, you stay in the Settlement, but get no money, and you give up the right to sue over the claims in this Settlement.
- **File a Claim:** You must submit a valid Claim Form by **January 30, 2023**, to get money from the Settlement.
- **Exclude Yourself:** You can exclude yourself from the Settlement and keep your right to sue about the claims in this lawsuit, but you will not get any money. Requests for Exclusion must be received by **January 30, 2023**.
- **Object:** You remain in the Settlement, but you tell the Court why you think the Settlement should not be approved. Objections must be submitted by **January 30, 2023**.

A Final Approval Hearing was held on **December 8, 2022**, at **2:00 p.m. PT** at Courtroom 2 of the United States District Court for the Northern District of California, 1301 Clay Street, Oakland, California, to consider approval of the Settlement, a payment up to a total of

$3,000,000 for Class Counsel for attorneys' fees, plus Class Counsel's expenses, and incentive awards to the named Plaintiffs not to exceed $5,000 for Plaintiff Kathleen Smith and $1,000 to Plaintiff Matthew Downing. All motions filed by Class Counsel are available on the Settlement Website. The Court did not rule yet on whether to grant final approval of the Settlement.

**This is only a summary.** More details about this Settlement and instructions on how to file a Claim, object, or exclude yourself are available at **www.kcupsrecyclingsettlement.com** or by calling **1-833-620-3588**.

Click here to unsubscribe to future emails related to this settlement

# Exhibit B

| FIRST NAME | LAST NAME |
|---|---|
| SUSAN | ABBATTE |
| HELGE | BLUCHER |
| TERESA | BRIGHT |
| LEE | COLE JR. |
| DEBORAH | DAVIS |
| ALEXANDER | FINKEL |
| VICTORIA | RAFA |
| JAMES | RYAN |
| PATTY | SMARR |
| MARK | SULLIVAN |
| WENDY | ULCH |
| RICKY | VANCE |

# Exhibit C

KROLL SETTLEMENT ADMINISTRATION

| | |
|---|---|
| **Total Due:** | **USD 196,000.00** |
| Invoice No: | PA00564565 |
| Sequence No: | 1235 |
| Invoice Date: | April 26, 2022 |
| Due Date: | April 27, 2022 |

**PRIVILEGED & CONFIDENTIAL**

Through April 30, 2022

**RE: Smith v Keurig Green Mountain, Inc.**

| | |
|---|---|
| Retainer to be applied against Professional Services to be rendered | USD 196,000.00 |
| **Total Due:** | **USD 196,000.00** |

| | |
|---|---|
| **Total Due:** | **USD 75,691.00** |
| Invoice No: | PA00588983 |
| Sequence No: | 1708 |
| Invoice Date: | July 31, 2022 |
| Due Date: | August 01, 2022 |

**PRIVILEGED & CONFIDENTIAL**

Through July 31, 2022

**RE: Smith v Keurig Green Mountain, Inc.**

| | |
|---|---|
| Retainer to be applied against Professional Services to be rendered | USD 75,691.00 |
| **Total Due:** | **USD 75,691.00** |

KROLL
SETTLEMENT
ADMINISTRATION

| | |
|---|---|
| **Total Due:** | **USD 99,270.85** |
| Invoice No: | PA00613034 |
| Sequence No: | 2092 |
| Invoice Date: | October 31, 2022 |
| Due Date: | November 01, 2022 |

**PRIVILEGED & CONFIDENTIAL**

Through September 30, 2022

**RE: Smith v Keurig Green Mountain, Inc.**

| | | |
|---|---|---|
| Fees for Hourly Professional Services Rendered | | USD 34,500.00 |
| Other Professional Services Rendered | | 335,810.91 |
| Out-of-Pocket Expenses | | |
| Location Services Expense | 123.32 | |
| PO Box Rental | 62.50 | |
| Postage and Courier | 465.12 | |
| | | 650.94 |
| Retainer Applied | | (271,691.00) |
| **Total Due:** | | **USD 99,270.85** |

| | |
|---|---|
| **Total Due:** | **USD 40,609.09** |
| Invoice No: | PA00621969 |
| Sequence No: | 2270 |
| Invoice Date: | November 21, 2022 |
| Due Date: | November 22, 2022 |

**PRIVILEGED & CONFIDENTIAL**

Through October 31, 2022

**RE: Smith v Keurig Green Mountain, Inc.**

| | | |
|---|---|---|
| Fees for Hourly Professional Services Rendered | | USD 7,725.25 |
| Other Professional Services Rendered | | 32,878.71 |
| Out-of-Pocket Expenses | | |
| Postage and Courier | 5.13 | |
| | | 5.13 |
| **Total Due:** | | **USD 40,609.09** |

**Total Due:** **USD 115,038.50**
Invoice No: PA00631199
Sequence No: 2444
Invoice Date: December 20, 2022
Due Date: December 21, 2022

**PRIVILEGED & CONFIDENTIAL**

Through November 30, 2022

**RE: Smith v Keurig Green Mountain, Inc.**

| | | |
|---|---|---|
| Fees for Hourly Professional Services Rendered | | USD 24,475.25 |
| Other Professional Services Rendered | | 90,539.31 |
| Out-of-Pocket Expenses | | |
| Postage and Courier | 23.94 | |
| | | 23.94 |
| **Total Due:** | | **USD 115,038.50** |

**KROLL**
SETTLEMENT ADMINISTRATION

| | |
|---|---|
| **Total Due:** | **USD 95,308.67** |
| Invoice No: | PA00638911 |
| Sequence No: | 2580 |
| Invoice Date: | January 18, 2023 |
| Due Date: | January 19, 2023 |

**PRIVILEGED & CONFIDENTIAL**

Through December 31, 2022

**RE: Smith v Keurig Green Mountain, Inc.**

| | | |
|---|---|---|
| Fees for Hourly Professional Services Rendered | | USD 15,851.00 |
| Other Professional Services Rendered | | 79,455.96 |
| Out-of-Pocket Expenses | | |
| Postage and Courier | 1.71 | |
| | | 1.71 |
| **Total Due:** | | **USD 95,308.67** |

# EXHIBIT E

# Companion Guide to the How2Recycle Decision Matrix



How2Recycle

A Project of greenblue

Case 3:26-cv-02172-LL-BJW Document 11-2 Filed 07/28/26 PageID.489 Page 138 of 434

## Introduction

**The How2Recycle Decision Matrix is a framework that consolidates the criteria, standards, and data used to evaluate the recyclability of packaging.**

Its purpose is to provide clarity and transparency around our process, so members, partners, and stakeholders can better understand the basis for How2Recycle label decisions.

This summary version highlights the core categories of evaluation along with key additional considerations. While less detailed than the internal version, it offers insight into how recyclability is determined for label requests and where the key challenges lie. This public summary matrix offers a high-level look at where each material and format generally stand today in terms of collection, sortation, reprocessing, and end markets, as well as additional factors impacting recyclability, providing insight into our process and the factors influencing label assignments.

## How2Recycle Definition of Recyclability

The How2Recycle Decision Matrix is based on our definition of recyclability, which spans five core assessment categories and four additional consideration categories (shown right) to determine overall Label Eligibility.

**Explore How2Recycle's Overall Recyclability Assessment for Core and Challenged Formats**

## Standard for Assessing

The Standard for Assessing tables on the following pages list the standard, assessment considerations, and data sources for each of the main assessment categories (Applicable Law, Collection, Sortation, Reprocessing, End Markets), the four additional consideration categories (Consumer Experience, Material Health, Product Application/Product Residue, Consistency & Common Sense), and overall Label Eligibility. The information in these tables is an abbreviated version of the How2Recycle Overall Recyclability Assessment for Core and Challenged Formats resource. The Standard for Assessing serves as the basis for understanding each assessment category within the How2Recycle Decision Matrix.

### CORE ASSESSMENT CATEGORIES




### ADDITIONAL CONSIDERATION CATEGORIES



| CORE ASSESSMENT | STANDARD | ASSESSMENT CONSIDERATIONS | DATA SOURCES |
|---|---|---|---|
| **Applicable Law** | What does the law say about recyclability claims? | How2Recycle ensures its labels comply with all relevant laws and regulations, including the FTC's Green Guides, Competition Bureau Canada's standards, and emerging state and provincial policies. This helps maintain consumer trust and prevents misleading claims. This criterion assesses whether the package meets the legal requirements for recyclability claims in the regions where it is sold. | Federal Trade Commission (FTC) "Green Guides"<br>State Legislation (California SB 343)<br>Competition Bureau Canada Guidance, emerging Canadian regulations |
| **Collection** | What percentage of the population has access to recycle this package in their community? | Assessing a package's acceptance to existing recycling programs involves examining the percentage of the population with access to recycling services in their communities. How2Recycle uses The Recycling Partnership's Community Recycling Program Acceptance Data to assess recycling access for specific materials and formats in the U.S. and refers to CM Consulting's report, "Access to Residential Recycling of Packaging and Packaging Material in Canada," for Canada. How2Recycle will refer to new data that SPC and RRS are collecting on PE film and flexible packaging access. Additionally, as of August 2025, How2Recycle incorporates the collection data from CalRecycle's Material Characterization Study to determine compliance with SB 343. | The Recycling Partnership's Community Recycling Program Acceptance Data (U.S.)<br>CM Consulting's report on residential recycling of packaging materials in Canada<br>SPC and RRS data on PE film and flexible packaging (2025)<br>Material Characterization Study Final Findings (CalRecycle, 2025) |
| **Sortation** | Will the package be properly and consistently sorted (dimensionality, rigidity, etc.) in a material recovery facility (MRF) or recycling center? | Sortation refers to how well the package can be identified and sorted into the correct material stream at Material Recovery Facilities (MRFs). Factors like size, shape, flexibility, and density impact whether the package is correctly sorted into the appropriate recycling stream. Poor sortation can result in contamination or disposal in landfills. Packaging that meets industry standards for dimensionality and format has a higher likelihood of successful sorting and recycling. Additional testing may be required for package formats not covered by existing protocols. | APR sortation tests (e.g., SORT-S-02 for size, SORT-S-05 for 2D/3D sorting)<br>MRF sortation studies conducted by third-party experts |
| **Reprocessing** | Will the package be successfully reprocessed at paper mills, plastic reclaimers, film recyclers, etc.? Is the package technically recyclable based on current protocols and industry standards? | Technical recyclability testing assesses how well packaging materials integrate with existing recycling systems. This testing is crucial for understanding how these materials behave in recycling processes, identifying potential challenges, and confirming their compatibility with industry standards. It evaluates whether materials can be effectively reprocessed into new products, ensuring they meet technical specifications and are clean, contaminant-free, and suitable for existing recycling technologies like those used in paper mills or plastic reprocessors. | APR Design® Guide for Plastics Recyclability<br>Critical Guidance Protocols for specific materials like PET, HDPE, PP, and PE films<br>Fiber protocols (e.g., OCC-E, SBS-E for paper packaging) from labs like Western Michigan University |
| **End Markets** | Is there strong demand for the recycled package's material to be used to manufacture new products? | A key factor in recycling is the existence of a viable end market for the recycled material. This criterion evaluates the demand for the recycled content that can be recovered from the package. High demand for the recycled material enhances the chances that it will be utilized in the production of new products. Conversely, if the recycled material lacks a robust market or is challenging to sell, the package may not be deemed truly recyclable, even if the material can be processed technically. | Bale specifications (ReMA, APR model specifications)<br>Market trends (e.g., recycling capacity, material demand, and value trends) |

| ADDITIONAL CONSIDERATIONS | STANDARD | ASSESSMENT CONSIDERATIONS | DATA SOURCES |
|---|---|---|---|
| **Product Application/ Product Residue** | How does the product impact the recyclability of the packaging? What level of product residue is acceptable? | Product application can have a significant impact on the recyclability of the package. The assessment looks at the product that is contained within each package, and how it may interact with the collection, sortation, and reprocessing of the material. Packaging containing hazardous materials or substances, or products that leave residue (e.g. wet, sticky, or oily residue on PE film, grease or food stains on paper, certain toxic products in rigid plastic container) require additional considerations that may result in a less favorable recyclability label. | Clean & Dry Protocol for PE flexibles (under development)<br>Internal assessment<br>Data submitted by member companies |
| **Consumer Experience** | How do consumers interact with the package? How easy is it for consumers to recycle this package? | Evaluating the user-friendliness of a package from a recycling perspective involves examining whether consumers can easily understand the recycling instructions, the effort required to prepare the package for recycling (such as cleaning or separating components), and if the recycling process aligns with common consumer behaviors. If a package is overly complicated or inconvenient to recycle, consumers may be less likely to follow through, which can reduce its effective recyclability. | Consumer studies on recycling behaviors<br>Internal assessment<br>Feedback from How2Recycle members regarding instructions |
| **Material Health** | Does the package contain intentionally added substances that are harmful or potentially harmful to the environment and/ or human or nonhuman animal health? | Safety of the materials used in the package is a key consideration. The assessment looks for harmful chemicals, additives, or contaminants that could pose risks to human health, animal life, or the environment during recycling. Materials with toxic substances may require special handling or disposal, which can limit their recyclability. Packaging that is known or suspected to present health or safety risks is not suitable for recycling and, therefore, circularity. | Total Organic Fluorine (TOF) testing for PFAS<br>SPC Position Statements on Degradability and Material Additives |
| **Consistency & Common Sense** | Is the package recyclability assessment consistent with those of similar product categories? Does the How2Recycle label provide clear and practical guidance to consumers on how to recycle? | Consistency in recyclability assessments across similar product categories and packaging types is essential. This involves evaluating whether the recycling instructions and guidelines provided to consumers are logical, practical, and straightforward. Clear and sensible labeling helps consumers easily understand how to recycle the package, reducing confusion and increasing the likelihood of proper recycling. | Comparison with assessments of similar product categories<br>Consumer feedback on labeling clarity |
| **Label Eligibility** | Given the overall assessment, what label category is the base material and format eligible for? Are there factors (labels, adhesives, attachments, etc.) that could render the material less recyclable? | How2Recycle takes a holistic look at the data in the five main assessment categories and additional consideration factors. Given the data to support each element of recyclability, material and formats are determined to be eligible for one of four labels: Widely Recyclable, Check Locally, Not Yet Recyclable, or Store Drop-off. The ultimate label determination is based on each individual package and may receive a lesser recyclability label. Considerations listed in each assessment category may impact the final label. | |

Case 3:26-cv-02172-LL-BJW Document 11-2 Filed 07/28/26 PageID.492 Page 141 of 434

# Interpreting the Decision Matrix

This Summary Decision Matrix is designed to provide a high-level snapshot of How2Recycle's current material and format assessments. It is a starting point for understanding recyclability determinations, not a comprehensive specification.

### Highest Possible Eligibility

The table shows the best-case outcome for each material and format category based on our current data and methodology, without incorporating testing results. While this makes the table easier to read, individual formats may still differ from the general category outcome depending on the specifications of the packaging submitted for assessment. However, packaging in some categories may be eligible for a higher designation if it successfully passes technical recyclability testing.

### Impacts of Package Design

Package design elements can significantly impact recyclability, even if the base material is generally recyclable. Design-level attributes include colorants, closures, labels, adhesives, shrink sleeves, and barrier layers. These features are fully considered in our internal Decision Matrix and influence the final label assignment, even if not shown in detail in the summary table.

### Format-Level Differences

Within a material category, different formats may have distinct outcomes. Even within those formats, there can be differences in overall recyclability. This table groups general formats together for conciseness, but internally, these differences are carefully assessed.

### Dynamic and Evolving Data

The assessments presented reflect current data but will evolve as new data sources become available, community acceptance changes, MRF technology improves, end market demand shifts, and regulations are implemented or updated. The Decision Matrix is updated regularly, and the public version will be revised as necessary to remain accurate.



# Assessment Details by Category

## Collection

As part of an ongoing joint effort between GreenBlue and The Recycling Partnership (TRP), How2Recycle's data for acceptance is informed largely by TRP's U.S. Community Recycling Program Acceptance Data. Thanks to this partnership, How2Recycle receives detailed and timely information on the collection of specific material formats for recycling in the United States. This data helps inform the label eligibility of package formats and if those formats have a change in recyclability or need to be placed under review for a potential change.

Of note, How2Recycle is continuing to reference third party data outside of The Recycling Partnership's U.S. Community Recycling Program Acceptance Data for certain packaging format categories. Formats impacted by third-party data adjustments are marked with a dagger (†) in the table. If you'd like to learn more about our shared methodology, use it to conduct an acceptance study, or share additional data supporting acceptance of specific materials or formats, please reach out to the How2Recycle team.

Additionally, as of August 2025, How2Recycle has made the decision to integrate California eligibility into our national recyclability determinations. California SB 343 specifies that for materials to be considered recyclable in California, it must be accepted for curbside collection by jurisdictions serving at least 60% of California's population and sorted by facilities serving at least 60% of statewide programs into streams designated for recycling. The "Category Assessment" for Collection shown in the matrix reflects the national acceptance percentage, but the "Overall Assessment" for Applicable Law reflects the inclusion of California-specific data. Affected categories are marked with an asterisk (*) in the table. For more information on this decision, please reference the Supplementary Member Notice: California SB 343 Impacts on Labeling Eligibility, published in July 2025.

### *Category Assessment*

The Collection "Category Assessment" is based on acceptance percentages. Assessment indicates label eligibility for each base material and/or format based on acceptance alone. Formats impacted by third-party data adjustments are marked with a dagger (†) in the table.

| US | CAN | |
|---|---|---|
| >60% | >50% | Eligible for *Widely Recyclable* |
| 20-60% | 20-50% | Eligible for *Check Locally* |
| <20% | <20% | Eligible for *Not Yet Recyclable* |

## Sortation

The main data used to determine sortation is industry sortation protocols. Additional testing may be required for package formats not covered by existing protocols.

### *Category Assessment*

The Sortation "Category Assessment" is based on general information regarding challenges with the appropriate sortation of the listed material. The indicated option is the general assessment for each material/format. Formats that are generally sorted without issue are considered green. Those with moderate sortation issues, or which may require testing are considered yellow. Material/format types that are known to have significant sortation issues are listed as red.

- *No* significant sortation issues
- *Moderate* sortation issues
- *Moderate* sortation issues. *Testing typically required*
- *Significant* sortation issues
- *Not* sorted in MRF

## Reprocessing

The reprocessing assessment category is one of the most complex. There are numerous factors that can impact the quality of the reprocessed material from a package, including attachments, additives, coatings, etc. Decisions regarding specific packages are dependent on all considerations. The list of design aspects that may impact recyclability are listed in detail in the "Design Aspects Impacting Core Assessment" column.

### *Category Assessment*

The Reprocessing "Category Assessment" is based on general information regarding challenges with the reprocessing of the packaging. The indicated option is the general assessment for each material/format. Formats that are generally reprocessed without issue (i.e., designed for recycling) are considered green. Those with moderate reprocessing considerations are shown in yellow. Material/format types that are known to have reprocessing concerns are listed as red.

- *No* significant reprocessing issues
- *Moderate* reprocessing issues
- *Moderate* reprocessing issues. *Testing typically required*
- *Significant* reprocessing issues
- *No/limited* data on reprocessing

## End Markets

The end markets assessment category is an evaluation of the strength of end markets for packaging materials. End markets have historically been challenging to assess definitively. In addition to this Decision Matrix, a new framework for an End Market Scoring System is in development. This scoring system is intended to result in composite scores to be used to assess the strength of end markets for each material/format category.

### *Category Assessment*

The End Markets "Category Assessment" is based on the assessed end market strength: Strong, Moderate, or None/Negligible. This determination is made via the How2Recycle Criteria for Assessing End Markets. How2Recycle is currently working to refine this evaluation criteria through the development of an End Markets Scoring System. Future Decision Matrix updates will reference this new system.

- *Strong* end markets
- *Moderate* strength end markets
- *None or negligible* end markets
- *No/limited data* on end markets

## Design Aspect Impacting Core Assessment

As noted above, the Summary Decision Matrix does not capture all of the design-level nuances that can influence recyclability. The general factors impacting the core assessment are listed. These factors are fully accounted for in our internal matrix and final label assignments, even if they are not individually displayed in detail in this summary.

### *Category Assessment*

The "Category Assessment" for the design aspects impacting core assessments is used to note the design considerations which are taken into account in our label request form and may ultimately impact the recyclability of the material/format listed.

## Additional Considerations Categories

The additional consideration categories include: Product Application/Product Residue, Consumer Experience, Material Health, and Consistency & Common Sense.

### *Category Assessment*

The "Category Assessment" for the additional consideration categories is used to note the circumstances in which these additional considerations may be a concern for the recyclability of the material/format listed.

## Applicable Law

Although applicable law is the basis of the How2Recycle assessment, it is the last criteria category displayed in the Decision Matrix. This is due to the current law requiring the other factors to be in place in order to legally label a package recyclable.

### *Category Assessment*

Applicable Law "Category Assessment" is based on 2012 FTC Green Guides guidance, unless superseded by state regulations (currently only California SB 343). As noted in the above Collection section, the "Overall Assessment" for Applicable Law reflects the inclusion of California-specific data. Affected categories are marked with an asterisk (*) in the table.

- Packaging meets *all* category criteria
- Packaging meets *some* criteria
- *Does not* meet all criteria

### Label Eligibility

The label eligibility listed in the Decision Matrix is the highest recyclability assignment possible for the material and/or format. The ultimate label determination is based on each individual package, and as a result packages may receive a less favorable recyclability label. Considerations listed in each assessment category may impact the final label.

| UNITED STATES | CANADA |
|---|---|
| Widely Recyclable | Widely Recyclable |
| Check Locally | Check Locally |
| Not Yet Recyclable | Not Yet Recyclable |
| Store Drop-off | |

## Utilizing the Decision Matrix

The How2Recycle Decision Matrix represents an important milestone in How2Recycle's commitment to advancing transparency and consistency in recyclability labeling. By publishing this summary, we aim to empower members and partners with a clearer understanding of how recyclability decisions are made and encourage constructive dialogue to continue improving the system.

As recycling infrastructure, technology, and regulations evolve, the Decision Matrix will remain a living resource. We will continue to update it regularly to reflect the latest verified data and industry best practices. We invite our members, partners, and stakeholders to engage with us, share data and insights, and collaborate in building a stronger, more resilient recycling system for the future.

Explore the Decision Matrix



Case 3:26-cv-02172-LL-BJW Document 11-2 Filed 07/28/26 PageID.495 Page 144 of 434

## Key Takeaways

- **This matrix reflects a "best-case" view of material eligibility.**
  The highest possible recyclability designation is shown for each material/format category. Final label assignments may differ based on design details such as color, attachments, or barriers, or additional considerations such as product application and consumer experience.
- **Nuance and format-specific details matter.**
  Even within one material category, outcomes can vary significantly. The internal Decision Matrix considers these distinctions and applies them case by case.
- **Data is dynamic and will continue to evolve.**
  Collection rates, sortation technology, end market demand, and regulations are all subject to change. The Decision Matrix is updated regularly to stay aligned with the most current information.
- **Transparency is central to the Decision Matrix.**
  This public summary is designed to give members, partners, and stakeholders a clear window into how How2Recycle determines recyclability and assigns labels.
- **Collaboration strengthens the system.**
  Member and partner input helps improve the Decision Matrix over time. This feedback loop ensures that our recyclability criteria remain credible, defensible, and useful for the industry.



## Additional Resources

The How2Recycle program is committed to transparency and clarity in how we assign labels and make recyclability decisions. Over the years, we have published a range of resources to help members, partners, and stakeholders understand our process and the data behind it. If this document does not fully answer your questions, we encourage you to explore the following resources:

- How2Recycle Guidelines for Use – Comprehensive instructions for proper use of the How2Recycle label and detailed information on the specifications required when submitting label requests.
- Supplementary Member Notices – Updates on regulatory changes, methodology refinements, and program improvements.
  - Supplementary Member Notice: California SB 343 Impacts on Labeling Eligibility
  - Supplementary Member Notice: Member Platform Update & Post Pro Label Rollout Process
- Overall Recyclability Assessment for Core and Challenged Formats – A detailed look at how we assess core and challenged formats.
- The How2Recycle Guide to Recyclability – Explains how we define recyclability and what data informs our decisions.
- The How2Recycle Guide to Future Recyclability – A forward-looking view on how recyclability criteria may evolve.
- Updated Criteria for Assessing End Markets – Announcement detailing how we evaluate end-market strength.
- Criteria for Assessing Material Health – Announcement explaining our approach to material health in recyclability assessments.
- Consumer Preparation Rule - Announcement explaining How2Recycle's approach to determining what consumer preparation of packaging for recycling is reasonable.

For any additional questions, feedback, or requests for clarification, please reach out to us at **How2Recycle@greenblue.org**. We welcome dialogue and collaboration to continue improving transparency and building shared understanding across the recycling system.

# EXHIBIT F

# K-CUP RECYCLABILITY CLAIMS

Truth in Advertising
P.O. Box 927
Madison, CT 06443

SCS ENGINEERS

01225026.00 | September 30, 2025

438 S. Marengo Avenue
Pasadena, CA 91101
626-792-9593

# Table of Contents


Section — Page

**Cover Letter** ........ i
**Executive Summary** ........ 1
**1.0 Background** ........ 1
**2.0 Waste Characterization Studies and Program Access** ........ 2
2.1 California ........ 3
2.2 Florida ........ 3
2.3 Georgia ........ 4
2.4 Illinois ........ 4
2.5 Michigan ........ 4
2.6 New York ........ 4
2.7 North Carolina ........ 4
2.8 Ohio ........ 5
2.9 Pennsylvania ........ 5
2.10 Texas ........ 5
**3.0 Recycling Facility Survey** ........ 5
**4.0 Industry Experts Survey** ........ 8
**5.0 Alternative Recycling Methods** ........ 8
**6.0 Limitations of Recycling Facilities** ........ 9
**7.0 Survey Deviations and Limitations** ........ 9
**8.0 Conclusions** ........ 10
**9.0 References** ........ 11


## Tables


Table 1. Summary of Statewide and City Plastic #5 Program Acceptance and Waste Characterization Studies ........ 2
Table 2. Recycling Facility Survey Response Summary ........ 6
Table 3. Summary of Key Barriers to K-Cup Recycling ........ 6


## Appendices


Appendix A Expert Qualifications
Appendix B Survey Questionnaire
Appendix C Survey Results

# EXECUTIVE SUMMARY

Truth in Advertising (TINA.org) contracted with SCS Engineers (SCS) to conduct an analysis regarding the recyclability of Keurig K-Cup® single-serve coffee pods (K-Cups). The information gathered in this study will be used by TINA.org to analyze whether the marketing for these products deceives US consumers.

SCS conducted comprehensive surveys with recycling industry representatives in major US cities to assess whether K-Cups are recycled through residential curbside or drop-off recycling programs. The methodology included a review of published reports, expert consultations, and analysis of state waste characterization data.

This report provides a summary of research on the recyclability of K-Cups in the 10 largest states, by population, in the United States. The findings of this report are derived from manufacturer documentation, state-level Waste Characterization Studies (WCSs), and independent survey responses from recycling and transfer facilities. According to data from WCSs conducted in the focus states, K-Cups are infrequently tracked as a separate material type and are typically categorized under broader groupings such as “Other Plastic Packaging.” Although many municipalities accept Plastic #5 (polypropylene) for recycling, K-Cups commonly pass through sorting equipment in recycling facilities and are often considered contaminated with coffee grounds or other parts of the coffee pod, resulting in disposal.

Survey results indicate that although most recycling and transfer facilities accept Plastic #5 materials, only a limited number specifically accept or process K-Cups. Typically, these facilities require consumers to disassemble the pods before recycling. Commonly cited barriers to recycling K-Cups include difficulties related to size-based screening and contamination. Alternative recovery solutions, such as third-party take-back initiatives and the Keurig Dr Pepper (KDP) K-Cycle recycling program, provide options for pod recycling outside of curbside collections; however, these alternatives may be constrained by the additional costs posed by the recycling services.

# 1.0 BACKGROUND

K-Cups, a widely used form of single-use coffee pods sold and distributed by KDP, have gained popularity due to their convenience, variety of flavors, and multiple brew sizes and options. Additionally, the existing market for K-Cup has grown and is expected to continue to grow despite a significant drop in away-from-home business caused by the pandemic. In 2021, one industry source projected U.S. consumption would surpass 30 billion K-Cups, whereas another analysis put 2021 usage around 18 billion pods. In 2023, the company saw a nearly 4 percent drop in sales as consumers returned to the office but expect their market to grow to $1.6 billion by 2032.

The disposable K-Cups are approximately 2 inches by 2 inches, Each pod consists of a small plastic cup, typically made from Plastic #5 (polypropylene). Inside the cup, a paper filter holds the beverage grounds, allowing hot water to pass through during brewing while keeping the grounds contained. The top of the pod is sealed with an aluminum foil lid.

## 2.0 WASTE CHARACTERIZATION STUDIES AND PROGRAM ACCESS

Many states conduct Waste Characterization Studies to identify the types and quantities of waste disposed of in landfills. These studies involve sorting, weighing, and analyzing waste samples to assess material composition and contamination levels. K-Cups are often labeled as non-recyclable, though they are made of Plastic #5 which is commonly identified in waste characterization studies. However, their small size makes recycling and accurate classification challenging. Though the WCSs below do not specifically examine, sort, or characterize K-Cups, they do offer insights into waste streams in the various communities and the findings of Plastic #5 in waste.

Across the 10 states studied, curbside acceptance of Plastic #5 varies across individual community programs. No state mandates universal collection of Plastic #5 items. Many city guidance documents still direct single-serve coffee pods to trash because their small size and coffee-ground residue hinder sorting in recycling facilities. Even where programs accept “rigid plastics #1-7,” K-Cups are often explicitly labeled as an exception. The national residential recycling rate for Plastic #5 is approximately 8%, meaning approximately nine out of ten Plastic #5 packages are not recycled and instead are lost to disposal. A summary of statewide and individual city WCSs are included in **Table 1**, below. K-Cups, which are not typically tracked in WCSs, are included with Plastic #5:

Table 1. Summary of Plastic #5 Program Acceptance and Waste Characterization Study Results

| State | Plastic #5 Acceptance Policy | Waste Characterization Metric for Plastic |
|---|---|---|
| California | Plastics #5 have been officially designated as materials that must be recycled in communities representing at least 65% of the state’s population by 2032. Many cities do not accept K-Cups as Plastic #5 and direct consumers to place waste in garbage. | Statewide study: polypropylene (#5) containers ≈0.6% of disposed municipal solid waste (MSW) by weight; K-Cups not separately identified. |
| Florida | Acceptance of Plastic #5 varies by county; no recent statewide characterization. | County studies: #3–#7 plastics are 0.2% of disposed MSW by weight; K-Cups not separately identified. |
| Georgia | Metro Atlanta programs include Plastic #5. Limited information on state-wide policy. | 2005 statewide study: plastics, in aggregate, ≈15.8% of disposed MSW by weight; no #5 or K-Cup breakout. |
| Illinois | In Chicago, there is no municipal policy on Plastic #5; non-governmental sources direct K-Cup pods to MSW. | Statewide study: combined #3, #4, #5, #7 plastics ≈4.1% of disposed MSW by weight; no K-Cup breakout. |
| Michigan | #3 –#7 plastics recyclable only in select communities; no mention of K-Cup pods. | Statewide study: #3–#7 plastics ≈4.1% of disposed MSW by weight; #5 and K-Cups not reported separately. |

| State | Plastic #5 Acceptance Policy | Waste Characterization Metric for Plastic |
|---|---|---|
| New York | In New York City (NYC), all rigid plastic containers are accepted if emptied and rinsed; no municipal guidance on K-Cup pods. Limited information on state-wide policy. | NYC study identified K-Cups for sorting; plastic pods counted within "Other Plastic"; no separate percentage for #5 alone. |
| North Carolina | City of Raleigh excludes K-Cup pods from recycling. Limited information on state-wide policy. | County study tracked "dairy" plastics including #5 tubs/lids within broader container categories; K-Cups not separately identified. |
| Ohio | Central Ohio program accepts bottles, clamshells, tubs, jugs and cups; all other plastics—including K-Cup pods—must be excluded. Limited information on state-wide policy. | Regional studies group #3–#7 plastics; no standalone #5 or K-Cup percentage; included within broader plastic categories in disposed waste. |
| Pennsylvania | Cities of Philadelphia and Pittsburgh accept #5; Pittsburgh explicitly excludes K-Cup pods. Limited information on state-wide policy. | Plastics comprise 18.9% of statewide disposal. |
| Texas | Cities of Houston and Dallas accept Plastic #5; City of Houston specifically excludes K-Cup pods from recyclables. Limited information on state-wide policy. | Austin study: combined #3 and #5 plastics ≈1.6% of disposed MSW by weight; K-Cups not separately identified. |

## 2.1 CALIFORNIA

Under California's implementation of the Plastic Pollution Prevention and Packaging Producer Responsibility Act (SB 54), Plastic #5 has been officially designated as a material that must be recycled in communities representing at least 65 percent of the state's population by 2032.

However, CalRecycle reports that fewer than 15 percent of California's material recovery facilities currently sort Plastic #5 rigid plastics into separate recycling streams, resulting in less than 3 percent of Plastic #5 waste generated statewide being successfully collected and sorted for recycling. Consequently, despite the technical inclusion of Plastic #5 in the regulated recyclable stream, local acceptance of K-Cup pods remains inconsistent. As a result, individual cities and waste haulers frequently treat K-Cup pods as conventional refuse, directing consumers to dispose of them in the MSW stream rather than recycling programs.

## 2.2 FLORIDA

While Florida has conducted WCSs, such as those in Alachua and Pinellas counties, these reports were not conducted in the previous 10 years, and do not specifically address K-Cups or Plastic #5. Plastics are grouped into broader categories. Orange County conducted a WCS, which found that plastics #3 - #7 comprised 0.2 percent of waste collected.

County-level acceptance of Plastic #5 varies; there is no recent statewide waste characterization data to confirm K-Cup policies.

## 2.3 GEORGIA

The state's 2005 Statewide WCS provides data on various waste components. However, it does not specifically mention K-Cups or Plastic #5, grouping plastics into broader categories that encompass multiple material types. Plastic recycling in this study found that on aggregate plastics made up 15.8 percent of the disposed waste stream.

In Atlanta and its surrounding suburbs, curbside recycling includes Plastic #5. Metro Atlanta accepts Plastic #5, but statewide policy information is limited and unclear regarding K-Cups.

## 2.4 ILLINOIS

Illinois has conducted WCSs, but these studies do not specifically address K-Cups or Plastic #5, grouping plastics into broader categories that include various material types. In the 2010 Chicago Department of Environment WCS, plastic made up 12.4 percent of the waste stream.

Some non-governmental sources indicate that K-Cups should not be recycled in the City of Chicago; no specific reasons were provided.

## 2.5 MICHIGAN

Michigan's Department of Environment, Great Lakes, and Energy (EGLE) – then known as the Michigan Department of Environmental Quality – published a WCS in 2016 which indicated that plastics comprised 10 percent of the waste composition. However, specific data on K-Cups or Plastic #5 is not readily available, as plastics are often grouped into broader categories in this report.

EGLE's website indicates "Plastic products with Nos. 1 or 2 (e.g., plastic water bottles, milk jugs) are widely accepted in recycling programs. However, you may find products numbered 3-7. These types of plastic are recyclable – but only in select communities in Michigan." This website does not specifically mention K-Cups.

## 2.6 NEW YORK

New York State does not have comprehensive statewide WCS results. However, WCSs have been conducted in New York City and other communities. New York City's 2017 waste characterization identified K-Cup pods as a distinct item for sorting, with predominantly plastic pods counted within the "Other Plastic" category That category exhibited an estimated recycling capture rate of approximately 20.7 percent; the study did not publish a separate percentage for #5 plastics alone.

New York City's official website does not provide guidance on K-Cups specifically nor on plastic recycling by number. New York City does indicate that all rigid plastic containers are accepted regardless of number, if they are empty and rinsed.

## 2.7 NORTH CAROLINA

North Carolina lacks a recent, accessible WCS. Plastics are typically categorized broadly, limiting detailed analysis of these specific items.

Responses from North Carolina Department of Environment and Natural Resources' Division of Pollution Prevention and Environmental Assistance and the Association of Postconsumer Plastic Recyclers do not explicitly state that Plastic #5 is accepted. Cities such as Raleigh do not accept K-Cups in the recycling stream.

## 2.8 OHIO

Ohio lacks a recent comprehensive WCS. The available reports tend to categorize plastics broadly, limiting detailed analysis of these specific items.

The Solid Waste Authority of Central Ohio states that "Recycling programs accept plastic bottles, plastic clear clamshell containers, tubs, jugs and cups. All other plastics – such as plastic grocery bags -- should be kept out of the recycling cart," yet does not break down recycling rules by plastic number or K-Cups specifically. Additionally, some recycling entities in the state advise customers not to recycle K-Cups as they are too small.

## 2.9 PENNSYLVANIA

Pennsylvania's WCS indicates that plastic makes up 18.9 percent of the statewide aggregate waste disposal, though it does not break down Plastic #5 or K-Cups to its own categories. The two largest metropolitan areas of Pennsylvania – Philadelphia and Pittsburg – both accept Plastic #5, though Pittsburg explicitly instructs consumers not to recycle K-Cups.

## 2.10 TEXAS

Texas has not currently conducted a comprehensive statewide WCS. However, some individual municipalities have completed WCSs, though the availability of detailed findings at the city level remains limited. Dallas, for example, has performed a WCS but does not specifically mention K-Cups in its analysis. Instead, Plastic #5 is grouped within a broader category labeled "#3–#7 containers." The Dallas curbside recycling program accepts plastics numbered 1 through 7.

San Antonio's waste management plan remarks that, "Today, coffee is usually sold in a lightweight foil or paper pouch which is not recyclable." There is no specific reference to K-Cups in the city's plan.

Houston does not have a city-level WCS. The municipal recycling program accepts plastics #1–5 and #7, specifically including bottles, tubs, and jugs. However, coffee pods are not listed among accepted items, and the guidance to residents is, "when in doubt, throw it out."

Austin's 2020 WCS reports that Plastic #3 (Polyvinyl Chloride) and Plastic #5 together constitute about 1.5% of disposed material by weight. The report does not single out K-Cups as a separate category.

# 3.0 RECYCLING FACILITY SURVEY

From March to June of 2025, SCS conducted a national survey of recycling professionals to assess the availability of K-Cup recycling across the United States. Outreach efforts focused on contacting multiple collectors and processors within the 10 most populous states. The survey aimed for broad coverage, through interviews, and attained 17 responses to survey questions described in the table below and as discussed in detail in Section 7.0 of this report. Interview targets included the six largest national haulers and recyclers operating within the selected municipalities, representing

approximately 89 percent of the total U.S. waste and recycling market. See **Table 2** below for a summary of responses. The survey questionnaire is included in **Appendix B**, and detailed survey results are included in **Appendix C.**

Table 2. Recycling Facility Survey Response Summary

| | Yes | No | No Comment |
|---|---|---|---|
| Accepts Plastic #5 | 11 | 3 | 3 |
| Accepts Small #5 (<4") | 7 | 4 | 6 |
| Accepts K-Cups | 4 | 9 | 4 |
| Actively Solicits #5 K-Cups | 3 | 6 | 10 |
| Required Separation | 7 | - | 10 |
| Recent Policy Changes in K-Cup Acceptance | 0 | 13 | 4 |
| Anticipated Changes in K-Cup Acceptance | 1 | 11 | 5 |

Survey results revealed several operational and market barriers to K-Cup recycling, outlined in **Table 3** below.

Table 3. Summary of Key Barriers to K-Cup Recycling

| Barrier Type | Description |
|---|---|
| Material Composition | Mixed materials (plastic, aluminum, organic waste) reduce processability. |
| Contamination | Residual coffee grounds increase rejection rates in Material Recovery (Recycling) Facilities (MRFs). |
| Size and Weight | Small dimensions cause sorting failure during mechanical screening. |
| Infrastructure Limits | Most MRFs are not designed to capture or process small-format plastics. |
| Economic Viability | Low resale value and high processing costs deter facility investment. |
| Consumer Participation | Disassembly is rarely performed by consumers, limiting program success. |

Multiple respondents flagged two core barriers: size and contamination. Pods are too small to be captured and fall through the sorting equipment, and their multi-material design (foil lid, plastic cup, and coffee grounds) makes them hard to sort and clean. Several operators said they don't target or track pods, rely on third-party MRFs, and lack visibility into downstream handling. Even where Plastic #5 is accepted, end markets are weak, often unprofitable, and adding pods would further devalue already dirty bales (e.g., residue from dairy containers). Upgrades like robotic sorting were viewed as poor ROI for such low-volume items; capturing pods would likely require separate collection or labor-intensive picking—both seen as cost-prohibitive without consumer disassembly and better education. Comments indicated that pods are rarely captured and typically lost to residue rather than recycled.

Responses were received from 15 MRFs and two transfer stations across the U.S., including facilities in California (Anaheim), Michigan (Southfield and Grand Rapids), Florida (Sarasota and Miami), and others serving metropolitan regions such as Los Angeles, Detroit, and Miami-Dade. The survey asked a series of questions related to K-Cup recycling and resulted in seventeen complete responses. The survey included both single-stream MRFs and mixed-waste processing MRFs, offering insight into diverse infrastructure and regional market conditions. Although several cities now list 'rigid #1–#7 plastics' in curb-side guidelines, our facility survey shows that K-Cups rarely survive processing: 4 out of the 17 surveyed stating that they would accept K-Cups under the condition that they are cleaned and separated into component parts. K-Cups' small size and contamination potential, limited market value, and MRF equipment barriers continue to hinder recovery, especially in regions with limited infrastructure investment.

One operator noted they previously had to pay a broker to haul away mixed plastics due to insufficient market value, suggesting that the cost of recovery often outweighs the return. Another respondent stated that even with more robotic sorting infrastructure, the low volume of #3–#7 plastics (including K-Cups) would not justify the capital expenditure due to poor return on investment.

The multi-material design of K-Cups, consisting of a Plastic #5 shell, paper filter, coffee grounds, and aluminum lid, also poses a contamination problem for recycling systems. Some facilities that do accept K-Cups require the pod to be disassembled by consumers before it can be recycled. Respondents agreed that consumer preparation is unlikely to occur at scale in residential recycling, and some emphasized that failure to disassemble the pods properly leads to rejected loads and higher contamination rates.

A recurring issue cited across regions was that K-Cups are too small to be effectively captured by existing mechanical sorting systems. Their size causes them to fall through the sorting screens and glass breakers that are designed to separate larger containers. This issue was noted by operators in both California and Michigan, where facilities acknowledged that even advanced facilities with automated equipment failed to recover K-Cups consistently. As one California operator put it, "the main issue is the foil and grounds as well as the size." Another operator indicated "They [K-Cups] fall through the glass breakers rather than going over top like larger items to continue sorting."

A facility in Miami noted that while they accept recyclables broadly, K-Cups are not actively solicited for collection; and in Ohio, one facility reported that even though Plastic #5s are accepted generally, K-Cups are discouraged because they often fall through equipment screens or contribute to contamination.

When asked about future expectations, the majority (65 percent) of facilities indicated that no significant changes were anticipated in the next 2–3 years regarding the recycling of K-Cups. One California-based facility said that policy changes might occur in the long term if downstream markets or producer responsibility models shift, but that the current infrastructure does not support widespread recovery.

Overall, the majority (59 percent) of surveyed facilities indicated that they accept Plastic #5 in their standard recycling stream. However, only 20 percent of respondents said that they explicitly accept K-Cups, one with the caveat that they are only accepted if emptied. Several facilities explicitly stated that, despite accepting Plastic #5s like tubs and rigid containers, they advise residents not to recycle K-Cups due to their small size and mixed material construction.

In summary, while Plastic #5 is recyclable and commonly accepted in curbside collection programs, actual recovery of small-format items like K-Cups remains limited. This is due to a convergence of issues: mechanical screening limitations, product contamination, and market constraints. Similar surveys conducted by Greenpeace in 2022 found that 1 out of 375 MRFs explicitly accepted Plastic #5 coffee pods.

# 4.0 INDUSTRY EXPERTS SURVEY

In addition to the facility surveys, SCS interviewed two industry experts regarding the recyclability of K-Cups. We interviewed a Vice President of a major North American waste management company, operating 367 collection operations, 248 transfer stations and 75 recycling centers across 41 states in the U.S. and Canada. SCS also spoke to a Solid Waste and Recycling Manager for a large city. They were asked to give SCS their insight regarding recycling operations for coffee pods. They focused on the challenges posed by the materials and processes involved. The consensus of the discussion is that the multi-material composition, small size, and contamination of coffee pods result in their frequent rejection and disposal in landfills:

- Material acceptance criteria: Accepts Plastic #5, foils, and organic materials in many facilities but requires materials to be clean, dry, empty, and larger than 2 inches; coffee pods rarely meet these standards due to contamination and size issues.

- Processing challenges: Coffee pods are not designed for recycling processes, often breaking during sorting, which releases contaminants and leads to landfill disposal; current sorting technologies and policies are not tailored for coffee pods.

- Market outlook: While Plastic #5 markets are developing positively, coffee pods are viewed as contaminants with limited potential for inclusion in future recycling streams due to sorting and contamination difficulties.

# 5.0 ALTERNATIVE RECYCLING METHODS

Although local recycling companies often depend on the profitability of recycled materials, several companies have developed partnerships with brands and retailers to fund the recycling process. Some of these business models are based on funding from the producer, and the service includes a bag, box, or pallet that is shipped to and from the consumer to allow for transportation of the K-Cups to the recycling facility and includes the cost or recycling the K-Cups. The best-known is TerraCycle's Zero Waste Box program. Customers purchase a pre-paid collection box (capacity of approximately 450 pods) or a bulk pallet bag (capacity of approximately 22,000 pods), fill it with any brand of coffee capsules—grounds and foil included—and ship it back via UPS. TerraCycle then separates the polypropylene, aluminum, and organics; plastics are processed into pellets for reuse, metals are recovered, and coffee grounds are composted. Pricing is roughly $133 USD per small box (cost of approximately 29¢ per pod) and $1,628 USD per pallet (cost of approximately 7¢ per pod). Service is limited to the contiguous U.S.

Two additional options rely on producer or brand funding. The g² revolution Coffee-Pod Mail-Back kit, marketed directly to offices and hospitality venues, provides return cartons or bins that are processed at g²'s Midwest facility; costs are quoted case-by-case but fall in a similar 6–12¢ per-pod range, with no consumer disassembly required. KDP partners with g² on its K-Cycle® workplace program—collection bins are sold through Keurig distributors and shipped to an Emterra recycling site when full—and in 2024 it launched an at-home mail-back bag for households lacking local acceptance. The program claims that in 2019, users recycled 1,250,000 pounds of K-Cups.

Some coffee producers such as Don Francisco's® Coffee bags and pods, Café La Llave® Espresso coffee pods, and José's® Gourmet Coffee fully subsidize TerraCycle "brigade" boxes, letting consumers ship qualifying pods free of charge while TerraCycle credits loyalty points to designated charities. Although these alternatives overcome the size-and-contamination barriers that limit curbside recovery, their adoption is constrained by per-pod fees, geographic exclusions (Alaska, Hawaii, Puerto Rico), and, in the case of brand-sponsored brigades, limited enrollment slots.

However, The Last Beach Cleanup filed a March 4, 2021 lawsuit against TerraCycle Inc. and 10 major brands, alleging they label hard-to-recycle packaging "recyclable with TerraCycle" while imposing strict sign-up caps that shut most consumers out of the free mail-back program. According to the complaint, those consumers are then pushed toward TerraCycle's pricey Zero Waste Box service or end up discarding the items, rendering the "recyclable" claim misleading. Plaintiffs also say the companies have not produced records proving the collected material is recycled, in violation of California's consumer-protection laws. TerraCycle CEO Tom Szaky rejects the allegations (Goldsberry, 2021).

# 6.0 LIMITATIONS OF RECYCLING FACILITIES

Numerous limitations of existing recycling infrastructure inhibit the effective recovery of K-Cups. While Plastic #5 is accepted by many municipal recycling programs, the actual processing of small-format items such as K-Cups is typically infeasible. Several constraints have been identified through the facility operator feedback:

- Size Limitations: Mechanical sorting equipment in many MRFs, including disc screens and glass breakers, is designed for larger items. K-Cups frequently fall through these screens and are mistakenly routed for traditional disposal with small waste material, making effective capture highly unlikely.

- Material Contamination: The presence of coffee grounds and residual liquid introduces contamination to the plastic and aluminum components. Many facilities lack the capacity to clean or separate such materials effectively and therefore reject pods altogether.

- Sorting System Design: Even advanced facilities equipped with robotic sorting arms or optical sorters report low recovery rates of K-Cups. The pods' low weight, irregular shape, and material blend interfere with automated identification systems, especially when pods are not emptied or disassembled by consumers.

- Economic Constraints: Several facilities have indicated that the market value of recovered K-Cup materials is insufficient to justify the cost of labor or equipment upgrades required to process them. Some operators have had to pay brokers to remove low-value mixed plastics, highlighting the negative economic return associated with K-Cup recovery.

In summary, despite being made from a recyclable polymer, the practical recyclability of K-Cups is severely constrained by infrastructure limitations, contamination potential, and market economics.

# 7.0 SURVEY DEVIATIONS AND LIMITATIONS

Obtaining clear and consistent information from recycling facilities proved challenging. Many respondents supplied only partial or ambiguous data on K-Cup handling, reflecting the broader difficulty of tracking small-format, composite plastics within mixed recycling streams. Familiarity with

facility-level sorting capabilities varied markedly; several operators reported that they do not track K-Cups at all, limiting the availability of precise, actionable data. Consequently, the survey methodology was adjusted to broaden certain questions and to rely more heavily on qualitative feedback to fill quantitative gaps.

The survey was met by a low response rate: only 20 percent of the facilities contacted completed the questionnaire. This limited participation was offset by data gathered from recycling industry experts representing multiple states.

# 8.0 CONCLUSIONS

The findings from WCSs, facility surveys, and expert consultations indicate that although Plastic #5 is accepted in municipal recycling programs, K-Cups encounter several recycling challenges. These include size constraints, contamination from residual coffee grounds, multi-material composition, and limited market value impacting economic viability. Alternative recycling solutions, including third-party recycling programs and Keurig's K-Cycle initiative, offer additional recycling options; however, they are subject to limitations such as consumer costs, accessibility issues, and existing infrastructure constraints. As a result, many K-Cups continue to be disposed of via landfills or incineration. On aggregate, K-Cups are not typically accepted for recycling in the United States. Programs serving a substantial majority of consumers (≥60%) do not accept K-Cups as placed; further, K-Cups generally fail the recyclability test on all three prongs—access, storability, and end markets. Accordingly, 'recyclable' claims overstate real-world outcomes.

# 9.0 REFERENCES

(2017). 2017 NYC Residential, School, and NYCHA Waste Characterization Study. New York City: New York City Department of Sanitation

(2024). 2021 Disposal Facility-based Characterization of Solid Waste in California. Sacramento: California Department of Resources Recycling and Recovery.

(2023). Austin's 2020 Waste Characterization, Capture Rate and Diversion Study. https://www.houstontx.gov/solidwaste/plastics-oct22.pdf#:~:text=Plastics%20The%20City%20of%20Houston,accepted%20curbside%20or%20at%20the: Austin Resource Recovery.

Burlingame. (n.d.). Retrieved from FAQs: https://www.burlingame.org/FAQ.aspx?QID=563#:~:text=Are%20the%20Keurig%20K,in%20the%20black%20garbage%20bin

California Department of Resources Recycling and Recovery . (2025). SB 343 material characterization study: Final findings 2023/2024. Sacramento: (Publication No. DRRR-2025-1750).

California Department of Resources Recycling and Recovery. (2024, December 31). SB 343 Material Characterization Study Revised Preliminary Findings Report (DRRR-2024-1746). Retrieved from CalRecycle: https://www2.calrecycle.ca.gov/Publications/Details/1747

CalRecycle. (2025). SB 54: Plastic Pollution Prevention and Packaging Producer Responsibility Act – Packaging EPR. Retrieved from CalRecycle: https://calrecycle.ca.gov/packaging/packaging- epr/

Cambio Roasters. (2021, August 6). Should You Recycle K-Cups®? Let's Break it Down. Retrieved from Cambio: https://cambioroasters.com/blogs/news/should-you-recycle-k-cups%C2%AE- lets-break-it-down#:~:text=Why%20Does%20This%20Matter%3F

CDM. (2010). Waste Characterization Study. Chicago: CHICAGO DEPARTMENT OF ENVIRONMENT.
Curbside Recycling. (2025). Retrieved from City of Pittsburg: https://www.pittsburghpa.gov/Resident-Services/Trash-Recycling/Curbside-Pick- Up/Curbside-Recycling#:~:text=Image%3A%20Accepted

Diane M Shand, C. J. (2021). Keurig Dr Pepper Inc. New York City: S&P Global Ratings.

(2025). FAQ: Material-Specific Recycling Information. Lansing: Department of Environment, Great Lakes, and Energy.

Goldsberry, C. (2021, August 12). TerraCycle and Corporate Partners Sued by NGO for Misleading Consumers. Retrieved from PlasticsToday: https://www.plasticstoday.com/packaging/terracycle-and-corporate-partners-sued-by-ngo- for-misleading-consumers

Greenpeace USA. (2022). Circular Claims Fall Flat Again: 2022 Update. Greenpeace.

https://www.rumpke.com/blog/guide-to-recycling-k-cups-and-coffee-pods#:~:text=K,Small

Heller, M. (2017). Food Product Environmental Footprint Literature Summary: Coffee. Center for Sustainable Systems, University of Michigan; Oregon Department of Environmental Quality.

Intellegent Blends. (2021, July 1). The Growth of K-Cup® Usage During COVID-19. Retrieved from Intellegent Blends: https://intelligentblends.com/the-growth-of-k-cup-usage-during-covid-19/#:~:text=Image%3A%20A%20white%20cup%20is,it%20doesn%E2%80%99t%20look%20like%20it%E2%80%99s

North Carolina State University. (2025). Waste Reduction and Recycling. Retrieved from Recycling North Carolina State University: https://recycling.ncsu.edu/recycling-guide/#:~:text=University%20recycling,and%20other%20single%20serve

NYC 311. (2024). Retrieved from Recycling Rules: https://portal.311.nyc.gov/article/?kanumber=KA-02013

Perkins, S. (2018). Your county-by-county guide to recycling in metro Atlanta. The Atlanta Journal-Constitution.

Plastic (PET) Recycling. (n.d.). Retrieved from Solid Waste Authority of Central Ohio: https://www.swaco.org/430/Plastic-PET-Recycling#:~:text=Although%20some%20fear%20that%20recycling,you%20will%20be%20recycling%20right

R. W. Beck. (2005). Georgia Statewide Waste Characterization Study. Georgia Department of Community Affairs.

(2023). Recyclability Status of Covered Material Categories. Sacramento: Department of Resources Recycling and Recovery (CalRecycle).

Recycle by City. (2025). keurig coffee pods. https://www.recyclebycity.com/chicago/guide/garbage-cart/coffee-pods/keurig-coffee-pods#:~:text=keurig%20coffee%20pods%20,sorted%20at%20the%20recycling%20facility: Recycle by City.

Responses from N.C. DPPEA and the Association of Postconsumer Plastic Recyclers. (n.d.). Retrieved from NC.gov: https://files.nc.gov/ncdeq/Environmental%20Assistance%20and%20Customer%20Service/Plastic%20Bottles/Other%20Resources/FAQs.pdf#:~:text=3,container%20in%20your%20recycling%20bin

Riddler, M. (2024, November 9). Share of U.S. consumers who own a single-cup coffee brewing system from 2005 to 2020. Retrieved from Statista: https://www.statista.com/statistics/316217/us-ownership-of-single-cup-brewing-systems/

Schoonmaker, D. (2016). economic impact potential and characterization of municipal solid waste in Michigan. Lansing: Michigan Department of Environmental Quality.

Solid Waste Management Department. (2025). Retrieved from Houston Recycles: https://www.houstontx.gov/solidwaste/plastics-oct22.pdf#:~:text=Plastics%20The%20City%20of%20Houston,accepted%20curbside%20or%20at%20the

The Recycling Partnership, Polypropylene Recycling Coalition – Annual Report 2024 (Oct. 30, 2024).

Tim Townsend, A. B. (2010). ALACHUA COUNTY WASTE COMPOSITION STUDY . Alachua County Public Works Department.

Townsend, T. (2019). Waste Composition of Palm Beach County. Gainesville: University of Florida.

(2019). Waste Characterization Study. Columbus: Solid Waste Authority of Central Ohio.

(2022). Waste Characterization Study. Harrisburg: Pennsylvania Department of Environmental Protection.

Wenzel, E. (2024). What companies can learn from Keurig's SEC case over K-Cup recycling claims.

Trellis Group Inc.

# Appendix A

# Expert Qualifications

## EXPERT QUALIFICATIONS

*Michelle P. Leonard, Senior Vice President, SCS Engineers*

Michelle Leonard is a nationally recognized expert in solid waste planning and recycling with more than 35 years of experience in environmental consulting and project management. She leads Sustainable Materials Management (SMM) initiatives for public agencies and private clients, including zero-waste planning, infrastructure assessments, and market analyses. Ms. Leonard has served as an expert in litigation and regulatory matters—most notably providing expert analysis in the Keurig Green Mountain class action in the U.S. District Court, Northern District of California, where she evaluated the extent to which single-serve coffee pods labeled as “recyclable” are actually recyclable in practice, including conducting an extensive survey of California MRFs regarding acceptance and sortation capabilities. She has also supported Truth in Advertising (TINA.org) by researching the real-world recyclability of K-Cups nationwide, drawing on published reports, facility outreach, and data analysis. Ms. Leonard is SCS Engineers’ National Expert in Solid Waste Planning & Recycling, a past president within SWANA leadership, and has been recognized in industry trade coverage for her leadership in recycling and zero-waste program design.

*Sonya S. Betker, Project Director Sustainability/Circular Economy, SCS Engineers*

Sonya S. Betker is a nationally recognized sustainability professional with more than two decades of experience advancing zero waste, circular economy, and sustainable materials management (SMM) initiatives for public agencies, private industry, and nonprofit organizations. At SCS Engineers, she leads and co-leads projects spanning construction and demolition waste diversion, cruise line zero-waste pilots, kitchen remodeling reuse initiatives, and biochar/carbon market development. Ms. Betker specializes in aligning client operations with the TRUE Zero Waste framework, integrating regulatory compliance, cost analysis, and resource recovery into actionable strategies. She also serves as Vice President of the National Stewardship Alliance Foundation and as a Board Member of Reuse Minnesota and SWANA Minnesota Chapter, reflecting her leadership in advancing practical reuse and materials recovery solutions nationwide.

# Appendix B

# Survey Questionnaire

# SURVEY QUESTIONNAIRE

**Survey: Assessing the Recyclability of K-Cups**

**1. Facility/ Operator: Contact Information**

A. Facility / Company Name:
B. Location (Address, City, State):
C. Primary Geographic Area Served (e.g., counties, cities, regions):
D. Contact Person Name & Title:
E. Contact Email / Phone:

**2. Facility Operations**

Do you operate as a:

- ☐ Single stream recyclables MRF
- ☐ Mixed Processing MRF-Recycling Hauler
- ☐ Other (please specify)

**3. Materials Accepted: Focus on #5 Plastics and K-Cups**

A. Does your facility accept #5 plastic (polypropylene) items for recycling?

- ☐ Yes
- ☐ No

B. Does your facility accept small format #5 plastic items (e.g., smaller than 4 inches in two dimensions)?

- ☐ Yes
- ☐ No

C. Does your facility accept single-serve coffee pods (e.g., K-Cups) for recycling?

- ☐ Yes
- ☐ No

D. If yes to single-serve coffee pods, do you specifically accept or target those made of #5 plastic (e.g., K-Cups)?

- ☐ Yes
- ☐ No

### 4. K-Cup Acceptance Requirements (Please answer the following questions only if your facility accepts K-cups for recycling.)

A. How does your facility require K-Cups to be accepted for recycling?

- ☐ Whole pod (unseparated)
- ☐ Separated into plastic cup, foil lid, filter, and coffee grounds

B. What are the biggest barriers to accepting K-Cups separated vs. whole (e.g., contamination, equipment limitations, cost, labor)?

### 5. Processing & Sorting

A. Please describe how K-Cups are captured/sorted

- What sorting technology or processes do you use (e.g., optical sorters, manual picking)?
- Do you sort K-Cups into separate #5 bales, mixed #3–7 bales, or include them with other materials?
- How much of this material (weight, volume, or item count) do you capture on a daily or weekly basis?

B. Not Captured/Disposed

- If these materials are not captured or fully sorted, what happens to them (e.g., sent to landfill, incineration, or other)?

C. Changes in Operations

- Have your K-Cup (or small #5 plastic) collection policies changed over the past 5 years (e.g., started accepting them, stopped accepting them)? If yes, please explain.
- Do you anticipate any changes in the next 2–3 years regarding your ability to collect K-Cups for recycling or disposal? If yes, please explain.

### 6. Market & End Destinations

A. If your facility produces separate #5 bales:

- Have you had issues maintaining a consistent buyer for the resulting material stream?
- Do you need to further prepare, clean, or otherwise process these items for them to be accepted by downstream markets?

B. If your facility includes K-Cups or other #5 plastics in mixed #3–7 bales:

- Have you had issues maintaining a consistent buyer for the resulting material stream?
- Do you need to conduct any special preparation for these bales?

C. If you handle K-Cups or other #5 plastics in any other way (e.g., shred and separate foil, filter, etc.):

- Have you had issues maintaining a consistent buyer for the resulting material stream?
- Do you need to separate the foil, filter, or coffee grounds to meet market requirements?
- What is the final disposition of these separated or processed materials?

## 7. Additional Notes or Comments

- Please share any feedback on challenges or opportunities related to recycling single-serve coffee pods (e.g., contamination from coffee grounds, small size, multi-material components, etc.).

# Appendix C

## Survey Results

# SURVEY RESPONSES

**Survey: Assessing the Recyclability of K-Cups**

## 1. Facility/ Operator: Contact Information

Note: Only general location is shown to maintain respondent anonymity.




## 2. Facility Operations

Do you operate as a (select all that apply):




**Dump and bale, Transfer trailer, Box Truck, Shred, Roll Shear, Cross Dock*

### 3. Materials Accepted: Focus on #5 Plastics and K-Cups

A. Does your facility accept #5 plastic (polypropylene) items for recycling?




**The facility accepts recyclables but operates as a transfer station, sending the materials to a third party for sorting and resale. He did not know the name of the third-party.*

B. Does your facility accept small format #5 plastic items (e.g., smaller than 4 inches in two dimensions)?




**No - MRF has optical sorting technology for plastics but the number 5s are typically hand sorted out.*

***technically acceptable, don't say they aren't allowed on website, but an item <2.5"-3" will always fall through screen right away and never get recycled*

C. Does your facility accept single-serve coffee pods (e.g., K-Cups) for recycling?




**would tell them not to if asked because it likely won't be recovered, but not specified on education materials not to include*

D. If yes to single-serve coffee pods, do you specifically accept or target those made of #5 plastic (e.g., K-Cups)?



**4. K-Cup Acceptance Requirements (Please answer the following questions only if your facility accepts K-cups for recycling.)**

A. How does your facility require K-Cups to be accepted for recycling?




B. What are the biggest barriers to accepting K-Cups separated vs. whole (e.g., contamination, equipment limitations, cost, labor)?



## 5. Processing & Sorting

A. Please describe how K-Cups are captured/sorted

- What sorting technology or processes do you use (e.g., optical sorters, manual picking)?

12 responses




**manual pre-sort, manual plastics sorting for #1/#2 from commingled line prior to robots*

***Star screens, shaker tables that separate small items like glass*

****some manual QC especially at pre-sort*

*****Mainly serves as a transfer station.*

- Do you sort K-Cups into separate #5 bales, mixed #3–7 bales, or include them with other materials?

7 responses




- How much of this material (weight, volume, or item count) do you capture on a daily or weekly basis?
  - *Unknown*
  - *Check with MRF*
  - *2-3 bales #5 weekly*
  - *The combo bale of #1 and #5 we capture approx. 20 bales per week at an average weight of 1,540lbs per bale.*
  - *will not be captured in any bale, sees them in residual*
  - *1-2% of stream*
  - *N/A*
  - *30,000 lbs per week, estimate*

B. Not Captured/Disposed

- If these materials are not captured or fully sorted, what happens to them (e.g., sent to landfill, incineration, or other)?




C. Changes in Operations

- Have your K-Cup (or small #5 plastic) collection policies changed over the past 5 years (e.g., started accepting them, stopped accepting them)? If yes, please explain.




- Do you anticipate any changes in the next 2–3 years regarding your ability to collect K-Cups for recycling or disposal? If yes, please explain.
  - *no*
  - *No*
  - *It is possible, currently the challenge on recovery of the #5 is the size of the material, too small.*
  - *No - they're impossible to recycle with the MRF technology they currently have or will have.*
  - *no comment*
  - *No changes at the city level*

## 6. Market & End Destinations

A. If your facility produces separate #5 bales:

- Have you had issues maintaining a consistent buyer for the resulting material stream?

10 responses




- Do you need to further prepare, clean, or otherwise process these items for them to be accepted by downstream markets?

10 responses



B. If your facility includes K-Cups or other #5 plastics in mixed #3–7 bales:

- Have you had issues maintaining a consistent buyer for the resulting material stream?




- Do you need to conduct any special preparation for these bales?



C. If you handle K-Cups or other #5 plastics in any other way (e.g., shred and separate foil, filter, etc.):

- Have you had issues maintaining a consistent buyer for the resulting material stream?

10 responses




- Do you need to separate the foil, filter, or coffee grounds to meet market requirements?

11 responses



- What is the final disposition of these separated or processed materials?




## 7. Additional Notes or Comments

- Please share any feedback on challenges or opportunities related to recycling single-serve coffee pods (e.g., contamination from coffee grounds, small size, multi-material components, etc.).
  - *The facility accepts recyclables but operates as a transfer station, sending the materials to a third party for sorting and resale. Do not know the name of the third-party or what their operations consist of.*
  - *Contamination and size (many fall out in the process)*
  - *Contamination from coffee grounds typically and education that they are recyclable and proper procedure for recycling the k-cups.*
  - *Haven't been targeting or monitoring for these pods. Hard to know how many are even in their stream, not collecting many. #5 are challenging and education could be improved for residents to understand what is and isn't recyclable plastic. Small size a challenge in any MRF system to capture. Robots are trained to grab polypropylene and assumes K-cups would be included but not sure if part of their training (had <1 yr, since July). Takes several months to have enough #5 or #3-7 bales to ship.*
  - *The main issue is the foil and grounds as well as the size.*
  - *The MRF technology does not allow for the recycling of K Cups due to its small size and composition.*
  - *Our biggest concerns are the small size and contamination on the k-cup (residual grounds, foil lids). Our #5 bales are already difficult to market, because product sold in #5 containers often stays on the container making them dirtier than other bales (yogurt, other dairy etc.). Adding k-cups would only further devalue these bales and possibly make them undesirable by our buyers.*
  - *Not feasible at their MRFs, would need a whole new line with robots or manual picking as the only way to get it from the residual, and unlikely to be ready to recycle*

*(separated and foil/coffee removed). Collecting coffee pods by themselves seems like only option that would work, and would likely be too expensive to be sustainable (especially if consumers weren't separating the pods themselves).*

- *size and mix of materials makes it challenging for the MRF and material mix also a challenge for the end market*
- *The challenge is two-fold, the public desire to break down and the k-cup is too small a fraction to be captured.*
- *Just due to size there isn't much else they can do to recover them. They fall through the glass breakers rather than going over top like larger items to continue sorting. Further limitation is the minimal value of 3-7 bales. About a year and half ago had to pay the broker to take them for a couple months; has bounced back since but guesses they lose money in general on 3-7, even with robots. Feel they could install more robots and still catch more due to sheer volume of 3-7 they receive, but wouldn't get ROI.*
- *Size and contamination*
- *Mainly serves as a transfer station, they don't recycle on-site.*

# EXHIBIT G

# PLASTIC MERCHANTS OF MYTH : CIRCULAR CLAIMS FALL FLAT




GREENPEACE



This image featured in a 1955 LIFE magazine article called "Throwaway Living" which celebrated a new, modern lifestyle populated by a variety of "disposable items (which) cut down houseold chores". 70 years later the same casual attitude to plastic waste is pervasive, propped-up by the false assertions of the plastics industry that recycling is the solution to plastic waste.

# CONTENTS

EXECUTIVE SUMMARY
CIRCULAR CLAIMS PROVEN FALSE (2025 UPDATE)
INTRODUCTION: UNMASKING THE MERCHANTS OF MYTH 1
TIMELINE OF DECEIT 2
CIRCLES OF INFLUENCE 5
1. MAPPING THE MERCHANTS OF MYTH: MEMBERS, MESSAGES, TACTICS 7
1.1.2 PETROCHEMICAL INDUSTRY 7
PROPAGANDA TECHNIQUES USED BY PETROCHEMICAL INDUSTRY TRADE ASSOCIATIONS 9
1.1.3 CONSUMER PRODUCTS INDUSTRY 11
1.1.4 ORGANIZATIONS FUNDED BY THE PLASTICS AND PRODUCTS INDUSTRIES 12
1.2 MERCHANTS OF MYTH: MAIN DECEPTIVE MESSAGES 14
1.3 MERCHANTS OF MYTH: PRIMARY PROPAGANDA TACTICS 16
1.4 MERCHANTS OF MYTH: CIRCULAR BLAME GAME FOR CAUSES OF PLASTIC RECYCLING FAILURE 21
2. U.S. AND CALIFORNIA LEGAL REQUIREMENTS FOR CLAIMING PLASTICS ARE RECYCLABLE 23
2.1 U.S. FTC GREEN GUIDES REQUIREMENTS 24
2.2 CALIFORNIA LEGAL REQUIREMENTS 25
HOW2RECYCLE LABELS PROHIBITED UNDER THE TRUTH IN LABELING LAW 26
3. U.S. NATIONAL POST-CONSUMER RIGID PLASTIC WASTE AND RECYCLING ASSESSMENT 29
3.1 SUMMARY OF RESULTS 31
3.2 2025 U.S. PLASTIC WASTE GENERATION BY TYPE 32
3.3 U.S. POPULATION ACCESS TO CURBSIDE RECYCLING (FACTOR 1) 33
3.4 PERCENTAGE OF U.S. MRFS THAT ACCEPT A SPECIFIC ITEM (FACTOR 2) 33
3.5 EXISTING U.S. RECYCLING/REPROCESSING CAPACITY (FACTOR 3): ASSESSMENT OF U.S. POST-CONSUMER RIGID PLASTIC WASTE RECYCLING/REPROCESSING FACILITIES 35
3.5.1 ASSESSMENT SCOPE 35
3.5.2 ASSESSMENT RESULTS 36
4. 2025 CALIFORNIA POST-CONSUMER RIGID PLASTIC WASTE AND RECYCLING ASSESSMENT 41
4.1 2025 CALIFORNIA PLASTIC WASTE GENERATION BY TYPE 43
4.2 ACCEPTANCE OF ITEMS IN CALIFORNIA CURBSIDE RECYCLING BINS (CRITERION 1) 44
4.3 SORTATION OF ITEMS INTO DEFINED STREAMS IN CALIFORNIA MRFS (CRITERION 2) 44
4.4 RECYCLING/REPROCESSING CAPACITY FOR CALIFORNIA'S POST-CONSUMER PLASTIC WASTE (CRITERION 3) 45
4.5 CONTAMINATION LEVELS IN PLASTIC WASTE BALES PRODUCED BY CALIFORNIA MRFS AND COMPLIANCE WITH BASEL CONVENTION (CRITERION 4) 46
5. CONCLUSION: WHAT WE ARE CALLING FOR 48
APPENDIX A: U.S. EPA 2018 SUSTAINABLE MATERIALS MANAGEMENT REPORT – TABLE 8 FOR PLASTICS 50
APPENDIX B. 2025 SURVEY OF U.S. MATERIALS RECOVERY FACILITIES FOR PLASTIC WASTE ITEM ACCEPTANCE IN CURBSIDE RECYCLING BINS: SURVEY METHODOLOGY AND PUBLIC TRANSPARENCY 52
APPENDIX C: SURVEY OF U.S. POST-CONSUMER RIGID PLASTIC WASTE RECYCLING/ REPROCESSING FACILITIES 53
APPENDIX D: SURVEY OF U.S. POST-CONSUMER RIGID PLASTIC WASTE RECYCLING/ REPROCESSING FACILITIES 55
APPENDIX E: MASTER SURVEY OF ALL U.S. PLASTIC WASTE RECYCLING/REPROCESSING FACILITIES 55
REFERENCES 58
ENDNOTES 62

PUBLISHED BY
GREENPEACE U.S.
DECEMBER 2025

GREENPEACE INC.
1300 EYE STREET, NW
SUITE 1100 EAST
WASHINGTON, D.C. 20005
WWW.GREENPEACE.ORG

# EXECUTIVE SUMMARY

**Corporations must stop calling plastic products and packaging 'recyclable' or 'circular'.**



**"There was never an enthusiastic belief that recycling was ultimately going to work"**

LEWIS FREEMAN
SOCIETY OF THE PLASTICS INDUSTRY
SPEAKING ON NPR DOC. IN 2020



**After decades of meager investments accompanied by misleading claims and a very well-funded industry public relations campaign aimed at persuading people that recycling can make plastic use sustainable, plastic recycling remains a failed enterprise that is economically and technically unviable and environmentally unjustifiable.**

In 2018, as part of their latest iteration of promoting plastic recycling as a sustainable long-term pathway, the plastics and fast-moving consumer goods (FMCG) industries began touting the concept of a "circular economy for plastics" and committed to "voluntary business action" to eliminate problematic or unnecessary plastic packaging and ensure that 100% of plastic packaging was reusable, recyclable, or compostable by 2025.[1]

2025 was supposed to be the year that recycling would finally be proven to be an effective solution to the global plastic pollution and waste crisis. Instead, it has brought news of the "devastating" closure of California's largest PET#1 bottle recycler[2] and several other U.S. facilities, along with a warning in the European Union that the "plastic recycling industry is facing imminent collapse."[3] As the end of 2025 approaches, it is clear that voluntary commitments have failed to solve the plastic pollution crisis. Companies have not kept their promises, and it is time to demand more. Big brands like Nestlé, PepsiCo and Coca-Cola plainly intend to continue relying on single-use plastics to deliver their products, betting on the failed concept of plastic recycling despite knowing it is not a viable solution.

The latest U.S. government data indicates that just 5% of U.S. plastic waste is recycled annually,[4] down from a high of 9.5% in 2014.[5] Meanwhile, the amount of single-use plastics produced every year continues to grow,[6] driving the generation of ever greater amounts of plastic waste and pollution.

Despite the equivalent of 80 trash trucks per day[7] of unmanaged plastic waste entering U.S. lands, rivers, and coastal waters and increasing concern about the environmental and human health impacts of microplastic exposure,[8] the companies and big brands that make and sell disposable plastic products continue to promote recycling as the answer to our mounting plastic problem. The relentless focus on this ineffective and unworkable approach flies in the face of the hard facts presented in the previous two Greenpeace USA "Circular Claims Fall Flat" reports[9] and this new 2025 update. These reports collectively offer an unclouded assessment of the state of plastic recycling in the U.S. over a five-year period, providing transparent, traceable data that counters the flood of industry-sponsored statistics and wishful thinking posing as credible evidence.

The Introduction to this report tells the story of how the plastics and products industries and their front groups and associated organizations - the Merchants of Myth - have pushed the false promise of recycling as a solution to the









The two previous Circular Claims reports published by Greenpeace.

growing plastic pollution crisis over the past 40 years. Section 1 maps out the key players in this misinformation network, provides examples of the money flows between them and their misleading messages and tactics, and exposes the circular blame game they engage in to confuse the public as plastic recycling continues to fail.

In the wide spectrum of disinformation propagated by the Merchants of Myth, misleading labels and claims about recyclability on plastic products and packaging are the most direct deceptions aimed at consumers. Individual companies, retailers, and the plastics industry as a whole regularly make false and unsubstantiated claims about the recyclability of their products, to avoid product bans and negative consumer perception of wasteful products and packaging.[10] Many manufacturers use labels that indicate their products are recyclable when they are not recycled today and never have been.[11] Meanwhile, the lack of strong federal regulation drives states to enact their own laws to hold companies accountable for false claims about recyclability and to protect consumers and the environment from the associated harms.[12]

This and the two previous "Circular Claims Fall Flat" reports focus on the legitimacy of "recyclable" claims and labels on plastic products and packaging in the U.S. The comprehensive surveys whose results are presented here were performed at the U.S. national level and, for the first time in this update, specifically in California. California's current recyclability labeling laws are among the strictest in the country, and the new law that will take effect for products manufactured after October 4, 2026 (described in Section 2) will eliminate existing loopholes.

Because product companies typically label their products for national sales, California's requirements will largely become the national standard. Consequently, a thorough, transparent assessment of all key factors relevant to determining compliance is required. Entities responsible for monitoring compliance and litigating violations of the law must have access to comprehensive, credible data in order to support enforcement actions and ensure accountability.

The 2020 "Circular Claims Fall Flat" report was a landmark achievement: a pioneering comprehensive survey of post-consumer plastic waste recycling that identified the U.S.'s approximately 370 materials recovery facilities (MRFs) and the types of plastic waste accepted into recycling systems. That survey fact-checked decades of claims by the plastics and products industries purporting that all plastics are recyclable[13] and proved that a 2016 report on plastic acceptance and recycling levels by the front group Sustainable Packaging Coalition (SPC) was wildly exaggerated and incorrect.[14]

In this 2025 update, a new first-of-its-kind plant-level assessment of existing U.S. post-consumer plastic waste recycling/reprocessing facilities was performed to credibly define the post-consumer plastic waste recycling capacity



©Shutterstock

in the U.S. for specific material types and forms, providing a detailed, transparent assessment.

This survey confirmed that capacity for domestic recycling/reprocessing of plastic waste is extremely limited:

- Only 21 facilities with a combined maximum capacity to process 21% of PET#1 bottle waste generated in the U.S. are in commercial operation.
- No facilities were identified that commercially and continuously recycle/reprocess baled PET thermoform waste from MRFs.
- Only 22 facilities with a combined maximum capacity to process 22% of HDPE#2 containers (bottles, jugs, jars, tubs) and packaging waste are in commercial operation.
- Only 2 facilities with a combined maximum capacity to process 2% of rigid PP#5 waste are in commercial operation.
- No operating facilities were identified that process other types of post-consumer rigid plastic waste (PS#5, LDPE#4, PLA, PVC#3, and "Other" plastic).

What's more, this detailed survey proves that there has been no net gain in rigid post-household plastic waste recycling/reprocessing capacity since 2018 – a year that marked a turning point for the plastic recycling myth, because that is when China stopped accepting massive amounts of plastic waste from the U.S. and other countries. Just five new post-consumer rigid plastic waste recycling/reprocessing facilities have been identified that began commercial operation in the U.S. during or after 2018 and were still in operation as of October 2025, while six facilities have shut down during this period (see Section 3.5.2).

Section 4 presents the results of Greenpeace USA's 2025 California Post-Consumer Rigid Plastic Waste and Recycling Assessment. This proves that no material type or form of plastic packaging meets all four key criteria to legally use a recyclable label under California's new labeling law, SB 343, which will take effect in October 2026. The only two potential exceptions are clear PET#1 beverage bottles collected separately through the bottle redemption program and natural HDPE#2 bottles and jugs.

After more than four decades of false claims, it is time for the plastics and products industries to acknowledge that plastic recycling is a failed concept. Unlike with paper or metals, there are two insurmountable barriers that prevent plastic recycling from ever working at scale: toxicity and economics. The vast majority of plastic products and packaging produced each year cannot be safely recycled back into new food-grade plastic products,[15] and the flood of 500 million tons/yr of cheap new plastic production[16] kills the business case for large-scale investment in plastic recycling.

Post-consumer plastic waste has never made sense to recycle and will never make sense to recycle. The Merchants of Myth have led a 40-year campaign to have plastics viewed as recyclable in the same way as aluminum or cardboard – but plastic waste has never belonged in curbside recycling bins, because plastics are synthetic and made up of countless different formulations that cannot be safely converted back into recycled plastic. It's time for the Merchants of Myth to stop deceiving consumers and for policy makers to stop contaminating recycling streams with plastic waste.

Greenpeace USA demands that big brands act now to eliminate single-use plastics and packaging and not rely on the fiction that a "circular economy for plastics" can someday be created to put an end to the persistent problem of plastic pollution. Companies should no longer use false recyclable labels and claims as a smokescreen to divert attention from the real changes that are needed.



©Shutterstock

## GREENPEACE CALLS FOR IMMEDIATE ACTION BY COMPANIES, GOVERNMENTS, FRONT GROUPS, AND OTHER PLASTICS INDUSTRY PLAYERS:

### 1. COMPANIES MUST DISCONTINUE USING POLLUTING PLASTIC PACKAGING AND FOOD SERVICE ITEMS.

- The single-use plastic food service products most commonly found in cleanups, including cups, lids, clamshells, utensils, and trays, must be banned. These items have never been widely recycled in the U.S. and likely never will be.
- Companies must aggressively reduce reliance on all types of single-use plastic packaging and publicly support (directly and through relevant trade associations) reusable/refillable container schemes at the state and federal level.
- Quick-service restaurant companies should implement "Skip the Stuff" practices nationwide to reduce pollution and waste of ancillary items.[17]






### 2. COMPANIES AND THE RECYCLING INDUSTRY MUST BE TRUTHFUL AND TRANSPARENT WITH THE PUBLIC.

- MRFs must not accept plastic waste in curbside bins unless they will sort the collected materials into clean bales and sell them to U.S. plastic recyclers.
- MRFs must tell the public exactly which facilities they ship their baled materials to, including paper, metals, glass, and plastics, and provide data on how much of that material is recycled, landfilled, and incinerated.





### 3. ORGANIZATIONS MUST STOP PROMOTING PLASTIC RECYCLING.

- Organizations such as the World Economic Forum, and the United Nations Environment Programme must stop referring to a circular economy for plastics, a costly distraction that has delayed progress toward real solutions.
- Organizations must stop advocating for plastic recycling as the solution to the plastic waste and pollution problem, including adoption of minimum requirements for recycled plastic content.

### 4. GOVERNMENTS MUST SECURE A STRONG UN GLOBAL PLASTICS TREATY.

- The treaty must include provisions to reduce plastic production overall and to phase out harmful chemicals and products, to protect human health and the environment.


RECYCLE
THIS
American Chemistry Council
ALLIANCE TO END PLASTIC WASTE
PLASTICS

# INTRODUCTION: UNMASKING THE MERCHANTS OF MYTH

In 1988, the executive director of a leading plastics industry-funded front group, Council on Plastics and Packaging in the Environment,[18] published a newspaper column proclaiming: "Plastic is just about the most recyclable material there is. Soon it will be possible to collect and recycle virtually all plastic materials collected from the post-consumer waste stream. It's just that most people aren't aware of it yet."[19] This falsehood was echoed 20 years later by the managing director of the Plastics Division of the American Chemistry Council (ACC), who stated that "plastic recycling companies are able to accept all kinds of materials."[20]

But after decades of industry claims that all plastics are recyclable and that recycling is the solution to the growing problem of plastic pollution and waste, the truth is self-evident: **The persistently very low U.S. and global plastic recycling rates demonstrate that recycling is not a legitimate fix.** Plastic recycling has been an obvious failure for years. If any other industry were to tout a solution with a success rate of just 5%[21] as the only possible answer to a problem of its own creation with massive public health and environmental implications, the outcry would be deafening and the legislative response swift.

So what has enabled this false promise to survive for so long?

As the Center for Climate Integrity (CCI) observes in its 2024 report "The Fraud of Plastic Recycling," "Underpinning [the] plastic waste crisis is a decades-long campaign of fraud and deception about the recyclability of plastics."[22] That campaign has been led by the stakeholders that benefit financially from promoting the plastic recycling myth. These are the only entities still claiming that recycling will someday work to meaningfully reduce plastic pollution and waste.

As detailed in the book Merchants of Doubt,[24] the tobacco industry effectively stalled progress on public health protections for 50 years by spending many millions of dollars casting doubt on the vast array of medical evidence proving that inhaling cigarette smoke caused cancer and other diseases. The plastics and products industries and their front groups and associated organizations have been plastic "Merchants of Myth," using the same tactics and spending millions of dollars of their own to promote the plastic recycling lie, in spite of the mountain of evidence – including actual mountains of plastic trash – proving that plastics are fundamentally not safe or economical to recycle.

## QUICK RECAP: FIVE REASONS WHY MECHANICAL AND CHEMICAL RECYCLING HAVE FAILED AND WILL ALWAYS FAIL

**Plastic waste is:**

1. **extremely difficult to collect,**
2. **virtually impossible to sort for recycling,**
3. **environmentally harmful to reprocess,**
4. **often made of and contaminated by toxic materials, and**
5. **not economical to recycle, since high-quality new plastic is cheap and abundant.**

**Importantly, due to systemic limitations in feedstock quality, health regulations, and limited production capacity, post-consumer recycled plastic from household waste is not being produced at commercial scale for food-grade uses globally or in the U.S., and likely never will be. While there is some availability of food-grade PET#1 for beverage bottles only, there are growing toxicity concerns here, too.[25]**

**Importantly, due to toxic compounds created during the recycling process, food safety regulations, and economics, post-consumer recycled plastic from household waste is not being produced at commercial scale for food-grade uses globally or in the U.S., and likely never will be.[26]**

# THE TIMELINE OF DECEIT

The plastics industry has been working to shape society's view of plastic waste for over 70 years. Starting in 1953 with the launch of Keep America Beautiful, their line has been that plastic waste management is primarily the responsibility of individuals. Since then their advertising campaigns have flipped between hopeless despair and blind optimism. The 'crying Indian' adverts of 1971 suggest that plastic pollution is the fault of litterers and not the companies that produce or sell single use plastic packaging. The incredibly upbeat 'Plastics make it possible' commercials of the late '80s and early '90s celebrated the uses of plastic while industry insiders, including those at the Society of the Plastics Industry, were aware of how unrealistic it was that the problem of plastic waste would ever be solved.

## 1953




Keep America Beautiful (KAB) launched, starting a 70+ year campaign focused on individuals relationship with waste plastic. No mention of plastic producers.

## 1988




Resin Codes which look like the chasing arrows recycling symbol, introduced by SPI (now PLASTICS)

PLASTICS INDUSTRY ASSOCIATION






## 1955



A premonition of plastic in 2025, "Just use once, then throw away" declared LIFE magazine's 'Throwaway Living' article.

## 1987




American Plastics Council created a series of adverts promoting a unequivocally positive vision of plastic, as a force for social good, countering growing negative public sentiment about plastic waste.

## 1970




Gary Anderson, student at USC, designs the 'chasing arrows' to represent paper recycling.

## 1971

Keep American Beautiful's infamous 'Crying Indian' campaign framed a waste and polution crisis as being about the conscience of the individual.



**1989**



"If the public thinks that recycling is working then they're not going to be as concerned about the environment."

LARRY THOMAS, FORMER HEAD OF SOCIETY OF THE PLASTICS INDUSTRY

**1994**

ExxonMobil

"we are committed to the activities, but not committed to the results"

**2008**

How2Recycle

Check Locally* | Store Drop-off

*Not recycled in all communities

The 'Check Locally' and 'Store Drop-Off' messages imply that recycling is widespread, just maybe not in your community or store, when in fact most plastic is unrecyclable anywhere. The new symbols released September 2025 do not address this problem.

**2020**



"There was never an enthusiastic belief that recycling was ultimately going to work"

LEWIS FREEMAN
SOCIETY OF THE PLASTICS INDUSTRY
SPEAKING ON NPR DOC. IN 2020

**2019**




Coke, Dr Pepper and Pepsi launched 'Every Bottle Back', a commitment to circular plastics which sounds good but is practically impossible.

**2019**

ALLIANCE TO END PLASTIC WASTE

American Chemistry Council · P&G · Shell · Dow · Chevron Phillips Chemical Company LP · BASF · ExxonMobil · MITSUBISHI CHEMICAL

Founded by global oil and chemicals firms "building unique and impactful circular solutions" but doing little of anything meaningful.

**2022**

Coca-Cola announces 25% of all beverages globally to be sold in reusable/refillable bottles.

Coca-Cola

Coca-Cola quietly abandons reuse target in favor of recycled material.

**2024**

**2023**

American Chemistry Council

ACC spends $30M+ promoting Advanced Recycling, previously known as Chemical Recycling, a widely discredited solution to the growing stock-piles of plastic awaiting recycling.

In 1988 the 'chasing arrows' symbol was championed for all seven types of plastic resin - suggesting that all plastic is equally recyclable. It's not. In 2008 of the 'How2recycle' symbols further muddied the water - even if the consumer does 'Check Locally' or use a 'Store Drop-off' that does not mean those items will be successfully recycled. 2019 saw big oil and the plastics industry form the disingenuously named Alliance to End Plastic Waste. Now in the mid 2020s, the plastics industry is leaning heavily on the idea that 'Advanced' or 'Chemical' recycling will solve the problem of plastic waste, even as inherent economic and environmental barriers prevent these technologies from being viable at scale. Real solutions - investing in reuse and refill models, or simply producing much less plastic, especially for use in throwaway packaging - are not only ignored by the plastics industry, but strongly opposed.

Renewed global criticism of single-use plastics exploded around 2017, due to the first global quantification of plastic pollution in the ocean,[27] grisly photos of its fatal effects on ocean life in documentaries like the BBC's Blue Planet,[28] China's ban on plastic waste imports,[29] and the major increases in plastic production in the U.S. by petrochemical companies.[30]

Following the tobacco industry's playbook, the plastics and products industries' response was a massive increase in funding for groups such as The Recycling Partnership (TRP) and the Global Plastic Action Partnership, media advertising, and other public relations efforts to boost promotion of the plastic recycling myth. U.S. tax records reveal that TRP's annual funding skyrocketed from $0.9 million in 2011 to $37 million in 2023 - a more than 40-fold increase.[31] As evidence of the human health risks and planetary harms of single-use plastics mounted, the amount of funding to the Merchants of Myth continued to rise.

The plastics industry will never voluntarily admit that plastic is not recyclable, with industry organizations like the ACC and the Association of Plastic Recyclers (APR) instead clinging to the excuse that, even after four decades of investment in recycling programs and infrastructure, plastic recycling is still "in its infancy"[32] or "in the 'embryonic stage' of its development."[33]

But just as the tobacco industry's initially successful tactic of systematic promotion of disinformation ultimately failed it after 50 years of falsely claiming that cigarettes were safe to smoke,[35] it is beginning to fail the plastics and products industries. And just as Big Tobacco can no longer claim that cigarettes are not dangerous because not all smokers develop lung cancer, the plastics industry must be prohibited from promoting the false narrative that all plastics are recyclable and brushing aside health and environmental concerns because 5% of plastic waste is recycled.

**"A small number of petrochemical companies including Exxon and Mobil began a decades-long campaign... in the 1980s to convince the public that mechanical recycling would solve the plastic waste and pollution crisis. This campaign, which is ongoing today, succeeded in convincing the public that plastics were recyclable. This gave ExxonMobil cover for decades to continue producing more and more plastic unchecked."**

**STATE OF CALIFORNIA V. EXXONMOBIL[36]**

# "Why say, because it can't be recycled today, we should stop claiming it to be recyclable?"

**MATT SEAHOLM**
**PRESIDENT AND CEO OF THE PLASTICS INDUSTRY ASSOCIATION, SEPTEMBER 1, 2023[34]**





**"For more than half a century, the plastics industry has engaged in an aggressive campaign to deceive the public, perpetuating a myth that recycling can solve the plastics crisis. The truth is: The vast majority of plastic cannot be recycled, and the recycling rate has never surpassed 9%."**

ROB BONTA
ATTORNEY GENERAL OF CALIFORNIA

The Merchants of Myth have been highly effective in their efforts to quell doubts about the safety and growing ubiquity of plastics over the past decades, much as the Merchants of Doubt succeeded in their tobacco-related efforts for a half-century. The public outcry about plastic waste in the early 1990s receded thanks to an intensive campaign aimed at convincing people that recycling offered a practical approach to dealing with the problem.[37] States and municipalities promoted plastic recycling as a way to reduce the need for landfills, although recycling capacity lagged far behind production.[38]

In much the same way that the tobacco industry cynically continued making people sick by promoting its carcinogenic products as "safe" long after the risks were established, the Merchants of Myth are putting human health at risk and harming the environment by continuing to position the massive expansion of single-use plastics as unproblematic, invoking the illusion of recycling as a solution.

The idea of a circular economy for plastics has been called "the greatest toxic greenwashing hoax in history."[39] But labeling these actions benign "greenwashing" is too kind - that term trivializes the widespread and growing harm done by the perpetuation of lies about plastic recycling. It is time to finally reject the false claims by the Merchants of Myth that have enabled the vast expansion of single-use plastics production, pollution, and waste, putting the health of people and the planet in danger.

# CIRCLES OF INFLUENCE: BIG OIL, THE RECYCLING LOBBY, RETAIL AND FMCG BRANDS

sabic
DOW
BOREALIS
INDORAMA
ExxonMobil
Braskem
Shell
BASF
INEOS
Chevron Phillips Chemical Company LP
Formosa Plastics
TotalEnergies

American Chemistry Council
The Recycling Partnership — Building a Better Recycling System
APR
NAPCOR — National Association for PET Container Resources
PLASTICS INDUSTRY ASSOCIATION
ALLIANCE TO END PLASTIC WASTE
CBA CONSUMER BRANDS ASSOCIATION
U.S. PLASTICS PACT
SPC
greenblue
How2Recycle
GLOBAL PLASTIC ACTION PARTNERSHIP



Coca-Cola
Kroger
PEPSI
Dr Pepper
DANONE — ONE PLANET. ONE HEALTH
MARS
COLGATE-PALMOLIVE
ALDI
P&G
Unilever
Nestlé
Mondelēz International

# 1. MAPPING THE MERCHANTS OF MYTH: MEMBERS, MESSAGES AND TACTICS

**The plastics, packaging, and recycling industries have waged a decades-long misinformation campaign to perpetuate the myth that plastic is recyclable.[40] In fact, the most recent official U.S. government data indicates that in 2019, of the estimated 44 Mt of plastic waste managed domestically, just 5% was recycled, with the vast majority (86%) being landfilled and the rest incinerated.[41]**

**Drawing from existing sources and public information, this section paints the big picture of the Merchants of Myth network, describing its main members and their funding, their key deceptive messages and primary propaganda tactics, and the circular blame game they play with regard to the causes of the failure of plastic recycling.**

## 1.1.2 PETROCHEMICAL INDUSTRY

The petrochemical companies producing plastics and the trade associations they fund began touting the false solution of plastic recycling in the 1980s,[42] and they remain the leading players in the Merchants of Myth network to this day. Trade organizations promoting the plastic recycling myth include:[43]

- The **Alliance to End Plastic Waste (AEPW)**, an industry-backed coalition of plastic producers and petrochemical companies[44] formed in 2019 that heavily promotes the fantasy of a circular economy for plastics.[45] In 2022, Planet Tracker reported that 8 of the top 20 single-use plastic waste makers were AEPW members.[46] The group received a staggering $66 million in contributions in its first year and reported an annual income of $80 million (an increase of 21%) in 2023.[47]

- The **American Chemistry Council (ACC)**, which represents nearly 200 companies "engaged in the business of chemistry."[48] Members of the Plastics Division, many of which are also members of AEPW, include various U.S. petrochemical companies that produce plastics as well as plastic waste pyrolysis companies such as Brightmark.[49] A trade association funded by its member companies, ACC reported an annual income of $181 million to the IRS in 2023.[50]

- The **Association of Plastic Recyclers (APR)**, the self-described "voice of plastic recyclers."[51] The APR owns two recycling industry publications that promote plastic recycling: Plastics Recycling Update and Resource Recycling. According to financial reports submitted to the IRS, its income increased more than sevenfold between 2011 and 2023, from $0.7 million to $5.3 million.[52]

- The **National Association for PET Container Resources (NAPCOR)**, the trade association for the PET plastic packaging industry in the U.S., Canada, and Mexico. NAPCOR represents nearly 70 companies, including major petrochemical and plastic corporations.[53] The group reported annual revenues in the range of $624,000 to $836,000 between 2011 and 2018, but the figure jumped to $1.3 million in 2019 and had risen to $1.7 million by 2024.[54]

- The **Plastics Industry Association (PLASTICS)**, which calls itself "the voice of the plastics industry." Members include plastic processors, equipment manufacturers and mold makers, material suppliers, and recyclers.[55] During the period from 2011 to 2023, the annual revenue reported by PLASTICS to the IRS ranged between about $10 million in most years to around $30 million in years when National Plastics Conferences were held.[56]



# PROPAGANDA TECHNIQUES USED BY PETROCHEMICAL INDUSTRY TRADE ASSOCIATIONS

ALLIANCE TO END PLASTIC WASTE

American Chemistry Council

APR ASSOCIATION OF PLASTIC RECYCLERS

NAPCOR National Association for PET Container Resources

PLASTICS INDUSTRY ASSOCIATION



The **Alliance to End Plastic Waste** has been widely criticized for engaging in greenwashing, with critics noting that in its first five years, leading members produced over 1,000 times more plastic than it cleaned up.[57] The organization proudly claims to have supported over 80 projects worldwide aiming to "help end plastic waste and transition towards a circular economy for plastic"[58] – but it reportedly quietly abandoned its initially stated goal of diverting 15 million tons of plastic waste from the environment by the end of 2023, when it became clear that it was ludicrously far from achieving this objective.[59] In fact, the AEPW reports the cumulative impact of its work since 2019 as a meager 239,985 tons of unmanaged waste reduced.[60] To put this into perspective, it is estimated that over 50 million metric tons of unmanaged macroplastic waste is produced globally each year.[61]

The **American Chemistry Council** has similarly used the tactic of publicizing impossible and deceptive voluntary goals as part of its promotion of false solutions to the plastic waste and pollution crisis, including its 2018 objectives that "100% of plastics packaging is reused, recycled or recovered by 2040" and "100% of plastics packaging is recyclable or recoverable by 2030."[62] Setting a goal two decades in the future cannot be seen as a credible commitment; it is a delay tactic. What's more, the terms "recover" and "recoverable" are known to be linked to "energy recovery," or incineration.[63] In short, the organization was promising to make all plastic packaging burnable by 2030.

In addition to attempting to mislead investors, governments, and the public into believing that we can recycle our way out of the plastic pollution crisis through investment in "advanced recycling technologies,"[64] the ACC has pushed for the use of mass balance systems as a requirement for "attainment of the national standard for recycled plastics in packaging and credibility of marketing claims."[65] The U.S. Environmental Protection Agency (EPA) has rejected this approach, stating that "Allowing producers to advertise that a product contains 'recycled content' based on the amount of recycled material purchased is deceptive"[66] and recommending that sustainable plastic packaging contain at least 15% postconsumer recycled content by weight.[67]

The **Association of Plastic Recyclers** also employs various tactics to promote false messages on plastic

**THIS SQUARE REPRESENTS 50 MILLION METRIC TONS OF UNMANAGED MACROPLASTIC WASTE PRODUCED GLOBALLY, ANNUALLY**

**THIS SQUARE REPRESENTS THE 239,985 TONS, THE CUMULATIVE IMPACT OF THE ALLIANCE TO END PLASTIC WASTE ON UNMANAGED WASTE REDUCTION SINCE 2019**

recycling, including giving out awards to "individuals and organizations who have made great strides in improving plastics recyclability."[68] In May 2025, the APR announced a new campaign called "Recycling in Action" that coordinates public tours of materials recovery facilities (MRFs) and plastic recycling facilities, ostensibly to "demonstrate how recycling works."[69] Inspection of the list of tour sites shows that just one is a post-consumer plastic waste reprocessing facility (KW Plastics in Alabama). This campaign promotes the myth that MRFs are "recycling" facilities; more accurately, it should be called "Collection and Plastic Bottle Sortation in Action."

**NAPCOR** has been accused of a range of deceptive practices intended "to mislead the public into believing disposable water bottles and other single-use containers are far more likely to be recycled than they actually are."[70] This includes pushing the misleading claim that PET plastic bottles are "100% recyclable"[71] and even environmentally friendly, with the group asserting that "Multiple studies . . . have shown that PET plastic packaging is better for the environment compared to alternatives such as aluminum and glass packaging."[72]

NAPCOR has also promoted the myth of endless recyclability, stating that "up to 100% of a PET package can be made from recycled PET, which can, in turn, be recycled again and again."[73] These claims fly in the face of countless studies showing the environmental harms of PET packaging,[74] which is estimated to account for 12% of solid waste produced globally each year,[75] and the fact that "in most regions, PET bottles are intended for single-use packaging and are disposed after first use."[76] They are also contradicted by NAPCOR's own most recent data, which cites a U.S. PET bottle collection rate of 33% and an average of 16.2% of post-consumer recycled PET (rPET) content in U.S. bottles and jars – both of which are described as the highest levels ever.[77]

In 2023, **PLASTICS** launched its million-dollar "Recycling is Real" campaign,[78] complete with a website, promotional videos, and advertisements showcasing "Recycling Stories."[79] The campaign's digital ad effort, targeting government officials, elected lawmakers, and brands, aimed to counteract messages from groups like Greenpeace that have criticized plastic recycling as ineffective and misleading.[80] Many of the "Stories" – just a few of which are actually about facilities that recycle post-household plastic waste – employ testimonials by low-income workers, often in small towns, emphasizing their reliance on the recycling industry for their livelihoods.[81] Other industries that have been exposed for using this well-known propaganda technique, which exploits the workers' economic vulnerability and perceived credibility,[82] include the tobacco,[83] coal,[84] and asbestos industries.[85]

PLASTICS has also been called out by Greenpeace USA and others for lobbying efforts to pass preemption laws prohibiting local bans on the use of single-use plastic products (see Section 1.3).

CONSUMER
BRANDS
ASSOCIATION



©Shutterstock

## 1.1.3 CONSUMER PRODUCTS INDUSTRY

**Consumer Brands Association (CBA)**

The CBA claims to represent "over 2,000 iconic brands" – including companies that manufacture food, beverages, and household and personal care products – and lobbies on behalf of those brands in Washington, D.C., and in key states across the country.[86] In written comments to the U.S. Federal Trade Commission (FTC) as the agency revised the Green Guides (discussed in Section 2) in 2023,[87] the CBA argued for a very loose definition of "recyclable" that environmental experts worried would allow companies to "slap the 'recyclable' label on virtually anything"[88] – including all types of single-use plastics.[89]

**"The Consumer Brands Association believes companies should be able to stamp 'recyclable' on products that are technically 'capable' of being recycled, even if they're all but guaranteed to end up in a landfill."**

**LISA SONG**
**PROPUBLICA, SEPTEMBER 9, 2024[90]**

## 1.1.4 ORGANIZATIONS FUNDED BY THE PLASTICS AND PRODUCTS INDUSTRIES

**The Recycling Partnership (TRP)**
TRP's stated goal is to "[work] with communities, companies, and policymakers to help advance the entire recycling industry."[91] U.S. tax records show that the organization experienced a staggering 40-fold increase in funding between 2011 and 2023, from $0.9 million to $37 million.[92]

Current funding partners include plastics and products companies such as Braskem, the Dow Chemical Company, Eastman Chemical Company, ExxonMobil, Indorama, LyondellBasell, Milliken, and Total Energies,[93] with ExxonMobil reportedly investing $1.5 million in 2018[94] and tax declarations showing that Milliken contributed $1.25 million between 2021 and 2023.[95] Several front groups that receive funding from the plastics and products industries, such as the ACC, APR, and PLASTICS, are also listed as funding partners,[96] and tax declarations show that the AEPW contributed $3.68 million between 2022 and 2023.[97]

Additional product and retail industry funders include Coca-Cola ($1.99 million in 2020), PepsiCo ($4 million between 2020 and 2021), and Walmart ($6.99 million between 2020 and 2024).[98]

The Recycling Partnership leads many plastic recycling promotion activities and supports campaigns led by others, as evidenced throughout this report.

**U.S. Plastics Pact**
The U.S. Plastics Pact is a consortium of businesses, nonprofit organizations, government agencies, and research institutions that "work together toward a common vision of a circular economy for plastics."[99] It received $1.2 million in funding in 2022 and $1.9 million in 2023.[100]

**Sustainable Packaging Coalition (SPC)/How2Recycle**
SPC is a subsidiary of the GreenBlue Institute, which is registered as a nonprofit in the U.S. It describes itself as "a membership-based organization that believes in the power of industry to advance sustainable packaging, through education, collaboration and action," with membership encompassing "the entire packaging value chain."[101]

According to financial reporting to the IRS, GreenBlue's revenue increased nearly fivefold between 2015 and 2023, from $1.9 million to $8.8 million.[102] One of its "most visible success stories"[103] is How2Recycle , launched by SPC in 2012.[104] Since then, product companies have flooded store shelves with thousands of products in plastic packaging with misleading or blatantly false How2Recycle labels.[105] In September 2025, the City of Philadelphia filed a lawsuit against two product companies (S.C. Johnson & Son and Bimbo Bakeries) for their use of the How2Recycle Store Drop-off recyclable label on plastic film products and packaging, to stop the harms caused by plastic pollution and contamination in curbside recycling bins.[106]

# "Let's be clear. The How2Recycle® label's primary purpose is not to help consumers navigate recycling, but to protect the illusion that plastic recycling works."

PETER BLAIR, JUST ZERO,
REPORTED BY GRIST, SEPTEMBER 26, 2025[107]

# 1.2 MERCHANTS OF MYTH: MAIN DECEPTIVE MESSAGES




**The Merchants of Myth use a common script to promote single-use plastics and plastic recycling. Some of their main messages are fact-checked in this section.[108]**

## 1. FALSE CLAIM: RECYCLED CONTENT REDUCES PLASTIC WASTE AND POLLUTION.[109]

**Truth:** As described in "Circular Claims Fall Flat Again,"[110] the concept of using recycled content in plastic packaging is a hoax masquerading as an achievable goal with positive environmental benefits. Creating safe, food-grade recycled plastic is infeasible using the vast majority of post-consumer plastic feedstocks, and even the limited amount of recycled PET used in beverage bottles today has been found to have health risks.[111]

What's more, products sold with claims of recycled content generally do not provide traceable proof of the origin of the alleged plastic waste, and there is no guarantee that it is contributing to reducing plastic waste or pollution in the U.S. For example, as detailed by The New York Times in 2022, the alleged recycled PET used in Driscoll's berry packaging was imported from Thailand,[112] but since the U.S. does not export PET waste to Thailand,[113] the waste PET used to make the berry containers was not from domestic sources.

Even more concerning is that there are no widely used methods to prove that the "recycled PET" is actually recycled rather than virgin plastic,[114] and CalRecycle does not require proof of recycled content to meet the AB 793 recycled content mandate in PET bottles.[115]

## 2. FALSE CLAIM: LACK OF CURBSIDE RECYCLING COLLECTION IS WHY PLASTICS AREN'T RECYCLED AT A HIGHER RATE.[116]

**Truth:** California's low plastic recycling rate shows this isn't true. Curbside residential recycling has been widespread in the state since 1989, when the California Integrated Waste Management Act (AB 939) mandated that all California cities and counties implement solid waste diversion plans.[117] Still, in 2021, the California Statewide Recycling Commission determined that only PET#1 and HDPE#2 bottles and jugs meet the criteria for being considered recyclable statewide.[118] This shows that lack of access to curbside recycling is not the main cause of low plastic recycling rates or limited acceptance of plastic items for recycling at MRFs.

## 3. FALSE CLAIM: PLASTIC ITEMS ACCEPTED IN CURBSIDE RECYCLING BINS WILL BE RECYCLED.[119]

**Truth:** While Waste Management (now called WM) and other waste companies try to hide behind the excuse that the final fate of an accepted item is "business confidential," reporters have exposed that many accepted plastic items are not recycled, but rather are incinerated or disposed of.[120] Accepting items in curbside bins that processing facilities do not want creates contamination that increases costs to consumers.

## 4. FALSE CLAIM: PLASTIC ITEMS PUT IN STORE DROP-OFF RECYCLING BINS WILL BE RECYCLED.

**Truth:** Several major U.S. retailers offer store drop-off bins for items that are not accepted

in curbside recycling, such as plastic bags and film. Multiple investigations have shown that flexible plastics collected in store recycling bins were not recycled, but instead were incinerated or disposed of in landfills.[121]

## 5. FALSE CLAIM: "RECYCLE-READY" PLASTIC PACKAGING IS A SIGN OF MEANINGFUL PROGRESS.

**Truth:** Many companies – including Driscoll's, with regard to its PET thermoform clamshell containers for berries – tout their unrecyclable plastic packaging as being "recycle ready."[122] This is deceptive because it suggests to consumers that the packaging can and will actually be recycled, despite a lack of recycling facilities purchasing thermoform bales and there being no guarantee that this material will ever meet the U.S. national and California legal requirements for claiming recyclability (see Section 2).

## 6. FALSE CLAIM: PLASTICS CAN BE RECYCLED OVER AND OVER AGAIN.

**Truth:** PET beverage bottles account for the majority of recycled plastic in the U.S. and globally, yet significant material losses are incurred during sortation and recycling. The Recycling Partnership admits that 17% of PET bottles are lost in sorting in MRFs,[123] and processing of PET bottle bales is estimated to recover only around 70% of the incoming material.[124] The material yield thus diminishes substantially in each iteration. In addition, toxicity concerns have been raised with regard to the use of recycled PET, as discussed previously in this section.

## 7. FALSE CLAIM: PLASTIC PACKAGING CREATED THROUGH THE PURCHASE OF MASS BALANCE CERTIFICATES COUNTS AS RECYCLED CONTENT.

**Truth:** Companies such as Mondelēz have claimed to be "contributing to the sourcing of recycled plastics via the ISCC mass balance approach, helping to support a more circular pack economy in the U.S."[125] According to the California Department of Justice, ISCC mass balance certificates are a "false and misleading accounting scheme" with no environmental benefit.[126] Environmental journalism platform Grist describes them as "a convoluted credit system [that] allows companies to label virgin plastic as recycled."[127] As mentioned previously, the U.S. EPA concurs, describing the scheme as deceptive.[128]

## 8. FALSE CLAIMS: LIFE CYCLE ANALYSES (LCAS) SHOW THAT PLASTICS ARE BETTER THAN OTHER MATERIALS FOR THE ENVIRONMENT.[129]

**Truth:** The plastics industry's LCAs typically focus only on greenhouse gas emissions, ignoring plastic's "many other devastating consequences to public health and the environment – from marine litter and toxic chemicals that leach out of plastics to hazardous air pollution from waste incineration."[130] Furthermore, the industry's claims that pyrolysis, or advanced recycling, is beneficial from a greenhouse gas emissions perspective have been proven false.[131]

## 9. FALSE CLAIM: PLASTIC RECYCLING MUST BE GIVEN MORE TIME TO WORK.

**Truth:** Despite recent claims by organizations such as the ACC and APR that plastic recycling is still "in its infancy"[132] or in the early stages of its development,[133] the plastics industry has been promoting it as a solution to the plastic waste problem since the 1980s, when it "led an influential drive encouraging municipalities to collect and process recyclable materials as part of their waste-management systems."[134]

## 10. FALSE CLAIM: THE WORLD WILL ALWAYS HAVE PLASTIC WASTE, SO WE HAVE TO RECYCLE IT.

**Truth:** Companies created a throw-away culture by pushing single-use plastics on consumers.[135] There are economic, safe alternatives to single-use plastics, including sales of sodas in reusable bottles,[136] home carbonation machines,[137] and reusable school lunch trays,[138] among many other options.

# 1.3 MERCHANTS OF MYTH: PRIMARY PROPAGANDA TACTICS

**The Merchants of Myth use a variety of tactics to promote the plastic recycling myth and delay serious regulation of single-use plastics. The following are just a few examples:**




1. **Voluntary company goals promising to reduce plastic use, increase recyclability, or stop distribution of specific plastic products.** As documented by Reuters in 2020,[139] history is littered with failed voluntary corporate pledges regarding plastic recycling, proving that they are little more than a distract-and-delay tactic. Examples include:

- **Corporate 2025 Goals.** The highly touted 2025 goals set by the signatories of the Ellen MacArthur Foundation's Global Commitment for plastic use reduction, plastic recyclability, and recycled content have failed at a group level and for individual companies. By mid-2024, companies were starting to revise or abandon their goals and push back the timelines for implementation, with weak excuses such as claiming the original objectives were too ambitious[140]

- The first element in the U.S. Plastics Pact's "Roadmap to 2025" report, published in June 2021, is "Define a list of packaging that is problematic or unnecessary by 2021 and take measures to eliminate them by 2025."[141] In January 2022, the U.S. Plastic Pact released its Problematic and Unnecessary Materials List, described as "a first step to accelerating progress toward a circular economy for plastic packaging in the United States"




Figure 3: Aldi store brand pretzels sold in PVC containers[142]

and identifying "11 items that are not currently reusable, recyclable, or compostable at scale in the U.S. and are not projected to be kept in a closed loop in practice and at scale by 2025."[143] As of September 2025, surveys of products sold in U.S. stores show that many U.S. Plastics Pact members are still selling products containing materials on this list (see e.g. Figure 3).

- **Coca-Cola:** In 2022, Coca-Cola committed to have 25% of its drinks sold in refillable or returnable glass or plastic bottles or cups by 2030.[144] By the end of 2024, the company was reported to have quietly dropped this goal, replacing it with a weaker commitment regarding use of recycled content in all primary packaging.[145]

- **Kroger:** In 2018, Kroger announced that it would voluntarily eliminate single-use plastic bags from all of its 2,700-plus stores by 2025.[146] However, the company's 2024 Environmental, Social & Governance Report indicated that it was still some 2,000 stores short of meeting that objective and "[continuing] to explore how to achieve progress on this challenging topic."[147]

2. **Media campaigns with deceptive claims.** In 2023, the U.S. National Advertising Review Board recommended that the American Beverage Association alter an online and TV advertisement for the "Every Bottle Back" initiative because it made false claims about PET bottle recycling.[148]

3. **Promotion of grossly false plastics acceptance databases.** The Earth911 website instructs consumers on whether a specific plastic item is accepted for recycling in their local area and where to find a drop location to leave it for recycling.[149] Groups linking to the site include How2Recycle.[150] However, inspection of the information provided on the Earth911 website proves that it is inaccurate and could lead to dangerous, costly contamination in curbside recycling bins. For example, the site incorrectly instructs residents across California to place plastic bags and plastic cups in their curbside bins, but this is prohibited by almost all California recycling programs because most MRFs do not accept them.

4. **Publication of wildly inflated performance data.** Since solid waste regulation has always been managed at a state or local level, there is limited reliable data available from independent sources on national access to curbside recycling. For example:

- **The Recycling Partnership and GreenBlue (SPC/How2Recycle) Community Recycling Program Acceptance Data:** overstates primary recycling program acceptance rates for a wide range of single-use plastic packaging, such as 56% for PET thermoforms, 61% for PET cups, and 60% for HDPE cups and lids.[151] As detailed in Section 3, the comprehensive survey carried out for this report shows that just 8% of Americans have access to recycling systems that accept PET thermoforms, 6% have access to systems that accept any type of plastic cup, and 1% have access to recycling systems that accept any type of loose plastic lid.

5. **Publication of reports claiming there is future potential for plastic recycling.** For example:

- In a 2019 report, Closed Loop Partners listed 98 providers of "transformational technologies" with the supposed potential to "stop plastic waste, keep materials in play and grow markets."[152] As of 2025, the vast majority of these - at least 93 - either never progressed past the concept stage or have gone bankrupt or shut down.[153]

- Groups such as the ACC heavily promote chemical recycling, claiming that this approach can process complex and contaminated plastics that traditional mechanical recycling cannot handle, thereby contributing to a circular economy.[154] However, critics highlight various concerns, including cost, toxic emissions, inefficiency and energy use, environmental justice issues, and limited impact.[155]

6. **Pilot projects claiming there is a future potential for plastic recycling.** Examples include:

- **Secondary sortation:** As exposed by PBS Frontline and NPR in the 2020 Plastic Wars documentary, the plastics industry has launched multiple pilot facilities for secondary sortation of plastic waste that have not succeeded at commercial scale.[156] Even after that investigation highlighted the persistent use of misleading claims about secondary plastic recycling, the ACC continues to promote these technologies.[157]

- **Materials Recovery for the Future (MRFF):** The ACC's highly publicized MRFF pilot project was intended to show that flexible plastics could be collected in curbside bins and sorted and sold for recycling/reprocessing.[158] While the scheme's promoters claimed it was a success,[159] the program only ran from 2020 to 2022 and was shut down due to supposed operational challenges and a need for further infrastructure and market development. Despite this failure, TRP has recently announced another MRF film project in San Antonio, TX.[160]

7. **Lobbying for preemption laws and against reduction in single-use plastics**. The Plastics Industry Association was called out in 2018 by Greenpeace USA, As You Sow, The Sierra Club, and other groups for its collaboration with the American Legislative Exchange Council (ALEC) on lobbying efforts to pass preemption laws - anti-democratic laws that prohibit local bans on the use of plastic bags, expanded polystyrene foam cups, and other single-use plastic products[161] - at the state level.[162] This campaign led several companies - including Clorox, Coca-Cola, PepsiCo, S.C. Johnson, and General Motors - to leave the organization.[163] PLASTICS no longer publicly reveals the names of member companies and does not list "product companies" as a member category.

8. **Leadership and excellence awards that promote false plastic recycling claims.** For example, SPC gave its 2021 Innovation in Recovery award to General Mills for its "Nature Valley Store Drop-Off Recyclable Snack Wrapper."[164] As investigations by the likes of Bloomberg and CBS News have shown, the Store Drop-off recyclable label is a false promise, with much of the material consumers drop off ending up in landfills.[165]

9. **Trade groups and NGOs receiving funding from the plastics and products industries to project credibility.** Examples include:

- **GreenBlue (SPC/How2Recycle):** GreenBlue describes itself as "an environmental nonprofit on a mission to accelerate the transition to a regenerative, just, and sustainable materials economy."[166] Product companies pay an annual membership fee to use How2Recycle labels - including the deceptive Store Drop-off and Check Locally labels commonly seen on flexible plastic packaging.




7
OTHER

# PLASTICS RECYCLING ISN'T WORKING, BUT WHO IS TO BLAME?

ACCORDING TO THE MERCHANTS OF MYTH

THE PLASTIC RECYCLING INDUSTRY

CONSUMERS FOR NOT DOING IT RIGHT

PRODUCT COMPANIES

THE OIL INDUSTRY

BOTTLE DEPOSIT SYSTEMS

THE US GOVERNMENT

PRODUCERS OF NEW PLASTIC

IMPORTERS OF RECYCLED PLASTIC

THE U.N.

POOR INFRASTRUCTURE

AND GREENPEACE

# 1.4 MERCHANTS OF MYTH: CIRCULAR BLAME GAME FOR CAUSES OF PLASTIC RECYCLING FAILURE

The Merchants of Myth have been recycling their false claims for 40 years. Now that the latest iteration of plastic recycling promises – the "voluntary commitments" made by the signatories of the EMF Global Commitment – have failed, they are engaging in a circular blame game instead of admitting the truth and focusing on implementing real solutions:

- **Product companies blame the plastic recycling industry for not creating a larger supply of recycled plastic for them to use,[167] and they blame consumers for not wanting to pay more for recycled plastic.[168]**
- **The plastic recycling industry blames product companies for not buying available recycled plastic or entering into long-term contracts.[169]**
- **The recycling industry, product companies, and the government blame lack of infrastructure for low rates of recycling.[170]**
- **Product companies and the plastic recycling industry blame consumers for not putting their plastic waste into recycling bins,[171] and the recycling industry blames Greenpeace and others for publishing reports critical of plastic recycling that cause consumers to become cynical about doing so.[172]**
- **The plastics, products, and recycling industries blame the government for lack of supportive public policy, consumer education, and public funding for plastic recycling.[173]**
- **Product companies blame the U.N. for not creating a level playing field to allow them to buy more expensive recycled plastic.[174]**
- **The U.S. plastic recycling industry blames imports of recycled plastic for undercutting their business.[175]**
- **Governments, including public recycling agencies, blame the plastics industry for producing too much cheap new plastic, undermining the economics of plastic recycling.[176]**
- **The plastics industry blames the oil industry for keeping prices too low to make plastic recycling economical.[177]**
- **The North American PET trade association says that bottle deposit systems are needed to collect enough PET bottles for recycling.[178]**
- **The beverage industry and curbside recycling industry say that curbside collection is effective for collecting PET bottles for recycling and that bottle deposit systems hurt curbside recycling.[179]**

All of these players refuse to admit the obvious – plastic products and packaging cannot be recycled at meaningful scale, and recycled content cannot be significantly increased because of two fatal flaws: (1) inherent, uncontrollable toxicity in recycled plastic and (2) the prohibitively high costs of even downcycling plastic into non-food-grade uses.

AUTHENTICATED

# Senate Bill No. 343

## CHAPTER 507

An act to amend Sections 17580 and 17580.5 of the Business and Professions Code, and to amend Sections 18015 and 42355.5 of, and to add Section 42355.51 to, the Public Resources Code, relating to environmental advertising.

[Approved by Governor October 5, 2021. Filed with Secretary of State October 5, 2021.]

LEGISLATIVE COUNSEL'S DIGEST

SB 343, Allen. Environmental advertising: recycling symbol: recyclability: products and packaging.

(1) Existing law declares that it is the public policy of the state that environmental marketing claims, whether explicit or implied, should be substantiated by competent and reliable evidence to prevent deceiving or misleading consumers about the environmental impact of plastic products and that, for consumers to have accurate and useful information about the environmental impact of plastic products, environmental marketing claims should adhere to uniform and recognized standards.

This bill would further declare that it is the public policy of the state that claims related to the recyclability of a product or packaging be truthful and that consumers deserve accurate and useful information related to how to properly handle the end of life of a product or packaging.

This bill would require the Department of Resources Recycling and Recovery, on or before January 1, 2024, in order to provide information to the public to evaluate whether a product or packaging is recyclable in the state and is of a material type and form that routinely become feedstock used in the production of new products and packaging, to update specified regulations to require disposal facility operators, among other operations and facilities, to provide information to the department regarding how material collected or processed by the operations and facilities was collected and what material types and forms are actively recovered, and not considered contaminants, by the operation or facility. The bill would require the department to conduct, publish on its internet website, and update as provided, a characterization study of material types and forms that are collected, sorted, sold, or transferred by solid waste facilities identified by the department for inclusion in the study. The bill would provide that, except as specified, a product or packaging is considered recyclable in the state if, based on the information published by the department, the product or packaging is of a material type and form collected for recycling by recycling programs for jurisdictions that collectively encompass at least 60% of the population of the state, among other statewide recyclability criteria.

90

# 2. U.S. AND CALIFORNIA LEGAL REQUIREMENTS FOR CLAIMING PLASTICS ARE RECYCLABLE



©Shutterstock

As detailed in the 2020 "Circular Claims Fall Flat" report,[180] U.S. claims and labels relating to environmental benefits of products are regulated at the national level by the Federal Trade Commission's Green Guides, established by the FTC pursuant to its authority under U.S. Federal Trade Commission Act.[181] Codified in the U.S. Code of Federal Regulations (16 CFR 260, Guides for the Use of Environmental Marketing Claims), the Green Guides contain standards and examples to help companies understand what constitutes deceptive or misleading environmental advertising.[182]

The Green Guides are not legally binding regulations, are not enforced at the federal/national level, and do not preempt state or local laws. In addition, they have not been updated since 2012.[183] Notably, the Green Guides permit the use of "qualified" recyclable labels that indicate that some products are accepted in curbside recycling bins in only a few communities. The industry-sponsored How2Recycle program took advantage of this in the development of its misleading Check Locally label, which has been used on thousands of plastic products and packaging materials (see box on p33).

This, together with the lack of enforcement and other loopholes exploited by product companies, resulted in California passing a sweeping labeling reform law in October 2021. SB 343, known as the "Truth in Labeling" or "Truth in Recycling" law, prohibits the use of qualifications such as "check locally" as well as any form of the term "recyclable" or circular chasing arrows symbols on products and packaging that are not collected for recycling by programs that collectively serve at least 60% of the population of the state, among other criteria.[184] Several other states, including Indiana, Maine, Michigan, and Rhode Island, have also adopted statutes that incorporate all or parts of the Green Guides into state law, permitting enforceability at the state level.[185]

Compliance with California's new labeling law will be required for all products sold in the state that are manufactured after October 4, 2026. As noted in the comments provided to the U.S. FTC by Greenpeace USA and other NGOs in April 2023, "Since California has the largest state population... and products are typically labeled for nationwide sales, it is likely that most product companies will design their product labels to comply with California's law."[186] Claims on company websites are also subject to the law. Thus, it is expected that the entry into force of SB 343 will catalyze corrections to the widespread use of false and misleading recyclable labels across the country.[187]

# 2.1 U.S. FTC GREEN GUIDES REQUIREMENTS




"there is no real benefit to consumers in being informed that a product or package is technically recyclable if a program is not available enabling them to recycle"

Under the Green Guides, a product is considered recyclable only if it "can be collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item."[188] The Green Guides specifically preclude entities from marketing certain products as recyclable, stating that "If any component significantly limits the ability to recycle the item, any recyclable claim would be deceptive" and that "an item that is made from recyclable material, but, because of its shape, size, or some other attribute, is not accepted in recycling programs, should not be marketed as recyclable."[189]

In clarifying the guidance regarding claims of recyclability, the previous revision of the Green Guides stated that "For a product to be called recyclable, there must be an established recycling program, municipal or private, through which the product **will be** converted into, or used in, another product or package"[190]. The FTC also acknowledged the EPA's observation that "there is no real benefit to consumers in being informed that a product or package is technically recyclable if a program is not available enabling them to recycle the material after use."[191]

To legitimately claim a product as "recyclable," the FTC requires that recycling facilities be available to a "substantial majority" of U.S. residents, defined to be at least 60%, and that the collected product be used in the manufacturing or assembly of a new item.[192]

Therefore, the key factors required to determine an item's recyclability at the national level are:

- **Access to collection of an item in an established recycling system:** The U.S. population's access to collection of a specific item is determined through two factors: **access to curbside recycling for that item (factor 1)** and **percentage of MRFs that accept that item (factor 2)**.
- **Existing U.S. recycling/reprocessing capacity for an item (factor 3):** Access to curbside recycling and acceptance of a plastic item at an MRF alone do not provide a sufficient or "reasonable" assurance to a consumer that it will be manufactured into another item. Sufficient market demand and domestic recycling/reprocessing capacity must exist for a plastic product to be considered "recyclable."[193] Without this, the plastic material collected by the MRFs will not be purchased by manufacturers and will not be recycled into other products.[194]

# 2.2 CALIFORNIA LEGAL REQUIREMENTS

There are two primary sets of legal codes that recycling labels must comply with in California: Business and Professions Code (BPC) 17580–17581 (the Environmental Marketing Claims Act) and Public Resources Code (PRC) 42355.51, known as SB 343. As stated on the CalRecycle website, SB 343's legal requirements are intended to identify "what gets recycled."[195] That clearly does not include items that could theoretically be recycled in a laboratory or by some unknown process that may become available in the future, or that are converted into fuel or exported to an unknown fate, such as being burned in a cement kiln in Canada or Mexico.

SB 343 prohibits use of the chasing arrows symbol or any other indicator of recyclability on products and packaging unless certain criteria are met. The four key criteria of the law can be summarized as follows:[196]

- **Collection:** The product must be "collected for recycling by recycling programs for jurisdictions that collectively encompass at least 60 percent of the population of the state."
- **Sortation:** The product must be "sorted into defined streams for recycling processes by large volume transfer or processing facilities . . . that process materials and collectively serve at least 60 percent of recycling programs statewide."
- **Recycling/Reclaiming:** The product must be "of a material type and form that routinely becomes feedstock used in the production of new products or packaging."
- **Basel Contamination Level:** The defined streams must be "sent to and reclaimed at a reclaiming facility consistent with the requirements of the Basel Convention." (As described in the European Commission's Waste Shipments Correspondents' Guidelines No. 12 on the classification of plastic waste, this requires a 2% maximum contamination level in sorted bales.[197])

By extension, there must be sufficient recycling or reprocessing (which CalRecycle typically calls "reclaiming") capacity to handle at least 60% of the waste generated by a particular product in California, and enough facilities must exist and be in operation to process that waste. Otherwise, the item cannot possibly "get recycled" as intended by the law and CalRecycle.

Notably, SB 343 explicitly disallows "qualified" recyclable labels such as "check locally" or "product may not be recyclable in your area," which had arguably been considered permissible under California's prior legislation incorporating the Green Guides (BPC 17580.5).

In Section 4 of this report, all four key SB 343 criteria are analyzed, the specific gaps in information required to make a determination about recyclability status are outlined, and data is provided to make that determination for a range of plastic products and packaging.




©Shutterstock

**"...does not include items that could theoretically be recycled in a laboratory or by some unknown process"**

# HOW2RECYCLE LABELS PROHIBITED UNDER TRUTH IN LABELING LAW

greenblue

SUSTAINABLE PACKAGING COALITION®




How2Recycle, created by the Sustainable Packaging Coalition, is a subsidiary of the GreenBlue Institute has created three particularly deceptive How2recycle labels that fall foul of the labeling restrictions established by SB 343:

- **Store Drop-off:** The How2Recycle website states that "In the US, plastic bags, wraps, and films aren't accepted in most curbside or drop-off programs. However, many of these packages are eligible for Store Drop-off recycling."[198] Using this label allows companies to claim their flexible plastics are recyclable and suggests to consumers that these items will be recycled, but in reality, there is no pathway or capacity to collect, sort, and recycle flexible plastic packaging in the U.S. (see box in Section 3).
- **Check Locally:** This label indicates that an item is recyclable, with the disclaimer that this may not be the case in all areas. It has been widely used by product companies on packaging that is not remotely recyclable, including items that are generally not accepted in curbside bins (such as plastic packaging bonded to cardboard).
- **Not Recyclable Unless:** This version of the How2Recycle Not Yet Recycled label commonly appears on products with integrated non-recyclable components, such as unrecyclable shrink sleeves (see Clorox bottle, next page).

SB 343 requires that a product or its packaging can only be labeled as recyclable through a store drop-off program if it has a demonstrated recycling rate of at least 60% through 2029 and 75% by 2030, meaning not less than that amount of the product or packaging sold in the state is collected, sorted, and reprocessed into new products or packaging.[199] This is not the case for flexible plastics anywhere in the U.S. (see box in Section 3).

SB 343 also requires that products and packaging meet specific criteria to be considered recyclable (outlined in Section 2.2) and to be presented as such, explicitly stating that "Displaying a chasing arrows symbol or any other statement indicating the product is recyclable

How2recycle labels create confusion. The Clorox pistol spray bottle (right) has a full-body shrink sleeve label on the PET#1 bottle so it can only be recycled if the consumer dismantles the pack. The Old El Paso taco kit pack needs three separate bins, with the plastic coated card box likely not to be recyclable in your area, or anywhere.







©Shutterstock

directly on the product shall be deemed to be deceptive or misleading" for any product or packaging that does not meet those criteria.[200] The Check Locally label fails to meet these conditions because recyclability claims in California must be based on statewide access and infrastructure, not on whether a few local programs might accept the item. If a product isn't collected, sorted, and recycled at scale across the state, any conditional claims – like "check locally" – are considered misleading and not permitted.

Conditional language like "bottle not recyclable unless label removed" is likewise considered misleading under California's Environmental Marketing Claims Act, which SB 343 reinforces. CalRecycle's implementation guidance indicates that if the entire package isn't recyclable in its as-sold form, it cannot be labeled recyclable at all – even if a component (like the bottle without the label) technically could be.

In recognition of these issues, GreenBlue (SPC/How2Recycle) and TRP have recently joined forces to create a new "Recycle Check" label with a QR code that links to TRP's National Recycling Database.[201] Notably, this database contains only information on acceptance of products in recycling bins,[202] not on whether the products are actually sorted and recycled. Thus, while the new label omits the arrows, it still fails to provide accurate information on the recyclability of items that use it.

How2Recycle has also recently redesigned its "Legacy" Not Yet Recyclable, Store Drop-off, and Check Locally labels,[203] removing the circular arrows symbol from the new "Pro" labels "out of an abundance of caution"[204] (see Figure 6). The new Check Locally, Store Drop-off, and Do Not Recycle labels are arguably still not compliant with SB 343 because they contain the text "How2Recycle.info." The new symbols are still communicating the same misleading information to the consumer, that effective recycling happens in-store, or at certain locations and not others.







The broken recycling system which the plastics industry seeks to hide from view. A Curbside collection is not available in many neighborhoods. B MRFs are often perceived as the place where recycling happens when in fact they are for sorting plastic *before* it can be recycled. C Bales of unwanted plastic intended for recycling are piling up at MRFs across the country because new 'virgin' plastic is cheaper than recycled plastic. D and E Most plastic waste is ultimately dumped or burned. ©Shutterstock, ©Creativecommons and ©Unsplash









# 3. U.S. NATIONAL POST-CONSUMER RIGID PLASTIC WASTE AND RECYCLING ASSESSMENT

In February 2020, Greenpeace USA published the results of its first-of-its-kind comprehensive survey of post-consumer plastic waste recycling in the U.S., in a report titled "Circular Claims Fall Flat."[205] The survey examined the specific types of plastic waste accepted by the U.S.'s approximately 370 MRFs and estimated the country's total post-consumer plastic waste recycling/reprocessing capacity, in order to determine which consumer plastic products meet the legal definition of "recyclable" in the U.S. Updated results were published in October 2022, in "Circular Claims Fall Flat Again."[206]

In this third iteration of that landmark survey, 385 operating U.S. MRFs that sort post-consumer plastic waste were identified and acceptance of specific plastic products at each facility was again assessed. The 2025 survey also includes a groundbreaking new plant-level assessment of existing post-consumer plastic waste recycling/reprocessing facilities, to more accurately define the national and regional recycling capacities in the U.S. for specific material types and forms. Such a detailed assessment is necessary to expose the truth behind the disingenuous narrative promoted by the plastics and products industries and the other Merchants of Myth - that mere acceptance in a curbside recycling bin means that an item is recyclable and will be recycled.

Put simply, plastic items will not be recycled and cannot be claimed to be recyclable in the U.S. unless sufficient recycling or reprocessing capacity exists to handle them.

Post-household flexible plastic waste - including bags, films, and food wrappers - has never been collected in meaningful amounts in the U.S., nor sorted or actually recycled/reprocessed into new products. The Recycling Partnership, citing a Flexible Plastics Association report, stated in 2021 that "the current residential recycling rate for film and flexible packaging is just 2%."[207]

Two primary pathways for collection of flexible plastic waste - collection through curbside recycling bins and store drop-off - have been proposed and tested in the U.S., and they have both failed. MRFs almost universally do not accept flexible plastics because they harm sortation equipment systems and are difficult to separate mechanically,[208] and the material collected is contaminated with no real value.[209] TRP's own estimate indicates that just 1% of U.S. households have access to curbside recycling programs that accept monolayer PE film;[210] other types of flexible packaging, including multilayer film, are almost universally not accepted. This is consistent with TRP's recent statement that "less than 1 percent of the nearly 5 million tons [of film and flexible packaging] generated nationally is recycled."[211]

Although many Americans have access to store-drop off collection options, TRP allows that this avenue is problematic because it is less convenient than curbside recycling and not all forms of films and flexibles are accepted. Consequently, it acknowledges that "this collection method cannot be solely used to reach a 30% recycling rate for film and flexible packaging"[212] (in line with EMF's definition of recyclable[213]), and it is even less likely to ever meet the requirements stipulated in the U.S. FTC Green Guides and by SB 343 (see Section 2). What's more, investigations by several organizations have revealed that flexible plastics collected in store recycling bins are often not recycled, but instead are incinerated or disposed of in landfills.[214]

As a result, the assessment described in this report, as in the 2020 and 2022 reports, focuses on post-consumer rigid plastic waste.

# PLASTIC RESIN IDENTIFICATION CODES



# 3.1 SUMMARY OF RESULTS

Table 1 summarizes the results of the 2025 U.S. national MRF survey and detailed plastic recycling/reprocessing facility assessment survey, which indicate that only PET#1 bottles and HDPE#2 containers come close to meeting the U.S. FTC's definition of recyclable. Even for these materials, with current U.S. recycling/reprocessing capacity able to handle less than 25% of the waste generated annually, it is highly unlikely that the 60% threshold established by the FTC is met. Consistent with the findings from 2020 and 2022, no other material types or forms are collected, sorted, or recycled/reprocessed in sufficient volumes to be considered recyclable under the terms set out in the Green Guides or SB 343.[215]

## TABLE 1: 2025 U.S. POPULATION'S ACCESS TO MUNICIPAL COLLECTION AND CAPACITY FOR RECYCLING/REPROCESSING INTO NEW PRODUCTS

| PLASTIC ITEM | A % of U.S. MRFs that accept item | B % of U.S. population with access to municipal collection of item | C Maximum national recycling/reprocessing capacity (%) | D Can product be labeled as "recyclable" per U.S. FTC Green Guides? |
|---|---|---|---|---|
| PET#1 bottles[1] | 100% | 60% | 21% | Marginal |
| HDPE#2 containers[1,2] | 100% | 60% | 22% | Marginal[2] |
| PP#5 tubs and containers | 46% | 28% | 2% | No |
| PP#5 or PS#6 coffee pods | 0% | 0% | 0% | No |
| Plastic clamshells | 12% | 7% | PET#1 thermoforms: 0% | No |
| Plastic cups | 9% | 6% | PP#5: 2%<br>PS#6: 0% | No |
| Plastic trays | 4% | 3% | PP#5: 2%<br>PS#6: 0% | No |
| Expanded polystyrene (EPS) food service | 1% | <1% | 0% | No |
| Plastic lids and caps (loose) | 2% | 1% | PET#1 thermoforms: 0%<br>PP#5: 2% | No |
| Plastic plates | 1% | <1% | PP#5: 2%<br>PS#6: 0 | No |
| Plastic cutlery, straws, land stirrers | 0% | 0% | PS#6: 0 | No |
| Plastic packaging tray forms | 1% | 0% | PET#1 thermoforms: 0%<br>PP#5: 2% | No |

**NOTES:**

**COLUMN A:** % determined from 2025 U.S. MRF survey (details provided in Appendix B).

**COLUMN B:** It is estimated that about 60% of U.S. residents have access to established curbside recycling collection transported to MRFs (see Section 3.3). The 60% access factor was applied to the MRF acceptance data (column (A)) to determine the specific access rate by product type.

**COLUMN C:** Details provided in Section 3.5 and Appendix C.

**COLUMN D:** Overall assessment of whether the item can legitimately be claimed or labeled as recyclable based on % of total population with access to municipal collection (column (B)) and availability of facilities capable of recycling collected materials into new products (column (C)). The Green Guides require that a significant (>60%) portion of the total U.S. population have access to established recycling programs to claim an item as recyclable, and the collected products must be manufactured into new items.[216]

[1] Bottles cannot have non-recyclable or non-sortable shrink sleeves.

[2] Natural and colored HDPE bottles and jugs are combined because recycling facilities do not distinguish between the two feedstocks, making separate analysis impossible. Natural HDPE bottles and jugs have a higher recycling rate than colored containers.

The total recycling/reprocessing capacity for the two widely accepted plastic items remains low, at 21% for PET#1 bottles and 22% for HDPE#2 containers – under the 30% threshold set by the EMF New Plastics Economy initiative for determining whether a plastic product is recyclable.[217] As in 2020 and 2022, no type of plastic packaging in the U.S. meets the EMF NPE definition of "recyclable" in 2025.

While the Association of Plastic Recyclers claims that "mechanical recyclers already have ample capacity to significantly increase the amount of plastics recycled,"[218] the results of this survey prove that is a false claim. U.S. capacity for recycling PET#1 bottles and HDPE#2 containers remains limited, and there is negligible capacity for recycling any other type of post-consumer rigid plastic waste. This survey therefore confirms the finding from previous years that no types of single-use plastic food service or packaging items can be claimed as recyclable in the U.S., according to the federal government's definition.

As the 2021 Plastic Fast Food Survey revealed, fast food companies use many types of single-use plastics, including PET#1, HDPE#2, LDPE#4, PP#5, and PS#6 cups, lids, clamshells, trays, bags, and cutlery.[219] Americans have negligible access (<8%) to MRFs that accept these items, and the items are not reprocessed in the U.S. Reprocessing/recycling capacity for PP#5 items is estimated at just 2%, suggesting that the vast majority of the collected PP#5 waste is disposed of to landfill or incinerated. As described in Section 3.5, PET clamshell thermoforms have negligible value, and there are currently no commercial mechanical recycling/reprocessing facilities that are known to be purchasing PET#1 thermoform bales from U.S. MRFs and recycling them into new products.[220]

## 3.2 2025 U.S. PLASTIC WASTE GENERATION BY TYPE

To assess the recycling rate of specific types of plastic products and packaging, granular waste data is required. The U.S. EPA's "Advancing Sustainable Materials Management: Facts and Figures Fact Sheet," last published for the year 2018,[221] contains the most recent official government estimates of plastic waste generation by material type and form (see Appendix A).

Given the age of this data, waste generation rates must be adjusted to account for the increase in production and sales of single-use plastics in the intervening period. Packaging experts Smithers estimate an annual growth rate of 3.7% for single-use plastic packaging between 2020 and 2025.[222] Table 2 shows the U.S. EPA's estimates for plastic waste generation by material type and form in 2018, and the updated estimates for 2025 based on this growth rate.

### TABLE 2: 2018 BASELINE AND 2025 ESTIMATE OF U.S. RIGID PLASTIC PRODUCTS AND PACKAGING WASTE GENERATION

| Category | 2018 Thousand U.S. Tons | 2025 Thousand U.S. Tons |
|---|---|---|
| PET#1 bottles | 3,130 | 4,036 |
| Non-bottle PET#1 packaging (thermoforms) | 730 | 941 |
| HDPE#2 containers | 2,249 | 2,900 |
| Non-container HDPE#2 packaging | 800 | 1,032 |
| PP#5 plates, cups, bottles, and packaging | 1,420 | 1,831 |
| PS#6 plates, cups, bottles and packaging | 1,230 | 1,586 |
| LDPE/LLDPE#5 plates, cups, bottles, and packaging | 970 | 1,251 |
| PLA#7 plates, cups, bottles, and packaging | 50 | 64 |
| Other resin #7 plates, cups, bottles, and packaging | 360 | 464 |
| PVC#3 resin plates, cups, bottles, and packaging | 320 | 413 |
| Total | 11,259 | 14,518 |

## 3.3 U.S. POPULATION ACCESS TO CURBSIDE RECYCLING (FACTOR 1)

Not all Americans have access to established community recycling systems. Therefore, the percentage of the U.S. population with access to such systems is the first factor that must be determined.

The EPA recognizes municipal curbside collection of recycling as sufficient infrastructure to ensure that deposited materials are collected and delivered to a functional MRF for sortation.[223] Lack of access to curbside recycling is commonly cited by federal, state, and local governments and the plastics and products industries as a major barrier to improving

recycling rates.[224] Based on recent calls for public funding to improve access to curbside recycling[225] and widespread acknowledgement, including from the EPA,[226] that access to drop-off recycling is not equivalent to access to curbside recycling, only the latter is counted as access to an established recycling system in this study.

In its August 2024 "Assessment of the U.S. Recycling System," the EPA states that "Roughly 40 percent of households do not have access to recycling services for packaging materials equivalent in quality to trash disposal services,"[227] which is in line with The Recycling Partnership's estimate that about 60% of Americans have access to established recycling systems.[228]

With these figures in mind, the same estimate for the percentage of the American population with access to established recycling systems is used in this update as in the 2022 and 2020 "Circular Claims Fall Flat" reports: 60%. However, it's important to note that this estimate is conservatively high. There are multiple other reports that indicate that national access to curbside recycling may be lower, including an August 2024 estimate from the EPA that cites a mean estimated level of just 44%.[229]

In addition, access does not equal use. A 2024 TRP report states that only 43% of American households participate in recycling.[230] A March 2025 Waste Dive article reports that at an APR conference a few days earlier, a TRP representative stated that "curbside collection is flagging," while a recycling industry expert acknowledged that "curbside collection volumes are down by an estimated 50% over the last 10 years."[231] This trend has not been helped by the fact that, after China implemented its National Sword import restriction policy in 2018, many cities across the U.S. ended curbside collection for recycling because of rising costs, as tracked by Waste Dive through 2019.[232] Recent announcements of cities ending curbside recycling due to cost and contamination include Winter Garden, FL (2024),[233] York, SC (2024),[234] and (2024).[235]

## 3.4 PERCENTAGE OF U.S. MRFS THAT ACCEPT A SPECIFIC ITEM (FACTOR 2)

Table 3 in Section 3.1 provides a summary of the 2025 survey's results. Details of the methodology are given in Appendix B. A map of the 385 operating municipal waste MRFs identified in the 2025 survey is shown in over.[236]








©Shutterstock

## FIGURE 6: THE 385 U.S. RESIDENTIAL MATERIALS RECOVERY FACILITIES



## 3.5 EXISTING U.S. RECYCLING/REPROCESSING CAPACITY (FACTOR 3): ASSESSMENT OF U.S. POST-CONSUMER RIGID PLASTIC WASTE RECYCLING/ REPROCESSING FACILITIES

### 3.5.1 ASSESSMENT SCOPE

According to the Green Guides, for a plastic item to be labeled as recyclable, established facilities that recycle or reprocess the collected and sorted waste into plastic resin for use in manufacturing or assembling another item must exist.[237]

**Put simply: If sufficient facilities are not in operation to recycle/reprocess specific types of post-consumer plastic waste, then those particular items cannot be claimed to be recyclable.**

No clear, comprehensive assessment of U.S. recycling/reprocessing capacity for specific types of post-consumer plastic waste appears to be available in the public domain. For the purposes of this report, Greenpeace USA sought to fill this gap. Five plastics and recycling industry data sources[238] were analyzed to produce a detailed plant-level assessment of recycling/reprocessing capacity in the United States.

### ASSESSMENT COUNTS MAXIMUM CAPACITY, NOT ACTUAL RUN RATES

This survey reports the maximum capacity of U.S. facilities that recycle post-consumer rigid plastic waste, rather than the actual run rates. It therefore represents a conservatively high estimate, assuming that all facilities operate at full design throughput. Even under those ideal conditions, the results show that U.S. capacity still falls well short of the 60% threshold required to claim that plastics are recyclable under the law (see Section 2).

The plastic recycling industry itself acknowledges that existing post-consumer plastic waste recycling/reprocessing facilities are not running at full capacity. As APR President and CEO Steve Alexander recently admitted, "There's a persistent narrative that plastics recycling is limited by a lack of infrastructure or technical capability. That's simply not true. Mechanical recyclers have ample built capacity . . . across all major resin types to produce more recycled plastic and reduce reliance on virgin plastic."[239] Alexander cites a March 2025 APR study that found that post-consumer plastic reclaimers in the U.S. and Canada operate at 64% capacity for PET, 65% for HDPE, and 58% for polypropylene.[240]

Industry representatives blame a range of issues for this, including:

- Lack of efficient, modern collection infrastructure[241] and insufficient supply of plastic waste[242]
- Variability of curbside acceptance[243]
- Product companies not purchasing recycled plastic because new plastic (including off-spec resin[244]) is cheaper[245]
- Availability of cheaper recycled plastic imported from countries with less stringent environmental regulations[246]

Included in the survey were all identified facilities that

1. **process post-consumer plastic waste, including facilities that also process post-industrial plastic scrap at the same location;**
2. **process rigid containers and packaging, including food service ware (e.g., cups, plates);**
3. **are in commercial operation; and**
4. **are located in the U.S.**

Details on these facilities are provided in Appendix C. Not included in the survey are additional facilities identified using the cited sources that

1. **process only post-industrial (pre-consumer) plastic scrap;**
2. **process flexible/film plastic waste;**
3. **process bulky rigid durables (e.g., buckets, totes, horticultural containers); and**
4. **are located outside of the U.S.**

Appendix D provides details on all identified facilities. Only domestic facilities were included in the assessment because its purpose was to evaluate U.S. capacity for recycling plastics and compare it with U.S. plastic waste generation. It would be neither responsible nor credible to include plastic recycling facilities in neighboring countries, because those facilities' capacity must be allocated to managing those countries' own plastic waste. With estimated plastic recycling rates of just 8%[247] and 5%,[248] respectively, both Canada and Mexico clearly have insufficient capacity to handle their own waste. Plastic recycling rates in other Central American countries are also very low.

Only facilities that process rigid plastics were included in the assessment because flexible plastics are generally not accepted in U.S. curbside recycling systems (see box in Section 3).

## CHEMICAL RECYCLING PLANTS

At the time the assessment was performed, six chemical recycling plants in commercial operation in the U.S. were identified.[249] Only one of these was included in the survey: the Eastman methanolysis plant in Kingsport, TN. This facility is reported to be in commercial operation and to process a range of PET wastes, including carpet, textiles, automotive parts, and opaque PET bottles.[250] A conservatively high estimate of 20% of Eastman's feedstock was assumed to be PET bottles. The five other pyrolysis plants that were in operation at the time of the assessment were not included because they primarily process clean commercial plastic waste film (not rigid plastics), and the refining of pyrolysis oil converts the vast majority of plastic waste into fuel, which is not legally recognized as "recycling."[251] The PureCycle polypropylene recycling plant in Ironton, OH, was not included because it was not in commercial operation at the time of the assessment.[252]

## POST-INDUSTRIAL PLASTIC SCRAP RECYCLING/REPROCESSING PLANTS

Post-industrial plastic recycling facilities that process only post-industrial plastic scrap were not included in the assessment. The OECD, U.S. EPA, state agencies, and others reporting on plastic waste generation focus on **post-consumer** plastic waste. This category encompasses all post-commercial plastic waste, including items such as pallet wrap film waste that consumers never touch. **Post-industrial** plastic scrap is the clean, uniform plastic scrap left over from product manufacturing.

The few recycled content laws in the U.S. require the use of post-consumer recycled content and expressly exclude post-industrial scrap.[253] Plastic scrap from product manufacturing is clean, new plastic that can be reprocessed and fed back into the same production line. Recycling plastic scrap is a normal business process for the plastic manufacturing industry. A review of the Plastics News recyclers/brokers list shows that the majority of plastic recycling/reprocessing facilities operating in the U.S. handle post-industrial waste.[254]

# 3.5.2 ASSESSMENT RESULTS

The survey revealed that U.S. capacity for recycling/reprocessing post-consumer rigid plastic waste is extremely limited:

- **PET#1 bottles:** 21 facilities with a combined maximum capacity to process 21% of U.S. PET bottle waste were identified.
- **PET#1 thermoforms:** No mechanical plastic recycling facilities were identified that commercially and continuously recycle/reprocess baled PET#1 thermoform waste from MRFs. While some PET#1 bottle recyclers may process a minimal amount (<5%) of PET#1 thermoforms with bottles, the already low PET#1 bottle recycling capacity was allocated to that category. Any allocation of PET#1 bottle processing capacity to thermoforms would only further lower the PET#1 bottle recycling capacity.
- **HDPE#2 containers:** 22 facilities with a combined maximum capacity to process 22% of HDPE#2 containers (bottles, jugs, jars, tubs) and packaging waste were identified.
- **PP#5 bottles/tubs/cups/trays/plates:** 2 facilities with a combined maximum capacity to process 2% of rigid PP waste were identified.
- **PS, LDPE, PLA, PVC, and "Other" plastic:** No operating facilities were identified that process these types of post-consumer plastic waste.

The total maximum recycling/reprocessing capacity for all 43 identified facilities is just 1.5 million tons/yr. To provide perspective, this is less than the amount of new plastic produced by ExxonMobil's two U.S. polypropylene factories in 2024 (1.8 million tons).[255]

The average capacity of these facilities is very small, at just 35,234 tons/yr. The average capacity of the PET bottle recycling plants is 40,580 tons/yr, which is about 9% of the amount of new PET plastic produced by a single Indorama bottle manufacturing plant in Alabama (450,000 tons/yr).[256]

Table 3 provides a detailed summary of the results. Details on the facilities identified are provided in Appendix C.

# TABLE 3: SUMMARY OF U.S. FACILITIES RECYCLING POST-CONSUMER RIGID PLASTIC WASTE BY MATERIAL TYPE AND FORM

| Plastic Item | 2025 U.S. Plastic Waste (Thousand U.S. Tons) | Number of U.S. Facilities That Accept Item | Maximum Recycling/ Reprocessing Capacity (Thousand U.S. Tons/Yr) | Maximum Recycling/ Reprocessing Capacity (%) |
|---|---|---|---|---|
| **PET#1 bottles** | 4,036 | 21 | 852 | 21% |
| **Non-bottle PET#1 packaging[2] (thermoforms[3])** | 941 | 0 | 0 | 0 |
| **HDPE#2 containers[1]** | 2,900 | 22 | 624 | 22% |
| **Non-container HDPE#2 packaging** | 1,032 | 0 | 0 | 0 |
| **PP#5 containers and packaging** | 1,831 | 2 | 38 | 2% |
| **PS#6 containers and packaging** | 1,586 | 0 | 0 | 0 |
| **LDPE/LLDPE#4 containers and packaging** | 1,251 | 0 | 0 | 0 |
| **PLA#7 containers and packaging** | 64 | 0 | 0 | 0 |
| **Other resin containers and packaging** | 464 | 0 | 0 | 0 |
| **PVC#3 containers and packaging** | 413 | 0 | 0 | 0 |

1. Containers include bottles, jugs, tubs, and jars that can hold liquids or powders.

2. Packaging includes rigid food service products (e.g., cups, bowls) and packaging (trays, clamshells, cartons, lids).

3. Thermoforms are rigid food service products (e.g., cups) and packaging (trays, clamshells, lids) made from molding sheets of PET#1 into forms. Bottles and jars are made by blowing preformed shapes.

Tables 4 to 6 show the number and capacity of operational facilities that process PET#1 bottle, HDPE#2 container, and PP#5 container and rigid packaging waste, by geographical region. This analysis is relevant because it is well accepted that transportation costs are a major factor in the viability of recycling markets, especially for low-value plastics.[257]

# TABLE 4: REGIONAL CAPACITY FOR PET#1 BOTTLE RECYCLING/REPROCESSING

| Geographic Area | 2024 Population | Region's PET#1 Bottle Waste (Thousand U.S. Tons/Yr) | Number of of Post-Consumer Recycling/ Reprocessing Facilities | Maximum Recycling/ Reprocessing Capacity (Thousand U.S. Tons/Yr) | Capacity to Recycle Region's PET#1 Bottle Waste |
|---|---|---|---|---|---|
| **United States** | 343,314,283 | 4,036 | 21 | 852 | 21% |
| **Northeast** | 58,884,852 | 692 | 3 | 128 | 18% |
| **Midwest** | 66,625,978 | 783 | 6 | 216 | 28% |
| **South** | 137,787,677 | 1,620 | 6 | 294 | 18% |
| **Northwest** | 18,143,300 | 213 | 1 | 25 | 12% |
| **Southwest** | 22,441,213 | 264 | 1 | 40 | 15% |
| **California** | 39,431,263 | 464 | 4 | 150 | 32% |

# TABLE 5: REGIONAL CAPACITY FOR HDPE#2 CONTAINER RECYCLING/REPROCESSING

| Geographic Area | 2024 Population | Region's HDPE#2 Container Waste (Thousand U.S. Tons/Yr) | Number of Post-Consumer Recycling/ Reprocessing Facilities | Maximum Recycling/ Reprocessing Capacity (Thousand U.S. Tons/Yr) | Capacity to Recycle Region's HDPE#2 Container Waste |
|---|---|---|---|---|---|
| **United States** | 343,314,283 | 2,889 | 22 | 624 | 22% |
| **Northeast** | 58,884,852 | 495 | 3 | 60 | 12% |
| **Midwest** | 66,625,978 | 561 | 8 | 146 | 26% |
| **South** | 137,787,677 | 1,159 | 7 | 355 | 31% |
| **Northwest** | 18,143,300 | 153 | 1 | 6 | 4% |
| **Southwest** | 22,441,213 | 189 | 0 | 0 | 0% |
| **California** | 39,431,263 | 332 | 3 | 57 | 17% |

## TABLE 6: REGIONAL CAPACITY FOR PP#5 CONTAINER AND RIGID PACKAGING RECYCLING/REPROCESSING

| Geographic Area | 2024 Population | Region's PP#5 Container and Packaging Waste (Thousand U.S. Tons/Yr) | Number of Post-Consumer Recycling/ Reprocessing Facilities | Maximum Recycling/ Reprocessing Capacity (Thousand U.S. Tons/Yr) | Capacity to Recycle to Region's PP#5 Container and Packaging Waste |
|---|---|---|---|---|---|
| **United States** | 343,314,283 | 1,831 | 2 | 38 | 2% |
| **Northeast** | 58,884,852 | 314 | 0 | 0 | 0% |
| **Midwest** | 66,625,978 | 355 | 1 | 3 | 1% |
| **South** | 137,787,677 | 735 | 1 | 35 | 5% |
| **Northwest** | 18,143,300 | 97 | 0 | 0 | 0% |
| **Southwest** | 22,441,213 | 120 | 0 | 0 | 0% |
| **California** | 39,431,263 | 210 | 0 | 0 | 0% |

## U.S. POST-CONSUMER RECYCLING/ REPROCESSING CAPACITY FOR PP#5 RIGID PLASTIC WASTE

The lack of capacity to recycle or reprocess post-consumer rigid polypropylene #5 plastic waste is worth highlighting, because the Merchants of Myth have gone to great lengths to deceive U.S. consumers and legislators into believing that PP#5 products are recyclable.

In 2016, How2Recycle announced that PP was "moving up to the Widely Recycled category" and no longer needed to be labeled Check Locally, explaining that "availability to recycling isn't the only factor that How2Recycle analyzes; we also look to whether or not a package is likely to be sorted correctly at materials recovery facilities, as well as reprocessed effectively."[258] In 2019, however, it was reported that the American Chemistry Council's production and recycling figures showed that PP was "one of the least recycled post-consumer plastics, at a rate below 1 percent for post-consumer recovery."[259]

After Greenpeace USA contacted How2Recycle in late 2019 to preview the findings of the 2020 "Circular Claims Fall Flat" report,[260] which indicated that only 31% of the U.S. population had access to recycling systems that accept PP#5 tubs and containers and highlighted various other issues with their recyclability, How2Recycle reinstated the Check Locally qualification for PP#5, citing "changes in U.S. recycling programs."[261]

This decision was reversed in July 2022 for rigid PP tubs, bottles, jugs, and jars, following a supposedly successful two-year campaign by the "Polypropylene Recycling Coalition,"[262] launched under TRP's leadership with the stated goal of improving recovery and recycling of PP#5 waste and developing end markets for "high-quality recycled polypropylene."[263] The Coalition's first annual report, however, published in October 2024, projected that its efforts had resulted in "an estimated 64 million pounds [32,000 tons] of incremental polypropylene recycled annually"[264] – the equivalent of less than 2% of the post-consumer PP#5 rigid plastic waste generated each year in the U.S. (see Table 6).

In response to media reports, several companies have removed the How2Recycle labels from their PP#5 containers. As shown in Figure 7, for example, Target's new label for its PP#5 yogurt tubs (the red label, designed in 2024) no longer features the Widely Recycled label included on the older blue label (designed in 2022).

Critically, this detailed survey proves that there has been no net gain in post-household plastic rigid waste recycling/reprocessing capacity since 2018 – a year that marked a turning point for the plastic recycling myth, because that is when China stopped accepting massive amounts of plastic waste from the U.S. and other countries. Despite claims at the time that Chinese companies were rushing to set up shop in the U.S. to fill the gap,[265] new domestic recycling capacity has failed to materialize.

# FIGURE 7: TARGET YOGURT TUBS SHOWING REMOVAL OF HOW2RECYCLE LABEL




Five facilities that recycle/reprocess post-household rigid plastic waste were identified that began commercial operation in 2018 or later and are still in operation as of October 2025:[266]

- Alpek (CarbonLite): PET recycling facility in Pennsylvania (60,000 tons/yr)
- Eastman: PET chemical recycling in facility Tennessee (24,000 tons/yr post-consumer capacity for opaque PET bottles)
- Republic Services/Blue Polymers: PET recycling facility in Indiana (40,000 tons/yr)
- Republic Services: PET recycling facility in Nevada (40,000 tons/yr)
- Vertix: HDPE container recycling in facility Ohio (25,000 tons/yr)

The total rigid post-household plastic waste recycling capacity of the five new facilities is approximately 189,000 tons/yr.

Six facilities were identified that closed in 2018 or later:

- Alpek (Clear Path): PET recycling facility in North Carolina (64,000 tons/yr)[267]
- Evergreen: PET bottle recycling facility in California (50,000 tons/yr)[268]
- rPlanet Earth: PET bottle recycling in California (40,000 tons/yr)[269]
- Pactiv Evergreen: PET bottle recycling facility in Michigan (capacity unknown)[270]
- PreZero: HDPE and PP container recycling facility in South Carolina (30,000 tons/yr)[271]
- Trigon: HDPE container recycling facility in Pennsylvania (10,000 tons/yr)[272]

The total capacity of the facilities that closed was at least 194,000 tons/yr. Therefore, there has been no net gain in U.S. rigid post-consumer plastic recycling capacity from 2018 to 2025.


Download
Our App
For Great
Deals
& Nutrition info
HAWAIIAN PUNCH®
PLASTIC
CUP

# 4. 2025 CALIFORNIA POST-CONSUMER RIGID PLASTIC WASTE AND RECYCLING ASSESSMENT

**Table 7 outlines the four key criteria in the California SB 343 Truth in Recycling labeling law (described in Section 2.2) and the data sources employed in this assessment. The determination of criterion 1 is simpler than for the national survey; since California households are generally required to participate in curbside recycling programs, lack of access to established recycling systems is not considered a factor.**

## TABLE 7: MAIN SB 343 CRITERIA AND SOURCES OF DATA FOR ASSESSMENT

| Criteria[1] | Quantified Requirement | Data Source |
|---|---|---|
| **1. Collection:** The product must be "collected for recycling by recycling programs for jurisdictions that collectively encompass at least 60 percent of the population of the state." | 60% of Californians have access to curbside recycling bins that accept a particular item. | 2025 California MRF survey of item acceptance in curbside recycling bins (Section 4.2) |
| **2.Sortation:** The product must be "sorted into defined streams for recycling processes by large volume transfer or processing facilities . . . that process materials and collectively serve at least 60 percent of recycling programs statewide." | 60% of California MRFs sort the item into a bale type that is purchased by recycling/reprocessing facilities without further sortation. | CalRecycle sortation data published in the RDRS system, confirmed by background data collected by CalRecycle for its SB 343 Preliminary Findings Report (Section 4.3) |
| **3. Recycling/Reclaiming:** The product must be "of a material type and form that routinely becomes feedstock used in the production of new products or packaging." | Recycling/reprocessing facilities that purchase California's waste have capacity for 60% of the amount of the item waste. | Detailed survey of recycling/reprocessing facilities in California (Section 4.4) |
| **4. Basel Contamination Level:** The defined streams must be "sent to and reclaimed at a reclaiming facility consistent with the requirements of the Basel Convention." | Maximum contamination level of 2% in sorted bales.[2] | CalRecycle bale composition data published in SB 343 2023 Preliminary Findings Report and 2025 Final Findings Report (Section 4.5) |

1 State of California (2021),
2 European Commission (2021) p. 5

SB 343's labeling restrictions will take effect for all products sold in California that are manufactured after October 4, 2026. The summary in Table 8 of the results of the present assessment shows that, as of mid-2025, no type of plastic packaging meets all four key criteria to legally use a recyclable label under SB 343, with two potential exceptions:

- **Clear CRV PET#1 beverage bottles:** California BPC § 17580(e) effectively exempts plastic beverage containers that are in the bottle deposit system (California Redemption Value, or CRV) from SB 343's restrictions.[273] In September 2025, the "only reclaimer processing Grade B bales at a large scale" in California shut down.[274] The four remaining PET#1 bottle recyclers primarily process clean, segregated PET bottles collected at redemption centers and do not recycle PET#1 bottles collected through curbside recycling programs (Grade B bales).
- **Natural HDPE#2 bottles and jugs:** While food-grade recycled HDPE is not produced at large scale due to associated toxicity risks, natural HDPE#2 bottles and jugs are a unique subset and are in high demand because the natural color can be dyed to other colors for use in products like orange detergent containers.[275] Although there is insufficient processing capacity for all HDPE rigid plastic waste produced in California, assuming that the state's three identified recyclers/preprocessors that accept this material type prioritize natural HDPE#2 bottle/jug material due to its high value, their combined capacity could be sufficient to meet the 60% capacity requirement.

# TABLE 8: SUMMARY OF RESULTS OF 2025 CALIFORNIA POST-CONSUMER RIGID PLASTIC WASTE AND RECYCLING ASSESSMENT

| PLASTIC ITEM | A % of CA Curbside Recycling Bins That Accept Item (>60% Required) | B % of CA MRFs That Sort Item into Defined Bales (>60% Required) | C Maximum CA Recycling/ Reprocessing Capacity for Item (>60% Required) | D Basel Convention Contamination Limit in Sorted Bales (<2% Required) | D Can Product be Labeled "Recyclable" per SB 343? |
|---|---|---|---|---|---|
| **PET#1 bottles** | **PASS:** 100% | **PASS:** 100% | **FAIL:** 32% | **FAIL:** 7-10% | **No**[1] |
| **HDPE#2 containers** | **PASS:** 100% | **PASS:** 100% | **FAIL:** 17%[2] | **FAIL:** 6-10%[3] | **No**[4] |
| **PP#5 tubs and containers** | **FAIL:** 53% | **FAIL:** 17% | **FAIL:** 0% | **FAIL:** 37% | **No** |
| **PP#5 or PS#6 coffee pods** | **FAIL:** 0% | **FAIL:** Too small for sorting | **FAIL:** 0% | **FAIL:** Pods not sorted into bales | **No** |
| **PET#1 plastic clamshells** | **FAIL:** 22% | **FAIL:** 1% | **FAIL:** 0% | **FAIL:** 11% | **No** |
| **Plastic cups** | **FAIL:** 16% | **FAIL:**<br>**PS#6:** Sorted bales not created in CA<br>**PP#5:** 17% | **FAIL:** 0% | **FAIL:**<br>**PP#5:** 37% | **No** |
| **Plastic trays** | **FAIL:** 13% | **FAIL:**<br>**PP#5:** 17% | **FAIL:** 0% | **FAIL:**<br>**PP#5:** 37% | **No** |
| **Expanded polystyrene (EPS) food service** | **FAIL:** 5% | **FAIL:** Sorted bales not created in CA | **FAIL:** 0% | **FAIL:** No sorted bales created | **No** |
| **Plastic lids and caps (loose)** | **FAIL:** 5% | **FAIL:** Too flat or small for sorting | **FAIL:**<br>**PS#6:** 0%<br>**PP#5:** 0% | **FAIL:** Lids not sorted into bales | **No** |
| **Plastic plates** | **FAIL:** 5% | **FAIL:**<br>**PS#6:** Sorted bales not created in CA<br>**PP#5:** 17% | **FAIL:**<br>**PS#6:** 0%<br>**PP#5:** 0% | **FAIL:**<br>**PS#6:** 0%<br>**PP#5:** 37% | **No** |
| **Plastic cutlery, straws, and stirrers** | **FAIL:** 1% | **FAIL:** Too small for sorting | **FAIL:** 0% | **FAIL:** Cutlery not sorted into bales | **No** |
| **Plastic packaging trays** | **FAIL:** 3% | **FAIL:** Too flat and odd-shaped for sorting | **FAIL:** 0% | **FAIL:** Packaging trays not sorted into bales | **No** |

1 California BPC § 17580(e) effectively exempts plastic beverage bottles that are in the bottle deposit system (CRV) from SB 343's restrictions.
2 Natural HDPE#2 milk jugs/containers pass if capacity prioritizes them.
3 Natural HDPE#2 bottles/jug bales are at the limit to pass (5% contamination, could potentially improve to 2%).
4 Natural HDPE#2 bottles/jugs are a unique subset that may pass the criteria.

These findings are consistent with and supported by findings and statements by CalRecycle and the California Statewide Recycling Commission regarding recyclability in the state:

- The August 31, 2021, Senate Third Reading Analysis of SB 343 states: "According to CalRecycle, only plastics with the code #1 for PET, used in water and soda battles, and #2 high-density polyethylene (HDPE), used in milk jugs and shampoo bottles, are commonly recycled. Even other types of products made from PET and HDPE are not readily recyclable in California. . . . The rest of the resin types #3 through #7 are generally not recycled."[276]
- SB 1335 (the Plastic Packaging Act) requires CalRecycle to maintain a List of Approved Food Service Packaging, which includes products that meet specific reusable, recyclable, or compostable criteria. This list does not include any type of rigid plastic bowl, cup, plate, container, or tray as recyclable; the only plastic items included are the Meisei Co. HDPE Sushi Tray Lid-20 and 30, both listed as HDPE#2.[277]
- The California Statewide Recycling Commission has determined that only PET#1 bottles and HDPE#2 bottles/jugs are recyclable in California.[278]

# 4.1 2025 CALIFORNIA PLASTIC WASTE GENERATION BY TYPE

CalRecycle published limited data on California's plastic waste generation by material type and form in two 2024 reports. The first, "2021 Disposal-Facility-Based Characterization of Solid Waste in California,"[279] provides a high-level categorization of post-consumer plastic waste generated in the state in 2021. The total figure, including rigids, durables, flexible plastic, and trash bags, is 5,445 thousand tons (Figure 8). Excluding flexible plastics, trash bags, durable items, and remainder/composite plastics, the total for rigid plastics and packaging is 2,347 thousand tons.

## FIGURE 8: 2021 CALIFORNIA STATEWIDE DISPOSAL DATA (U.S. TONS)

| | Percentage of total waste stream | Tons/Yr |
|---|---|---|
| **Plastic Waste Type** | 13.7% | 5,445,299 |
| **PETE Beverage Containers** | 0.6% | 240,391 |
| **PETE Bottles and Jars - Non-CRV** | 0.2% | 84,250 |
| **HPDE Beverage Containers - CRV** | 0.1% | 24,042 |
| **HDPE Bottles and Jars - Non-CRV** | 0.4% | 161,107 |
| **Expanded Polystyrene Packaging** | 0.2% | 86,555 |
| **Plastic Trash Bags** | 1.5% | 591,581 |
| **Plastic Grocery and Other Merchandise Bags** | 0.6% | 231,072 |
| **Film Products - Non-Packaging** | 0.5% | 203,940 |
| **Flexible Plastic Pouches** | 0.0% | 15,464 |
| **Non-Bag Commercial and Industrial Packaging Film** | 1.4% | 557,528 |
| **Other Film Bags and Plastic Mailing Pouches** | 0.4% | 155,443 |
| **Rigid Plastic Food Service Ware** | 1.3% | 503,597 |
| **Other Plastic Packaging** | 3.1% | 1,247,468 |
| **Durable Plastic Items** | 2.3% | 901,707 |
| **Remainder/Composite Plastic** | 1.1% | 441,155 |

The second, a "Source Reduction Basene Technical Report" created for the Plastic Pollution Prevention and Packaging Producer Responsibility Act (SB 54),[280] is based on 2023 data. It estimates that 2,900 thousand tons of plastic, comprising single-use plastic packaging and food service ware, were sold, offered for sale, or distributed in California during that year. This estimate includes both rigid and non-rigid (flexible) plastics, and detailed data on specific material types and forms is not provided.

For the purposes of the present assessment, more granular data is required. Using the 2025 values extrapolated from the national plastic waste generation data in the U.S. EPA's latest "Advancing Sustainable Materials Management: Facts and Figures Fact Sheet"[281] (shown in Appendix A) as a baseline, it is possible to credibly estimate waste generation rates for specific material types and forms in California by scaling the national data according to the state's share of the total population. Per the most recent U.S. Census information, California represents 11.5% of the U.S. population.[282]

Table 9 shows the results of these calculations.

## TABLE 9: ESTIMATED RIGID PLASTIC PRODUCTS AND PACKAGING WASTE GENERATION IN CALIFORNIA (BASED ON 2025 U.S. NATIONAL ESTIMATES)

| Category | 2025 U.S. National (Thousand U.S. Tons) | 2025 California (Thousand U.S. Tons) |
|---|---|---|
| PET#1 bottles | 4,036 | 464 |
| Non-bottle PET#1 packaging (thermoforms) | 941 | 108 |
| HDPE#2 containers | 2,900 | 333 |
| Non-container HDPE#2 packaging | 1,032 | 118 |
| PP#5 plates, cups, bottles, and packaging | 1,831 | 210 |
| PS#6 plates, cups, bottles, and packaging | 1,586 | 182 |
| LDPE/LLDPE#4 plates, cups, bottles, and packaging | 1,251 | 143 |
| PLA#7 plates, cups, bottles, and packaging | 64 | 7 |
| Other resin #7 plates, cups, bottles, and packaging | 464 | 53 |
| PVC#3 resin plates, cups, bottles, and packaging | 413 | 47 |
| **Total** | **14,508** | **1,665** |

The estimate produced here by extrapolating from the EPA's data is far lower than CalRecycle's estimate of the total amount of rigid plastic products and packaging waste produced annually in the state (2,347 thousand tons/yr, based on 2021 data). This suggests that the approach this study takes of using the EPA's data for calculating recycling rates is highly conservative. Since the actual amounts of different types of plastic waste generated may be higher, the recycling rates may in fact be even lower.

## 4.2 ACCEPTANCE OF ITEMS IN CALIFORNIA CURBSIDE RECYCLING BINS (CRITERION 1)

Acceptance of a specific plastic waste item in curbside recycling bins is the first step in the recycling process. As part of the comprehensive U.S. national survey (see Section 3.4 and Appendix B), California's 76 operating MRFs were evaluated to determine which specific types of plastic waste are accepted for collection. So-called "dirty MRFs" were not included in this analysis because they process mixed municipal solid waste, making it impossible to distinguish between materials that could be recycled and those destined for disposal.

The 2025 California MRF survey results are shown in column (A) of Table 10. Only two plastic items meet the 60% curbside recycling acceptance requirement: PET#1 bottles and HDPE#2 containers.

## 4.3 SORTATION OF ITEMS INTO DEFINED STREAMS IN CALIFORNIA MRFS (CRITERION 2)

After collection, MRFs separate material types and forms into bales based on demand by plastic waste recyclers/reprocessors. Across the U.S. and in California, MRFs typically create only sorted bales of PET#1 bottles and HDPE#2 bottles/jugs, because strong end market demand exists only for those items. It's generally not considered cost-effective to sort PET#1 thermoforms or PP#5 rigids, due to issues such as low bale values, sortation challenges, contamination issues, and limited demand. This is reflected in column (B) of Table 8.[283]

## 4.4 RECYCLING/REPROCESSING CAPACITY FOR CALIFORNIA'S POST-CONSUMER PLASTIC WASTE (CRITERION 3)

Collection and sortation of plastic waste are the just first two steps in the recycling process – for a plastic item to be considered recyclable in California, recyclers/reprocessors that handle that specific type of plastic waste must exist.

SB 343 recognizes this in two places (emphasis added):[284]

- PRC § 42355.51(b)(1) specifies that "a product or packaging that displays [any] symbol or statement indicating the product or packaging is recyclable, or otherwise directing the consumer to recycle the product or packaging, is deemed to be a deceptive or misleading claim . . . unless the product or packaging is considered recyclable in the state pursuant to subdivision (d) **and is of a material type and form that routinely becomes feedstock used in the production of new products or packaging**."
- PRC § 42355.51(d)(2)(B)(i) stipulates that a material type and form labeled as recyclable must be "sorted into defined streams for recycling processes by large volume transfer or processing facilities . . . that process materials and collectively serve at least 60 percent of recycling programs statewide, **with the defined streams sent to and reclaimed at a reclaiming facility consistent with the requirements of the Basel Convention**."

These legal requirements are not met if no facilities exist to process a given material type and form, or if the existing facilities have insufficient capacity to serve at least 60% of California's recycling programs.

As a part of the U.S. national survey described in Section 3.5, a survey of plastic waste recyclers in California was performed to identify facilities that reclaim bales of sorted rigid household plastic wastes from California MRFs. Included in the survey were all identified facilities that

1. **process post-consumer plastic waste only, including facilities that also process post-industrial plastic scrap at the same location;**
2. **process rigid containers and packaging, including food service ware (e.g., cups, plates);**
3. **are in commercial operation; and**
4. **are located in California.**

Not included in the survey were additional identified facilities that

1. **process only post-industrial (pre-consumer) plastic scrap;**
2. **process flexible/film plastic waste;**
3. **process bulky rigid durables (e.g., buckets, totes, horticultural containers); and**
4. **are located outside of California.**

The names and locations of the identified facilities are provided in Appendix C.[285] As Table 10 shows, just four post-consumer PET #1 bottle recyclers and three post-consumer HDPE #2 bottle and packaging recyclers were identified in California. There is insufficient recycling/reprocessing capacity in the state to meet the 60% legal requirement for any material type or form of plastic waste.

### TABLE 10: SUMMARY OF CALIFORNIA FACILITIES RECYCLING POST-CONSUMER PLASTIC WASTE BY MATERIAL TYPE AND FORM

| PLASTIC ITEM | 2025 California plastic waste (thousand U.S. Tons) | Number of CA facilities that accept item | Maximum recycling/ reprocessing capacity (thousand u.S. Tons/yr) | Maximum recycling/ reprocessing capacity (%) |
|---|---|---|---|---|
| PET#1 bottles | 464 | 5 | 150 | 32% |
| Non-bottle PET#1 packaging (clamshells) | 108 | 0 | 0 | 0% |
| HDPE#2 containers | 332 | 3 | 57 | 17% |
| PP#5 plates, cups, bottles, and packaging | 210 | 0 | 0 | 0% |
| PS#6 plates, cups, bottles, and packaging | 182 | 0 | 0 | 0% |
| LDPE/LLDPE#4 plates, cups, bottles, and packaging | 144 | 0 | 0 | 0% |
| PLA#7 plates, cups, bottles, and packaging | 7 | 0 | 0 | 0% |
| Other resin#7 plates, cups, bottles, and packaging | 53 | 0 | 0 | 0% |
| PVC#3 resin plates, cups, bottles, and packaging | 47 | 0 | 0 | 0% |

## 4.5 CONTAMINATION LEVELS IN PLASTIC WASTE BALES PRODUCED BY CALIFORNIA MRFS AND COMPLIANCE WITH BASEL CONVENTION (CRITERION 4)

As described in the previous section, SB 343 stipulates that the sorted plastic waste sent to reclaiming facilities for recycling must be "consistent with the requirements of the Basel Convention."[286]

The Basel Convention's Plastics Amendments (2019) require plastic waste shipments to be "almost free from contamination and other types of waste," which has been defined and implemented in practice by Basel parties to fall below a 2% non-target material concentration level by weight.[287] In effect, the Basel requirements prohibit mixed plastic waste bales and place strict levels on contamination in plastic waste bales created by MRFs.

In December 2023, CalRecycle released the SB 343 Material Characterization Study Preliminary Findings Report.[288] Basel Action Network (BAN) and The Last Beach Cleanup performed comprehensive, detailed assessments of the legal requirements of SB 343 and California Assembly Bill (AB) 881, the material characterizations and other information provided in the SB 343 report, and California's plastic waste export data, publishing the results in a Fact Briefing in February 2024.[289] A key finding was that all plastic waste bales produced by California MRFs contain contamination levels well above 2%, meaning they cannot be categorized as "recyclable" under SB 343.

In the SB 343 Material Characterization Study Final Findings Report published in April 2025, CalRecycle added additional sampling data for several categories of plastic waste and a new material type and form (PET thermoforms). Appendix E provides a comparison of the 2023 preliminary data and the 2025 final data, which was assessed using the method described in the BAN/Last Beach Cleanup report. With the exception of natural HDPE#2 bottles and containers, all of the bale categories again failed to meet the SB 343 contamination threshold.



©CreativeCommons

# 5. CONCLUSION

**Corporations must stop calling plastic products and packaging 'recyclable' or 'circular'.**

The Merchants of Myth would have us believe that we can recycle our way out of the plastic pollution crisis – but after four decades of broken promises and lack of results, it is clear that this is a failed and unworkable solution.

With every year that passes, the need for meaningful change becomes more urgent. It is estimated that in the U.S., just 5% of plastic waste is recycled[290] – and with plastic production projected to continue to increase in the future and the amount of plastic pollution sure to rise along with it,[291] radical action must be taken to halt this trajectory, curbing demand and increasing product lifespans.

Uncontrolled global plastic production means using virgin plastic will always be cheaper than any other option. This undermines the real solutions that are needed to end the plastic pollution crisis and protect human and planetary health.

Governments must agree to a strong Global Plastics Treaty that protects our climate by keeping oil and gas in the ground and drastically cutting plastic production. If current estimates that plastic production is set to double or even triple in the next 25 years prove correct, it could account for more than a fifth of the world's remaining carbon budget by 2050,[292] which will undermine efforts to control the climate crisis.

We urgently need to cut plastic production and use if we are to limit global warming to below 1.5 degrees. As governments negotiate the Global Plastics Treaty, big brands need to stop relying on single-use plastics and transition to reuse and refill systems.

# WHAT WE ARE CALLING FOR

We echo and expand the demand made in both the State of California's 2024 lawsuit against plastics producer ExxonMobil[293] and the City of Philadelphia's 2025 lawsuit against product companies S.C. Johnson & Son and Bimbo Bakeries:[294]

We are in the midst of a crisis. After more than 40 years of investment, recycling capacity in the U.S. falls far short of being able to handle the amount of plastic that is used and collected for recycling today, with most facilities focused on just a few types of plastic waste.

The time for half-solutions has passed. To meet the urgent need for reducing plastic production, pollution, and waste:

## 1. COMPANIES MUST DISCONTINUE USING POLLUTING PLASTIC PACKAGING AND FOOD SERVICE ITEMS

- The single-use plastic food service products most commonly found in cleanups, including cups, lids, clamshells, utensils, and trays, must be banned. These items have never been widely recycled in the U.S. and likely never will be.
- Companies must aggressively reduce reliance on all types of single-use plastic packaging and publicly support (directly and through relevant trade associations) reusable/refillable container schemes at the state and federal level.
- Quick-service restaurant companies should implement "Skip the Stuff" practices nationwide to reduce pollution and waste of ancillary items.[295]

## 2. COMPANIES AND THE RECYCLING INDUSTRY MUST BE TRUTHFUL AND TRANSPARENT WITH THE PUBLIC

- MRFs must not accept plastic waste in curbside bins unless they will sort the collected materials into clean bales and sell them to plastic recyclers.
- MRFs must tell the public exactly which facilities they ship their baled materials to, including paper, metals, glass, and plastics, and provide data on how much of that material is recycled, landfilled, and incinerated.

## 3. ORGANIZATIONS MUST OWN UP TO THEIR MISTAKES AND STOP PROMOTING PLASTIC RECYCLING

- Organizations such as the World Economic Forum and the United Nations Environment Programme must stop referring to a circular economy for plastics, a costly distraction that has delayed progress toward real solutions.
- Organizations must stop advocating for plastic recycling as the solution to the plastic waste and pollution problem, including adoption of minimum requirements for recycled plastic content.

## 4. GOVERNMENTS MUST SECURE A STRONG UN GLOBAL PLASTIC TREATY

The treaty must include provisions to reduce plastic production overall and to phase out harmful chemicals and products, to protect human health and the environment.

# APPENDIX A: U.S. EPA 2018 SUSTAINABLE MATERIALS MANAGEMENT REPORT – TABLE 8 FOR PLASTICS[296]

* Mechanical and non-mechanical recycling.
† Nondurable goods other than containers and packaging.
§ Due to source data aggregation, PET cups are included in "Other Plastic Packaging".
** All other nondurables include plastics in disposable diapers, clothing, footwear, etc.
*** Injection stretch blow molded PET containers as identified in Report on Postconsumer PET Container Recycling Activity in 2017.
National Association for PET Container Resources. Recycling includes caps, lids and other material collected with PET bottles and jars.
† White translucent homopolymer bottles as defined in the 2017 United States National Postconsumer Plastics Bottles Recycling Report. American Chemistry Council and the Association of Postconsumer Plastic Recyclers.
Y Other plastic packaging includes coatings, closures, lids, caps, clamshells, egg cartons, produce baskets, trays, shapes, loose fill, etc.
PP and HDPE caps and lids recycled with PET bottles and jars are included in the recycling estimate for PET bottles and jars.
Other resins include commingled/undefined plastic packaging recycling.
Some detail of recycling by resin omitted due to lack of data.
Neg. = negligible, less than 5,000 tons
HDPE = High density polyethylene PET = Polyethylene terephthalate PS = Polystyrene
LDPE = Low density polyethylene PP = Polypropylene PVC = Polyvinyl chloride
LLDPE = Linear low density polyethylene PLA = Polylactide

| **Product Category** | **Generation** | **Recycled*** | | **Combusted with energy Recovery** | **Landfilled** |
|---|---|---|---|---|---|
| | **(Thousand tons)** | **(Thousand tons)** | **(% of generation)** | **(Thousand tons)** | **(Thousand tons)** |
| **Durable Goods** | | | | | |
| PET | 660 | | | | |
| HDPE | 1,590 | | | | |
| PVC | 180 | | | | |
| LDPE/LLDPE | 2,130 | | | | |
| PP | 4,590 | | | | |
| PS | 760 | | | | |
| Other resins | 3,780 | | | | |
| **Total Plastic in Durable Goods** | **13,690** | **930** | **6.8%** | **1,740** | **11,020** |
| **Nondurable Goods†** | | | | | |
| **PLASTIC PLATES AND CUPS§** | | | | | |
| LDPE/LLDPE | 20 | | | | |
| PLA | 30 | | | | |
| PP | 160 | | | | |
| PS | 820 | | | | |
| **SUBTOTAL PLASTIC PLATES AND CUPS** | **1,030** | **Neg.** | **Neg.** | **200** | **830** |
| **TRASH BAGS** | | | | | |
| HDPE | 230 | | | | |
| LDPE/LLDPE | 1,000 | | | | |
| **SUBTOTAL TRASH BAGS** | 1,230 | | | | |
| **All other nondurables**** | | | | | |
| PET | 770 | | | | |
| HDPE | 690 | | | | |
| PVC | 270 | | | | |
| LDPE/LLDPE | 1,710 | | | | |
| PLA | 40 | | | | |
| PP | 1,570 | | | | |
| PS | 130 | | | | |
| Other resins | 20 | | | | |
| **SUBTOTAL ALL OTHER NONDURABLES** | **5,200** | **180** | **3.5%** | **980** | **4,040** |
| **TOTAL PLASTICS IN NONDURABLE GOODS, BY RESIN** | | | | | |
| PET | 770 | | | | |
| HDPE | | 920 | | | |
| PVC | 270 | | | | |
| LDPE/LLDPE | 2,730 | | | | |
| PLA | 70 | | | | |
| PP | 1,730 | | | | |
| PS | 950 | | | | |
| Other resins | 20 | | | | |
| **TOTAL PLASTICS IN NONDURABLE GOODS** | **7,460** | **180** | **2.4%** | **1,420** | **5,860** |

| Product Category | Generation | Recycled* | | Combusted with energy Recovery | Landfilled |
|---|---|---|---|---|---|
| | (Thousand tons) | (Thousand tons) | (% of generation) | (Thousand tons) | (Thousand tons) |
| **BOTTLES AND JARS***** | | | | | |
| PET | 3,130 | 910 | 29.1% | 440 | 1,780 |
| **NATURAL BOTTLES[†]** | | | | | |
| HDPE | 750 | 220 | 29.3% | 100 | 430 |
| **OTHER PLASTIC CONTAINERS** | | | | | |
| HDPE | 1,600 | 290 | 18.1% | | |
| PVC | 20 | Neg. | | | |
| LDPE/LLDPE | 40 | Neg. | | | |
| PP | 250 | 20 | 8.0% | | |
| PS | 80 | Neg. | | | |
| **SUBTOTAL OTHER CONTAINERS** | 1,990 | 310 | 15.6% | 330 | 1,350 |
| **BAGS, SACKS AND WRAPS** | | | | | |
| HDPE | 640 | 50 | 7.8% | | |
| PVC | 70 | | | | |
| LDPE/LLDPE | 2,780 | 370 | 13.3% | | |
| PP | 570 | | | | |
| PS | 140 | | | | |
| **SUBTOTAL BAGS, SACKS AND WRAPS** | 4,200 | 420 | 10.0% | 740 | 3,040 |
| **OTHER P ASTICS PACKAGING[ᵞ]** | | | | | |
| PET | 730 | 70 | 9.6% | | |
| HDPE | 800 | Neg. | | | |
| PVC | 300 | Neg. | | | |
| LDPE/LLDPE | 910 | Neg. | | | |
| PLA | 20 | Neg. | | | |
| PP | 1,010 | 30 | 3.0% | | |
| PS | 330 | 20 | 6.1% | | |
| Other resins | 360 | Neg. | | | |
| SUBTOTAL OTHER PACKAGING | 4,460 | 120 | 2.7% | 850 | 3,490 |
| **TOTAL PLASTICS IN CONTAINERS AND PACKAGING, BY RESIN** | | | | | |
| PET | 3,860 | 980 | 25.4% | | |
| HDPE | 3,790 | 560 | 14.8% | | |
| PVC | 390 | Neg. | | | |
| LDPE/LLDPE | 3,730 | 370 | 9.9% | | |
| PLA | 20 | Neg. | | | |
| PP | 1,830 | 50 | 2.7% | | |
| PS | 550 | 20 | 3.6% | | |
| Other resins | 360 | Neg. | | | |
| TOTAL PLASTICS IN CONTAINERS AND PACKAGING | 14,530 | 1,980 | 13.6% | 2,460 | 10,090 |
| **TOTAL PLASTICS IN MSW, BY RESIN** | | | | | |
| PET | 5,290 | 980 | 18.5% | | |
| HDPE | 6,300 | 560 | 8.9% | | |
| PVC | 840 | Neg. | | | |
| LDPE/LLDPE | 8,590 | 370 | 4.3% | | |
| PLA | 90 | Neg. | | | |
| PP | 8,150 | 50 | 0.6% | | |
| PS | 2,260 | 20 | 0.9% | | |
| Other resins | 4,160 | 1,110 | 26.7% | | |
| TOTAL PLASTICS IN MSW | 35,680 | 3,090 | 8.7% | 5,620 | 26,970 |

# APPENDIX B: 2025 SURVEY OF U.S. MATERIALS RECOVERY FACILITIES FOR PLASTIC WASTE ITEM ACCEPTANCE IN CURBSIDE RECYCLING BINS: SURVEY METHODOLOGY AND PUBLIC TRANSPARENCY

# LINK TO APPENDIX B

## ADD LINK

Greenpeace USA's original comprehensive, objective survey of acceptance by U.S. MRFs of plastic items collected through curbside residential recycling systems has been continually updated since its creation in October 2019 and was carried out for this update in January to March 2025. The survey was performed and verified by technically qualified volunteers of The Last Beach Cleanup:[297] two registered professional chemical engineers and a recycling industry expert. The technical experts involved have no financial conflicts of interest related to legitimate recyclable labels for plastic products that would influence the assessment or results. The acceptance information was found in the public domain and is publicly shared to promote transparency and establish a traceable account of facts related to "recyclable" claims and labels for plastic products. The details of the survey were captured in a spreadsheet that is publicly available on the Greenpeace USA website.

**Survey of Plastic Item Acceptance:** A "MRFshed" approach was employed to survey the acceptance of plastic items sent to recycling facilities by U.S. residents who have access to curbside recycling. A MRFshed is defined "as a group of communities that funnel material into the same materials recycling facility (MRF)."[298] Through web searches, each MRF was investigated for the public disclosure of items accepted for curbside recycling. About one-third of the MRFs provided information on acceptance of plastic items at the facility. When MRF acceptance information was not found, a search of websites of local cities or counties that direct recycling to a specific MRF was performed. If this secondary approach revealed no information about the MRF, recycling guidance provided by the MRF owner (e.g., Republic Services' Recycling Simplified[299] guidelines to customers) was captured. The acceptance guidance provided by MRFs and local municipal governments ranged from complicated "wizard" search tools to easily understandable text and photos. Where there was inconsistency between text and photo guidance, all items listed or shown were considered accepted. This approach was intentionally conservative to avoid bias.

**Use of the Survey:** The survey was performed and verified by two registered professional chemical engineers and a recycling industry expert. The information in the survey spreadsheet may be quoted with attribution to the original source of the information (provided by links in the spreadsheet). The 2025 U.S. MRF survey results may be quoted with attribution to Greenpeace USA.

**Survey Updates:** Submissions by MRFs and local governments are welcomed to update or correct the information found and presented. Links to publicly available information are required to revise the traceable account. Since external links may change at any time, we request notification of a broken link. Please send updates with links to lastbeachcleanup@gmail.com.

# APPENDIX C: SURVEY OF U.S. POST-CONSUMER RIGID PLASTIC WASTE RECYCLING/REPROCESSING FACILITIES

| United States: MRF Post-Consumer Rigid Plastic Recyclers | | | | | | | | PET Bottles | PET Thermoforms | HDPE Rigid Containers (Not Bulky/ Buckets) | PP Rigid Containers |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Total for Sorting (TPY[1]) | Max Capacity (TPY) | Max Capacity (TPY) | Max Capacity (TPY) | Max Capacity (TPY) |
| **Total** | | | | | | | 1,515,059 | 852,149 | 0 | 624,459 | 38,450 |
| **Company** | **Startup** | **City** | **State** | **Market Region** | **Post-Consumer Plastic Waste Processed** | **Capacity References & Assumptions** | | | | | |
| **ADS Recycling** | Before 2018 | Shippenville | PA | NE | HDPE bottles, per company brochure. Small amount of post-commercial PP may be recycled (auto bumpers). | Sustainability Report states 542 million lbs/yr of post-industrial and post-consumer plastic waste recycled. Assume 50% post-consumer plastic waste. No data on individual facilities available. Divided equally between 6 facilities shown on company website. Georgia plant shutdown announcement in 2025. | 22,500 | | | 22,500 | |
| **ADS Recycling (formerly Jet Polymer)** | Before 2018 | Fort Payne | AL | S | HDPE bottles, per company brochure. Small amount of post-commercial PP may be recycled (auto bumpers). | Sustainability Report states 542 million lbs/yr of post-industrial and post-consumer plastic waste recycled. Assume 50% post-consumer plastic waste. No data on individual facilities available. Divided equally between 6 facilities shown on company website. Georgia plant shutdown announcement in 2025. | 22,500 | | | 22,500 | |
| **ADS Recycling** | Before 2018 | La Grange | GA | S | HDPE bottles, per company brochure. Small amount of post-commercial PP may be recycled (auto bumpers). | Sustainability Report states 542 million lbs/yr of post-industrial and post-consumer plastic waste recycled. Assume 50% post-consumer plastic waste. No data on individual facilities available. Divided equally between 6 facilities shown on company website. Georgia plant shutdown announcement in 2025. | 22,500 | | | 22,500 | |
| **ADS Recycling** | Before 2018 | Cordele | GA | S | HDPE bottles, per company brochure. Small amount of post-commercial PP may be recycled (auto bumpers). | Sustainability Report states 542 million lbs/yr of post-industrial and post-consumer plastic waste recycled. Assume 50% post-consumer plastic waste. No data on individual facilities available. Divided equally between 6 facilities shown on company website. Georgia plant shutdown announcement in 2025. | 22,500 | | | 22,500 | |
| **ADS Recycling** | Before 2018 | Pandora | Ohio | MW | HDPE bottles, per company brochure. Small amount of post-commercial PP may be recycled (auto bumpers). | Sustainability Report states 542 million lbs/yr of post-industrial and post-consumer plastic waste recycled. Assume 50% post-consumer plastic waste. No data on individual facilities available. Divided equally between 6 facilities shown on company website. Georgia plant shutdown announcement in 2025. | 22,500 | | | 22,500 | |
| **ADS Recycling** | Before 2018 | Winchester | KY | S | HDPE bottles, per company brochure. Small amount of post-commercial PP may be recycled (auto bumpers). | Sustainability Report: 542 million lbs/yr of post-industrial and post-consumer plastic waste recycled. Assume 50% post-consumer plastic waste. No data on individual facilities available. Divided equally between 6 facilities shown on company website. Georgia plant shutdown announcement in 2025. | 22,500 | | | 22,500 | |
| **Alpek (formerly DAK)** | Before 2018 | Richmond | IN | MW | PET bottles | Per Recycling Today article, capacity is 50,000 tons/yr. | 50,000 | 50,000 | | | |
| **Alpek (formerly CarbonLite)** | 2023 | Reading | PA | NE | PET bottles | Per Plastics Machinery & Manufacturing article, capacity is 60,000 tons/yr. | 60,000 | 60,000 | | | |
| **Cedar Poly LLC** | Before 2018 | Tipton | Iowa | MW | HPDE bottles | Company states that it processes 70 million lbs/yr. | 35,000 | | | 35,000 | |
| **Clean Tech Inc.** | Before 2018 | Dundee | MI | MW | PET bottles, HDPE bottles/containers | Company states that it recycles 3 billion bottles/yr. Assume average of 20g/ bottle and 50/50 split between PET and HDPE bottles. | 66,139 | 33,069 | | 33,069 | |
| **Denton Plastics Inc.** | Before 2018 | Portland | OR | NW | HDPE bottles | Per Recycling Today article, processes 12 million lbs/yr of HDPE. | 6,000 | | | 6,000 | |
| **Eastman** | 2024 | Kingsport | TN | S | PET bottles | Company states 110,000 Mt/yr capacity and lists five sources of PET waste. Assume that one-fifth (20%) is PET bottles. | 24,250 | 24,250 | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Envision Plastics** | Before 2018 | Reidsville | NC | S | HDPE bottles | Assume 50% of total Envision capacity. | 37,500 | | | 37,500 | |
| **Envision Plastics** | Before 2018 | Chino | CA | CA | HDPE bottles | Assume 50% of total Envision capacity. | 37,500 | | | 37,500 | |
| **Epic Plastics** | Before 2018 | Lodi | CA | CA | HDPE bottles | Per company website, 15 million lbs/yr of post-consumer HDPE plastic bottles diverted from landfills. | 7,500 | | | 7,500 | |
| **Evergreen** | Before 2018 | Clyde | OH | MW | PET bottles | Plastics News article states 80 million lbs/yr capacity. | 40,000 | 40,000 | | | |
| **Evergreen (formerly UltrePET LLC)** | Before 2018 | Albany | NY | NE | PET bottles | Evergreen presentation states 50 million lbs/yr capacity. | 25,000 | 25,000 | | | |
| **Fresh Pak** | Before 2018 | Houston | TX | S | HDPE bottles | Company states that it processes 5 tons of recycled plastic per month. | 60 | | | 60 | |
| **Global Plastics Recycling** | Before 2018 | Perris | CA | CA | PET bottles | Plastics Recycling Update article states 40 to 50 million lbs/yr capacity. | 25,000 | 25,000 | | | |
| **Graham Recycling Co.** | Before 2018 | York | PA | NE | HDPE bottles | Recycling Today article states 17,850 tons/yr processed. | 17,850 | | | 17,850 | |
| **Green Earth Plastic Recycling** | Before 2018 | Joliet | IL | MW | HPDE bottles | Plastics News article states 10% of 9.6 million lbs/yr processed is from post-consumer plastic waste. | 480 | | | 480 | |
| **Indorama Ventures** | Before 2018 | Dallas | TX | S | PET bottles | Plastics Recycling Update article states 100 million lbs/yr capacity. | 50,000 | 50,000 | | | |
| **Indorama Ventures Sustainable Solutions** | Before 2018 | Fontana | CA | CA | PET bottles | Sustainable Plastics article states 100 million lbs/yr capacity. | 50,000 | 50,000 | | | |
| **Indorama Ventures Sustainable Solutions (formerly Custom Polymers PET LLC)** | Before 2018 | Athens | AL | S | PET bottles | Resource Recycling article states 155 million lbs/yr capacity. | 77,500 | 77,500 | | | |
| **KW Plastics Recycling** | Before 2018 | Troy | AL | S | HDPE bottles/ containers, PP containers: 70% post-consumer plastic waste per Plastics News | Total capacity is planned to be 750 million lbs/yr. PP recycling line is 100 million lbs/yr. HDPE recycling capacity assumed to be remaining 650 million lbs/yr. | 262,500 | | | 227,500 | 35,000 |
| **Marglen Industries** | Before 2018 | Rome | GA | S | PET bottles | Per news article, 90 million lbs/yr of PET bottle waste | 45,000 | 45,000 | | | |
| **Mohawk Industries Inc.** | Before 2018 | Summerville | GA | S | PET bottles | Company states it recycles ~5.5 billion PET bottles/yr. Assume 9.25g/bottle. | 56,080 | 56,080 | | | |
| **Orpet LLC** | Before 2018 | St. Helens | OR | NW | PET bottles | Resource Recycling article estimates 50 million lbs/yr capacity after expansion. | 25,000 | 25,000 | | | |
| **Peninsula Plastics Recycling Inc.** | Before 2018 | Turlock | CA | CA | PET bottles | Resource Recycling article states 70 million lbs/yr of PET bottles processed. | 35,000 | 35,000 | | | |
| **Phoenix Technologies International LLC** | Before 2018 | Bowling Green | OH | MW | PET bottles | Company website states 80 million lbs/yr of PET recycled. | 40,000 | 40,000 | | | |
| **Placon (Ecostar Plastics)** | Before 2018 | Madison | WI | MW | PET bottles | Recycling Today article states 22 to 25 million lbs of recycled PET flake produced annually. | 12,500 | 12,500 | | | |
| **Plastic Recycling Inc. (merged with St. Joseph Plastics)** | Before 2018 | Indianapolis | IN | MW | HDPE bottles | Plastics News Plastics Recyclers/ Brokers list indicates 30% of 100 million lbs/yr is post-consumer HDPE. | 15,000 | | | 15,000 | |
| **PolyQuest (PQ Recycling LLC)** | Before 2018 | Farmingdale | NY | NE | PET bottles | Per company website, facility processes 36 million lbs/yr of plastic waste. | 18,000 | 18,000 | | | |
| **Polywood LLC** | Before 2018 | Roxboro | NY | NE | HDPE bottles | Resource Recycling article states projected capacity of 40 million lbs/yr. | 20,000 | | | 20,000 | |
| **RePET Inc.** | Before 2018 | Chino | CA | CA | PET bottles | WA State Department of Ecology report states 80 million lbs/yr of PET flake processed. | 40,000 | 40,000 | | | |
| **Republic Services Polymer Center Las Vegas** | 2023 | Las Vegas | NV | SW | PET bottles | Resource Recycling article states capacity to process 80,000 tons/yr, 50% of which is PET bottles. | 40,000 | 40,000 | | | |
| **Republic Services Polymer Center Indianapolis** | 2025 | Indianapolis | IN | MW | PET bottles | Resource Recycling article states capacity to process 80,000 tons/yr, 50% of which is PET bottles. | 40,000 | 40,000 | | | |
| **St. Joseph Plastics (merged with Plastic Recycling Inc.)** | Before 2018 | St. Joseph | MO | MW | PP containers | Plastics News Plastics Recyclers/ Brokers list indicates 15% of 46 million lbs/yr is post-consumer PP. | 3,450 | | | | 3,450 |
| **Talco Plastics** | Before 2018 | Long Beach | CA | CA | HDPE bottles | Per company website (archived), capacity is 24 million lbs/yr. | 12,000 | | | 12,000 | |
| **Tangent Technologies (formerly Bedford Technology LLC)** | Before 2018 | Worthington | MN | MW | HDPE bottles | Per company website, total capacity is 15,000 tons/yr. Assume 50% split between two plants. | 7,500 | | | 7,500 | |
| **Tangent Technologies LLC** | Before 2018 | Aurora | IL | MW | HDPE bottles | Per company website, total capacity is 15,000 tons/yr. Assume 50% split between two plants. | 7,500 | | | 7,500 | |
| **Unifi Inc.** | Before 2018 | Reidsville | NC | S | PET bottles | Company press release states 75 million lbs/yr capacity. | 37,500 | 37,500 | | | |
| **Vertix** | 2023 | New Albany | OH | MW | HDPE bottles | Company website states 50 million lbs/yr capacity. | 25,000 | | | 25,000 | |

1 TPY = U.S. tons per year.

# APPENDIX D: MASTER SURVEY OF ALL U.S. PLASTIC WASTE RECYCLING/REPROCESSING FACILITIES

## ADD LINK

# APPENDIX E: DETAILED ASSESSMENT OF MATERIAL CHARACTERIZATION DATA WITH RESPECT TO BASEL CONVENTION REQUIREMENTS

**Table E-1: Summary of Results of CalRecycle Study with respect to Basel Convention Y48 Threshold – Comparison of 2023 Preliminary and 2025 Final Reports** (all results are percentages; major changes denoted in red)

| | HDPE Mix | Natural HDPE Bottles and Containers | Pigmented HDPE Bottles and Containers | Mixed Rigid Plastics[1] | PET Bottles | PET Bottles and Containers | Plastics #3-7[1] | Polypro-pylene | PET Thermoforms (New in 2025) |
|---|---|---|---|---|---|---|---|---|---|
| Number of samples | 2023: 2<br>2025: 2 | 2023: 12<br>2025: 20 | 2023: 15<br>2025: 32 | 2023: 7<br>2025: 38 | 2023: 12<br>2025: 12 | 2023: 11<br>2025: 41 | 2023: 6<br>2025: 9 | 2023: 15<br>2025: 24 | 2023: 0<br>2025: 6 |
| Basel compliant? | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: N/A<br>2025: No |
| SB 343 compliant? | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: N/A<br>2025: No |
| AB 881 compliant? | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: No<br>2025: No | 2023: N/A<br>2025: No |
| Mixed with plastic fractions creating a mix other than PP, PE, PET | 2023: 0<br>2025: 0 | 2023: 2<br>2025: 0 | 2023: 3<br>2025: 0 | 2023: 100[1]<br>2025: 100[1] | 2023: 9<br>2025: 2 | 2023: 8<br>2025: 3 | 2023: 100[1]*<br>2025: 100[1] | 2023: 1<br>2025: 23 | 2023: N/A<br>2025: 9 |
| Contamination of target plastic or target mixture (PP, PE, PET) with other plastics or materials (denoted by (a)) | 2023: 8<br>2025: 6 | 2023: 6<br>2025: 5 | 2023: 12<br>2025: 10 | 2023: 100[1]<br>2025: 100[1] | 2023: 17<br>2025: 7 | 2023: 17<br>2025: 10 | 2023: 100[1]<br>2025: 100[1] | 2023: 15<br>2025: 37 | 2023: N/A<br>2025: 11 |
| Total contamination including with unrecyclable forms of polymers (denoted by (b)) | 2023: 13<br>2025: 8 | 2023: 36<br>2025: 14 | 2023: 21<br>2025: 10 | 2023: 100[1]<br>2025: 100[1] | 2023: 40<br>2025: 22 | 2023: 64<br>2025: 38 | 2023: 100[1]<br>2025: 100[1] | 2023: 31<br>2025: 42 | 2023: N/A<br>2025: 12 |
| **MT&F Category** | | | | | | | | | |
| PL01 PET clear bottles (non-CRV) | 0 | 2023: 1 (b)<br>2025: 0 | 2023: 1 (b)<br>2025: 0 | 0 | 2023: 17<br>2025: 23 | 2023: 11<br>2025: 18 | 2023: 2<br>2025: 0 | 2023: 0<br>2025: 1 (b) | 0 |
| PL02 PET clear beverage bottles (CRV) | 0 | 0 | 0 | 0 | 2023: 45<br>2025: 55 | 2023: 26<br>2025: 48 | 2023: 1<br>2025: 1 | 0 | 0 |
| PL03 PET pigmented bottles (non-CRV) | 0 | 0 | 2023: 3 (b)<br>2025: 0 | 0 | 2023: 1 (b)<br>2025: 0 | 2023: 1 (b)<br>2025: 2 (b) | 2023: 3<br>2025: 0 | 0 | 0 |
| PL04 PET pigmented beverage bottles (CRV) | 0 | 0 | 0 | 0 | 2023: 2 (b)<br>2025: 3 (b) | 2023: 1 (b)<br>2025: 3 (b) | 0 | 0 | 0 |
| PL05 PET thermoformed clamshells and containers | 0 | 0 | 0 | 0 | 2023: 10 (b)<br>2025: 5 (b) | 2023: 19 (b)<br>2025: 10 (b) | 2023: 0<br>2025: 1 | 2023: 1 (b)<br>2025: 2 (b) | 88 |
| PL06 other PET clear single-use rigids | 2023: 1 (b)<br>2025: 0 | 0 | 2023: 1 (b)<br>2025: 0 | 0 | 2023: 5 (b)<br>2025: 6 (b) | 2023: 12 (b)<br>2025: 10 (b) | 2023: 3<br>2025: 2 | 2023: 2 (b)<br>2025: 0 | 1 (b) |
| PL07 other PET pigmented single-use rigids | 2023: 2 (b)<br>2025: 0 | 0 | 2023: 2 (b)<br>2025: 0 | 0 | 2023: 1 (b)<br>2025: 0 | 2023: 1 (b)<br>2025: 0 | 2023: 1<br>2025: 0 | 2023: 1 (b)<br>2025: 0 | 0 |
| PL08 PET multi-use rigids | 0 | 2023: 23 (b)<br>2025: 0 | 0 | 2023: 7<br>2025: 0 | 0 | 0 | 0 | 0 | 0 |
| PL09 HDPE clear beverage bottles (non-CRV) | 2023: 42<br>2025: 44 | 2023: 57<br>2023: 56 | 2023: 1<br>2025: 2 | 0 | 0 | 2023: 11<br>(b)2025: 0 | 2023: 1<br>2025: 0 | 0 | 0 |
| PL10 HDPE clear beverage bottles (CRV) | 0 | 2023: 6<br>2025: 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PL11 HDPE buckets (food) | 0 | 0 | 0 | 2023: 19<br>2025: 4 | 0 | 0 | 0 | 0 | 0 |
| PL12 HDPE buckets (non-food) | 2023: 0<br>2025: 2 | 0 | 2023: 1<br>2025: 0 | 2023: 7<br>2025: 14 | 0 | 0 | 0 | 2023: 2 (b)<br>2025: 0 | 0 |
| PL13 other HDPE clear single-use rigids | 2023: 42<br>2025: 45 | 2023: 0<br>2025: 23 | 2023: 4<br>2025: 12 | 0 | 2023: 1 (b)<br>2025: 0 | 0 | 0 | 2023: 1 (b)<br>2025: 0 | 0 |
| PL14 HDPE pigmented single-use rigids | | 2023: 2 (b)<br>2025: 9 (b) | 2023: 72<br>2025: 76 | 2023: 7<br>2025: 3 | 0 | 2023: 1 (b)<br>2025: 3 (b) | 2023: 3<br>2025: 3 | 2023: 6 (b)<br>2025: 2 (b) | 0 |

| | HDPE Mix | Natural HDPE Bottles and Containers | Pigmented HDPE Bottles and Containers | Mixed Rigid Plastics[1] | PET Bottles | PET Bottles and Containers | Plastics #3-7[1] | Polypro-pylene | PET Thermoforms (New in 2025) |
|---|---|---|---|---|---|---|---|---|---|
| **PL15 other HDPE multi-use rigids** | 0 | 0 | 0 | 2023: 11<br>2025: 24 | 0 | 0 | 2023: 10<br>2025: 4 | 0 | 0 |
| **PL18 LDPE clear beverage bottles** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2023: 1 (b)<br>2025: 0 | 0 |
| **PL19 LDPE clear single-use rigids** | 0 | 0 | 0 | 0 | 0 | 0 | 2023: 1<br>2025: 0 | 0 | 0 |
| **PL20 LDPE pigmented single-use rigids** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2023: 2 (b)<br>2025: 0 | 0 |
| **PL21 LDPE multi-use** | 0 | 0 | 0 | 0 | 0 | 0 | 2023: 1<br>2025: 0 | 0 | 0 |
| **PL22 PP clear single-use rigids** | 2023: 1 (b)<br>2025: 1 (b) | 2023: 1 (b)<br>2025: 0 | 2023: 1 (b)<br>2025: 0 | 0 | 2023: 2 (b)<br>2025: 1 (b) | 2023: 1 (b)<br>2025: 0 | 2023: 25<br>2025: 33 | 2023: 36<br>2025: 29 | 0 |
| **PL23 PP pigmented single-use rigids** | 2023: 1 (b)<br>2025: 1 (b) | 2023: 3 (b)<br>2025: 0 | 2023: 1 (b)<br>2025: 0 | 2023: 6<br>2025: 3 | 0 | | 2023: 20<br>2025: 27 | 2023: 31<br>2025: 25 | 0 |
| **PL24 PP multi-use** | 0 | 0 | 0 | 2023: 22<br>2025: 14 | 2023: 1 (b)<br>2025: 0 | 0 | 2023: 4<br>2025: 3 | 2023: 5<br>2025: 4 | 0 |
| **PL33 films - plastic bags - designed for reuse** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **PL34 films - plastic non-bags - agricultural and commercial** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **PL35 films - plastic non-bags - other film** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **PL16 PVC single-use rigids** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **PL17 PVC multi-use** | 0 | 0 | 0 | 2023: 5<br>2025: 0 | 0 | 0 | 0 | 0 | 0 |
| **PL25 PS thermoformed clamshells and containers** | 0 | 0 | 0 | 0 | 2023: 3 (a,b)<br>2025: 0 | 0 | 3 | 0 | 0 |
| **PL26 PS densified - single-use food service ware** | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| **PL27 PS expanded - packaging** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **PL28 PS expanded - food service ware** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **PL29 PS densified - multi-use** | 0 | 0 | 0 | 2023: 1<br>2025: 0 | 0 | 0 | 0 | 0 | 0 |
| **PL30 other (7) single-use rigids** | 0 | 2023: 1 (a, b)<br>2025: 0 | 2023: 1 (a,b)<br>2025: 0 | 0 | 2023: 1 (a,b)<br>2025: 0 | 2023: 1 (a,b)<br>2025: 0 | 2023: 1<br>2025: 2 | 2023: 1 (a,b)<br>2025: 5 (a,b) | 0 |
| **PL31 plastic wine bladders** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **PL32 films - plastic bags - compostable** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **PL36 films - plastic bags - designed for disposal** | 0 | 0 | 0 | 0 | 0 | 0 | 2023: 0<br>2025: 1 | 0 | 0 |
| **PL37 unknown plastic type or mixture of multiple plastic resins (single-use)** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2023: 0\|<br>2025: 5 (a,b) | 2025: 5 (a,b) |
| **PL38 mixed plastic multi-use** | 0 | 0 | 0 | 2023: 3<br>2025: 0 | 2023: 1 (a,b)<br>2025: 0 | 0 | 2023: 0<br>2025: 4 | 2023: 0<br>2025: 13 (a,b) | 0 |
| **PL39 remainder/ composite plastic** | 0 | 2023: 1 (a,b)<br>2025: 0 | 2023: 2 (a,b)<br>2025: 0 | 2023: 0<br>2025: 0 | 2023: 4 (a,b)<br>2025: 2 (a,b) | 2023: 7 (a,b)<br>2025: 3 (a,b) | 0 | 0 | 2025: 4 (a,b) |
| **Other rare items** | 2023: 5 (a,b)<br>2025: 5 (a,b) | 2023: 1 (a,b)<br>2025: 5 (a,b) | 2023: 3 (a,b)<br>2025: 10 (a,b) | 2023: 1<br>2025: 5 | 2023: 5 (a,b)<br>2025: 5 (a,b) | 2023: 5 (a,b)<br>2025: 7 (a,b) | 2023: 4<br>2025: 11 | 2023: 4 (a,b)<br>2025: 13 (a,b) | 2025: 2 (a,b) |
| **SP02 bulky items** | 0 | 0 | 0 | 2023: 5<br>2025: 0 | 0 | 0 | 0 | 0 | 0 |

| | HDPE Mix | Natural HDPE Bottles and Containers | Pigmented HDPE Bottles and Containers | Mixed Rigid Plastics[1] | PET Bottles | PET Bottles and Containers | Plastics #3-7[1] | Polypro-pylene | PET Thermoforms (New in 2025) |
|---|---|---|---|---|---|---|---|---|---|
| **X02 gable top cartons (non-CRV)** | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| **X03 aseptic containers (non-CRV)** | 0 | 0 | 0 | | 0 | 0 | 2023: 1<br>2025: 0 | 0 | 0 |
| **X10 green material, clean wood, and food scraps** | 0 | 2023: 2 (a,b)<br>2025: 0 | 2023: 1 (a,b)<br>2025: 0 | 0 | 2023: 1 (a,b)<br>2025: 0 | 2023: 1 (a,b)<br>2025: 0 | 2023: 2<br>2025: 1 | 0 | 0 |
| **X11 mixed material single-use** | 2023: 1 (a,b)<br>2025: 1 (a,b) | 0 | 2023: 2 (a,b)<br>2025: 0 | 2023: 2<br>2025: 0 | 0 | 2023: 1 (a,b)<br>2025: 0 | 2023: 2<br>2025: 1 | 2023: 1 (a,b)<br>2025: 0 | 0 |
| **X12 remainder/ composite mixed material multi-use** | 0 | 0 | 2023: 1 (a,b)<br>2025: 0 | 2023: 4<br>2025: 3 | 0 | 2023: 1 (a,b)<br>2025: 0 | 2023: 1<br>2025: 0 | 2023: 0<br>2025: 1 (a,b) | 0 |
| **X13 fines and residuals** | 2023: 1 (a,b)<br>2025: 0 | 0 | 0 | 0 | 0 | 0 | 2023: 1<br>2025: 0 | 0 | 0 |
| **M02 aluminum beverage cans (CRV)** | 0 | 0 | 0 | 0 | 0 | 0 | 2023: 1<br>2025: 0 | 0 | 0 |
| **M06 aluminum foil (>3 mm), molded containers** | 0 | 0 | 0 | 0 | 0 | 0 | 2023: 1<br>2025: 0 | 2023: 1 (a,b)<br>2025: 0 | 0 |
| **M07 tin/steel cans, lids (non-CRV)** | 0 | 0 | 0 | 0 | 0 | 0 | 2023: 1<br>2025: 0 | 0 | 0 |
| **M10 tin/aerosol containers** | 2023: 1 (a,b)<br>2025: 0 | 0 | 0 | 0 | 2023: 1 (a,b)<br>2025: 0 | 2023: 1 (a,b)<br>2025: 0 | 0 | 0 | 0 |
| **M12 ferrous metals** | 0 | 0 | 0 | 0 | 0 | 0 | 2023: 1<br>2025: 0 | 0 | 0 |
| **M13 other non-ferrous metals** | 0 | 0 | 0 | 2023: 2<br>2025: 0 | 0 | 0 | 0 | 0 | 0 |
| **F01 cardboard/ old corrugated containers (OCC)** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2023: 1 (a,b)<br>2025: 0 | 0 |
| **F06 folded paper containers and other paperboard packaging** | 0 | 0 | 0 | 0 | 0 | 0 | 2023: 1<br>2025: 1 | 2023: 1 (a,b)<br>2025: 0 | 0 |
| **F07 other paper** | 2023: 1 (a,b)<br>2025: 0 | 0 | 0 | 0 | 2023: 1 (a,b)<br>2025: 0 | 0 | 2023: 2<br>2025: 2 | 2023: 1 (a,b)<br>2025: 0 | 0 |
| **F10 composite food service paper and packaging** | 0 | 0 | 0 | 0 | 0 | 0 | 2023: 1<br>2025: 0 | 2023: 5 (a,b)<br>2025: 0 | 0 |
| **G05 glass containers - brown/ amber (non-CRV)** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **G09 remainder/ composite glass** | 0 | 0 | 0 | 0 | 0 | 0 | 2023: 1<br>2025: 0 | 0 | 0 |
| **H01 household hazardous waste** | 0 | 2023: 1 (a,b)<br>2025: 0 | 2023: 2 (a,b)<br>2025: 0 | 0 | 0 | 0 | 0 | 0 | 0 |

1 Mixed plastics are not compliant by definition.

# REFERENCES


AFPM. (2018, April 11). In petrochemical industry, a second wave of growth brought by shale. https://www.afpm.org/newsroom/blog/petrochemical-industry-second-wave-growth-brought-shale

Alexander, S. (2024, November 21). Real challenge in plastics recycling is economics, not capacity. Letter to Plastics News. https://www.plasticsnews.com/perspective/real-challenge-plastics-recycling-economics-not-capacity

Alexander, S. (2025, August 20). Recyclers have the capacity – Let's use it. Plastics Recycling Update. https://resource-recycling.com/plastics/2025/08/20/recyclers-have-the-capacity-lets-use-it/

Alliance to End Plastic Waste. (n.d.). Home page. Retrieved September 10, 2025, from https://www.endplasticwaste.org

Alliance to End Plastic Waste. (n.d.). Test-bedding solutions for change. Retrieved September 10, 2025, from https://www.endplasticwaste.org/what-we-do/projects

Alliance to End Plastic Waste. (n.d.). Who we are. Retrieved September 10, 2025, from https://www.endplasticwaste.org/who-we-are/about#network

Alpek. (2025, May 30). Alpek will cease operations at its PET facility in North Carolina. https://www.alpek.com/pr-alpek-will-cease-operations-at-its-pet-facility-in-north-carolina/

American Beverage Association. (n.d.). Together, we're committed to getting every bottle back. Retrieved September 10, 2025, from https://www.americanbeverage.org/initiatives-advocacy/creating-sustainable-solutions/

American Chemistry Council. (n.d.). About ACC. Retrieved September 10, 2025, from https://www.americanchemistry.com/about-acc

American Chemistry Council. (n.d.). Plastics Division membership. Retrieved September 10, 2025, from https://www.americanchemistry.com/better-policy-regulation/plastics/plastics-division-membership

American Chemistry Council. (2018, May 19). U.S. plastics resin producers set circular economy goals to recycle or recover 100% of plastic packaging by 2040. https://www.americanchemistry.com/chemistry-in-america/news-trends/press-release/2018/u.s.-plastics-resin-producers-set-circular-economy-goals-to-recycle-or-recover-100-of-plastic-packaging-by-2040

American Chemistry Council. (2020, May 28). Flexible packaging recycling in material recovery facilities pilot. https://www.americanchemistry.com/better-policy-regulation/plastics/resources/flexible-packaging-recycling-in-material-recovery-facilities-pilot

American Chemistry Council. (2021a). 5 actions for sustainable change: A plan for Congress to accelerate a circular economy for plastics. https://plasticmakers.org/resource/5-actions-for-sustainable-change-a-plan-for-congress-to-accelerate-a-circular-economy-for-plastics/

American Chemistry Council. (2021b). Principles for the advanced recycling of plastics using a mass balance approach. https://www.americanchemistry.com/content/download/9931/file/Principles-for-the-Advanced-Recycling-of-Plastics-Using-a-Mass-Balance-Approach.pdf

American Chemistry Council. (2022, April 12). The potential economic impact of advanced recycling and recovery facilities in the United States. https://www.americanchemistry.com/content/download/10845/file/Potential-Economic-Impact-of-Advanced-Recycling-Recovery-Facilities-in-the-US.pdf

American Chemistry Council. (2022, March 15). Reports: Secondary sortation economically attractive and necessary to scale up recycling. https://www.americanchemistry.com/chemistry-in-america/news-trends/press-release/2022/reports-secondary-sortation-economically-attractive-and-necessary-to-scale-up-recycling

Association of Plastic Recyclers. (n.d.). About Extended Producer Responsibility packaging laws. Retrieved September 10, 2025, from https://plasticsrecycling.org/tools-and-resources/policy-hub/policy-priorities/packaging-epr-laws/

Association of Plastic Recyclers. (n.d.). APR Certified PCR directory. Retrieved May 10, 2025, from https://plasticsrecycling.org/tools-and-resources/apr-tools/apr-pcr-certification/apr-pcr-certification-directory/

Association of Plastic Recyclers. (n.d.). APR Recycling Leadership Awards. https://plasticsrecycling.org/apr-recycling-leadership-awards/

Association of Plastic Recyclers. (n.d.). Buyers & sellers directory. Retrieved May 10, 2025, from https://plasticsrecycling.org/tools-and-resources/buyers-sellers-directory/

Association of Plastic Recyclers. (2023, March 16). Recycled plastic content requirements are here and more are coming soon. Here is what you need to know. https://plasticsrecycling.org/resources/recycled-plastic-content-requirements-are-here-and-more-are-coming-soon-here-s-what-you-need-to-know/

Association of Plastic Recyclers. (2023, November 15). The Association of Plastic Recyclers celebrates America Recycles Day. https://plasticsrecycling.org/resources/the-association-of-plastic-recyclers-celebrates-america-recycles-day/

Association of Plastic Recyclers. (2025, April 29). Nationwide tours will demonstrate how recycling works for inaugural Recycling in Action month. https://plasticsrecycling.org/resources/nationwide-tours-will-demonstrate-how-recycling-works-for-inaugural-recycling-in-action-month/

Association of Plastic Recyclers. (2025, May 21). 2025 plastic recycling capacity in the US and Canada. https://plasticsrecycling.org/resources/2025-plastic-recycling-capacity-in-the-us-and-canada/

Averett, S. (2012, June 18). Symbol of change: A look at the How-2Recycle labeling system. Waste360. https://www.waste360.com/waste-recycling/symbol-of-change-a-look-at-the-how-2recycle-labeling-system

Banks, S. L., Jackman, S. E., & Lourié, B. (2025, April 11). Countdown to compliance: California's new "recyclable" labeling law. Greenberg Glusker. https://www.greenbergglusker.com/tox-of-the-town/countdown-to-compliance-californias-new-recyclable-labeling-law/

Basel Action Network. (n.d.). Plastic waste trade data, United States exports. https://www.ban.org/plastic-waste-project-hub/trade-data/usa-export-data-annual-summary

Basel Action Network & The Last Beach Cleanup. (2024, February 12). Fact briefing: California state's own data reveals consumer plastics are not recyclable and are being exported illegally. https://wiki.ban.org/images/9/9d/FactBriefingCaliforniaPlasticWaste.pdf

BBC Earth. (2017). Blue planet II. https://www.bbcearth.com/shows/blue-planet-ii

Beaumont, H. (2024, December 5). How the plastic industry undermines democracy by blocking bans. Environmental Health Network. https://www.ehn.org/plastic-industry-undermines-democracy

Benyathiar, P., Kumar, P., Carpenter, G., Brace, J., & Mishra, D. K. (2022). Polyethylene terephthalate (PET) bottle-to-bottle recycling for the beverage industry: A review. Polymers (Basel) 14(11), 35745942. https://doi.org/10.3390/polym14122366

Bettenhausen, C. (2024, June 5). Fulcrum BioEnergy abandons trash-to-fuel plant in Nevada. C&E News. https://cen.acs.org/energy/Fulcrum-BioEnergy-abandons-trashfuel-plant/102/web/2024/06

Beyond Plastics & IPEN. (2023). Chemical recycling: A dangerous deception. https://www.beyondplastics.org/publications/chemical-recycling

Beyond Plastics & The Last Beach Cleanup. (2022). The real truth about the U.S. plastics recycling rate: 2021 report. https://www.beyondplastics.org/publications/us-plastics-recycling-rate

Bofiliou, T., Willis, J., Guessous, N., & Kozlowski, N. (2022). Alliance to End Plastic Waste: Barely credible. Planet Tracker briefing paper. https://planet-tracker.org/wp-content/uploads/2022/08/AEPW.pdf

Boren, Z., Howard, E., & Budiastrawan, I. P. A. (2024, November 20). Companies behind campaign to "end plastic waste" produced 1,000 times more plastic than it cleaned up. Unearthed. https://unearthed.greenpeace.org/2024/11/20/alliance-to-end-plastic-waste-oil-chemical-exxon-shell-total/

Brock, J. (2020, October 5). Set, miss, repeat – Big brands and plastic recycling targets. Reuters. https://www.reuters.com/article/world/asia-pacific/set-miss-repeat-big-brands-and-plastic-recycling-targets-idUSKBN2601ML/

Brock, J., Volcovici, V., & Geddie, J. (2021, July 29). The recycling myth: Big Oil's solution for plastic waste littered with failure. Reuters. https://www.reuters.com/investigates/special-report/environment-plastic-oil-recycling/

The Brownsville Herald. (2008, February 11). Plastic: Recycle the bags or replace them? https://www.newspapers.com/image/36360122

California's Statewide Commission on Recycling Markets and Curbside Recycling. (2021, July 1). Policy recommendations. https://calrecycle.ca.gov/recyclingcommission/

CalRecycle. (n.d.). Accurate recycling labels. Retrieved September 10, 2025, from https://calrecycle.ca.gov/wcs/recyclinglabels/

CalRecycle. (n.d.). Enforcement. Retrieved September 10, 2025, from https://calrecycle.ca.gov/lgcentral/enforcement/

CalRecycle. (n.d.). List of approved food service packaging. Retrieved September 10, 2025, from https://www2.calrecycle.ca.gov/ListofApprovedFoodServicePackaging/

CalRecycle. (n.d.). Plastic minimum content standards and reporting for beverage manufacturers. Retrieved September 10, 2025, from https://calrecycle.ca.gov/bevcontainer/bevdistman/plasticcontent/

CalRecycle. (n.d.). Recycling and Disposal Reporting System (RDRS). Retrieved September 10, 2025, from https://calrecycle.ca.gov/swfacilities/rdreporting/

CalRecycle. (2023, December 28). SB 343 material characterization study preliminary findings. https://www2.calrecycle.ca.gov/Publications/Details/1729

CalRecycle. (2024, February 13). Public meeting notice: SB 343 preliminary findings report informational session. Agenda posted at: https://www2.calrecycle.ca.gov/PublicNotices/Details/5313

CalRecycle. (2024, May 30). 2021 disposal-facility-based characterization of solid waste in California. DRRR-2024-1737. https://www2.calrecycle.ca.gov/wastecharacterization/study

CalRecycle. (2024, December 31). Source reduction baseline technical report: A Plastic Pollution Prevention and Packaging Producer Responsibility Act needs assessment cumulative report. DRRR-2024-1747. https://www2.calrecycle.ca.gov/Publications/Details/1748

CalRecycle. (2025, April 4). SB 343 material characterization study final findings 2023/2024. https://www2.calrecycle.ca.gov/Publications/Details/1751

CBS Sunday Morning. (2024, April 14). Critics call out recycling "fraud" by plastics industry. https://www.youtube.com/watch?v=Rwppg-bZwrpg

Celik, Y., Shamsuyeva, M., & Endres, H. J. (2022). Thermal and mechanical properties of the recycled and virgin PET – Part I. Polymers 14(7), 1326. https://doi.org/10.3390/polym14071326

Center for Climate Integrity. (2024). The fraud of plastic recycling. https://climateintegrity.org/uploads/media/Fraud-of-Plastic-Recycling-2024.pdf

Center for Climate Integrity. (2025). The fraud of advanced recycling. https://climateintegrity.org/projects/advanced-recycling-fraud

CEPR. (2024, December 18). The Chinese plastic waste import ban: Lessons for EU policy. https://cepr.org/voxeu/columns/chinese-plastic-waste-import-ban-lessons-eu-policy

Changing Markets. (2020, September 3). Talking trash: The corporate playbook to false solutions to the plastic crisis. https://talking-trash.com/wp-content/uploads/2020/09/TalkingTrash_FullReport.pdf

Chartres, N., Cooper, C. B., Bland, G., Pelch, K. E., Gandhi, S. A., BakenRa, A., & Woodruff, T. J. (2024). Effects of microplastic exposure on human digestive, reproductive, and respiratory health: A rapid systematic review. Environmental Science & Technology 58(52), 39692326. https://doi.org/10.1021/acs.est.3c09524

City of York. (2024, August 26). City to end curbside recycling services. https://www.yorksc.gov/media/7096

Closed Loop Partners. (n.d.). US and Canada recycling infrastructure and plastic waste map. Retrieved May 10, 2025, from https://www.closedlooppartners.com/research/us-and-canada-recycling-infrastructure-and-plastic-waste-map/

Closed Loop Partners. (2019). Accelerating circular supply chains for plastics: A landscape of transformational technologies that stop plastic waste, keep materials in play and grow markets. https://www.closedlooppartners.com/wp-content/uploads/2021/01/CLP_Circular_Supply_Chains_for_Plastics_Updated.pdf

Consumer Brands Association. (n.d.). Membership benefits. Retrieved September 10, 2025, from https://consumerbrandsassociation.org/membership-benefits/

Consumer Brands Association. (2023, April 22). Consumer Brands Association submission for April 2023 FTC Green Guides 04 22 23. https://www.regulations.gov/comment/FTC-2022-0077-0965

Copley, M. (2024, June 9). Creating a throw-away culture: How companies ingrained plastics in modern life. NPR. https://www.npr.org/2024/06/09/nx-s1-4942415/disposable-plastic-pollution-waste-single-use-recycling-climate-change-fossil-fuels

Corkery, M. (2019, April 7). Beverage companies embrace recycling, until it costs them. The New York Times. https://www.nytimes.com/2019/07/04/business/plastic-recycling-bottle-bills.html

Cottom, J. W., Cook, E., & Velis, C. A. (2024). A local-to-global emissions inventory of macroplastic pollution. Nature 633, 101-108. https://www.nature.com/articles/s41586-024-07758-6

Cramer, K. (2016, August 11). Sharpening our gaze on packaging recyclability. How2Recycle. https://fr.how2recycle.info/news/2016/sharpening-our-gaze-on-packaging-recyclability

The Daily Item. (1988, June 10). Plastics - A great future recycling promise. https://www.newspapers.com/newspage/481879341/

Davies, W., & Farris, E. (2025, July 28). The best sparkling water maker for bubbly beverages on demand. Bon Appétit. https://www.bonappetit.com/story/best-soda-makers

Dell, J., MacKerron, C., & Smith, T. (2018, October 26). Why are "sustainable" companies supporting plastic bag lobbyists? As You Sow. https://www.asyousow.org/blog/sustainable-companies-support-plastic-bag-lobbyists

Dhaka, V., Singh, S., Anil, A. G., Naik, T. S. S. K., Garg, S., Samuel, J., Kumar, M., Ramamurthy, P. C., & Singh, J. (2022). Occurrence, toxicity and remediation of polyethylene terephthalate plastics. A review. Environmental Chemistry Letters 20(3), 1777-1800. https://doi.org/10.1007/s10311-021-01384-8

DiFrisco, E. (2022, November 2). Hold the plastic, please: Reusable food tray project reduces waste and toxics. Center for Environmental Health. https://ceh.org/latest/press-releases/hold-the-plastic-please-reusable-food-tray-project-reduces-waste-and-toxics/

Dinman, E. (2025, May 7). Spokane's recycling bin blues: Many plastics end up incinerated despite residents' best efforts. The Spokesman-Review. https://www.spokesman.com/stories/2025/may/07/spokanes-recycling-bin-blues-many-plastics-end-up-/

Duke Nichols Institute. (2022). Plastic pollution policy country profile: Mexico. https://nicholasinstitute.duke.edu/sites/default/files/projects/Plastic-Pollution-Policy-Country-Profile-Mexico.pdf

Earth911. (n.d.). Recycling search. https://search.earth911.com

Earth911. (2024, February 12). How to use Earth911 to improve your community's recycling & reuse results. https://earth911.com/home-garden/how-to-use-earth911-to-improve-your-communitys-recycling-reuse-results/

Eastman. (n.d.). It's the Feedstock™: Unlocking the value in waste. Retrieved September 10, 2025, from https://www.eastman.com/en/sustainability/environmental/circularity/circular-solutions/its-the-feedstock

Ellen MacArthur Foundation. (n.d.). Designing out plastic pollution with the circular economy. https://www.ellenmacarthurfoundation.org/topics/plastics/overview

Ellen MacArthur Foundation. (n.d.). The U.S. Plastics Pact. https://www.ellenmacarthurfoundation.org/us-plastics-pact

Ellen MacArthur Foundation. (2013). Towards the circular economy, vol. 1. https://www.aquafil.com/assets/uploads/ellen-macarthur-foundation.pdf

Ellen MacArthur Foundation. (2016). The New Plastics Economy: Rethinking the future of plastics. https://www.ellenmacarthurfoundation.org/the-new-plastics-economy-rethinking-the-future-of-plastics

Ellen MacArthur Foundation. (2020). New Plastics Economy Global Commitment: Commitments, vision and definitions. https://www.ellenmacarthurfoundation.org/global-commitment/global-commitment-annual-reports-and-resources

Ellen MacArthur Foundation. (2021a). 2021 Global Commitment progress report, Driscoll's. https://www.ellenmacarthurfoundation.org/global-commitment-2021/signatory-reports/ppu/driscolls

Ellen MacArthur Foundation. (2021b). The Global Commitment 2021 progress report. https://www.ellenmacarthurfoundation.org/global-commitment-2021/overview

Ellen MacArthur Foundation. (2022). The Global Commitment 2022 progress report. https://www.ellenmacarthurfoundation.org/global-commitment-2022/overview

Ellen MacArthur Foundation. (2023, October 31). The Global Commitment: A common vision for a circular economy for plastics. https://www.ellenmacarthurfoundation.org/global-commitment/overview

Ellen MacArthur Foundation. (2024). The Global Commitment 2024 progress report. https://content.ellenmacarthurfoundation.org/m/528a7cd095787dec/original/The-Global-Commitment-2024-Progress-Report.pdf

Ellen MacArthur Foundation. (2024, November 18). Now live: The Global Commitment 2024 annual report. https://www.ellenmacarthurfoundation.org/news/now-live-the-global-commitment-2024-annual-report

Elliott, S. (2007, March 13). Dig this campaign. The New York Times. https://www.nytimes.com/2007/03/13/business/media/12ad-newsletter1.html

Enck, J., & Dell, J. (2022, May 30). Plastic recycling doesn't work and will never work. The Atlantic. https://www.theatlantic.com/ideas/archive/2022/05/single-use-plastic-chemical-recycling-disposal/661141/

Enerkem. (2024, June 30). Enerkem to retire its Edmonton biofuels facility. https://enerkem.com/newsroom/enerkem-to-retire-its-edmonton-biofuels-facility

Eunomia. (2023). The 50 states of recycling: A state-by-state assessment of US packaging recycling rates. https://www.ball.com/getmedia/eb3620b7-e8af-44af-83cd-fb8606753600/50-STATES_2023-V12.pdf

European Commission. (2021). Waste shipments correspondents' guidelines no. 12 on the classification of plastic waste. https://environment.ec.europa.eu/system/files/2021-12/Correspondents'%20guidelines%20No%2012%20final%20Nov%202021%20corr1.pdf

ExxonMobil. (2025). 2024 annual report. https://investor.exxonmobil.com/sec-filings/annual-reports

Fox, S. (2025, July 6). The Recycling Partnership's push to make film and flexible packaging recyclable at scale. Recycling Product News. https://www.recyclingproductnews.com/article/43453/the-recycling-partnerships-push-to-make-film-and-flexible-packaging-recyclable-at-scale

GAIA. (2022). Tracking trends in advanced/chemical "recycling." https://www.no-burn.org/wp-content/uploads/2022/08/Plastics-Burning-Legislative-Alert_Final_August182022.pdf

Gallenberger, M. (2024, February 7). Portage Council votes to end curbside recycling program that hasn't recycled anything for years. Lakeshore Public Media. https://www.lakeshorepublicmedia.org/local-news/2024-02-07/portage-council-votes-to-end-curbside-recycling-program-that-hasnt-recycled-anything-for-years

Gerassimidou, S., Lanska, P., Hahladakis, J. N., Lovat, E., Vanzetto, S., Geueke, B., Groh, K. J., Muncke, J., Maffini, M., Marin, O. V., & Iacovidou, E. (2022). Unpacking the complexity of the PET drink bottles value chain: A chemicals perspective. Journal of Hazardous Materials 430, 128410. https://doi.org/10.1016/j.jhazmat.2022.128410

Gonzalez, G. (2019, October 16). APR: Chemical recycling is not "silver bullet" for plastics challenges. Waste Dive. https://www.wastedive.com/news/apr-chemical-recycling-plastic-sej/564995/

Goodman, P. S. (2022, March 14). How high oil prices threaten a California plastic container business. The New York Times. https://www.nytimes.com/2022/03/14/business/russia-ukraine-supply-chain-plastic.html

Government of Canada. (2023, May 5). Recycled content and labelling rules for plastics: Regulatory framework paper. https://www.canada.ca/en/environment-climate-change/services/canadian-environmental-protection-act-registry/recycled-content-labelling-rules-plastics.html

GOV.UK. (n.d.). Ellen Macarthur Foundation. Find and update company information service. Retrieved September 10, 2025, from https://find-and-update.company-information.service.gov.uk/company/06897785

GreenBlue. (n.d.). About GreenBlue. Retrieved September 10, 2025, from https://greenblue.org/category/greenblue/

GreenBlue. (n.d.). Home page. Retrieved September 10, 2025, from https://greenblue.org

GreenBlue. (n.d.). Pro + plus. Retrieved September 10, 2025, from https://greenblue.org/projects/how2recycle/how2recycle-forward-label/

GreenBlue. (2024, January 5). How2Recycle upgrades recyclability of certain rigid polypropylene (PP) formats. https://greenblue.org/2024/01/05/how2recycle-upgrades-recyclability-of-certain-rigid-polypropylene-pp-formats/

GreenBlue. (2025, April 23). How2Recycle unveils new design for Store Drop-off label. https://greenblue.org/2025/04/23/new-sdo-label-design/

Greenpeace USA. (2020a). Circular claims fall flat: Comprehensive U.S. survey of plastics recyclability. https://www.greenpeace.org/usa/report-circular-claims-fall-flat/

Greenpeace USA. (2020b). Deception by the numbers. https://www.greenpeace.org/usa/deception-by-the-numbers/

Greenpeace USA. (2022). Circular claims fall flat again. https://www.greenpeace.org/usa/circular-claims-fall-flat-again/

Greenpeace USA. (2023). Forever toxic: The science on health threats from plastic recycling. https://www.greenpeace.org/usa/forever-toxic/

Gutman, M., Simon, E., Park, C., Simpson, T., Kofsky, J., Schlosberg, J., Brooksbank, T., Yamashita, S., & Kim, S. R. (2023, May 23). We put dozens of trackers in plastic bags for recycling. Many were trashed. ABC News. https://abcnews.go.com/US/put-dozens-trackers-plastic-bags-recycling-trashed/story?id=99509422

Gutman, M., Simon, E., Park, C., Simpson, T., Schlosberg, J., Brooksbank, T., & Nichols, M. (2024, April 23). Plastic bags from Walmart US recycling bins tracked to controversial plastic facilities in Southeast Asia. ABC News. https://abcnews.go.com/US/plastic-bags-walmart-us-recycling-bins-tracked-controversial/story?id=109491232

Ha, K. O. (2023, September 29). Don't trust plastic snack wrappers with recycling instructions. Bloomberg. https://www.bloomberg.com/news/features/2023-09-29/us-store-drop-off-plastic-recycling-often-ends-up-in-landfills

Helmer, J. (2023, February 15). "Skip the Stuff" laws aim to get rid of takeout trash. Foodprint. https://foodprint.org/blog/skip-the-stuff-laws/

Horton, H. (2024, December 3). Coca-Cola accused of quietly dropping its 25% reusable packaging target. The Guardian. https://www.theguardian.com/environment/2024/dec/03/coca-cola-accused-dropping-reusable-packaging-target

Houssini, K., Li, J., & Tan, Q. (2025). Complexities of the global plastics supply chain revealed in a trade-linked material flow analysis. Communications Earth & Environment 6, 257. https://www.nature.com/articles/s43247-025-02169-5

How2Recycle. (n.d.). Check Locally. Retrieved September 10, 2025, from https://how2recycle.info/about-the-how2recycle-label/check-locally/

How2Recycle. (n.d.). Store Drop-off: US only. Retrieved September 10, 2025, from https://how2recycle.info/about-the-how2recycle-label/store-drop-off-us-only/

ICIS. (n.d.). Recycling. https://www.icis.com/explore/sectors/recycling/

Indorama Ventures. (n.d.). AlphaPet. Retrieved September 10, 2025, from https://www.indoramaventures.com/en/worldwide/780/alphapet

Instrumentl. (n.d.). The Recycling Partnership. https://www.instrumentl.com/990-report/recycling-partnership-inc#past-awards-received

IUCN. (2024). Plastic pollution. https://iucn.org/resources/issues-brief/plastic-pollution

Jambeck, J. R., Andrady, A., Geyer, R., Narayan, R., Perryman, M., Siegler, T., Wilcox, C., & Lavender Law, K. (2015). Plastic waste inputs from land into the ocean. Science 347, 768-771. https://doi.org/10.1126/science.1260352

Johnson, A. (2024, December 14). City announces end of curbside recycling program due to costs and contamination issues. Hoodline. https://hoodline.com/2024/12/city-announces-end-of-curbside-recycling-program-due-to-costs-and-contamination-issues/

Johnson, J. (2025, June 9). Pennsylvania recycler, HDPE outdoor furniture maker closes. Plastics News. https://www.plasticsnews.com/news/pennsylvania-recycler-outdoor-furniture-maker-shuts-down

Just Zero. (2025). Greenwashed 2024: A look at corporate greenwashing and tips on how to spot it. https://just-zero.org/wp-content/uploads/2025/04/Just-Zero-Greenwashed-2024-Report.pdf

Karali, N., Khanna, N., & Shah, N. (2024). Climate impact of primary plastic production. Lawrence Berkeley National Laboratory. https://doi.org/10.2172/2336721

Kazdin T. (2024, November 4). PPRC 2024: Addressing the packaging recovery problem. Recycling Today. https://www.recyclingtoday.com/news/pprc-2024-addressing-the-packaging-recovery-problem/

Kazi, T. (2025, September 23). Consumer income pressure erodes appetite for recycled goods, resin in US. S&P Global. https://www.spglobal.com/commodity-insights/en/news-research/latest-news/chemicals/092325-consumer-income-pressure-erodes-appetite-for-recycled-goods-resin-in-us

Kaufman, D. (2025, September 9). EPA begins hazardous substances removal from former Omni Polymers facility in Toledo, Ohio. https://www.epa.gov/newsreleases/epa-begins-hazardous-substances-removal-former-omni-polymers-facility-toledo-ohio

Kroger. (2018, August 23). Kroger to phase out single-use plastic bags by 2025. https://ir.kroger.com/news/news-details/2018/Kroger-to-Phase-Out-Single-Use-Plastic-Bags-by-2025/default.aspx

Kroger. (2024). 2024 environmental, social & governance report. https://www.thekrogerco.com/wp-content/uploads/2025/03/Kroger-Co-2024-ESG-Report.pdf

Langton, L. G. (2023, February 10). Alliance to End Plastic Waste defends failures after achieving 0.2% of its targets. Packaging Insights. https://www.packaginginsights.com/news/alliance-to-end-plastic-waste-defends-failures-after-achieving-02-of-its-targets.html

The Last Beach Cleanup. (n.d.). 2021 fast food plastic survey. https://www.lastbeachcleanup.org/fastfoodsurvey

The Last Beach Cleanup. (n.d.). Global chemical recycling plant counter. Retrieved September 10, 2025, from https://www.lastbeachcleanup.org/globalchemicalrecyclingplantcounter

The Last Beach Cleanup. (n.d.). Home page. Retrieved September 10, 2025, from https://www.lastbeachcleanup.org

The Last Beach Cleanup. (2025, April 16). 2025 California post-consumer rigid plastic waste processors/recyclers. https://www.google.com/maps/d/u/0/viewer?mid=1-607zr7ES4RSJDYatxt6aRBdA-hslgE&ll=35.98551255455789%2C-119.2482077&z=8

The Last Beach Cleanup. (2025, October 5). U.S. residential material recovery facilities. https://www.google.com/maps/d/u/0/viewer?ll=32.662148462142305%2C-99.00628889999996&z=5&mid=1t0n5xjS6XH5Gt0GvHy4TWuF1q10LJe8

The Last Beach Cleanup & Beyond Plastics. (2022, May 4). The real truth about the U.S. plastic recycling rate. https://www.lastbeachcleanup.org/_files/ugd/dba7d7_5ae55cdb66d241239e8ae123c96ec9b8.pdf

The Last Beach Cleanup, Just Zero, Plastic Pollution Coalition, Beyond Plastic, Center for Biological Diversity, & Greenpeace USA. (2023, April 24). Guides for the use of environmental marketing claims - Green Guides review, matter no. P954501 (docket FTC-2022-0077). https://www.lastbeachcleanup.org/_files/ugd/dba7d7_f88bab1ed83146b59e07464e7e0150b9.pdf

LeBlanc, R. (2019, May 9). An overview of polypropylene recycling. LiveAbout. https://www.liveabout.com/an-overview-of-polypropylene-recycling-2877863

McNees, M. (2022, August 3). How2Recycle upgrades polypropylene to "Widely Recyclable." Recycling Today. https://www.recyclingtoday.com/news/how2recycle-upgrades-polypropylene-recyclability/

McNees, M. (2023, March 28). Report finds "untapped potential" in curbside film collection. Recycling Today. https://www.recyclingtoday.com/news/mrff-report-plastic-film-recycling-pilot-program/

Metz, S., Wholf, T. J., & Schechter, D. (2024, December 2). Starbucks promotes recycling to customers but many plastic cups end up in the trash. CBS News. https://www.cbsnews.com/news/starbucks-plastic-cups-recycling-trash/

Milbrandt, A., Coney, K., Badgett, A., & Beckham, G. T. (2022). Quantification and evaluation of plastic waste in the United States. Resources, Conservation and Recycling 183, 106363. https://doi.org/10.1016/j.resconrec.2022.106363

Mondelēz. (2024, September 18). Mondelēz International makes progress toward packaging goals with advanced recycling technology in Triscuit packaging. GlobeNewswire. https://www.globenewswire.com/news-release/2024/09/18/2948275/35903/en/Mondel%C4%93z-International-Makes-Progress-Toward-Packaging-Goals-with-Advanced-Recycling-Technology-in-Triscuit-Packaging.html

Montgomery, B. (2022). Economic propaganda in the United States (CMC senior theses, Claremont McKenna College). https://scholarship.claremont.edu/cgi/viewcontent.cgi?article=4142&context=cmc_theses

Monver, P. R. (2023, March 20). Is a testimonial a propaganda technique? Niva.io. https://niva.io/library/propaganda-testimonials

Moore, P., & Staub, C. (2020, May 21). Slipping through the cracks. Plastics Recycling Update. https://resource-recycling.com/plastics/2020/05/19/slipping-through-the-cracks/

Musulin, K. (2018, May 18). ACC aims to recycle, recover or reuse 100% of plastic packaging by 2040. Waste Dive. https://www.wastedive.com/news/American-Chemistry-Council-recycle-recover-plastic-packaging-2040/523179/

NAPCOR. (n.d.). NAPCOR members. Retrieved September 10, 2025, from https://napcor.com/napcor-membership/membership-directory-resources/

NAPCOR. (n.d.). PET reclaimers. Retrieved May 10, 2025, from https://napcor.com/recycling/pet-reclaimers/

NAPCOR. (n.d.). "What is PET?" Retrieved September 10, 2025, from https://napcor.com/about-pet/

NAPCOR. (2020, April 20). Trade associations align in support of beverage container deposit programs. https://napcor.com/news/manufacturing-container-focused-trade-associations-align-in-support-of-beverage-container-deposit-programs/

NAPCOR. (2023, March 6). PET plastic bottles have a significantly lower environmental impact compared to glass bottles and aluminum cans. https://napcor.com/news/pet-plastic-bottles-have-a-significantly-lower-environmental-impact-compared-to-glass-bottles-and-aluminum-cans/

NAPCOR. (2024, December 12). 2023 US PET bottle recycling rate reaches highest level in decades; Recycled PET content in US bottles reaches highest level ever. https://napcor.com/news/2023-pet-bottle-recycling-reach-new-heights/

National Institutes of Health. (n.d.). Life cycle environmental impacts of PET plastic water bottles. Retrieved September 10, 2025, from https://nems.nih.gov/sustain/Pages/PETWaterBottleImpact.aspx

Newberger, E. (2019, July 24). Coca-Cola, PepsiCo break ties with plastic lobbying group amid mounting scrutiny over pollution. NBC News. https://www.cnbc.com/2019/07/23/coca-cola-pepsi-co-break-ties-with-plastics-industry-association.html

OECD. (2022, June 3). Global plastic waste set to almost triple by 2060, says OECD. https://www.oecd.org/environment/global-plastic-waste-set-to-almost-triple-by-2060.htm

Oller, S. (2022, May 25). Big Food's sustainable packaging goals hit supply and demand reality. Waste Dive. https://www.wastedive.com/news/big-food-sustainable-packaging-goals-challenges/624351/

Oreskes, N., & Conway, E. M. (2010). Merchants of doubt: How a handful of scientists obscured the truth on issues from tobacco smoke to climate change. Bloomsbury.

Paben, J. (2022, September 8). Thermoform-to-thermoform bill draws mixed reactions. Plastics Recycling Update. https://resource-recycling.com/plastics/2022/09/08/thermoform-to-thermoform-bill-draws-mixed-reactions/

Packaging Dive. (2025, March 11). Companies begin to signal changes to 2025 plastic targets. https://www.packagingdive.com/news/plastic-packaging-sustainability-goals-changed/720372/

Packaging Europe. (2022, February 11). The Coca-Cola Company pledges to achieve 25% refillable or returnable portfolio by 2030. https://packagingeurope.com/news/the-coca-cola-company-pledges-to-achieve-25-refillable-or-returnable-portfolio-by-2030/7859.article

Palmer, E. (2019, September 15). S.C. Johnson joins Coca-Cola and PepsiCo in ditching ties to Plastics Industry Association: "This trend will only continue." Newsweek. https://www.newsweek.com/sc-johnson-joins-coca-cola-pepsico-ditching-ties-plastics-industry-association-this-trend-1461222

Parton, M. (2025, January 13). Despite an earlier pledge, Kroger has yet to eliminate single-use plastic bags. Modern Retail. https://www.modernretail.co/operations/despite-an-earlier-pledge-kroger-has-yet-to-eliminate-single-use-plastic-bags/

PBS Frontline & NPR. (2020). Plastic wars. https://www.youtube.com/watch?v=-dk3N0EgX7o

Pecci, K. L., Blair, P. W., & Budris, K. P. (2022, February 9). 5 ways Big Beverage sabotages recycling reform. Conservation Law Foundation. https://www.clf.org/blog/big-beverage-play-book-to-avoid-responsibility/

Plastic Pollution Coalition. (2025, April 11). New California bill (AB 473) threatens to gut "Truth in Labeling" law (SB 343). https://www.plasticpollutioncoalition.org/blog/2025/3/11/new-california-bill-ab-473-threatens-to-gut-truth-in-labeling-law-sb-343

Philadelphia Court of Common Pleas Civil Division, (2025, September 24). The City of Philadelphia v. Bimbo Bakeries USA and S.C. Johnson & Son. https://www.phila.gov/media/20250924115338/Plastic-Film-Recycling-Deception-Complaint.pdf

Pitti, A. (2025, January 20). PureCycle Technologies is already in cost hell. Seeking Alpha. https://seekingalpha.com/article/4750693-purecycle-technologies-is-already-in-cost-hell

Plastics Industry Association. (n.d.). Become a member. Retrieved September 10, 2025, from https://plasticsindustry.org/become-a-member/

Plastics Industry Association. (n.d.). Recycling is Real. https://recyclingisreal.com

Plastics Industry Association. (2023, September 14). Plastics Industry Association launches Recycling is Real advocacy campaign. https://www.plasticsindustry.org/newsroom/plastics-industry-association-launches-recycling-is-real-advocacy-campaign/

Plastics News. (n.d.). Plastic recyclers/brokers (2025). Retrieved May 10, 2025, from https://www.plasticsnews.com/businessdata/439/Plastics%20Recyclers/Brokers (subscription required)

Plastic Recyclers Europe. (2025, September 11). Wave of surging plastic recycling plant closures hits Europe. https://www.plasticsrecyclers.eu/news/wave-of-surging-plastic-recycling-plant-closures-hits-europe/

ProPublica. (n.d.). Alliance to End Plastic Waste Inc. Nonprofit explorer. https://projects.propublica.org/nonprofits/organizations/832463179

ProPublica. (n.d.). American Chemistry Council. Nonprofit explorer. https://projects.propublica.org/nonprofits/organizations/530104410

ProPublica. (n.d.). Association of Plastic Recyclers Inc. Nonprofit explorer. https://projects.propublica.org/nonprofits/organizations/521779031

ProPublica. (n.d.). Green Blue Institute. Nonprofit explorer. https://projects.propublica.org/nonprofits/organizations/10706799

ProPublica. (n.d.). National Association for Pet Container Resources Inc. Nonprofit explorer. https://projects.propublica.org/nonprofits/organizations/561590867

ProPublica. (n.d.). Nonprofit explorer. https://projects.propublica.org/nonprofits/

ProPublica. (n.d.). Plastics Industry Association Inc. Nonprofit explorer. https://projects.propublica.org/nonprofits/organizations/131325282

ProPublica. (n.d.). The Recycling Partnership Inc. Nonprofit explorer. https://projects.propublica.org/nonprofits/organizations/371622018

ProPublica. (n.d.). US Plastics Pact LLC. Nonprofit explorer. https://projects.propublica.org/nonprofits/organizations/851372760

Pyzyk, K. (2023, March 23). American beverage ad's "aspirational" claims overstate PET bottle recycling practices, ad panels say. Packaging Dive. https://www.packagingdive.com/news/american-beverage-every-bottle-back-claims-over-state-pet-bottle-recycling/645595/

Pyzyk, K. (2025, February 12). Pactiv Evergreen to close Michigan plant, cut 153 jobs. Packaging Dive. https://www.packagingdive.com/news/pactiv-evergreen-kalamazoo-michigan-plant-closure-layoffs/739878/

Quinn, M. (2021, June 23). Amid rising interest in packaging policy, bottle bill changes still struggle to break through. Waste Dive. https://www.wastedive.com/news/bottle-bill-container-deposit-2021-policy-struggle/602151/

Quinn, M. (2023, September 19). Plastic industry's $1M "Recycling is Real" campaign designed to reclaim the narrative. Waste Dive. https://www.wastedive.com/news/plastics-recycling-is-real-campaign-beyond-plastics-greenpeace/694061/

Quinn, M. (2025, February 11). California PET recyclers adapting ahead of Evergreen downsizing. Waste Dive. https://www.wastedive.com/news/evergreen-partial-closure-pet-california-mexico-exports/739798/

Quinn, M. (2025, March 18). Brightmark files for bankruptcy at Indiana chemical recycling facility. Waste Dive. https://www.wastedive.com/news/brightmark-bankruptcy-ashley-indiana-sale-process/742791/

Quinn, M. (2025, March 28). Data, transparency could shed light on curbside collection challenges. Waste Dive. https://www.wastedive.com/news/data-transparency-curbside-recycling-challenges-plastics-recycling-conference/743831/

Quinn, M. (2025, September 29). California recyclers look for new PET solutions in wake of rPlanet closure. Waste Dive. https://www.wastedive.com/news/california-recyclers-pet-markets-rplanet-closure-calrecycle/761357/

Rachal, M. (2024, August 20). 28% of PET bottles are being recycled, The Recycling Partnership reports. Packaging Dive. https://www.packagingdive.com/news/pet-bottles-packaging-recycling-coalition-data/724654/

Rachal, M. (2025, March 21). Packaging groups back bipartisan recycling bill in Congress. Packaging Dive. https://www.packagingdive.com/news/congress-recycling-infrastructure-accessibility-act-re-introduced/743223/

Rachal, M. (2025, August 19). Blue Polymers takes over food-grade rPET pellet production in California. Packaging Dive. https://www.packagingdive.com/news/blue-polymers-republic-services-rpet-pellet-california/757933/

Recycling Magazine. (2022, February 7). Film and flexible packaging recycling. https://www.recycling-magazine.com/2022/02/07/film-and-flexible-packaging-recycling/

The Recycling Partnership. (n.d.). Community recycling program acceptance data. Retrieved September 10, 2025, from https://recyclingpartnership.org/recycling-data/

The Recycling Partnership. (n.d.). Home page. Retrieved September 10, 2025, from https://recyclingpartnership.org

The Recycling Partnership. (n.d.). Our funding partners. Retrieved September 10, 2025, from https://recyclingpartnership.org/funding-partners/

The Recycling Partnership. (n.d.). Recycle check: Empowering people with real-time local recycling information. Retrieved September 10, 2025, from https://recyclingpartnership.org/recyclecheck/

The Recycling Partnership. (n.d.). Your one-stop source for community recycling program data. Retrieved September 10, 2025, from https://recyclingpartnership.org/data/

The Recycling Partnership. (2020, July 8). Press release: The Recycling Partnership launches Polypropylene Recycling Coalition to improve and increase America's recovery of plastic packaging and strengthen the circular economy. https://recyclingpartnership.org/press-release-the-recycling-partnership-launches-polypropylene-recycling-coalition-to-improve-and-increase-americas-recovery-of-plastic-packaging-and-strengthen-the-circular-economy/

The Recycling Partnership. (2021a). Addressing the challenge of film and flexible packaging data. https://recyclingpartnership.org/wp-content/uploads/dlm_uploads/2021/04/FF_Whitepaper_final.pdf

The Recycling Partnership. (2021b). Paying it forward: How investment in recycling will pay dividends. https://recyclingpartnership.org/paying-it-forward/

The Recycling Partnership. (2022, June 8). New recycling coalition to improve recovery of plastic packaging and enhance the circularity of PET packaging. https://recyclingpartnership.org/new-recycling-coalition-to-improve-recovery-of-plastic-packaging-and-enhance-the-circularity-of-pet-packaging/

The Recycling Partnership. (2024a). Polypropylene Recycling Coalition 2024 annual report. https://recyclingpartnership.org/wp-content/uploads/dlm_uploads/2024/10/PolyPro_AnnualReport_10.30.24.pdf

The Recycling Partnership. (2024b). State of recycling. https://recyclingpartnership.org/residential-recycling-report/

The Recycling Partnership. (2025, March 21). Diverting incidental film and flexibles from landfill - San Antonio, Texas: Case study. https://recyclingpartnership.org/diverting-incidental-film-and-flexibles-from-landfill-case-study/

Recycling Today. (2022, September 27). PreZero US to close South Carolina plant. https://www.recyclingtoday.com/news/prezero-us-closing-south-carolina-plant/

Riker Danzig. (2019, July 23). Deceptive environmental marketing? Recent challenges to advertisements for "recyclable" and "compostable" coffee pods. https://riker.com/blog/environmental-law/deceptive-environmental-marketing-recent-challenges-to-advertisements-for-recyclable-and-compostable-coffee-pods/

Science History Institute. (n.d.). History and future of plastics. Retrieved September 10, 2025, from https://www.sciencehistory.org/education/classroom-activities/role-playing-games/case-of-plastics/history-and-future-of-plastics/

Seal, B. (2024, April 8). Latest chemical recycling plant closing spurs concern over the industry's viability. Environmental Health News. https://www.ehn.org/chemical-recycling-plant-closing

Shain, S. (2023, September 1). Can plastic recycling ever really work? The New York Times. https://www.nytimes.com/2023/09/01/headway/plastic-recycling-california-law.html

Sharp, R., & Goff, S. (2025, March 11). "Chemical recycling" is a toxic trap. NRDC. https://www.nrdc.org/resources/chemical-recycling

Smith, A. (2025, February 19). Plant closures highlight larger migration. Resource Recycling. https://resource-recycling.com/recycling/2025/02/19/plant-closures-highlight-larger-migration/

Smith, A. (2025, May 7). APR training highlights challenges in film recycling. Plastics Recycling Update. https://resource-recycling.com/plastics/2025/05/07/apr-training-highlights-challenges-in-film-recycling/

Smith, R. L., Takkellapati, S., & Riegerix, R. C. (2022). Recycling of plastics in the United States: Plastic material flows and polyethylene terephthalate (PET) recycling processes. ACS Sustainable Chemistry & Engineering 10, 2084-2096. https://doi.org/10.1021/acssuschemeng.1c06845

Smithers. (2020). Sustainability and regulation impacting growth of single-use plastic. https://www.smithers.com/resources/2020/oct/single-use-plastic-packaging-sustainability-growth

Song, L. (2024, August 15). When is "recyclable" not really recyclable? When the plastics industry gets to define what the word means. ProPublica. https://www.propublica.org/article/plastics-industry-re-define-recyclable-ftc-grocery-bags

Song, L. (2024, August 29). Biden EPA rejects plastics industry's fuzzy math that misleads customers about recycled content. ProPublica. https://www.propublica.org/article/epa-rejects-mass-balance-plastics-recycling-safer-choice

Song, L. (2024, September 9). These household brands want to redefine what counts as "recyclable." ProPublica. https://www.propublica.org/article/recycling-recyclable-plastics-consumer-brands-association

Spevacek, J. (2024, February 20). Debunking the "fraud of plastic recycling." Plastics Today. https://www.plasticstoday.com/sustainability/debunking-the-fraud-of-plastic-recycling-

State of California. (2021). Public Resources Code ~ 42355.51. In SB 343: Truth in Labeling for Recyclable Materials. https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202120220SB343

State of California. (2021, August 31). Senate Bill 343 (Allen): Senate third reading analysis. https://billtexts.s3.amazonaws.com/ca/ca-analysishttps-leginfo-legislature-ca-gov-faces-billAnalysisClient-xhtml-bill-id-202120220SB343-ca-analysis-343678.pdf

State of California. (2024). California Business and Professions Code § 17580(e). https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=BPC&sectionNum=17580.&article=7

State of Indiana. (1992). Indiana Code § 24-5-17: Environmental marketing claims. https://law.justia.com/codes/indiana/title-24/article-5/chapter-17/

State of Maine. (2024). Title 38, § 2142: Advertising and marketing claims; waste reduction and recycling. https://legislature.maine.gov/statutes/38/title38sec2142.html

State of Michigan. (1976). Michigan Compiled Laws § 445.903: Unfair, unconscionable, or deceptive methods, acts, or practices in conduct of trade or commerce. https://www.legislature.mi.gov/Laws/MCL?objectName=MCL-445-903

State of Rhode Island. (2023). Title 6, § 6-13.3-1: Declaration of policy (Environmental Marketing Act). https://law.justia.com/codes/rhode-island/title-6/chapter-6-13-3/section-6-13-3-1/

Staub, C. (2020, February 5). Key curbside plastics no longer "widely" recyclable. Plastics Recycling Update. https://resource-recycling.com/plastics/2020/02/05/key-curbside-plastics-no-longer-widely-recyclable

Staub, C. (2024, March 26). RPET imports driving "perfect storm" for reclaimers. Plastics Recycling Update. https://resource-recycling.com/plastics/2024/03/26/rpet-imports-driving-perfect-storm-for-reclaimers/

Steimel, K. G., Hwang, R., Dinh, D., Donnell, M. T., More, S., & Fung, E. (2022). Evaluation of chemicals leached from PET and recycled PET containers into beverages. Reviews on Environmental Health 39(2), 251-260. https://doi.org/10.1515/reveh-2022-0183

Stephens, H. (2024, July 3). Reverse vending machines for recycling are gaining traction outside of bottle bill states. Waste Dive. https://www.wastedive.com/news/reverse-vending-machines-recycling-olyns-cycle-ball-coca-cola/720117/

Stina. (2021). Assessing the state of food grade recycled resin in Canada and the United States. http://www.plasticsmarkets.org/jsfcode/upload/wd_492/20211201120602_9_jsfwd_492_q2_1.pdf

Story of Stuff. (2023). Bring back refill. https://www.storyofstuff.org/wp-content/uploads/2023/10/Story-of-Stuff_Bring-Back-Refill-Report.pdf

Superior Court of the State of California, County of Los Angeles. (2023, November 21). The Last Beach Cleanup, plaintiff, v. Stater Bros. Markets, Revolution Plastics Holdings LLC, Revolution Sustainable Solutions, LLC, and AM Testing & Services, Inc., defendants, and California Department of Resources Recycling and Recovery. Case no. 22STCV18252. https://trellis.law/doc/234818854/real-party-in-interest-california-department-resources-recycling-recovery-s-statement-in-response-to-defendants-demurrers-filed-by-california-department-recycling-recovery-defendant

Superior Court of the State of California, County of Los Angeles. (2024, October 30). The people of the State of California, acting by and through Los Angeles County Counsel Dawyn R. Harrison, plaintiff, v. Pepsico, Inc.; Pepsi Bottling Ventures Llc; the Coca-Cola Company; and Reyes Coca-Cola Bottling, Llc; and Does 1-25, inclusive, defendants. https://file.lacounty.gov/SDSInter/lac/1169727_FiledPlasticsComplaintAgainstPepsiCoandCoke.pdf

Superior Court of the State of California, County of San Francisco. (2024, September 24). The people of the State of California, ex rel. Rob Bonta, Attorney General of California, plaintiff, v. Exxon Mobil Corporation, defendants. https://oag.ca.gov/system/files/attachments/press-docs/Complaint_People%20v.%20Exxon%20Mobil%20et%20al.pdf

Sustainable Packaging Coalition. (n.d.). About us. Retrieved September 10, 2025, from https://sustainablepackaging.org

Sustainable Packaging Coalition. (n.d.). SPC Innovator Awards. https://sustainablepackaging.org/engagement/spc-innovator-awards/award-winners/

Sustainable Packaging Coalition. (2016). 2015-16 centralized study on availability of recycling. https://www.plasticsmarkets.org/jsfcode/srvyfiles/wd_151/spc_centralized_study_plastic_1.pdf

Tabuchi, H., & Choi-Schagrin, W. (2021, September 8). California aims to ban recycling symbols on things that aren't recyclable. The New York Times. https://www.nytimes.com/2021/09/08/climate/recycling-california.html

Tamoor, M., Samak, N. A., Yang, M., & Xing, J. (2022). The cradle-to-cradle life cycle assessment of polyethylene terephthalate: Environmental perspective. Molecules 27(5), 1599. https://doi.org/10.3390/molecules27051599

Thomas, D. S., Kneifel, J. D., & Butry, D. T. (2024). The U.S. plastics recycling economy: Current state, challenges, and opportunities. NIST Advanced Manufacturing Series 100-64. https://nvlpubs.nist.gov/nistpubs/ams/NIST.AMS.100-64.pdf

Tita, B. (2018, October 27). Chinese firms snap up U.S. sites to process scrap. Wall Street Journal. https://www.wsj.com/articles/chinese-firms-snap-up-u-s-sites-to-process-scrap-1540641611

Tobacconomics. (2018). Tobacco control policies and employment. https://www.economicsforhealth.org/files/research/468/Tobacco-and-Employment-Policy-Brief-FINAL-Web-Version.pdf

Toloken, S. (2019, November 5). GM exits Plastics Association as environmental pressure campaign continues. Plastics News. https://www.plasticsnews.com/news/gm-exits-plastics-association-environmental-pressure-campaign-continues

Toloken, S. (2022, March 2). 175 countries commit to creating plastics pollution treaty. Plastics News. https://www.plasticsnews.com/news/plastics-pollution-treaty-negotiations-get-green-light

Toloken, S. (2025, March 27). APR seeks "level playing field" on recycled plastics imports. Plastics News. https://www.plasticsnews.com/news/apr-seeks-work-us-trade-agencies-level-playing-field-recycled-plastics-imports

Toloken, S. (2025, May 1). Plastics firms say lack of clarity could put a chill on chemical recycling. Plastics News. https://www.plasticsnews.com/news/unclear-regulations-risk-chilling-effect-chemical-recycling

Toto, D. (2018, April 9). ExxonMobil commits $1.5M to The Recycling Partnership. Recycling Today. https://www.recyclingtoday.com/news/exxonmobil-funds-the-recycling-parnership/

Toto, D. (2024, April 1). Plastics Recycling Conference 2024: Recyclers face numerous headwinds. Recycling Today. https://www.recyclingtoday.com/news/plastics-recycling-conference-2024-recyclers-face-numerous-headwinds/

U.K. Registry of Charities. (n.d.). Ellen MacArthur Foundation. https://register-of-charities.charitycommission.gov.uk/en/charity-search/-/charity-details/5003211/accounts-and-annual-returns

UNEP. (n.d.). The New Plastics Economy Global Commitment. https://www.unep.org/new-plastics-economy-global-commitment

UNEP. (2019, May 11). Report of the Conference of the Parties to the Basel Convention on the control of transboundary movements of hazardous wastes and their disposal on the work of its fourteenth meeting. UNEP/CHW.14/28. https://www.basel.int/TheConvention/ConferenceoftheParties/ReportsandDecisions/tabid/3303/Default.aspx

U.S. Census Bureau. (2024). Annual estimates of the resident population for the United States, regions, states, District of Columbia, and Puerto Rico: April 1, 2020 to July 1, 2024 (NST-EST2024-POP). https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html

U.S. EPA. (n.d.). National overview: Facts and figures on materials, wastes and recycling. https://www.epa.gov/facts-and-figures-about-materials-waste-and-recycling/national-overview-facts-and-figures-materials

U.S. EPA. (2020a). Advancing sustainable materials management: 2018 tables and figures. https://www.epa.gov/facts-and-figures-about-materials-waste-and-recycling/advancing-sustainable-materials-management

U.S. EPA. (2020b). Advancing sustainable materials management: Facts and figures fact sheet. https://www.epa.gov/facts-and-figures-about-materials-waste-and-recycling/advancing-sustainable-materials-management

U.S. EPA. (2023). Best practices for solid waste management: A guide for decision-makers in developing countries: Addressing plastic waste. EPA 530-R-23-011. https://www.epa.gov/system/files/documents/2023-07/SWM_PlasticWaste-Final.pdf

U.S. EPA. (2023, April 20). Green Guides review, matter no. P954501: U.S. Environmental Protection Agency comments on the Federal Trade Commission's proposed rule entitled "Guides for the Use of Environmental Marketing Claims." https://www.regulations.gov/comment/FTC-2022-0077-1366

U.S. EPA. (2024a). An assessment of the U.S. recycling system: Financial estimates to modernize material recovery infrastructure. EPA 530-R-24-010. https://www.epa.gov/system/files/documents/2024-12/financial_assessment_of_us_recycling_system_infrastructure.pdf

U.S. EPA. (2024b). EPA's Safer Choice and Design for the Environment (DfE) Standard. https://www.epa.gov/system/files/documents/2024-08/epas-safer-choice-and-design-for-the-environment-dfe-standard-with-changes-in-green.pdf

U.S. EPA. (2024c). Recycling needs survey and assessment: Report to Congress. EPA 530-R-24-012. https://www.epa.gov/system/files/documents/2024-12/recycling_needs_report_and_appendix.pdf

U.S. FTC. (n.d.). Green Guides. https://www.ftc.gov/news-events/topics/truth-advertising/green-guides

U.S. FTC. (1998). 16 CFR § 260. https://www.govinfo.gov/content/pkg/FR-1998-05-01/pdf/98-11455.pdf

U.S. FTC. (2012a). 16 CFR § 260. https://www.ftc.gov/sites/default/files/documents/federal_register_notices/guides-use-environmental-marketing-claims-green-guides/greenguidesfrn.pdf

U.S. FTC. (2012b). The Green Guides: Statement of basis and purpose. https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguidesstatement.pdf

U.S. FTC. (2022, December 14). FTC seeks public comment on potential updates to its "Green Guides" for the use of environmental marketing claims. https://www.ftc.gov/news-events/news/press-releases/2022/12/ftc-seeks-public-comment-potential-updates-its-green-guides-use-environmental-marketing-claims

U.S. Plastics Pact. (n.d.). Home page. Retrieved September 10, 2025, from https://usplasticspact.org

U.S. Plastics Pact. (n.d.). U.S. Plastics Pact Activators. Retrieved September 10, 2025, from https://usplasticspact.org/about/activators-of-the-u-s-plastics-pact/

U.S. Plastics Pact. (2021). Roadmap to 2025. https://usplasticspact.org/wp-content/uploads/dlm_uploads/2021/06/USPP_Roadmap-to-2025_6.15.21.pdf

U.S. Plastics Pact. (2021, June 15). U.S. Plastics Pact unveils national strategy to achieve 2025 circular economy goals. https://usplasticspact.org/u-s-plastics-pact-unveils-national-strategy-to-achieve-2025-circular-economy-goals/

U.S. Plastics Pact. (2022). Problematic and unnecessary materials report. https://usplasticspact.org/wp-content/uploads/dlm_uploads/2022/01/U.S.-Plastics-Pact-Problematic-Unnecessary-Materials-Report-1.25.2022.pdf

U.S. Plastics Pact. (2024). Impact report 2023-2024. https://usplasticspact.org/wp-content/uploads/2025/02/USPP_2023-24ImpactReport.pdf

U.S. Plastics Pact. (2025). Overcoming barriers to increasing the use of PCR in the U.S. https://usplasticspact.org/wp-content/uploads/2025/04/2025_Overcoming_PCR_Barriers_Final.pdf

Voloschuk, C. (2025, September 17). rPlanet Earth closes its doors. Recycling Today. https://www.recyclingtoday.com/news/rplanet-earth-closes-its-doors-pet-recycling-california/

Voorhees, J. (2024, November 24). How the plastic industry misleads consumers: Paid TikTok influencers, shady Facebook ads, and questionable math. FieldNotes. https://fieldnotes.co/investigations/napcor-positively-pet-plastic-misinformation

Wallach, J. (2022, November 14). Beyond the bottle: Solutions for recycling challenging plastics. McKinsey. https://www.mckinsey.com/industries/chemicals/our-insights/beyond-the-bottle-solutions-for-recycling-challenging-plastics

Waste Dive. (2019, November 15). How recycling has changed in all 50 states. https://www.wastedive.com/news/what-chinese-import-policies-mean-for-all-50-states/510751/

Waste Management. (n.d.). Recycling 101. https://www.wm.com/us/en/recycle-right/recycling-101

Whitmer, M. (2025, July 22). Asbestos cover-up. Asbestos.com. https://www.asbestos.com/featured-stories/cover-up/

Winters, J. (2022, October 20). The selective accounting behind the plastic industry's climate-friendly claims. Grist. https://grist.org/climate/the-selective-accounting-behind-the-plastic-industrys-climate-friendly-claims/

Winters, J. (2025, May 12). The misleading accounting behind your "recycled" plastic. Grist. https://grist.org/accountability/recycled-packaging-triscuit-mondelez-mass-balance-chemical-recycling/

Winters, J. (2025, September 26). A "coordinated campaign of deception": Philly sues 2 companies over misleading recycling labels. Grist. https://grist.org/accountability/philadelphia-sues-ziploc-sc-johnson-bimbo-bakeries-recycling-symbol-how2recycle

Wolman, J. (2022, July 13). The chemical exec pushing advanced plastics recycling. Politico. https://www.politico.com/newsletters/the-long-game/2022/07/13/the-chemical-exec-pushing-advanced-plastics-recycling-00045400

Yoder, K. (2024, June 12). How the recycling symbol lost its meaning. Grist. https://grist.org/culture/recycling-symbol-logo-plastic-design/

Ziani, K., Ioniță-Mîndrican, C.-B., Mititelu, M., Neacșu, S. M., Negrei, C., Moroșan, E., Drăgănescu, D., & Preda, O.-T. (2023). Microplastics: A real global threat for environment and food safety: A state of the art review. Nutrients 15(3), 617. https://doi.org/10.3390/nu15030617

# ENDNOTES


1 Ellen MacArthur Foundation (2020) p. 4
2 Voloschuk (2025)
3 Plastics Recyclers Europe (2025)
4 Milbrandt et al. (2022). This is lower than the estimated global recycling rate of 9% (Houssini et al. (2025), OECD (2022)).
5 This higher estimate included material exported to other countries for recycling, even though much of that plastic waste was ultimately burned or dumped (see Beyond Plastics & The Last Beach Cleanup (2022) p. 3).
6 Packaging experts Smithers (2020) predict a compound annual growth rate for production of single-use plastics of 3.7% per year.
7 Extrapolation of Jambeck et al.'s (2015) data to 2025. Assumes large dump truck capacity of 28,000 lbs.
8 See e.g. Chartres et al. (2024), U.S. EPA (2023) p. 6, and Ziani et al. (2023).
9 Greenpeace USA (2020a, 2022)
10 The Last Beach Cleanup et al. (2023)
11 The Last Beach Cleanup et al. (2023)
12 Tabuchi & Choi-Schagrin (2021)
13 The Daily Item (1988)
14 Sustainable Packaging Coalition (2016). It's worth noting that SPC has now removed that report from its website, but a link to the web page describing it can be found via the Wayback Machine: https://web.archive.org/web/20161127055144/https://greenblue.org/press/findings-released-from-spc-centralized-study-on-availability-of-recycling/.
15 Greenpeace USA (2023), Stina (2021)
16 IUCN (2024)
17 Helmer (2023)
18 According to the Center for Climate Integrity (2024), the Council on Packaging in the Environment (COPE), originally founded as the Council on Plastics and Packaging in the Environment (COPPE), was a front group created by the Society of the Plastics Industry (SPI) and petrochemical companies to promote plastic recycling. It was established in 1986 with a Dow executive as its chairman and SPI as its secretariat. COPE's steering committee members included DuPont, Shell, Dow, and the Flexible Packaging Association. Mobil was also a member company. The organization was disbanded in 1996.
19 The Daily Item (1988)
20 The Brownsville Herald (2008)
21 Beyond Plastics & The Last Beach Cleanup (2022) p. 2, Milbrandt et al. (2022)
22 Center for Climate Integrity (2024) p. 1
23 CBS Sunday Morning (2024)
24 Oreskes & Conway (2010)
25 Gerassimidou et al. (2022), Steimel et al. (2022)
26 Enck & Dell (2022)
27 Jambeck et al. (2015)
28 BBC Earth (2017)
29 CEPR (2024)
30 AFPM (2018)
31 ProPublica, "The Recycling Partnership Inc"
32 Wolman (2022)
33 Toto (2024)
34 Shain (2023)
35 Oreskes & Conway (2010)
36 Superior Court of the State of California, County of San Francisco (2024) p. 32
37 Center for Climate Integrity (2024)
38 U.S. EPA (n.d.)
39 The Last Beach Cleanup, home page
40 See e.g. Center for Climate Integrity (2024), Changing Markets (2020), PBS Frontline & NPR (2020), Superior Court of the State of California, County of Los Angeles (2024), and Superior Court of the State of California, County of San Francisco (2024).
41 Milbrandt et al. (2022). This estimate, made for the U.S. Department of Energy, includes plastic waste from residential, commercial, and institutional sources and comprises durable products, nondurable products (such as single-use plastic cups), containers, and packaging. Post-industrial (pre-consumer) plastic scrap was not included in the waste generation estimates.
42 See Center for Climate Integrity (2024), PBS Frontline & NPR (2020), and Superior Court of the State of California, County of San Francisco (2024) pp. 86-89.
43 Center for Climate Integrity (2024)
44 Alliance to End Plastic Waste, "Who We Are"
45 Alliance to End Plastic Waste, home page
46 Bofiliou et al. (2022)
47 ProPublica, "Alliance to End Plastic Waste Inc"
48 American Chemistry Council, "About ACC"
49 American Chemistry Council, "Plastics Division Membership"
50 ProPublica, "American Chemistry Council." The Plastics Division's funding is not broken out from the total, but the ACC's 2023 filing does report that the vice president of this division received $768,220 in compensation that year.
51 Association of Plastic Recyclers (2023, November 15)
52 ProPublica, "Association of Plastic Recyclers Inc"
53 NAPCOR, "NAPCOR Members"
54 ProPublica, "National Association for Pet Container Resources Inc"
55 Plastics Industry Association, "Become a Member"
56 ProPublica, "Plastics Industry Association Inc"
57 Boren et al. (2024). See also e.g. Bofiliou et al. (2022).
58 Alliance to End Plastic Waste, "Test-Bedding Solutions for Change"
59 Langton (2023)
60 Alliance to End Plastic Waste, home page. Unmanaged waste is waste that ends up in public ecosystems or illegal landfills or is burned in the open.
61 Cottom et al. (2024)
62 American Chemistry Council (2018)
63 Waste Dive reported in May 2018 that the ACC had pointed to the EnergyBag program in Omaha, NE - which sent collected plastic waste to be burned in a cement kiln - as an example of "recovery." See Musulin (2018).
64 American Chemistry Council (2021a), Greenpeace USA (2020b) p. 3
65 American Chemistry Council (2021a) p. 10. See also American Chemistry Council (2021b).
66 U.S. EPA (2023, April 20) p. 22
67 U.S. EPA (2024b) pp. 17-18
68 Association of Plastic Recyclers, "APR Recycling Leadership Awards"
69 Association of Plastic Recyclers (2025, April 29)
70 Voorhees (2024)
71 NAPCOR (2023)
72 NAPCOR, "What Is PET?"
73 NAPCOR, "What Is PET?"
74 See e.g. Dhaka et al. (2022), National Institutes of Health (n.d.), and Tamoor et al. (2022).
75 Benyathiar et al. (2022)
76 Benyathiar et al. (2022)
77 NAPCOR (2024)
78 Plastics Industry Association (2023)
79 Plastics Industry Association, "Recycling is Real"
80 Quinn (2023)
81 The Ultra-Poly, Envision, and Eastman videos, for example, feature statements such as "If we stopped recycling stuff, you'd be cutting the jobs of at least 250 people at this site," "I wouldn't have a job without recycling," and "Advanced recycling is real. I wouldn't have a job without it."
82 Montgomery (2022), Monver (2023)
83 Tobacconomics (2018)
84 Elliott (2007)
85 Whitmer (2025)
86 Consumer Brands Association, "Membership Benefits"
87 Consumer Brands Association (2023) pp. 9-12
88 Song (2024, August 15)
89 In early 2025, the CBA sponsored new legislation in California (AB 473) that environmental NGOs said would gut SB 343 and allow product companies to do exactly that. Faced with significant opposition by NGOs and businesses, the bill was reportedly pulled on April 10, 2025 (see Plastic Pollution Coalition (2025)).
90 Song (2024, September 9)
91 The Recycling Partnership, home page
92 ProPublica, "The Recycling Partnership Inc"
93 The Recycling Partnership, "Our Funding Partners"
94 Toto (2018)
95 Instrumentl, "The Recycling Partnership"
96 The Recycling Partnership, "Our Funding Partners"
97 Instrumentl, "The Recycling Partnership"
98 Instrumentl, "The Recycling Partnership." See also The Recycling Partnership, "Our Funding Partners."
99 U.S. Plastics Pact, home page
100 ProPublica, "U.S. Plastics Pact LLC"
101 Sustainable Packaging Coalition, "About Us"
102 ProPublica, "Green Blue Institute"
103 GreenBlue, home page
104 Averett (2012)
105 Yoder (2024)
106 Winters (2025)
107 Winters (2025)
108 In addition to the resources cited at the beginning of this section (c.f. note xx), sources that have documented these false claims include Brock et al. (2021), Center for Climate Integrity (2025), and Just Zero (2025).
109 U.S. Plastics Pact (2025)
110 Greenpeace USA (2022)
111 Gerassimidou et al. (2022), Steimel et al. (2022)
112 Goodman (2022)
113 Basel Action Network (n.d.)
114 Celik et al. (2022)
115 CalRecycle, "Plastic Minimum Content Standards and Reporting for Beverage Manufacturers"
116 The Recycling Partnership (2021b) pp. 12-13
117 CalRecycle, "Enforcement"
118 California's Statewide Commission on Recycling Markets and Curbside Recycling (2021) p. 94
119 Waste Management, "Recycling 101"
120 See e.g. Dinman (2025).
121 See e.g. Gutman et al. (2023, 2024), Ha (2023), and Metz et al. (2024).
122 Ellen MacArthur Foundation (2021a)
123 The Recycling Partnership (2022)
124 Moore & Staub (2020), Smith et al. (2022)
125 Mondelēz (2024)
126 Superior Court of the State of California, County of San Francisco (2024) p. 91
127 Winters (2025)
128 U.S. EPA (2023, April 20) p. 22
129 Winters (2022)
130 Winters (2022)
131 See e.g. Superior Court of the State of California, County of San Francisco (2024) pp. 86-89.
132 Wolman (2022)
133 Toto (2024)
134 Science History Institute (n.d.)
135 Copley (2024)
136 Story of Stuff (2023)
137 Davies & Farris (2025)
138 DiFrisco (2022)
139 Brock (2020)
140 Packaging Dive (2025)
141 U.S. Plastics Pact (2021), p. 4
142 Aldi is a U.S. Plastics Pact "Activator Accelerator" (see U.S. Plastics Pact, "U.S. Plastics Pact Activators").
143 U.S. Plastics Pact (2022). The list includes plastic cutlery, stirrers, and straws; opaque or tinted PET bottles; polyethylene terephthalate glycol (PETG); polyvinyl chloride (PVC) and polyvinylidene chloride (PVDC); polystyrene (PS) and expanded polystyrene (EPS); intentionally added perfluoroalkyl and polyfluoroalkyl (PFAS) substances; and label constructions deemed problematic (for example, due to use of difficult materials such as PETG, PVC, or PLA).
144 Packaging Europe (2022)
145 Horton (2024)
146 Kroger (2018)
147 Kroger (2024) p. 47. See also Parton (2025).
148 Pyzyk (2023)
149 Earth911, "Recycling Search"
150 Earth911 (2024), How2Recycle, "Check Locally"
151 The Recycling Partnership, "Community Recycling Program Acceptance Data"
152 Closed Loop Partners (2019)
153 Examples of providers that have gone out of business include the Agilyx pyrolysis plant in Oregon, Brightmark (RES Polyflow) pyrolysis plant in Indiana, Enerkem gasification plant in Canada, Fulcrum Bioenergy pyrolysis plant in Nevada, and Renewlogy pyrolysis plant in Utah. See Seal (2024), Quinn (2025, March 18), Enerkem (2024), Bettenhausen (2024), and Brock et al. (2021).
154 E.g. American Chemistry Council (2022, April 12).

155 See e.g. Beyond Plastics & IPEN (2023), Greenpeace USA (2022), and Sharp & Goff (2025).

156 PBS Frontline & NPR (2020)

157 American Chemistry Council (2022, March 15)

158 American Chemistry Council (2020, May 28)

159 McNees (2023)

160 The Recycling Partnership (2025)

161 Beaumont (2024)

162 Dell et al. (2018)

163 Newberger (2019), Palmer (2019), and Toloken (2019)

164 Sustainable Packaging Coalition, "SPC Innovator Awards"

165 Ha (2023), Metz et al. (2024)

166 GreenBlue, "About GreenBlue"

167 Rachal (2024)

168 Kazi (2025)

169 Alexander (2024)

170 See e.g. Eunomia (2023), Kazdin (2024), The Recycling Partnership (2024b), Thomas et al. (2024), and U.S. EPA (2024a).

171 Pecci et al. (2022)

172 Spevacek (2024)

173 Kazdin (2024), Toloken (2025, May 1), U.S. Plastics Pact (2025)

174 Toloken (2022)

175 Staub (2024)

176 U.S. Plastics Pact (2025)

177 Spevacek (2024)

178 NAPCOR (2020)

179 Corkery (2019), Quinn (2021)

180 Greenpeace USA (2020a)

181 U.S. FTC, "Green Guides"

182 Riker Danzig (2019)

183 The FTC initiated a formal process to revise the Green Guides in 2022 (see U.S. FTC (2022)), but as of the time of publication no updated version has been released.

184 State of California (2021)

185 State of Indiana (1992), State of Maine (2024), State of Michigan (1976), State of Rhode Island (2023). Rhode Island's Environmental Marketing Act empowers the State Attorney General to bring a suit for violations of the Green Guides.

186 The Last Beach Cleanup et al. (2023)

187 Banks et al. (2025)

188 U.S. FTC (2012a), 16 CFR § 260.12(a), p. 62129

189 U.S. FTC (2012a), 16 CFR § 260.12(d) and (a), pp. 62129, 62125; see also 16 CFR § 260.12(d), Examples 2 and 6, pp. 62129-62130.

190 U.S. FTC (1998), 16 CFR § 260.3(e), p. 24247

191 U.S. FTC (1998), 16 CFR § 260.1(b), p. 24242

192 U.S. FTC (2012a), 16 CFR § 260.12(a-b) p. 62129

193 U.S. EPA (2024a)

194 According to the U.S. FTC (2012b), pp. 174-175, "Unqualified recyclable claims for categories of products that municipal recycling programs collect, but do not actually recycle, may be deceptive. To make a non-deceptive unqualified claim, a marketer should substantiate that a substantial majority of consumers or communities have access to facilities that will actually recycle, not accept and ultimately discard, the product. As part of this analysis, a marketer should not assume that consumers or communities have access to a particular recycling program merely because the program will accept a product."

195 CalRecycle, "Accurate Recycling Labels"

196 State of California (2021). Additionally, the law states that products and packaging may only be labeled recyclable in California if they are designed to be recyclable, contain no components (such as inks, adhesives, or labels) that hinder recyclability, and are free of intentionally added harmful chemicals, including perfluoroalkyl or polyfluoroalkyl substances (PFAS) at concentrations at above 100 parts per million.

197 European Commission (2021) p. 5

198 How2Recycle, "Store Drop-off: US Only"

199 State of California (2021)

200 State of California (2021)

201 The Recycling Partnership, "Recycle Check"

202 The Recycling Partnership, "Your One-Stop Source for Community Recycling Program Data"

203 GreenBlue, "Pro + Plus"

204 GreenBlue (2025)

205 Greenpeace USA (2020a)

206 Greenpeace USA (2020b)

207 The Recycling Partnership (2021a) p. 2

208 Recycling Magazine (2022)

209 See e.g. Smith (2025) and Wallach (2022).

210 The Recycling Partnership (2021a) p. 4

211 Fox (2025). This finding is also consistent with the assessment of acceptance of plastic bags and films by U.S. MRFs carried out as part of the comprehensive survey detailed in Section 3.1, which determined that less than 1% of Americans (and 3% of California residents) have access to municipal collection systems that accept plastic bags and films.

212 The Recycling Partnership (2021a) p. 4

213 Ellen MacArthur Foundation (2020) p. 13

214 See e.g. Gutman et al. (2023, 2024), Ha (2023), and Metz et al. (2024).

215 This is consistent with findings and statements by CalRecycle concerning what is recyclable in California (see Section 4).

216 U.S. FTC (2012), 16 CFR § 260.12(d), p. 62129

217 This is the target threshold across "multiple regions, collectively representing at least 400 million inhabitants"; see Ellen MacArthur Foundation (2020) p. 13.

218 Alexander (2024)

219 The Last Beach Cleanup, "2021 Fast Food Plastic Survey"

220 As the president of the APR has reportedly stated, there is limited incentive for MRFs to separate out thermoforms, which they generally view as "a relatively low-volume commodity that doesn't justify the sorting costs and bunker space." See Paben (2022).

221 U.S. EPA (2020b)

222 Smithers (2020)

223 U.S. EPA (2024a)

224 See e.g. Eunomia (2023), Kazdin (2024), The Recycling Partnership (2024b), Thomas et al. (2024), and U.S. EPA (2024a).

225 The national-level Recycling Infrastructure and Accessibility Act (RIAA), first introduced in the U.S. Congress in 2022 and reintroduced in 2023 and 2025, proposes grants to expand curbside recycling programs and other activities to improve nationwide recycling. See e.g. Rachal (2025, March 21).

226 U.S. EPA (2024a) p. 5

227 U.S. EPA (2024a) p. 4

228 The Recycling Partnership (2021b). More specifically, TRP estimates that 56% of the population has access to established curbside collection services and 4% have access to established drop-off services.

229 U.S. EPA (2024c) p. 9

230 The Recycling Partnership (2024b) p. 4

231 Quinn (2025, March 28)

232 Waste Dive (2019)

233 Johnson (2024)

234 City of York (2024)

235 Gallenberger (2024)

236 The Last Beach Cleanup (2025, October 5)

237 U.S. FTC (2012), 16 CFR § 260.12(d), p. 62129

238 Association of Plastic Recyclers, "APR Certified PCR Directory"; Association of Plastic Recyclers, "Buyers & Sellers Directory"; Closed Loop Partners, "US and Canada Recycling Infrastructure and Plastic Waste Map"; NAPCOR, "PET Reclaimers"; and Plastics News, "Plastic Recyclers/Brokers (2025)"

239 Alexander (2025)

240 Association of Plastic Recyclers (2025, May 21)

241 See e.g. comments by Steve Alexander, President and CEO of APR, in Gonzalez (2019).

242 See e.g. Association of Plastic Recyclers, "About Extended Producer Responsibility Packaging Laws."

243 Toto (2024)

244 Toto (2024)

245 Alexander (2024, 2025)

246 Toloken (2025, March 27)

247 Government of Canada (2023)

248 Duke Nicholas Institute (2022)

249 The Last Beach Cleanup, "Global Chemical Recycling Plant Counter"

250 Eastman, "It's the Feedstock™: Unlocking the Value in Waste"

251 GAIA (2022)

252 Pitti (2025)

253 Association of Plastic Recyclers (2023, March 16)

254 Plastics News, "Plastic Recyclers/Brokers (2025)"

255 ExxonMobil (2025) p. 24

256 Indorama Ventures, "AlphaPet"

257 See e.g. Thomas et al. (2024) p. 18.

258 Cramer (2016)

259 LeBlanc (2019)

260 Communications between John Hocevar, Greenpeace USA, and Nina Goodrich, Sustainable Packaging Coalition (How2Recycle), in November 2019.

261 Staub (2020)

262 GreenBlue (2024), McNees (2022)

263 The Recycling Partnership (2020)

264 The Recycling Partnership (2024a) p. 4

265 Tita (2018)

266 This does not include facilities that opened and closed again during this time frame. Capacity details are provided in Appendix C.

267 Alpek (2025)

268 Quinn (2025, September 29). The PET bottle recycling portion of the Evergreen plant was shut down in early 2025. Evergreen sold the PET pelletizing portion of the plant to Republic Services, which imports rPET flake from its facility in Nevada for additional processing into rPET pellets.

269 Voloschuk (2025)

270 Smith (2025)

271 Recycling Today (2022)

272 Johnson (2025)

273 Specifically, California BPC § 17580(e) (State of California (2024)) states that "displaying a chasing arrows symbol or otherwise directing a consumer to recycle a consumer good shall not be considered misleading pursuant to . . . Section 42355.51 of the Public Resources Code. However, the requirements of BPC § 17580(a) still apply."

274 Voloschuk (2025)

275 Greenpeace USA (2023). Colored HDPE#2 plastic can only be downcycled to gray or black plastic, which is not popular with product companies.

276 State of California (2021, August 31) p. 2

277 CalRecycle, "List of Approved Food Service Packaging"

278 California's Statewide Commission on Recycling Markets and Curbside Recycling (2021) p. 94

279 CalRecycle (2024, May 30)

280 CalRecycle (2024, December 31)

281 The methodology for this calculation is provided in Section 3.2 of this report.

282 U.S. Census Bureau (2024)

283 The reported results are based on data collected by CalRecycle from MRFs and other waste handling facilities through the Recycling and Disposal Reporting System (RDRS) on the number of facilities that create sorted bales of waste by material and type, obtained for 2024 via a public records request. The amount of sorted waste and the destination are also reported. See CalRecycle, "Recycling and Disposal Reporting System (RDRS)."

284 State of California (2021)

285 See also The Last Beach Cleanup (2025, April 16).

286 State of California (2021), PRC § 42355.51(d)(2)(B)(i)

287 European Commission (2021) p. 5

288 CalRecycle (2023)

289 Basel Action Network & The Last Beach Cleanup (2024)

290 Milbrandt et al. (2022)

291 OECD (2022)

292 Karali et al. (2024)

293 Superior Court of the State of California, County of San Francisco (2024) p. 145

294 Philadelphia Court of Common Pleas, City of Philadelphia (2025)

295 Helmer (2023)

296 U.S. EPA (2020a)

297 The Last Beach Cleanup is a non-profit 501c3 organization whose mission is to reduce plastic pollution.

298 The Recycling Partnership (2017) p. 4

299 Republic Services, "Recycling simplified" https://www.recyclingtoday.com/news/reports-assess-progress-on-global-commitment-to-address-plastic-pollution/




mart





# PLASTIC MERCHANTS OF MYTH : CIRCULAR CLAIMS FALL FLAT

GREENPEACE

PUBLISHED
DECEMBER 2025

WWW.GREENPEACE.ORG

GREENPEACE INC.
1300 EYE STREET, NW
SUITE 1100 EAST
WASHINGTON, D.C. 20005

PROJECT MANAGER: KATE MELGES

DESIGN AND ILLUSTRATION:
PAUL HAMILTON / SEEYES.CO.UK

# EXHIBIT H

| w2Recycle Decision Matrix | | | Core Assessment Categories | | | | | | Overall Assessment | | Eligibility | | Additional Considerations Impacting Assessment | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Public Summary Version - 2/2/2026* | | | Collection | | Sortation | Reprocessing | End Markets | | Applicable Law | | Label Eligibility | | Design Aspects | Additional Assessment Categories |
| Category | Material | Example Format | US | Canada | US & Canada | US & Canada | US | Canada | US | Canada | US | Canada | Factors that may affect overall assessment | Product Application \| Consumer Experience \| Material Health \| Consistency & Common Sense |
| Rigid Plastics | PET | Bottles, Jugs, & Jars | >60% | >50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | | Meets all criteria | | Widely Recyclable | | Color<br>Additives, coatings, & layers<br>Labels & decorations<br>Closures, seals, & attachments<br>Package format & dimensions | Product application<br>Hazardous contents<br>Disassembly |
| | | Thermoforms (e.g. tray), Lids | 20-60% | >50% | No significant sortation issues | No significant reprocessing issues | Moderate strength end markets | Strong end markets | Meets some criteria | Meets all criteria | Check Locally | Widely Recyclable | | |
| | | Cups | >60% | >50% | No significant sortation issues | No significant reprocessing issues | Moderate strength end markets | Strong end markets | Meets some criteria | Meets all criteria | Check Locally | Widely Recyclable | | |
| | | Other (e.g. Foam (EPET)) | <20% | <20% | Moderate sortation issues | Moderate reprocessing issues | None or negligible end markets | | Does not meet all criteria | | Not Yet Recyclable | | | |
| | HDPE | Bottle, Jugs, & Jars | >60% | >50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | | Meets all criteria | | Widely Recyclable | | Color<br>Additives, coatings, & layers<br>Labels & decorations<br>Closures, seals, & attachments<br>Package format & dimensions | Product application<br>Hazardous contents<br>Disassembly |
| | | Tubs, Cups | >60% | >50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | | Meets all criteria | | Widely Recyclable | | | |
| | | Trays, Lids | 20-60% | >50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | | Meets some criteria | Meets all criteria | Check Locally | Widely Recyclable | | |
| | LDPE | Bottles, Jugs, & Jars | >60% | 20-50% | No significant sortation issues | No significant reprocessing issues | Moderate strength end markets | | Meets some criteria | | Check Locally | | Color<br>Additives, coatings, & layers<br>Labels & decorations<br>Closures, seals, & attachments<br>Package format & dimensions | Product application<br>Hazardous contents<br>Disassembly |
| | | Lids, Tubs, Cups | 20-60% | 20-50% | No significant sortation issues | No significant reprocessing issues | Moderate strength end markets | | Meets some criteria | | Check Locally | | | |
| | PP | Bottle, Jugs, & Jars | >60% | >50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | | Meets all criteria | | Widely Recyclable | | Color<br>Additives, coatings, & layers<br>Labels & decorations<br>Closures, seals, & attachments<br>Package format & dimensions | Product application<br>Hazardous contents<br>Disassembly |
| | | Tubs, Cups | >60% | >50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | | Meets all criteria | | Widely Recyclable | | | |
| | | Cups (small format), Lids, Trays, Clamshells | 20-60% | >50% | No significant sortation issues | No significant reprocessing issues | Moderate strength end markets | Strong end markets | Meets some criteria | Meets all criteria | Check Locally | Widely Recyclable | | |
| | | Single Use Pods | <20% | 20-50% | Moderate sortation issues. Testing typically required | No significant reprocessing issues | Moderate strength end markets | | Does not meet all criteria | Meets some criteria | Not Yet Recyclable | Check Locally | | |
| | | Foam | <20% | <20% | Moderate sortation issues | No significant reprocessing issues | None or negligible end markets | | Does not meet all criteria | | Not Yet Recyclable | | | |
| | PVC | All Formats | <20% | <20% | Significant sortation issues | Significant reprocessing issues | No/limited data on end markets | | Does not meet all criteria | | Not Yet Recyclable | | N/A | N/A |
| | PS | All Formats | <20% | <20% | Significant sortation issues | No/limited data on reprocessing | No/limited data on end markets | | Does not meet all criteria | | Not Yet Recyclable | | N/A | N/A |
| | #7, Other plastics (i.e. PLA, ABS, acrylics, multilayer) | All Formats | <20% | <20% | Significant sortation issues | No/limited data on reprocessing | No/limited data on end markets | | Does not meet all criteria | | Not Yet Recyclable | | N/A | N/A |
| Flexible Plastics | PE (HD and LD) | Wraps, Bags, Pouches, & Wrappers | >60% † | >50% | Not sorted in MRF | No significant reprocessing issues | Strong end markets | | Meets all criteria | | Store Drop-off | Widely Recyclable | Conversion methods & grades<br>Barrier layers & coatings<br>Additives<br>Attachments<br>Inks & adhesives | Product application<br>Product residue<br>Disassembly (e.g. removing label) |
| | | Net, Mesh, Woven Film | <20% | <20% | Not sorted in MRF | No significant reprocessing issues | None or negligible end markets | | Does not meet all criteria | | Not Yet Recyclable | | N/A | N/A |
| | PP | All Formats | <20% | <20% | Not sorted in MRF | No significant reprocessing issues | None or negligible end markets | | Does not meet all criteria | | Not Yet Recyclable | | N/A | N/A |
| | Paper | Mail, Office Paper, Bags | >60% | >50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | | Meets all criteria | | Widely Recyclable | | | |
| | | Coated 1 or 2 Sides | <20% | <20% | No significant sortation issues | Significant reprocessing issues | None or negligible end markets | | Does not meet all criteria | | Not Yet Recyclable | | | |
| | Paperboard | Uncoated / Clay Coated | >60% | >50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | | Meets all criteria | | Widely Recyclable | | | |
| | | Coated 1 Side | 20-60% | 20-50% | No significant sortation issues | Moderate reprocessing issues. Testing typically | Strong end markets | | Meets some criteria | | Check Locally | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Fiber | | Coated 2 Sides / Wax Coated | <20% | <20% | No significant sortation issues | Significant reprocessing issues | None or negligible end markets | Does not meet all criteria | Not Yet Recyclable | Additives<br>Printing & decorations<br>Functional coatings/laminate<br>Adhesives<br>Attachments<br>Format & size<br>*The assessment shown does not take technical recyclability testing into consideration. Uncoated/clay coated board may also have print decoration and overprint varnishes and remain eligible for a Widely Recyclable label.* | Product application<br>Product/food residue<br>Disassembly<br>Intentionally added PFAS |
| | Cardboard | Uncoated/ Clay Coated Corrugated | >60% | >50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | Meets all criteria | Widely Recyclable | | |
| | | Coated 1 Side Corrugated | 20-60% | 20-50% | No significant sortation issues | Moderate reprocessing issues. Testing typically | Strong end markets | Meets some criteria | Check Locally | | |
| | | Coated 2 Sides/ Wax Coated Corrugated | <20% | <20% | No significant sortation issues | Significant reprocessing issues | None or negligible end markets | Does not meet all criteria | Not Yet Recyclable | | |
| | Molded Fiber | Non-Food Packaging | >60% | >50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | Meets some criteria* | Check Locally / Widely Recyclable | | |
| | | Food Packaging | <20% | <20% | No significant sortation issues | Moderate reprocessing issues | None or negligible end markets | Does not meet all criteria | Not Yet Recyclable | | |
| | Spiral Wound Containers | Metal Bottom | 20-60% † | 20-50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | Meets some criteria | Check Locally | | |
| | | All Paper | 20-60% | 20-50% | No significant sortation issues | Moderate reprocessing issues. Testing typically | Strong end markets | Meets some criteria | Check Locally | | |
| | Format Specific | Aseptic / Gable Top Cartons | >60% † | >50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | Meets all criteria | Widely Recyclable | | |
| | | Paper Ice Cream Containers | <20% | <20% | Moderate sortation issues | Significant reprocessing issues | None or negligible end markets | Does not meet all criteria | Not Yet Recyclable | | |
| | | Paper Hot Cups | 20-60% | <20% | Moderate sortation issues | Moderate reprocessing issues | Moderate strength end markets | Meets some criteria* | Not Yet Recyclable | | |
| | | Pizza Boxes | >60% | >50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | Meets some criteria* | Check Locally / Widely Recyclable | | |
| Metal | Aluminum & Steel | Beverage & Food Cans | >60% | >50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | Meets all criteria | Widely Recyclable | Labels, attachments, & closures<br>Format & size | Product application<br>Hazardous contents<br>Disassembly |
| | | Aerosol Cans | 20-60% | >50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | Meets some criteria / Meets all criteria | Check Locally / Widely Recyclable | | |
| | Aluminum | Foil | 20-60% | 20-50% | Moderate sortation issues | No significant reprocessing issues | Strong end markets | Meets some criteria | Check Locally | | |
| | | Trays | 20-60% | 20-50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | Meets some criteria | Check Locally | | |
| | Stainless Steel | All Formats | <20% | <20% | Not sorted in MRF | No/limited data on reprocessing | No/limited data on end markets | Does not meet all criteria | Not Yet Recyclable | N/A | N/A |
| Glass | Soda Lime | All Formats | >60% | >50% | No significant sortation issues | No significant reprocessing issues | Strong end markets | Meets all criteria | Widely Recyclable | Coatings<br>Closures<br>Seals<br>Labels & attachments | Product application<br>Hazardous contents<br>Disassembly |
| | Borosilicate | All Formats | <20% | <20% | Significant sortation issues | No/limited data on reprocessing | No/limited data on end markets | Does not meet all criteria | Not Yet Recyclable | N/A | N/A |

†Collection percentage shown incorporates third party data outside of TRP's US Community Recycling Program Acceptance Data

*While collection percentage is shown for the US, applicable law reflects the inclusion of California-specific data. These categories have been downgraded from Widely Recyclable to comply with CA SB

# EXHIBIT I

**SENATE RULES COMMITTEE**
Office of Senate Floor Analyses
(916) 651-1520 Fax: (916) 327-4478



UNFINISHED BUSINESS

Bill No: SB 343
Author: Allen (D), et al.
Amended: 8/31/21
Vote: 21

SENATE ENVIRONMENTAL QUALITY COMMITTEE: 5-0, 3/15/21
AYES: Allen, Gonzalez, Skinner, Stern, Wieckowski
NO VOTE RECORDED: Bates, Dahle

SENATE JUDICIARY COMMITTEE: 9-0, 4/6/21
AYES: Umberg, Caballero, Durazo, Gonzalez, Hertzberg, Laird, Stern, Wieckowski, Wiener
NO VOTE RECORDED: Borgeas, Jones

SENATE APPROPRIATIONS COMMITTEE: 5-2, 5/20/21
AYES: Portantino, Bradford, Kamlager, Laird, Wieckowski
NOES: Bates, Jones

SENATE FLOOR: 31-6, 6/1/21
AYES: Allen, Archuleta, Atkins, Becker, Bradford, Caballero, Cortese, Dodd, Durazo, Eggman, Glazer, Gonzalez, Hertzberg, Hueso, Hurtado, Kamlager, Laird, Leyva, Limón, McGuire, Min, Newman, Pan, Portantino, Roth, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener
NOES: Borgeas, Grove, Jones, Nielsen, Ochoa Bogh, Wilk
NO VOTE RECORDED: Bates, Dahle, Melendez

ASSEMBLY FLOOR: 50-3, 9/8/21 - See last page for vote

**SUBJECT:** Environmental advertising: recycling symbol

**SOURCE:** Californians Against Waste
National Stewardship Action Council

**DIGEST:** This bill tightens the requirements around the permissible use of the "chasing arrows" recycling symbol and when claims regarding recyclability can be made and requires the Department of Resources Recycling and Recovery (CalRecycle) to publish the types and forms of recyclable products and packaging.

*Assembly Amendments* specify additional criteria for recyclability, change the process for which recyclability of material types is determined, make exceptions for existing state recycling and waste collection programs, and change the process for which products may become eligible to be labeled as recyclable, among other things.

**ANALYSIS:**

Existing law:

1) Provides for the following, under provisions relating to Environmental Representations Law (Business and Professions Code (BPC) §17580 et seq.):

   a) Requires any person who represents in advertising or on a label that the consumer good it manufactures or distributes is not harmful to, or is beneficial to, the natural environment through the use of certain terms (e.g., "ecologically friendly," "earth friendly," "green product,") or any like term, to maintain in written form certain information and documentation supporting the validity of the representation. This information and documentation must be furnished to the public upon request.

   b) Prohibits any person from making any untruthful, deceptive, or misleading environmental marketing claim. For purposes of this provision, "environmental marketing claim" includes any claim contained in the "Guides for the Use of Environmental Marketing Claims" published by the Federal Trade Commission (FTC).

   c) Provides that any violation of these requirements is a misdemeanor punishable by imprisonment in the county jail not to exceed six months, or by a fine of no more than $2,500, or both.

2) Finds and declares that it is the public policy of the state that environmental marketing claims, whether explicit or implied, should be substantiated by competent and reliable evidence to prevent deceiving or misleading consumers about the environmental impact of plastic products. (Public Resources Code (PRC) §42355.5)

3) Requires CalRecycle on or before January 1, 2021, to adopt regulations to establish a process and develop criteria for determining the types of food service packaging that are reusable, recyclable, or compostable. (PRC §42370.2)

4) Requires all rigid plastic bottles and containers sold in the state to be labeled with a code that indicates the resin type of their basic material. The code shall be placed inside a triangle, and letters indicating resin abbreviation shall be placed below the triangle. (PRC §18015 et seq.)

This bill:

1) Prohibits the sale, distribution, or import of a product or packaging into the state for which a deceptive or misleading claim about the recyclability of the product or packaging is made.

2) States that the use of the chasing arrows symbol, the chasing arrows symbol surrounding a resin identification code, or any other symbol or statement indicating recyclability is deemed to be deceptive or misleading unless the product or packaging is considered recyclable pursuant to statewide recyclability criteria. Specifies this provision does not apply to:

   a) The use of the chasing arrows symbol with a line through it at a 45-degree angle to convey that an item is not recyclable; or,

   b) Consumer goods that are required by federal or state law to display a chasing arrows symbol.

3) Prohibits the resin identification code from being placed inside a chasing arrows symbol, unless the product or packaging is considered recyclable pursuant to statewide recyclability criteria.

4) Provides direction for manufacturers of products and packaging.

5) Requires, on or before January 1, 2024, CalRecycle to:

   a) Update the regulations governing facility operator reports on disposal tonnages and origin of materials collected to include:

      i) How the material collected or processed by the operations and facilities was collected, and;

      ii) What material types and forms are actively recovered by the facility.

b) Publish the information collected, as specified.

6) Requires CalRecycle, by January 1, 2024, to conduct and publish a characterization study of material types and forms that are collected, sorted, sold, or transferred by solid waste facilities, as specified, and to update the characterization study every five years, beginning in 2027. Exempts CalRecycle actions under this provision from the Administrative Procedure Act.

7) Exempts products and packaging that is manufactured up to 18 months after the characterization study by CalRecycle is published or updated, or January 1, 2024, whichever is later.

8) Specifies that a product or packaging is considered recyclable if, based on the information published by CalRecycle, it is of a material type and form that:

   a) Is collected for recycling by recycling programs for jurisdictions that collectively encompass at least 60% of population of the state; and,

   b) Is sorted into defined streams for recycling processes by large volume transfer or processing facilities that process materials and collectively serve at least 60% of recycling programs statewide, with the defined streams sent to and reclaimed at a reclaiming facility consistent with the requirements of the Basel Convention.

9) Specifies additional requirements for products and packaging to be deemed recyclable, including, but not limited to:

   a) Does not contain any components, inks, adhesives, or labels that prevent recyclability; and,

   b) Does not contain intentionally added perfluoroalkyl or polyfluoroalkyl substances (PFAS), or other intentionally added hazardous chemicals, as specified.

**Background**

1) *Statewide Commission on Recycling Markets and Curbside Recycling Report*. The California Recycling Market Development Act (AB 1583, Eggman, Chapter 690, Statutes of 2019) required CalRecycle to convene a Statewide Commission on Recycling Markets and Curbside Recycling to issue policy recommendations for achieving specified market development and waste reduction goals and to provide regular feedback to the department on public messaging designed to encourage proper recycling and to minimize

contamination in curbside recycling programs. A preliminary policy report was published on January 1, 2021, proposing 19 different policies. One proposal, #15: "What is Recyclable?", made recommendations very similar to SB 343 to ensure that "residential and commercial recycling collection programs only collect material that is capable of being recycled through the collection and processing process."

2) *Current recycling labeling practices.* The FTC broadly prohibits unfair and deceptive acts or practices in advertising. To aid marketers in avoiding making environmental claims that mislead consumers, the FTC issued "Green Guides," which states that "a product or package should not be marketed as recyclable unless it can be collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item," and "marketers should clearly and prominently qualify recyclable claims to the extent necessary to avoid deception about the availability of recycling programs and collection sites to consumers." A Greenpeace USA survey of material recovery facilities (MRFs) found that hundreds of plastic products use misleading "recyclable" labels, based on what materials were actually recycled as of 2020.

3) *What is recyclable?* It is often unclear to consumers what is and is not recyclable. There are several reasons for this, including:

   a) *Resin identification codes.* In California, rigid plastic bottles and containers are required to display a resin identification code (RIC) inside of a triangle or a chasing arrows symbol. Consumers often assume this code means a package is automatically recyclable, but that is not the case. According to CalRecycle, only plastics with the code #1 for polyethylene terephthalate (PET), used in water and soda bottles, and #2 high-density polyethylene (HDPE), used in milk jugs and shampoo bottles, are commonly recycled. The rest of the resin types #3-7 are generally not recycled. Most of the products made from these materials end up being sent to landfills or incinerated.

   b) *Mixed materials and contamination.* Recyclability is further complicated by multi-layered materials such as films, coatings, or labels. Dirty or soiled plastics are worth less due to extra cleaning costs and they can also contaminate paper waste if placed in the same bin.

   c) *Regional and temporal variability.* The way plastics are recycled are complex and varies by jurisdiction. What can be recycled in one area of the state, may not be recyclable in another. As of 2015, there were an estimated

161 MRFs statewide. According to a 2020 Recyclability Screening Survey of 76 CA MRFs, plastic items made from resins #3-7 were accepted at a rate of 1-82% depending on the type of item. While all MRFs accepted PET and HDPE bottles and jugs, there was also variability in other #1 and #2 resin items accepted, such as PET clamshells, cups and HDPE rigid containers. Regardless of what items are collected, the survey indicated that most of those materials are not separated into individual bales and ultimately recycled.

4) *A market in flux.* One major driver of California's recycling efforts is the broader market for recyclable materials. In order for material to be recycled and not end up in a landfill, the cost of processing and using the recycled material must be less than that of virgin material. Prices for recyclable materials can fluctuate wildly over both the short term and the long term, leading to instability in recycling markets. California historically has exported about a third of its recycling, including about two-thirds of recycling in the blue bins, according to CalRecycle. Most went to China, but their "National Sword" policy significantly reduced the types of materials accepted for recycling from California after 2017. Recyclables that used to generate money now have no market. What can and will be recycled will continue to change as other markets for recyclables are sought both in-state and abroad. Furthermore, in 2020, virgin plastic prices fell by 14-43% depending on type, due to the drop in the price of crude oil.

**Comments**

1) *Purpose of Bill.* According to the author, "In California, less than 15 percent of single-use plastic is recycled. Despite robust curbside recycling programs and decades of public education efforts, the vast majority of single-use items are used once and then landfilled, incinerated, or dumped into the environment. This dismal recycling rate is due to many factors, most notably a severe drop in the market for recycled material and the low cost of virgin petroleum. Consumers dutifully fill their blue bins with items they believe are recyclable, which contaminate the recycling stream and make it more costly to sort and clean the truly recyclable material. The plastic resin identification coding (RIC) system, which classifies plastic types by numbers one through seven often displayed in the chasing-arrows symbol, further confuses consumers … Most consumers simply see the chasing arrows and assume a product can be recycled … SB 343 will end consumer confusion about which material is suitable for the blue bin, reduce contamination, lower waste volume, and improve recycling rates."

2) *Changes to labeling*. Based on current trends, the only plastics that would likely be allowed to be labeled with a chasing arrows symbol under the considerations of this bill would be PET #1 and HDPE #2 plastic bottles and jugs. That would be a significant change to how products are currently labeled, particularly for RICs required on all rigid plastic bottles and containers. Potentially, hundreds of companies would be required to change their labeling practices on their products, especially those made from resins #3-7. This would affect plastic products of all types, from single-use food packaging to shipping materials, toys, bags, and more.

3) *Greenwashing.* A growing number of consumers are looking to buy environmentally friendly, "green" products, including products that can and will be fully recycled. Companies have responded with "green" marketing touting the environmental benefits of what they're selling. Deceptive, exaggerated, or misleading labeling on products to make it appear more eco-friendly is called "greenwashing." California has instituted several laws to crack down on this practice, both generally by prohibiting "any untruthful, deceptive, or misleading environmental marketing claim" and more specifically by establishing requirements for use of terms such as "compostable" and "biodegradable." This bill expands these regulations on greenwashing, by explicitly adding the symbols and language associated with recycling, which are often associated with being eco-friendly, to the list of labels that are specifically regulated.

4) *Complexity of recycling statewide.* How and what materials are recycled varies across the state and over time. Different jurisdictions have different standards for recyclability, yet packaging and labeling are generally consistent across the state. CalRecycle is currently in the process of developing criteria for determining which materials that are not uniformly recycled across the state will be considered "recyclable" for food service packaging, as directed by the Sustainable Packaging for the State of California Act (SB 1335, Allen, Chapter 610, Statutes of 2018). A list of approved recyclable packaging for SB 1335 will be published later this year. SB 343 expands upon that work by requiring CalRecycle to perform a material characterization study for other types of forms of plastic products and packaging for which claims of recyclability may be made.

**Related/Prior Legislation**

SB 54 (Allen, 2019) would have enacted the California Circular Economy and Plastic Pollution Reduction Act to achieve a 75% reduction in single-use packaging and priority single-use products, as defined, by 2032 by imposing a

comprehensive regulatory scheme on producers, retailers, and wholesalers of single-use packaging and priority single-use products, to be administered by CalRecycle. SB 54 failed passage on the Assembly Floor.

SB 567 (DeSaulnier, Chapter 594, Statutes of 2011) created the Plastic Products Law under the California Integrated Waste Management Act of 1989, to prohibit a plastic product from being sold that is labeled "compostable," "home compostable," or "marine biodegradable" unless the plastic meets certain standards that is subject to CalRecycle requirements.

**FISCAL EFFECT:** Appropriation: No Fiscal Com.: Yes Local: Yes

According to the Assembly Appropriations Committee, CalRecycle estimates annual ongoing costs of $1.7 million to fund 11 positions to promulgate regulations, develop and update a list to determine the material types and forms deemed recyclable and to determine if a product or packaging is of a material type and form that is recyclable, if the product or packaging is manufactured 90 days or more after the date the list is published or updated (special fund).

**SUPPORT:** (Verified 9/8/21)

Californians Against Waste (co-source)
National Stewardship Action Council (co-source)
350 Bay Area Action
Active San Gabriel Valley
Algalita
Alliance of Mission-based Recyclers
Alliance of Nurses for Healthy Environments
Association of Compost Producers
Athens Services
Ban SUP (Single Use Plastic)
California Alliance of Nurses for Healthy Environments
California League of Conservation Voters
California Product Stewardship Council
California Resource Recovery Association
California Teamsters Public Affairs Council
California Waste and Recycling Association
California Waste Haulers Council
CALPIRG
Can Manufacturers Institute
Center for Oceanic Awareness, Research, and Education
Central Contra Costa Solid Waste Authority

City of Long Beach
City of Los Angeles
City of Thousand Oaks
Clean Water Action
Colorado Medical Waste, INC.
Container Recycling Institute
County of San Diego
Credo Beauty
Del Norte Solid Waste Management Authority
Detroiters Working for Environmental Justice
Ecology Center
EDCO
Environmental Working Group
Facts: Families Advocating for Chemical & Toxins Safety
Friends Committee on Legislation of California
Full Circle Environmental
Full Spectrum Strategy
Heal the Bay
Inland Ocean Coalition
League of California Cities
League to Save Lake Tahoe
Linkco INC.
Los Angeles County Board of Supervisors
Los Angeles County Solid Waste Management Committee/Integrated Waste Management Task Force
Marin County Hazardous and Solid Waste Management Joint Powers Authority
Marin Sanitary Service
Mendo Recycle
Merced County Regional Waste Management Authority
Ming's Recycling
National Recycling Coalition
National Recycling Partnership
Northern California Recycling Association
NRDC
Ocean Conservancy
Plastic Oceans International
Plastic Pollution Coalition
Prezero Us, INC.
Recology
Recyclesmart

Republic Services INC.
Resource Recovery Coalition of California
RethinkWaste
Richard Watson & Associates, Inc.
Robin's Restaurant
San Gabriel Valley Council of Governments
Santa Barbara Standing Rock Coalition
Save Our Shores
Save the Albatross Coalition
Sea Hugger
Seventh Generation Advisors
Sierra Club California
Silicon Valley Democratic Club
Special Waste Advisors
StopWaste
Story of Stuff
Surfrider Foundation
The 5 Gyres Institute
The Atrium
The Last Beach Cleanup
The Last Plastic Straw
The Nectary
Tri-ced Community Recycling
Turtle Island Restoration Network
Upstream
Waste Connection
Waste Management
Wishtoyo Chumash Foundation
Zanker Recycling
Zero Waste Marin
Zero Waste Sonoma
Zero Waste USA

**OPPOSITION:** (Verified 9/8/21)

American Chemistry Council
American Institute for Packaging and Environment
California Manufacturers & Technology Association
Consumer Brands Association
Consumer Technology Association
EPS Industry Alliance

Flexible Packaging Association
Food Packaging Institute
Household and Commercial Products Association
National Aerosol Association
Personal Care Products Council
Pet Food Institute
Plastics Industry Association
Serlin Haley Llp
Western Aerosol Information Bureau

**ARGUMENTS IN SUPPORT:** A coalition of 70+ organizations in support state, "SB 343 will reduce contamination in the recycling system, lower the costs for local governments and ratepayers, and empower consumers to make informed purchasing choices based on a product's recyclability. This will encourage producers to make sustainable packaging choices, and support companies looking for a steady supply of material to invest in recycling and reprocessing facilities in California."

**ARGUMENTS IN OPPOSITION:** A coalition of 14 organizations in opposition state, "Based on the current language of SB 343, we expect CalRecycle to establish a list of recyclable materials that is extremely limiting and similar to the list the Statewide Commission on Recycling Markets and Curbside Recycling developed which includes only 15 materials consisting of 8 paper materials, 2 forms of glass, 2 types of metals and 2 types of plastics and one type of colored plastic. This will have resounding impacts on the ability of the state to reach their 75% diversion goals and hinder the state's ability to adopt and implement a comprehensive circular economy solution to packaging. By limiting options and the innovation needed to ensure the recycling of more materials, SB 343 will cause more materials to go to landfill."

ASSEMBLY FLOOR: 50-3, 9/8/21
AYES: Bauer-Kahan, Bennett, Berman, Bloom, Boerner Horvath, Mia Bonta, Bryan, Burke, Calderon, Carrillo, Cervantes, Chau, Chiu, Cunningham, Friedman, Gabriel, Cristina Garcia, Eduardo Garcia, Lorena Gonzalez, Grayson, Holden, Irwin, Jones-Sawyer, Kalra, Lee, Levine, Low, Maienschein, Mathis, Mayes, McCarty, Mullin, Muratsuchi, Nazarian, O'Donnell, Petrie-Norris, Quirk, Quirk-Silva, Reyes, Luz Rivas, Robert Rivas, Santiago, Stone, Ting, Waldron, Ward, Akilah Weber, Wicks, Wood, Rendon
NOES: Bigelow, Davies, Gray

NO VOTE RECORDED: Aguiar-Curry, Arambula, Chen, Choi, Cooley, Cooper, Megan Dahle, Daly, Flora, Fong, Frazier, Gallagher, Gipson, Kiley, Lackey, Medina, Nguyen, Patterson, Ramos, Rodriguez, Blanca Rubio, Salas, Seyarto, Smith, Valladares, Villapudua, Voepel

Prepared by: Rylie Ellison / E.Q. / (916) 651-4108
9/9/21 9:49:19

****** END ******

# EXHIBIT J

CalRecycle

# SB 343 Material Characterization Study Final Findings 2023/2024

## April 2025



**State of California**

Gavin Newsom
Governor

**California Environmental Protection Agency**

Yana Garcia
Secretary

**Department of Resources Recycling and Recovery (CalRecycle)**

Zoe Heller
Director

**Public Affairs Office**
1001 I Street (MS 22-B)
P.O. Box 4025
Sacramento, CA 95812-4025
www.calrecycle.ca.gov/Publications/
1-800-RECYCLE (California only) or (916) 341-6300

**Publication # DRRR-2025-1750**

To conserve resources and reduce waste, CalRecycle reports are produced in electronic format only. If printing copies of this document, please consider use of recycled paper containing 100 percent postconsumer fiber and, where possible, please print on both sides.

This report does not constitute an endorsement or warranty concerning any products or processes.

CalRecycle does not discriminate on the basis of disability in access to its programs. CalRecycle publications are available in accessible formats upon request by calling the Public Affairs Office at (916) 341-6300. Persons with hearing impairments can reach CalRecycle through the California Relay Service at 1-800-735-2929.

# Table of Contents

Executive Summary ........ 1

Note on Recyclability Determinations ........ 2

Overview of Changes ........ 3

Data Records Available Pursuant to the Public Records Act ........ 4

Background ........ 4

Methods ........ 5

Material Types and Forms List ........ 5

Collection by Jurisdiction Residential Curbside Recycling Programs ........ 6

Materials Collected by Jurisdiction Residential Curbside Recycling Programs ........ 6

Alignment with SB 343 Material Types and Forms ........ 9

Materials Sorted by Large Volume Transfer/Processing Facilities (LVTP Facilities) . 9

Large Volume Transfer/Processing Facility Material Characterization Study ........ 10

Material Characterization Study ........ 14

Estimating Proportions of Material Types and Forms Sorted into Specified Outflows by LVTP Facilities ........ 15

Summary of Findings ........ 17

Overview of Data/Tables by Data Collection Effort ........ 17

Survey of Collection by Jurisdiction Residential Curbside Recycling Programs ........ 17

Materials Sorted by LVTP Facilities/Material Characterization Study ........ 18

Collection by Jurisdiction Residential Curbside Recycling Programs ........ 19

Table 1. Percentage of Statewide Population with Access to a Residential Curbside Recycling Program Which Accepts SB 343 Material Types and Forms ........ 20

Materials Sorted by Large Volume Transfer/Processing Facilities .......... 24

Table 2. Sorting of Material Types and Forms to All Outflows, by Counties Served by Surveyed LVTP Facilities .......... 25

Material Characterization Study at Large Volume Transfer/Processing Facilities .... 30

Table 3A. Material Characterization of Fiber Outflows .......... 30

Table 3B. Material Characterization of Glass Outflows .......... 32

Table 3C. Material Characterization of Metal Outflows .......... 35

Table 3D. Material Characterization of Plastic Outflows .......... 40

Table 3E. Material Characterization of Residuals .......... 46

Abbreviations and Acronyms .......... 48

Glossary of Terms .......... 50

Bibliography .......... 51

# Executive Summary

Lawmakers enacted Senate Bill 343 (SB 343, Allen, Chapter 507, Statutes of 2021) prohibiting the use of the chasing arrows symbol or any other indicator of recyclability on products and packaging unless producers can show certain criteria are met. (See Public Resources Code section 42355.51. Unless otherwise indicated, all statutory references in this report are to the Public Resources Code (PRC).) SB 343 places responsibility of the use of recyclability labeling on the producer of the product and packaging.

SB 343 additionally requires the California Department of Resources Recycling and Recovery (CalRecycle) to conduct and publish a characterization study of materials collected, sorted, sold, or transferred for recycling in California (see section 42355.51(d)(1)). SB 343 neither authorizes nor directs CalRecycle to determine or report on the recyclability of particular products and packaging or the appropriate use of the chasing arrows or other indicators of recyclability. Parties evaluating whether a product is eligible to be labeled recyclable in California may utilize additional information not presented in this study.

In 2023, CalRecycle completed its first material characterization study to inform a baseline understanding and initial benchmark of common materials collected, sorted, sold or transferred for recycling through a sample size of the state's large processors. CalRecycle contracted with Cascadia Consulting Group to conduct the study. SB 343 specifically requires CalRecycle to study recycling streams through large volume processors that collect waste from more than half of the state's population areas. CalRecycle and Cascadia designed a study that incorporated representative, cost-effective sampling and analysis for data gathering that minimized disruption to facility operators. Collection of additional material characterization sampling was conducted in January and February 2024, and jurisdiction collection program information was conducted in September and October 2024.

The final 2023/2024 study findings provide information on whether a product or package is commonly recyclable in California for the purposes of section 42355.51. The findings of this study reflect:

- Information from local jurisdictions on the materials accepted by their residential curbside recycling programs.
- Survey results detailing the sorting activities at California large volume transfer/processing facilities (LVTP facilities).
- Results of material characterization sampling of recyclable materials at LVTP facilities statewide.

SB 343 requires CalRecycle to revise the study in 2027 and every five years thereafter. CalRecycle will continuously improve its methodology and approach to support a broad look at recyclability of materials across the state.

Future studies will be designed to better align with covered materials categories for SB 54 (Allen, Chapter 75, Statutes of 2022).

For a brief overview of the tables and pertinent data within this study, refer to the Summary of Findings section.

# Note on Recyclability Determinations

Section 42355.51(d)(2) requires that products and packaging meet several criteria to be considered recyclable in the state. Criteria include that such materials:

1) Are accepted for collection by jurisdiction recycling programs (section 42355.51(d)(2)(A)). See Table 1 and supporting data in Appendix 1.
2) Are sorted into defined streams by large volume transfer/processing facilities (LVTP facilities) (section 42355.51(d)(2)(B)(i)). See Table 2 and supporting data in Table 3 and Appendix 1.
3) Are sent to a reclaimer and reclaimed consistent with the Basel Convention (section 42355.51(d)(2)(B)(i)).
4) Meet specific composition and design requirements (section 42355.51(d)(3)).

This report provides data only on jurisdiction residential curbside recycling program collection and the sorting behaviors of LVTP facilities in California (items (1) and (2) above). It does not provide information on the destination or ultimate disposition of materials sorted and sold by LVTP facilities (item (3)). Nor does it provide information regarding the composition or design of specific products or packaging (item (4)).

Regarding item (3), the “Basel Convention” refers to the Basel Convention on the Control of Transboundary Movements of Hazardous Waste and their Disposal, which entered into force in 1992 and has 179 member countries. It aims to reduce the adverse impacts of the cross-border transportation, management, and disposal of hazardous and other waste. See the Basel Convention webpage for more information.

The Basel Convention elements most relevant to SB 343 are those restricting the export and import of plastic recyclables and waste. These restrictions were added through amendments that became effective January 1, 2021, (see the U.S. Environmental Protection Agency (EPA) webpage or the Basel Convention plastic waste webpage for more information). Basel Convention restrictions focus on the type of material (e.g., type of plastic), contamination levels, whether the importing country is a party to it, and whether there are additional trade agreements in place (see the U.S. EPA webpage concerning international trade agreements, including the Basel Convention).

Because this report does not provide information regarding items (3) and (4), it does not contain all the information necessary to determine the recyclability status for any particular product or packaging. To make such a determination, entities will require additional information - in particular, information relevant to sections 42355.51(d)(2)(B)(i) and 42355.51(d)(3).

Public comments received from December 28, 2023, through May 31, 2024, and January 1, 2025, through March 12, 2025, are included in Appendix 2.

## Overview of Changes

This section summarizes the revisions to the Revised Preliminary Findings Report (DRRR-2024-1746) published December 31, 2024, embodied in this final report.

**Main Report**

This final report incorporates the following revisions:

- Minor clarification changes to Table 1 (see report section – Collection by Jurisdiction Residential Curbside Recycling Programs).
- Updated text throughout to reflect updated numbers of counties served by study facilities (34 of 58 counties, encompassing 93% of California's population) due to the inclusion of additional counties served by two study facilities, as verified by CalRecycle's collected survey data.
- Results updated in Table 2 (see report section – Materials Sorted by Large Volume Transfer/Processing Facilities), based on the inclusion of four additional counties served by two study facilities and the modification of two facility outflows from Gable-top Carton or Aseptic Containers to one inclusive outflow of both Gable-top Carton and Aseptic Containers. All changes were verified by CalRecycle's collected LVTP facilities survey data.
- Minor clarifying changes to Table 2 (see report section – Materials Sorted by Large Volume Transfer/Processing Facilities).

**Appendix 1**

- Minor clarifying changes to several tables.
- Updated text throughout to reflect updated numbers of counties served by study facilities (34 of 58 counties, encompassing 93% of California's population) due to the inclusion of additional counties served by two study facilities, verified by CalRecycle's collected survey data.
- Added methodology for inclusion of a table from the Preliminary Report - "2023 jurisdiction survey" in Section 1.4.

- Added a table from the Preliminary Report – “2023 jurisdiction survey” to supplement Material Types and Forms not addressed in the updated jurisdiction survey (“2024 jurisdiction survey”). The new table is in Section 2.2 Table E1.
- Results updated in Section 1.6, Table B1; Section 2.3, Table F1; Section 2.4, Table G1; Section 2.4, Table G2; Section 2.5, Table G3, based on the inclusion of four additional counties served by two study facilities, as well as the modification of two facility outflows from Gable-top Carton or Aseptic Containers to one inclusive outflow of Gable-top Carton and Aseptic Containers. All changes were verified by CalRecycle’s collected data.
- Added a new table to Section 2.8, Table K1 which examines approximate object count for cartons in ONP and Mixed Paper, Gable-top Carton and Aseptic Carton, and Residual outflows.

**Additional Elements**

The following two elements have been added:

- Description of the Basel Convention parameters and how they apply to SB 343 criteria (see Note on Recyclability Determinations section, above).

- Public comments received by CalRecycle from January 1, 2025, through March 12, 2025 (see Appendix 2 – Public Comments).

## Data Records Available Pursuant to the Public Records Act

Records related to this report, such as R Statistical Program scripts, can be requested through the CalRecycle Public Records Portal and include:

- Local Jurisdiction Internet-Based Survey (2023)
- Local Jurisdiction Survey (2024)
- LVTP Facilities Survey
- LVTP Facilities-Based Material Characterization Study

# Background

SB 343 prohibits the use of the chasing arrows symbol or any other indicator of recyclability on products and packaging unless certain criteria are met. CalRecycle is required to publish data about the material types and forms that are collected, sorted, sold, or transferred by solid waste facilities (section 42355.51(d)(1)(B)(i)).

Section 42355.51(d)(1)(B)(v) directs CalRecycle to publish preliminary findings of the study and conduct a public meeting to present those findings and receive public comments. CalRecycle published the SB 343 Material Characterization Study

Preliminary Findings report (DRRR-2023-1728) on December 28, 2023. After receiving and considering public comments, CalRecycle is directed to finalize and publish the findings of the study. This report presents the findings of the study and also includes information regarding jurisdiction residential curbside recycling programs.

As outlined in section 42355.51(d)(2), a product or packaging may be considered recyclable in the state if the product or packaging is of a material type and form that is both:

1) Collected for recycling by jurisdiction recycling programs that collectively encompass at least 60% of the population of the state; and
2) Sorted into defined streams for recycling processes by large volume transfer/processing facilities (LVTP facilities) that:
   a) Process materials and collectively serve at least 60% of recycling programs statewide.
   b) Send the defined streams to and reclaimed at a reclaiming facility consistent with the requirements of the Basel Convention.

Collecting the information necessary to determine whether a material type and form meets the requirement of being sent to and reclaimed at a reclaiming facility consistent with the requirements of the Basel Convention would require reclaiming facilities located both in and out of the state to report on their acceptance of materials and the ultimate reclamation of those materials. SB 343 does not give CalRecycle the authority to require reclaiming facilities in or out of the state to report on their acceptance of materials and the ultimate reclamation of those materials.

# Methods

CalRecycle conducted two primary data collection efforts to provide information on the two criteria outlined in section 42355.51(d)(2). Data collection was conducted to:

- Gather information on material types and forms collected for recycling by jurisdiction residential curbside recycling programs.
- Gather information on material types and forms sorted by LVTP facilities in California.

The following methods are provided separately for each of the two data collection efforts.

## Material Types and Forms List

To standardize unique item descriptions across recycling programs at both the curbside collection and processing stages, CalRecycle first developed the material types and forms list. Candidate items were identified through consultation with internal subject-matter experts, informal survey of common products and disposed items, and interviews

of staff at LVTP facilities. Items likely handled by collection and/or sorting activities for recycling in California were assigned to 91 unique material types and forms. Each material type and form have a corresponding material class, alphanumeric code, name, definition, and example items for inclusion or exclusion (Appendix 1, Section 1.7, Table C1).

# Collection by Jurisdiction Residential Curbside Recycling Programs

To identify which recyclable materials are being accepted by jurisdiction residential curbside recycling programs across the state, local recycling information was collected for each jurisdiction in California. Using population data combined with information on materials accepted by jurisdiction residential curbside recycling programs, CalRecycle estimated the proportion of the statewide population that has access to jurisdiction residential curbside programs that accept a given material type and form for recycling collection (Table 1).

### List and Population of Jurisdictions in California

Jurisdiction names from survey entries were aligned to jurisdiction names in CalRecycle's Recycling and Disposal Reporting System (RDRS) and to city and county names in data from the California Department of Finance (DOF). The DOF publishes Population and Housing Estimates for the State of California each year on its website. The 'Balance of County' sections within the population spreadsheet were used to account for the population of unincorporated areas within a given California county.

## Materials Collected by Jurisdiction Residential Curbside Recycling Programs

### 2024 Jurisdiction Survey

To obtain information on the percentage of the California population with access to residential curbside recycling programs which accept each SB 343 material type and form, CalRecycle administered an online survey sent to all California jurisdictions via listserv from September 18 to October 18, 2024 ("2024 jurisdiction survey"). Staff from CalRecycle's Local Assistance and Market Development Branch followed up with individual jurisdictions after the survey's release. The survey was part of a larger data collection effort to characterize the types and forms of materials accepted for recycling by residential curbside collection programs (not including materials collected for composting or organics recycling).

Survey questions addressed information on type of collection program (e.g., number of bins), followed by six sections, organized by material class: (1) glass; (2) ceramic; (3) metal; (4) paper/fiber; (5) plastic; and (6) wood and other organics. For each section,

survey questions listed material types and asked respondents to indicate if a jurisdiction did not accept any of those materials in their residential curbside recycling programs (see Appendix 1, Section 1.2 for a full list of survey questions). If a jurisdiction has more than one hauler or the residential curbside recycling program differs within a jurisdiction, respondents were asked to answer in terms of the hauler/collection that serves the largest population.

The “2024 jurisdiction survey” response entries with any answered material acceptance questions were retained. For the jurisdiction-completed surveys, blank answers were considered “Accepted.” Survey entries that were blank for all material acceptance questions or could not be identified by the respondent or jurisdiction covered were removed.

CalRecycle received survey responses from 295 entities representing local jurisdictions, regional agencies, or recycling service providers. Some individual responses from regional agencies or recycling service providers covered multiple jurisdictions if the material types and forms in the residential curbside collection program were the same for every jurisdiction. The survey responses cover 437 out of 538 local jurisdictions, representing 89% of the California population.

**Remediating “2024 Jurisdiction Survey” / Local Jurisdiction Response Duplication**

For local jurisdictions that completed the “2024 jurisdiction survey,” CalRecycle staff conducted data remediation and analysis. Jurisdiction names were manually reviewed and aligned to city and county names in data from the California Department of Finance. CalRecycle staff reviewed the survey responses for duplication. When a single respondent submitted multiple complete survey entries for a single jurisdiction, the first submission was removed. When multiple survey entries covering a single jurisdiction were provided by both a local jurisdiction and hauler, CalRecycle staff combined entries into a single response, described under Recycling Acceptance Calculations.

All jurisdictions with no responses at the end of the duplication remediation process were added to the “CalRecycle online research secondary survey.”

**CalRecycle Online Research Secondary Survey**

For jurisdictions without recorded survey responses to the “2024 jurisdiction survey,” CalRecycle staff conducted online research and completed a modified version of the survey (see Appendix 1, Section 1.3) based on information provided to the public. The irecyclesmart.com website was used as a starting point to access recycling information for each jurisdiction, provided by a jurisdiction or hauler on materials collected for recycling in local residential curbside recycling programs. The Local Recycling Information webpage lists California jurisdictions and their corresponding recycling guides, which were obtained directly from the websites of the jurisdictions or from those

of the haulers partnered with a given jurisdiction. When the Local Recycling Information webpage included an inaccessible link or outdated information, staff used alternative data sources, such as jurisdictions' waste-disposal or recycling webpages found through the jurisdictions' websites and/or the websites of haulers partnered to a jurisdiction.

CalRecycle completed online research for the 101 local jurisdictions in which no relevant survey response was received. Additionally, CalRecycle completed online research for 11 additional jurisdictions in which jurisdiction-completed survey responses were later received. This resulted in an overlap of survey responses between the local jurisdiction surveys and the CalRecycle staff completed surveys. The remediating "2024 jurisdiction survey"/local jurisdiction response duplication section describes how duplicate information was resolved.

In CalRecycle's online research secondary surveys, each material type and form could be assigned as "Accepted," "Not Accepted," or "Unknown." "Unknown" was designated when a review of the relevant websites did not provide sufficient evidence for or against material acceptance in curbside recycling. The "Unknown" coding was used only for CalRecycle's online research secondary survey.

Each "Unknown" was converted to a proportion of "Accepted" based on the statewide average acceptance rate for each material type and form. For example, if a single material type and form was found to be accepted by 43% of the population based on known survey responses, all jurisdictions with an "Unknown" for that material type and form had the "Unknown" replaced with "43%," which represented 43% of that jurisdiction's population accepting that material type and form. If all responses for a given material type and form were "Unknown," this was estimated at 50% acceptance.

**Local Jurisdiction Survey Recycling Acceptance Calculations**

In the jurisdiction-completed surveys, each material type and form were assigned as "Accepted" or "Not Accepted." When multiple jurisdictions completed surveys (by the same respondent, answering for the same set of jurisdictions) that were retained after the earlier duplication remediation steps, these surveys were combined into a single response. Each material type and form were designated a proportion of "Accepted" based on consensus among the set of duplicated surveys. For example, if two survey copies said a material type and form was "Not Accepted," this was represented as 0% acceptance. If one survey copy said a material type and form was "Not Accepted" and the other copy was blank (presumed "Accepted"), this material type and form was represented with 50% acceptance.

**Calculating Statewide Acceptance Rates**

Analysis was conducted to determine the curbside residential recycling acceptance of each material type and form for each city or unincorporated county jurisdiction.

Populations of each jurisdiction served by residential curbside programs accepting each material were then summed and divided by the total state population. This calculated the statewide material acceptance rates.

This methodology assumes that each response reflects the entire population of a jurisdiction (city or unincorporated county). CalRecycle does not have data sufficient to accurately scale responses to cover subpopulations or partial material flows within jurisdictions.

## Alignment with SB 343 Material Types and Forms

Survey material types were converted to material types and forms. Material types surveyed did not uniquely identify SB 343 material types and forms. As such, a crosswalk table was developed and used to translate survey material category responses to SB 343 material type and form results (Appendix 1, Section 1.1).

Further, for some items, several survey material categories were averaged and reported as a single material type and form. For example, X13, Fines and Residuals, is the average of six distinct categories of small items which are unique within the collection survey (Ceramic, Glass, Metal, Organics, Paper, and Plastic) (see Appendix 1, Section 1.1 and Appendix 1, Section 2.1, Table D1 for details). In some cases, material types and forms are more specific than the survey material categories, so multiple material types and forms correspond to a single survey result. For example, Other Mixed Paper in the survey is the data source for four fiber material types and forms (see Appendix 1, Section 1.1 and Appendix 1, Section 2.1, Table D1 for details).

## Materials Sorted by Large Volume Transfer/Processing Facilities (LVTP Facilities)

Using a combination of surveys, facility visits, and material sorting at LVTP facilities, CalRecycle estimated the proportions of the state's recycling programs, at the county level, that are served by LVTP facilities sorting material types and forms into specified outflows for recycling processing.

### Large Volume Transfer/Processing Facility Surveys and Visits

Using information from CalRecycle's Solid Waste Information System (SWIS) and outflow data from CalRecycle's Recycling and Disposal Reporting System (RDRS), CalRecycle generated a list of 50 facilities that were permitted LVTP facilities with average quarterly potential reuse (AQPR) outflows of over 4,000 tons in 2022. In line with statute and to understand outcomes for the majority of materials collected and sorted for recycling statewide, this data collection prioritized the highest volume facilities among LVTP facilities statewide. The candidate facility list was developed from self-reported data in RDRS. If data was missing or misreported in RDRS, some high-volume LVTP facilities may be excluded from this candidate list.

CalRecycle developed phone and on-site surveys to collect information from LVTP facilities sorting recyclable materials (see Appendix 1, Section 1.5) ("2023 LVTP facility survey"). Questions covered topics including basic facility information, facility capacity, inflows and material origins, outflows and types of material aggregated for sale, and technologies deployed at the facility (see Appendix 1, Section 1.5 for a list of survey questions). Throughout the LVTP facilities survey data collection period (April 2023 through September 2023), CalRecycle staff made multiple attempts to contact each of the identified facilities. Out of 50 LVTP facilities, 37 facilities were responsive to phone surveys and 13 facilities opted not to participate in the survey or were not responsive. CalRecycle performed phone surveys with 37 LVTP facilities. Eight of the surveyed facilities did not perform material sorting activities on-site and were removed as facilities of interest. The surveyed facilities which do perform material sorting activities on-site serve counties that make up 93% of the state's population (see Appendix 1, Section 1.6). For data analysis purposes, CalRecycle treated the 93% of the population as representative of the state population. As such, "100% of counties served" means that CalRecycle has data supporting sortation by LVTP facilities that serve 93% of California's population and data was extrapolated for the remaining 7% of the population.

CalRecycle staff conducted more in-depth, in-person surveys with 24 of the 37 facilities, which included tours of the sorting activities and discussions on topics such as contamination, bale destinations and origins of processed material (see Appendix 1, Section 1.5). For each facility, information was gathered on the types of materials that were processed and aggregated for sale by LVTP facilities.

## Large Volume Transfer/Processing Facility Material Characterization Study

### LVTP Facilities Sampled

From the 37 surveyed LVTP facilities, 10 facilities were selected for sampling and sorting in August 2023, and an additional 13 were sampled in January and February 2024. LVTP facilities were classified by five regions (Central Valley, Coastal, Los Angeles and San Diego Basins, Mountain and San Francisco Bay Area) (see Figure 1 and Appendix 1, Section 1.6 for representative sampling of focal regions). Facilities were selected to maximize representative sampling by geography and population density.

The 23 facilities were distributed as follows among the regions of California:

1. Mountain – 1 facility
2. Central Valley – 4 facilities
3. San Francisco Bay Area – 5 facilities
4. Coastal – 3 facilities
5. Los Angeles and San Diego Basins – 10 facilities

**Figure 1. Map of Regions of California.**



**Sampling Logistics**

A contracted field team, with oversight from CalRecycle staff, conducted sampling and sorting at the 23 LVTP facilities. The contracted field staff and CalRecycle staff were on-site at each facility for two days. The contracted field team consisted of four to five individuals whose primary roles were sort crew lead, material sorters, and a photographer. They conducted the sample selection, collection, and hand-sorting of material. CalRecycle staff provided on the ground support, oversaw contractor work, communicated with facility managers, and performed visual characterizations of additional recyclable outflows that were not being hand-sorted.

Samples were collected from post-sort outflows, meaning that material would not undergo further processing at that facility. Sampled outflows were materials aggregated for sale or for further processing at another facility. Residual outflow destined for disposal was also sampled. Samples from these outflows were used to determine material sorting into specified outflows, described in the hand-sorted characterization and visual characterization sections.

**Figure 2. Excerpt from Contractor's Sampling Plan**

Material outflows were identified for collection within each facility with a description of how samples were collected from each outflow.

| 1. OCC | 2. Mixed Paper |
| --- | --- |
|  |  |
| Sorted material to be ejected from slide conveyor underneath storage container prior to baling | Sorted material to be ejected from slide conveyor underneath storage container prior to baling |

### Hand-Sorted Characterization

The contracted staff collected material from either loose or baled outflows prepared for sale or transfer by the facility and ensured that sampled material represented the outflows of the target facility. Each sample was measured out to a different weight depending on the material type (see Appendix 1, Section 2.3, Table F2 for further target sample weight details). The contractor determined that the target weight of each sample was representative of the composition of each outflow and supported by peer-reviewed scientific literature. Denser materials such as metal or glass consisted of 15- to 25-pound samples, while samples of low-density materials like cardboard or plastic weighed between 125 and 200 pounds. Each collected sample's weight (in pounds) was measured and recorded. The sorters spread out the collected sample on a sorting table with a grate, allowing for materials smaller than 2 inches to fall through; these materials are too small to be properly processed and sorted by the facility. Then the contracted field staff hand-sorted the remaining materials into 91 material subclasses based on material type and form (see Appendix 1, Section 1.7 for list) to a particle size of two inches until non-sortable fine material ("mixed residue") remained.

The sorters then weighed each material type and form sorted from each sample. The weight (in pounds) of the sorted material was recorded. Photos were taken of each sample before sorting, and throughout the sorting process. Raw data was collected through an application created by the contractor and subject to the application's built-in logic and error checking, and then subject to quality control and quality assurance measures. CalRecycle staff conducted statistical analysis on the collected information.

The contracted field team attempted to characterize a total of 20 samples per facility that included two samples from each 10 specific material type outflows selected (see Appendix 1, Section 2.3, Table F1 for a list of outflows sampled). Samples taken for hand-sorting prioritized outflows likely to contain heterogenous mixes of target items according to the defined material types and forms. Where appropriate to the content of the outflow, CalRecycle staff conducted visual characterizations of additional outflows of baled or piled post-sort material.

### Visual Characterization

CalRecycle field staff conducted a visual characterization of materials. The visual characterization process included taking photos of aggregated bales or bunkers to later identify rates of contamination within these outflows. For each site, two to four visual characterizations were conducted per outflow. Characterizations on the same material outflow were distinguished by sampled outflow number and subsample number. A 0.5m x 0.5m quadrat was placed flat on a bale surface as a guide outlining the bounds of each sample. An image of each sample was recorded digitally through encompassing the full quadrat and a placard identifying the site location, date, sample material, sampled outflow number, and sample number. The minimum pictures captured, if safe to do so, were a close-up straight on view, slightly offset to the right view, slightly offset

to the left view, and a distant straight on view showing multiple aggregates if applicable. Any noteworthy information about the outflow materials were discussed and noted with facility operators.

**Figure 3. A quadrat boundary for visual assessment for bales and other outflows.**



## Material Characterization Study

In total, 196 hand-sorted samples and 70 visually characterized samples were taken from 10 facilities in August 2023. In January and February 2024, 263 hand-sorted samples and 36 visually characterized samples were taken from an additional 13 facilities.

CalRecycle used field study sorting data to identify the average makeup of 32 outflow types across 23 LVTP facilities. This includes hand-sorted and visually characterized samples across five fiber outflows, five glass outflows, seven metal outflows, and 14 plastic outflows (see Appendix 1, Section 2.3, Table F1 for details on outflows sampled).

Results of the Material Characterization Study are presented in Table 3A-E.

Additional outflow volume was composed of many material types and forms at low volumes (each material type and form made up under 1% of total composition of each outflow); these are described in the report as rare or low-abundance material types and forms. In total there were 817 occurrences of rare material types and forms across 24 outflow types (see Appendix 1, Section 2.5 for list).

## Estimating Proportions of Material Types and Forms Sorted into Specified Outflows by LVTP Facilities

CalRecycle estimated the percentage of counties statewide served by LVTP facilities sorting each material type and form into specified outflows for recycling processing. Using survey and sorting data, CalRecycle staff estimated the percentages in terms of the proportion of the state's recycling programs (at the county level) served by those LVTP facilities.

Data from the sampling and sorting were used to determine whether material types and forms were predominantly ending up in specified outflows, meaning the materials were consistently sorted into outflows destined for sale or further processing. Facilities often describe outflows with terminology unique to their operations. Inclusive alignment of cross-facility outflow information may miss nuance in variation in outflow contents (e.g., PET container vs. PET bottle and container vs. PET; mixed rigid plastic vs. rigid opaque composite plastic).

Hand-sorting data and visual characterization data were used to:

1. Identify which outflows each material type and form was found in; and
2. Estimate the proportion of that material type and form that ends up aggregated for sale/processing compared to disposed of in a residual outflow.

To estimate the information above, criteria were established to identify when the presence of a material type and form in an outflow is acceptable or likely to be a contaminant. For example, plastic items were commonly found in specified outflows for metal and paper. The plastic items are likely a contaminant and not a target material for those specified outflows. To avoid counting a contaminant as material sorted into a specified outflow, the following criteria were developed:

1. High-level material class (paper/fiber, glass, metal, plastic, other/ mixed) for the material type and form must match the material class of the specified outflow.
2. Where applicable, material type and form material subclass (e.g., resin type for plastic, or type of metal) must match the material subclass of the specified outflow.
3. The proportion of the material type and form in a specified outflow at a given facility must exceed the average proportion of material type and form in the disposed of residual across all facilities study-wide.
4. The material type and form must be present in that specified outflow for at least two facilities within the study.

If any of these criteria were not met, the presence of that material type and form in the specified outflow was not considered sufficient evidence of valid sortation. These methods are most effective for items that are relatively common within their target

outflows. If a material type and form was relatively rare across samples within an outflow, or across all samples within a facility, a robust evaluation may not be possible within the study parameters. Further explorations of rare items are provided in Appendix 1 (Section 2.5 – 2.8).

Among the 29 phone-surveyed facilities that perform material sorting activities on-site, 27 facilities reported a comprehensive list of common outflows from sorting of curbside recyclables. Survey data indicated which of the 27 survey facilities had each specified outflow present (Appendix 1, Section 2.3, Table F1). The 32 unique sampled outflows were mapped to the 26 closest-match survey outflows. This was then combined with survey data on which jurisdictions (at the county level) each facility serves. This produced the list of counties served by facilities with specified outflows available for each material type and form. Material sorting into mixed-resin plastic outflows and mixed paper outflows was also analyzed separately, by outflow, as these items may undergo secondary sorting at facilities outside the study parameters (See Appendix 1, Section 2.4, Table G2 for details).

# Summary of Findings

The following findings are provided separately for each of the two data collection efforts: (1) Collection by Jurisdiction Residential Curbside Recycling Programs; and (2) Materials Sorted by LVTP facilities.

# Overview of Data/Tables by Data Collection Effort

## Survey of Collection by Jurisdiction Residential Curbside Recycling Programs

Jurisdiction Residential Curbside Recycling Program results were obtained through surveys answered either directly from a jurisdiction or by CalRecycle staff using online resources.

- Table 1: displays the estimated percentage of the California population with access to residential curbside recycling programs which accept each SB 343 material type and form.
- Appendix 1, Section 1.1, Table A1: displays the alignment of material subclasses accepted by jurisdictions with residential curbside recycling programs to the SB 343 Material Types and Forms List (see Appendix 1, Section 1.7 for additional information).
- Appendix 1, Section 1.2: displays the survey questions used to obtain information on materials collected by each jurisdiction's recycling program directly from each jurisdiction.
- Appendix 1, Section 1.3: displays CalRecycle's online research secondary survey questions that CalRecycle staff used to obtain information on materials collected by each jurisdiction.
- Appendix 1, Section 1.4: addresses material type and forms not reported in the local jurisdiction survey or the supplementary local jurisdiction internet research survey of this report that were previously assessed in SB 343 Preliminary Findings Report (DRRR-2023-1728).
- Appendix 1, Section 2.1, Table D1: displays the results of the jurisdiction survey by both the survey material categories and by SB 343 material types and forms.

- Appendix 1, Section 2.2, Table E1: displays the results of the SB 343 Preliminary Findings Report (DRRR-2023-1728) jurisdiction survey of selected SB 343 material types and forms to supplement the jurisdiction survey results in the main report.

## Materials Sorted by LVTP Facilities/Material Characterization Study

- Table 2: displays the count and proportion of counties with access to surveyed LVTP facilities which sort to viable outflows, for each material type and form.
- Table 3A – 3E: displays the composition percentage of a material type and form within a given outflow, as categorized by material class. Results derived from Material Characterization Studies performed at LVTP facilities (supplementary data: see Appendix 1, Section 2.4).
- Appendix 1, Section 1.5: displays the questions asked of LVTP facilities by CalRecycle staff via phone interviews.
- Appendix 1, Section 1.6: displays the designation of counties to a focal region.
- Appendix 1, Section 1.7: displays the sortation list generated for the Material Characterization Study. The list includes outflow material classes, material type and form codes, material type and form names, and material definitions and examples. Appendix 1, Section 1.7 also informs Appendix 1, Section 1.1 (SB 343 material type and form alignment to materials accepted by jurisdictions for residential curbside recycling programs).
- Appendix 1, Section 2.3, Table F1: displays all outflow names, the corresponding number of samples, and number of facilities sampled in the Material Characterization Study.
- Appendix 1, Section 2.3, Table F2: displays proposed sample weights for common outflows targeted by the contracted field team.
- Appendix 1, Section 2.4, Table G1 - G3: displays information on materials sorted by Large Volume Transfer/Processing facilities, with data analysis for inflow-scaled partial coverage of counties, and specified outflows.
- Appendix 1, Section 2.5, Table H1 - H5: displays material types and forms rarely observed, as defined as less than 1% of the outflow, during the Material Characterization Study.
- Appendix 1, Section 2.6, Table I1: displays exempted material types and forms and provides the rationale for their exclusion from the study.
- Appendix 1, Section 2.7, Table J1: displays all material types and forms that met criteria to be classified as “sorted for recycling” and were evaluated for county access to sorting in this study.

- Appendix 1, Section 2.7, Table J2: displays all material types and forms that failed to meet criteria to be classified as “sorted for recycling,” and the cause of exclusion. These material types and forms were not further assessed for county access to sorting in this study.
- Appendix 1, Section 2.8, Table K1: provides an example of sparse data for rare and light-weight items in target outflows.

# Collection by Jurisdiction Residential Curbside Recycling Programs

Table 1 indicates the results of the statewide jurisdiction survey which assessed residential curbside recycling program collection. Column one lists the material class (Fiber, Glass, Metal, Plastic, and Other). Column two lists the material type and form code. Column three lists the material type and form name. Column four lists the number of jurisdiction survey material categories that were combined for each material type and form result (see Appendix1, Section 2.1, Table D1 for details by each survey material type). Column five lists the estimated percentage of California’s population with access to residential curbside recycling collection for a given material type and form. Materials that were not addressed by this jurisdiction survey are marked with “not applicable” (“NA”) and are addressed separately within Appendix 1, Section 2.2, Table E1.

“NA” is applied to Remainder/Composite items which are not identifiable to the level of material type and form. “Subject to Another Program” (“SAP”) is applied to items subject to additional programs. This includes M09 (subject to section 48701 (h)(1)(A)); SP03 (includes items subject to Business and Professions Code (BPC) section 17580 (g)(1)(B)); and SP01 (subject to BPC 17580 (g)(1)(C)).

† This study included residential curbside programs utilizing a mixed waste (“one-bin”) system in which jurisdictions provide a single bin to collect all waste (solid waste, recycling, green waste, food waste). In jurisdictions utilizing a one-bin system, where material types and forms were not separated into a designated recycling container, materials beyond the parameters of this study were captured and included in Table 1 for comprehensiveness. Examples include Plant Material Food Service Ware (X08), Treated Wood (X09), and Green Material, Clean Wood, and Food Scraps (X10).

## Table 1. Percentage of Statewide Population with Access to a Residential Curbside Recycling Program Which Accepts SB 343 Material Types and Forms

| Material Class | MT&F Code | SB 343 Material Type and Form Name (MT&F) | Number of Jurisdiction Survey Material Types | Percent of Population with Collection Access |
|---|---|---|---|---|
| Fiber | F01 | Uncoated Corrugated Cardboard/ Old Corrugated Containers (OCC) | 1 | 99% |
| Fiber | F02 | White Office-Type Paper and Mail | 1 | 99% |
| Fiber | F03 | Newspapers/ Newspaper Inserts | 1 | 97% |
| Fiber | F04 | Magazines and Catalogs | 1 | 97% |
| Fiber | F05 | Paper Bags and Kraft Paper | 2 | 97% |
| Fiber | F06 | Folded Paper Containers and Other Paperboard Packaging | 1 | 98% |
| Fiber | F07 | Other Mixed Paper | 1 | 97% |
| Fiber | F08 | Clean Molded Paper Fiber | 1 | 94% |
| Fiber | F09 | Uncoated Fiber-Based Food Service Ware | 0 | NA |
| Fiber | F10 | Composite Food Service Paper and Packaging | 0 | NA |
| Fiber | F11 | Uncoated Soiled Fiber Products | 0 | NA |
| Fiber | F12 | Remainder/ Composite Fiber | 1 | 38% |
| Fiber | X01 | Gable-top Cartons/ Aseptics - CRV | 2 | 73% |
| Fiber | X02 | Gable-top Cartons - Non-CRV | 1 | 74% |
| Fiber | X03 | Aseptic Containers - Non-CRV | 1 | 72% |
| Glass | G01 | Glass Containers - Clear/ Flint - Non-CRV | 1 | 97% |
| Glass | G02 | Glass Beverage Containers - Clear/ Flint - CRV | 1 | 97% |
| Glass | G03 | Glass Containers - Green/ Emerald - Non-CRV | 1 | 97% |

| Material Class | MT&F Code | SB 343 Material Type and Form Name (MT&F) | Number of Jurisdiction Survey Material Types | Percent of Population with Collection Access |
|---|---|---|---|---|
| Glass | G04 | Glass Beverage Containers - Green/ Emerald – CRV | 1 | 97% |
| Glass | G05 | Glass Containers - Brown/ Amber - Non-CRV | 1 | 97% |
| Glass | G06 | Glass Beverage Containers - Brown/ Amber - CRV | 1 | 97% |
| Glass | G07 | Glass Containers - Other Colors - Non-CRV | 1 | 97% |
| Glass | G08 | Glass Beverage Containers - Other Colors - CRV | 1 | 97% |
| Glass | G09 | Remainder/ Composite Glass | 1 | 46% |
| Other | H01 | Household Hazardous Waste | 0 | NA |
| Metal | M01 | Aluminum Cans and Lids - Non-CRV | 1 | 96% |
| Metal | M02 | Aluminum Beverage Cans - CRV | 1 | 96% |
| Metal | M03 | Aluminum Bottles - Non-CRV | 1 | 96% |
| Metal | M04 | Aluminum Bottles for Beverages - CRV | 1 | 96% |
| Metal | M05 | Aluminum Foil (<3 mm), Sheets | 1 | 81% |
| Metal | M06 | Aluminum Foil (>3 mm), Molded Containers | 1 | 82% |
| Metal | M07 | Tin/Steel Cans, Lids - Non-CRV | 1 | 99% |
| Metal | M08 | Tin/Steel Beverage Containers - CRV | 1 | 99% |
| Metal | M09 | Tin/Steel Paint Cans | SAP | SAP |
| Metal | M10 | Tin/Steel or Aluminum Aerosol Containers | 2 | 71% |
| Metal | M11 | Metal Hazardous Waste: Used Oil Filters, Gas Cylinders | 0 | NA |
| Metal | M12 | Other Ferrous Metal | 2 | 77% |
| Metal | M13 | Other Non-Ferrous Metal | 2 | 78% |
| Metal | M14 | Remainder/ Composite Metal | 0 | NA |
| Other | T01 | Textiles and Clothing | 2 | 19% |

| Material Class | MT&F Code | SB 343 Material Type and Form Name (MT&F) | Number of Jurisdiction Survey Material Types | Percent of Population with Collection Access |
|---|---|---|---|---|
| Other | X04 | Mailing Pouches & Shipping Envelopes | 1 | 29% |
| Other | X05 | Other Multi-Material Laminate Single-Use | 2 | 35% |
| Other | X06 | Single-Use Ceramic Packaging | 1 | 7% |
| Other | X08 | Plant Material Food Service Ware[†] | 1 | 37% |
| Other | X09 | Treated Wood[†] | 1 | 7% |
| Other | X10 | Green Material, Clean Wood, and Food Scraps[†] | 2 | 40% |
| Other | X13 | Fines and Residuals | 6 | 46% |
| Plastic | PL01 | PET Clear Bottles - Non-CRV | 1 | 99% |
| Plastic | PL02 | PET Clear Beverage Bottles - CRV | 1 | 99% |
| Plastic | PL03 | PET Pigmented Bottles - Non-CRV | 1 | 96% |
| Plastic | PL04 | PET Pigmented Beverage Bottles - CRV | 1 | 96% |
| Plastic | PL05 | PET Thermoformed Clamshells and Containers | 1 | 88% |
| Plastic | PL06 | Other PET Clear Single-Use Rigids | 3 | 91% |
| Plastic | PL07 | Other PET Pigmented Single-Use Rigids | 3 | 90% |
| Plastic | PL08 | PET Multi-Use Rigids | 1 | 85% |
| Plastic | PL09 | HDPE Clear Beverage Bottles - Non-CRV | 1 | 99% |
| Plastic | PL10 | HDPE Clear Beverage Bottles - CRV | 1 | 99% |
| Plastic | PL11 | HDPE Buckets: Food | 1 | 88% |
| Plastic | PL12 | HDPE Buckets: Non-Food | 1 | 88% |
| Plastic | PL13 | Other HDPE Clear Single-Use Rigids | 3 | 92% |
| Plastic | PL14 | HDPE Pigmented Single-Use Rigids | 3 | 92% |
| Plastic | PL15 | Other HDPE Multi-Use Rigids | 1 | 88% |
| Plastic | PL16 | PVC Single-Use Rigids | 1 | 52% |
| Plastic | PL17 | PVC Multi-Use | 1 | 52% |

| Material Class | MT&F Code | SB 343 Material Type and Form Name (MT&F) | Number of Jurisdiction Survey Material Types | Percent of Population with Collection Access |
|---|---|---|---|---|
| Plastic | PL18 | LDPE Clear Beverage Bottles | 1 | 75% |
| Plastic | PL19 | LDPE Clear Single-Use Rigids | 2 | 73% |
| Plastic | PL20 | LDPE Pigmented Single-Use Rigids | 2 | 73% |
| Plastic | PL21 | LDPE Multi-Use | 1 | 70% |
| Plastic | PL22 | PP Clear Single-Use Rigids | 4 | 78% |
| Plastic | PL23 | PP Pigmented Single-Use Rigids | 4 | 78% |
| Plastic | PL24 | PP Multi-Use | 0 | NA |
| Plastic | PL25 | PS Thermoformed Clamshells and Containers | 1 | 40% |
| Plastic | PL26 | PS Densified: Single-Use Food Service Ware | 2 | 37% |
| Plastic | PL27 | PS Expanded - Packaging | 2 | 35% |
| Plastic | PL28 | PS Expanded - Food Service Ware | 1 | 35% |
| Plastic | PL29 | PS Densified: Multi-Use | 1 | 40% |
| Plastic | PL30 | Other (7) Single-Use Rigids | 2 | 38% |
| Plastic | PL31 | Plastic Wine Bladders | 1 | 26% |
| Plastic | PL32 | Films - Plastic Bags - Compostable | 2 | 23% |
| Plastic | PL33 | Films - Plastic Bags - Designed for Reuse | 7 | 28% |
| Plastic | PL34 | Films - Plastic Non-Bags - Agricultural and Commercial | 9 | 29% |
| Plastic | PL35 | Films - Plastic Non-Bags - Other Film | 9 | 29% |
| Plastic | PL36 | Films - Plastic Bags - Designed for Disposal | 7 | 28% |
| Plastic | PL37 | Unknown Plastic Type or Mixture of Multiple Plastic Resins (Single-Use) | 2 | 38% |
| Plastic | PL38 | Mixed Plastic Multi-Use | 1 | 51% |
| Plastic | PL39 | Remainder/ Composite Plastic | 0 | NA |

| Material Class | MT&F Code | SB 343 Material Type and Form Name (MT&F) | Number of Jurisdiction Survey Material Types | Percent of Population with Collection Access |
|---|---|---|---|---|
| Other | SP01 | Tires | SAP | SAP |
| Other | SP02 | Bulky Items | 0 | NA |
| Other | SP03 | Mattresses and Foundations | SAP | SAP |
| Other | X11 | Mixed Material Single-Use | 0 | NA |
| Other | X12 | Remainder/ Composite Mixed Material Multi-Use | 0 | NA |

# Materials Sorted by Large Volume Transfer/Processing Facilities

Data gathered for this study is organized by those material types and forms sorted to each outflow. Supplementary data explores the impact of sorting to specified outflows (Appendix 1, Section 2.4, Table G1) and to mixed material outflows (Appendix 1, Section 2.4, Table G2), as well as inflow-scaled sorting for all outflows (Appendix 1, Section 2.4, Table G3). Surveyed facilities serve 34 of 58 counties statewide, and the populations of those counties make up 93% of the statewide population.

Table 2 displays the proportion of counties served by the surveyed LVTP facilities, with sorting of each material type and form by solid waste inflow tonnage. The first three columns describe the material type and form by unique material type and form code, SB 343 material type and form name, and material type and form class (Glass, Metal, Fiber, Plastic, and Other), respectively. The fourth and fifth columns show the count and percentage of counties served by surveyed LVTP facilities that sort that material type and form into outflows. Columns four and five assume that partial coverage of a county (at least one facility sorting each material type and form to a validated outflow) is equivalent to complete coverage of a county. Rows with a value of zero for counties served indicate material types and forms for which there was insufficient evidence of effective sorting to specified outflows within this study (see Appendix 1, Section 2.5; Appendix 1, Section 2.6; and Appendix 1, Section 2.7 for details).

“NA” is applied to Remainder/Composite items; Remainder/Composite categories are not identifiable to the level of material type and form. “SAP” is applied to items subject to additional programs. This includes M09 (subject to section

48701 (h)(1)(A)); SP03 (includes items subject to Business and Professions Code (BPC) 17580 (g)(1)(B)); SP01 (subject to BPC 17580 (g)(1)(C)); G02, G04, G06, G08, M02, M04, M08, PL02, PL04, PL10, X01 (subject to Division 12.1 of the PRC).

‡ This study included LVTP facilities that received waste through mixed waste ("one-bin") systems in which the residential curbside service providers utilize a single bin to collect all waste (solid waste, recycling, green waste, food waste). One-bin waste systems included materials, such as Plant Material Food Service Ware (X08), Treated Wood (X09), and Green Material, Clean Wood, and Food Scraps (X10), which are materials beyond the parameters of this study. These materials were not sorted into defined streams for recycling at the sampled LVTP facilities but were included in Table 2 for comprehensiveness.

## Table 2. Sorting of Material Types and Forms to All Outflows, by Counties Served by Surveyed LVTP Facilities

| MT&F Code | Material Type and Form (MT&F) | MT&F Class | Count of Counties Served | Percent of Counties Served |
|---|---|---|---|---|
| F01 | Uncoated Corrugated Cardboard/ Old Corrugated Containers (OCC) | Fiber | 34 | 100 |
| F02 | White Office-Type Paper and Mail | Fiber | 33 | 97 |
| F03 | Newspapers/ Newspaper Inserts | Fiber | 32 | 94 |
| F04 | Magazines and Catalogs | Fiber | 32 | 94 |
| F05 | Paper Bags and Kraft Paper | Fiber | 32 | 94 |
| F06 | Folded Paper Containers and Other Paperboard Packaging | Fiber | 32 | 94 |
| F07 | Other Mixed Paper | Fiber | 32 | 94 |
| F08 | Clean Molded Paper Fiber | Fiber | 0 | 0 |
| F09 | Uncoated Fiber-Based Food Service Ware | Fiber | 0 | 0 |
| F10 | Composite Food Service Paper and Packaging | Fiber | 0 | 0 |

| MT&F Code | Material Type and Form (MT&F) | MT&F Class | Count of Counties Served | Percent of Counties Served |
|---|---|---|---|---|
| F11 | Uncoated Soiled Fiber Products | Fiber | 0 | 0 |
| F12 | Remainder/ Composite Fiber | Fiber | NA | NA |
| G01 | Glass Containers - Clear/ Flint - Non-CRV | Glass | 34 | 100 |
| G02 | Glass Beverage Containers - Clear/Flint - CRV | Glass | SAP | SAP |
| G03 | Glass Containers - Green/ Emerald - Non-CRV | Glass | 34 | 100 |
| G04 | Glass Beverage Containers - Green/Emerald – CRV | Glass | SAP | SAP |
| G05 | Glass Containers - Brown/Amber - Non-CRV | Glass | 34 | 100 |
| G06 | Glass Beverage Containers - Brown/Amber - CRV | Glass | SAP | SAP |
| G07 | Glass Containers - Other Colors - Non-CRV | Glass | 34 | 100 |
| G08 | Glass Beverage Containers - Other Colors - CRV | Glass | SAP | SAP |
| G09 | Remainder/ Composite Glass | Glass | NA | NA |
| H01 | Household Hazardous Waste | Other | 0 | 0 |
| M01 | Aluminum Cans and Lids - Non-CRV | Metal | 27 | 79 |
| M02 | Aluminum Beverage Cans - CRV | Metal | SAP | SAP |
| M03 | Aluminum Bottles - Non-CRV | Metal | 27 | 79 |
| M04 | Aluminum Bottles for Beverages - CRV | Metal | SAP | SAP |
| M05 | Aluminum Foil (<3 mm), Sheets | Metal | 27 | 79 |
| M06 | Aluminum Foil (>3 mm), Molded Containers | Metal | 27 | 79 |
| M07 | Tin/Steel Cans, Lids - Non-CRV | Metal | 34 | 100 |
| M08 | Tin/Steel Beverage Containers - CRV | Metal | SAP | SAP |
| M09 | Tin/Steel Paint Cans | Metal | SAP | SAP |
| M10 | Tin/Steel or Aluminum Aerosol Containers | Metal | 34 | 100 |
| M11 | Metal Hazardous Waste: Used Oil Filters, Gas Cylinders | Metal | 0 | 0 |

| MT&F Code | Material Type and Form (MT&F) | MT&F Class | Count of Counties Served | Percent of Counties Served |
|---|---|---|---|---|
| M12 | Other Ferrous Metal | Metal | 25 | 74 |
| M13 | Other Non-Ferrous Metal | Metal | 25 | 74 |
| M14 | Remainder/ Composite Metal | Metal | NA | NA |
| PL01 | PET Clear Bottles - Non-CRV | Plastic | 34 | 100 |
| PL02 | PET Clear Beverage Bottles - CRV | Plastic | SAP | SAP |
| PL03 | PET Pigmented Bottles - Non-CRV | Plastic | 34 | 100 |
| PL04 | PET Pigmented Beverage Bottles - CRV | Plastic | SAP | SAP |
| PL05 | PET Thermoformed Clamshells and Containers | Plastic | 34 | 100 |
| PL06 | Other PET Clear Single-Use Rigids | Plastic | 34 | 100 |
| PL07 | Other PET Pigmented Single-Use Rigids | Plastic | 34 | 100 |
| PL08 | PET Multi-Use Rigids | Plastic | 0 | 0 |
| PL09 | HDPE Clear Beverage Bottles - Non-CRV | Plastic | 34 | 100 |
| PL10 | HDPE Clear Beverage Bottles - CRV | Plastic | SAP | SAP |
| PL11 | HDPE Buckets: Food | Plastic | 34 | 100 |
| PL12 | HDPE Buckets: Non-Food | Plastic | 34 | 100 |
| PL13 | Other HDPE Clear Single-Use Rigids | Plastic | 34 | 100 |
| PL14 | HDPE Pigmented Single-Use Rigids | Plastic | 34 | 100 |
| PL15 | Other HDPE Multi-Use Rigids | Plastic | 34 | 100 |
| PL16 | PVC Single-Use Rigids | Plastic | 0 | 0 |
| PL17 | PVC Multi-Use | Plastic | 0 | 0 |
| PL18 | LDPE Clear Beverage Bottles | Plastic | 0 | 0 |
| PL19 | LDPE Clear Single-Use Rigids | Plastic | 15 | 44 |
| PL20 | LDPE Pigmented Single-Use Rigids | Plastic | 0 | 0 |
| PL21 | LDPE Multi-Use | Plastic | 34 | 100 |

| MT&F Code | Material Type and Form (MT&F) | MT&F Class | Count of Counties Served | Percent of Counties Served |
|---|---|---|---|---|
| PL22 | PP Clear Single-Use Rigids | Plastic | 32 | 94 |
| PL23 | PP Pigmented Single-Use Rigids | Plastic | 34 | 100 |
| PL24 | PP Multi-Use | Plastic | 34 | 100 |
| PL25 | PS Thermoformed Clamshells and Containers | Plastic | 0 | 0 |
| PL26 | PS Densified: Single-Use Food Service Ware | Plastic | 0 | 0 |
| PL27 | PS Expanded – Packaging | Plastic | 0 | 0 |
| PL28 | PS Expanded - Food Service Ware | Plastic | 0 | 0 |
| PL29 | PS Densified: Multi-Use | Plastic | 0 | 0 |
| PL30 | Other (7) Single-Use Rigids | Plastic | 15 | 44 |
| PL31 | Plastic Wine Bladders | Plastic | SAP | SAP |
| PL32 | Films - Plastic Bags - Compostable | Plastic | 0 | 0 |
| PL33 | Films - Plastic Bags - Designed for Reuse | Plastic | 0 | 0 |
| PL34 | Films - Plastic Non-Bags - Agricultural and Commercial | Plastic | 0 | 0 |
| PL35 | Films - Plastic Non-Bags - Other Film | Plastic | 0 | 0 |
| PL36 | Films - Plastic Bags - Designed for Disposal | Plastic | 19 | 56 |
| PL37 | Unknown Plastic Type or Mixture of Multiple Plastic Resins (Single-Use) | Plastic | 34 | 100 |
| PL38 | Mixed Plastic Multi-Use | Plastic | 34 | 100 |
| PL39 | Remainder/ Composite Plastic | Plastic | NA | NA |
| SP01 | Tires | Other | SAP | SAP |
| SP02 | Bulky Items | Other | 0 | 0 |
| SP03 | Mattresses and Foundations | Other | SAP | SAP |
| T01 | Textiles and Clothing | Other | 0 | 0 |

| MT&F Code | Material Type and Form (MT&F) | MT&F Class | Count of Counties Served | Percent of Counties Served |
|---|---|---|---|---|
| X01 | Gable-top Cartons/ Aseptics - CRV | Fiber | SAP | SAP |
| X02 | Gable-top Cartons - Non-CRV | Fiber | 16 | 47 |
| X03 | Aseptic Containers - Non-CRV | Fiber | 16 | 47 |
| X04 | Mailing Pouches and Shipping Envelopes | Other | 0 | 0 |
| X05 | Other Multi-Material Laminate Single-Use | Other | 0 | 0 |
| X06 | Single-Use Ceramic Packaging | Other | 0 | 0 |
| X08 | Plant Material Food Service Ware‡ | Other | 0 | 0 |
| X09 | Treated Wood‡ | Other | 0 | 0 |
| X10 | Green Material, Clean Wood, and Food Scraps‡ | Other | 0 | 0 |
| X11 | Mixed Material Single-Use | Other | 0 | 0 |
| X12 | Remainder/ Composite Mixed Material Multi-Use | Other | NA | NA |
| X13 | Fines and Residuals | Other | NA | NA |

# Material Characterization Study at Large Volume Transfer/Processing Facilities

The following tables display the makeup of each characterized fiber, glass, metal, plastic, or residual outflow by material type and form. For ease of reading, tables are categorized by outflow material class: fiber (Table 3A), glass (Table 3B), metal (Table 3C), plastic (Table 3D), and residual (Table 3E). The residual outflows are samples from material aggregated at the end of the sorting process, destined for disposal. The first column of each table indicates the outflow name, and the second column indicates the total number of samples (hand-sort and visual characterization) of each outflow. Columns three through five describe the material type and form class, SB 343 material type and form name, and material type and form code, respectively. Column six indicates the mean percent composition of the outflow made up by each material type and form, and column seven indicates the standard deviation (SD). All rows with “NA” in the standard deviation column indicate that the material type and form occurred in only one sample of the relevant outflow. A related table of rare material types and forms in each outflow (<1% composition) is provided in Appendix 1, Section 2.5, Tables H1 - H5.

## Table 3A. Material Characterization of Fiber Outflows

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Gable-top Carton and Aseptic Containers | 15 | Fiber | Gable-top Cartons - Non-CRV | X02 | 67% | 25% |
| | | Fiber | Aseptic Containers - Non-CRV | X03 | 30% | 24% |
| Gable-top Carton and Aseptic Containers | 15 | NA | Other (rare items < 1% each) | NA | 3% | NA |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| OCC | 31 | Fiber | Uncoated Corrugated Cardboard/ Old Corrugated Containers (OCC) | F01 | 91% | 7% |
| | | Fiber | Folded Paper Containers and Other Paperboard Packaging | F06 | 3% | 3% |
| | | Fiber | Other Mixed Paper | F07 | 1% | 3% |
| | | NA | Other (rare items < 1% each) | NA | 6% | NA |
| ONP and Mixed Paper | 44 | Fiber | Uncoated Corrugated Cardboard/ Old Corrugated Containers (OCC) | F01 | 29% | 16% |
| | | Fiber | Other Mixed Paper | F07 | 13% | 11% |
| | | Fiber | White Office-Type Paper and Mail | F02 | 10% | 11% |
| | | Fiber | Folded Paper Containers and Other Paperboard Packaging | F06 | 10% | 4% |
| ONP and Mixed Paper | 44 | Fiber | Newspapers/ Newspaper Inserts | F03 | 9% | 7% |
| | | Fiber | Magazines and Catalogs | F04 | 8% | 5% |
| | | Fiber | Composite Food Service Paper and Packaging | F10 | 4% | 4% |
| | | Fiber | Paper Bags and Kraft Paper | F05 | 2% | 2% |
| | | Fiber | Remainder/ Composite Fiber | F12 | 2% | 2% |
| | | Fiber | Uncoated Soiled Fiber Products | F11 | 2% | 2% |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| | | Other | Remainder/ Composite Mixed Material Multi-Use | X12 | 1% | 2% |
| | | NA | Other (rare items < 1% each) | NA | 9% | NA |
| Shredded Paper | 1 | Fiber | White Office-Type Paper and Mail | F02 | 100% | NA |
| White Office Paper | 3 | Fiber | White Office-Type Paper and Mail | F02 | 100% | 0% |

## Table 3B. Material Characterization of Glass Outflows

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Glass - Brown/Amber | 1 | Glass | Glass Beverage Containers - Brown/Amber - CRV | G06 | 57% | NA |
| Glass - Brown/Amber | 1 | Glass | Glass Containers - Brown/ Amber - Non-CRV | G05 | 23% | NA |
| Glass - Brown/Amber | 1 | Glass | Glass Containers - Clear/ Flint - Non-CRV | G01 | 8% | NA |
| Glass - Brown/Amber | 1 | Glass | Remainder/ Composite Glass | G09 | 3% | NA |
| Glass - Brown/Amber | 1 | Plastic | Films - Plastic Bags - Designed for Disposal | PL36 | 2% | NA |
| Glass - Brown/Amber | 1 | Plastic | PP Pigmented Single-Use Rigids | PL23 | 1% | NA |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Glass - Brown/Amber | 1 | Fiber | Other Mixed Paper | F07 | 1% | NA |
| Glass - Brown/Amber | 1 | Plastic | Remainder/ Composite Plastic | PL39 | 1% | NA |
| Glass - Brown/Amber | 1 | Fiber | Remainder/ Composite Fiber | F12 | 1% | NA |
| Glass - Brown/Amber | 1 | NA | Other (rare items < 1% each) | NA | 2% | NA |
| Glass - Clear/Flint | 1 | Glass | Glass Beverage Containers - Clear/Flint - CRV | G02 | 65% | NA |
| Glass - Clear/Flint | 1 | Glass | Remainder/ Composite Glass | G09 | 15% | NA |
| Glass - Clear/Flint | 1 | Glass | Glass Containers - Clear/ Flint - Non-CRV | G01 | 7% | NA |
| Glass - Clear/Flint | 1 | Glass | Glass Containers - Green/ Emerald - Non-CRV | G03 | 3% | NA |
| Glass - Clear/Flint | 1 | Metal | Tin/Steel Cans, Lids - Non-CRV | M07 | 2% | NA |
| Glass - Clear/Flint | 1 | Plastic | Films - Plastic Bags - Designed for Disposal | PL36 | 2% | NA |
| Glass - Clear/Flint | 1 | Plastic | PET Clear Beverage Bottles - CRV | PL02 | 2% | NA |
| Glass - Clear/Flint | 1 | Plastic | Films - Plastic Non-Bags - Other Film | PL35 | 1% | NA |
| Glass - Clear/Flint | 1 | NA | Other (rare items < 1% each) | NA | 4% | NA |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Glass - Green/Emerald | 1 | Glass | Glass Beverage Containers - Green/Emerald - CRV | G04 | 31% | NA |
| Glass - Green/Emerald | 1 | Glass | Glass Containers - Green/ Emerald - Non-CRV | G03 | 28% | NA |
| Glass - Green/Emerald | 1 | Glass | Glass Beverage Containers - Brown/Amber - CRV | G06 | 17% | NA |
| Glass - Green/Emerald | 1 | Glass | Glass Containers - Brown/ Amber - Non-CRV | G05 | 8% | NA |
| Glass - Green/Emerald | 1 | Glass | Glass Containers - Clear/ Flint - Non-CRV | G01 | 5% | NA |
| Glass - Green/Emerald | 1 | Glass | Glass Beverage Containers - Clear/Flint - CRV | G02 | 4% | NA |
| Glass - Green/Emerald | 1 | Glass | Remainder/ Composite Glass | G09 | 3% | NA |
| Glass - Green/Emerald | 1 | Plastic | Films - Plastic Bags - Designed for Disposal | PL36 | 2% | NA |
| Glass - Green/Emerald | 1 | Fiber | Remainder/ Composite Fiber | F12 | 1% | NA |
| Glass - Green/Emerald | 1 | NA | Other (rare items < 1% each) | NA | 2% | NA |
| Glass Fines | 2 | Glass | Remainder/ Composite Glass | G09 | 100% | 0% |
| Mixed Glass | 39 | Glass | Remainder/ Composite Glass | G09 | 43% | 29% |
| Mixed Glass | 39 | Other | Fines and Residuals | X13 | 20% | 26% |
| Mixed Glass | 39 | Glass | Glass Containers - Green/ Emerald - Non-CRV | G03 | 6% | 12% |
| Mixed Glass | 39 | Fiber | Remainder/ Composite Fiber | F12 | 5% | 11% |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Mixed Glass | 39 | Fiber | Other Mixed Paper | F07 | 5% | 14% |
| Mixed Glass | 39 | Glass | Glass Containers - Clear/ Flint - Non-CRV | G01 | 5% | 9% |
| Mixed Glass | 39 | Other | Green Material, Clean Wood, and Food Scraps | X10 | 4% | 4% |
| Mixed Glass | 39 | Glass | Glass Containers - Brown/ Amber - Non-CRV | G05 | 2% | 4% |
| Mixed Glass | 39 | Glass | Glass Containers - Other Colors - Non-CRV | G07 | 1% | 3% |
| Mixed Glass | 39 | Other | Mixed Material Single-Use | X11 | 1% | 2% |
| Mixed Glass | 39 | NA | Other (rare items < 1% each) | NA | 8% | NA |

## Table 3C. Material Characterization of Metal Outflows

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Aluminum - UBC | 25 | Metal | Aluminum Beverage Cans - CRV | M02 | 94% | 1% |
| Aluminum - UBC | 25 | Plastic | PS Thermoformed Clamshells and Containers | PL25 | 3% | 18% |
| Aluminum - UBC | 25 | NA | Other (rare items < 1% each) | NA | 3% | NA |
| Aluminum – Other | 11 | Metal | Aluminum Foil (>3 mm), Molded Containers | M06 | 38% | 27% |
| Aluminum – Other | 11 | Metal | Aluminum Cans and Lids - Non-CRV | M01 | 21% | 20% |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Aluminum – Other | 11 | Metal | Tin/Steel or Aluminum Aerosol Containers | M10 | 12% | 10% |
| Aluminum – Other | 11 | Metal | Aluminum Foil (<3 mm), Sheets | M05 | 8% | 7% |
| Aluminum – Other | 11 | Metal | Other Non-Ferrous Metal | M13 | 5% | 8% |
| Aluminum – Other | 11 | Metal | Tin/Steel Cans, Lids - Non-CRV | M07 | 4% | 3% |
| Aluminum – Other | 11 | Metal | Aluminum Beverage Cans - CRV | M02 | 2% | 5% |
| Aluminum – Other | 11 | Metal | Aluminum Bottles - Non-CRV | M03 | 2% | 3% |
| Aluminum – Other | 11 | Metal | Aluminum Bottles for Beverages - CRV | M04 | 2% | 3% |
| Aluminum – Other | 11 | Other | Fines and Residuals | X13 | 2% | 2% |
| Aluminum – Other | 11 | NA | Other (rare items < 1% each) | NA | 3% | NA |
| Copper | 2 | Metal | Other Non-Ferrous Metal | M13 | 100% | 0% |
| Mixed Metal - Ferrous - Steel/ Tin Cans | 30 | Metal | Tin/Steel Cans, Lids - Non-CRV | M07 | 63% | 22% |
| Mixed Metal - Ferrous - Steel/ Tin Cans | 30 | Metal | Other Ferrous Metal | M12 | 15% | 12% |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Mixed Metal - Ferrous - Steel/ Tin Cans | 30 | Metal | Tin/Steel or Aluminum Aerosol Containers | M10 | 7% | 4% |
| Mixed Metal - Ferrous - Steel/ Tin Cans | 30 | Metal | Remainder/ Composite Metal | M14 | 4% | 8% |
| Mixed Metal - Ferrous - Steel/ Tin Cans | 30 | Metal | Tin/Steel Paint Cans | M09 | 2% | 12% |
| Mixed Metal - Ferrous - Steel/ Tin Cans | 30 | Other | Remainder/ Composite Mixed Material Multi-Use | X12 | 2% | 5% |
| Mixed Metal - Ferrous - Steel/ Tin Cans | 30 | Other | Green Material, Clean Wood, and Food Scraps | X10 | 1% | 4% |
| Mixed Metal - Ferrous - Steel/ Tin Cans | 30 | Metal | Other Non-Ferrous Metal | M13 | 1% | 2% |
| Mixed Metal - Ferrous - Steel/ Tin Cans | 30 | NA | Other (rare items < 1% each) | NA | 5% | NA |
| Mixed Metal - Large | 19 | Metal | Other Ferrous Metal | M12 | 64% | 26% |
| Mixed Metal - Large | 19 | Metal | Remainder/ Composite Metal | M14 | 22% | 23% |
| Mixed Metal - Large | 19 | Metal | Other Non-Ferrous Metal | M13 | 5% | 10% |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Mixed Metal - Large | 19 | Other | Remainder/ Composite Mixed Material Multi-Use | X12 | 4% | 10% |
| Mixed Metal - Large | 19 | Other | Household Hazardous Waste | H01 | 2% | 5% |
| Mixed Metal - Large | 19 | Metal | Tin/Steel Cans, Lids - Non-CRV | M07 | 1% | 2% |
| Mixed Metal - Large | 19 | NA | Other (rare items < 1% each) | NA | 2% | NA |
| Mixed Metal - Non-Ferrous | 38 | Metal | Aluminum Cans and Lids - Non-CRV | M01 | 25% | 23% |
| Mixed Metal - Non-Ferrous | 38 | Metal | Aluminum Foil (>3 mm), Molded Containers | M06 | 21% | 24% |
| Mixed Metal - Non-Ferrous | 38 | Metal | Aluminum Beverage Cans - CRV | M02 | 20% | 34% |
| Mixed Metal - Non-Ferrous | 38 | Metal | Tin/Steel or Aluminum Aerosol Containers | M10 | 8% | 15% |
| Mixed Metal - Non-Ferrous | 38 | Metal | Other Ferrous Metal | M12 | 6% | 13% |
| Mixed Metal - Non-Ferrous | 38 | Metal | Other Non-Ferrous Metal | M13 | 4% | 12% |
| Mixed Metal - Non-Ferrous | 38 | Metal | Tin/Steel Cans, Lids - Non-CRV | M07 | 3% | 9% |
| Mixed Metal - Non-Ferrous | 38 | Metal | Remainder/ Composite Metal | M14 | 3% | 6% |
| Mixed Metal - Non-Ferrous | 38 | Metal | Aluminum Foil (<3 mm), Sheets | M05 | 2% | 3% |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Mixed Metal - Non-Ferrous | 38 | Metal | Aluminum Bottles for Beverages - CRV | M04 | 1% | 2% |
| Mixed Metal - Non-Ferrous | 38 | Other | Remainder/ Composite Mixed Material Multi-Use | X12 | 1% | 3% |
| Mixed Metal - Non-Ferrous | 38 | NA | Other (rare items < 1% each) | NA | 5% | NA |
| Mixed Metal - Small | 6 | Metal | Other Ferrous Metal | M12 | 40% | 15% |
| Mixed Metal - Small | 6 | Metal | Remainder/ Composite Metal | M14 | 20% | 25% |
| Mixed Metal - Small | 6 | Metal | Tin/Steel Cans, Lids - Non-CRV | M07 | 14% | 7% |
| Mixed Metal - Small | 6 | Other | Fines and Residuals | X13 | 11% | 16% |
| Mixed Metal - Small | 6 | Metal | Other Non-Ferrous Metal | M13 | 10% | 13% |
| Mixed Metal - Small | 6 | Other | Household Hazardous Waste | H01 | 1% | 2% |
| Mixed Metal - Small | 6 | Other | Remainder/ Composite Mixed Material Multi-Use | X12 | 1% | 2% |
| Mixed Metal - Small | 6 | NA | Other (rare items < 1% each) | NA | 3% | NA |
| Mixed Metal - Small Ferrous | 11 | Metal | Tin/Steel Cans, Lids - Non-CRV | M07 | 60% | 16% |
| Mixed Metal - Small Ferrous | 11 | Metal | Other Ferrous Metal | M12 | 21% | 11% |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Mixed Metal - Small Ferrous | 11 | Other | Remainder/ Composite Mixed Material Multi-Use | X12 | 5% | 7% |
| Mixed Metal - Small Ferrous | 11 | Metal | Tin/Steel or Aluminum Aerosol Containers | M10 | 4% | 3% |
| Mixed Metal - Small Ferrous | 11 | Other | Mixed Material Single-Use | X11 | 2% | 3% |
| Mixed Metal - Small Ferrous | 11 | Metal | Tin/Steel Paint Cans | M09 | 2% | 4% |
| Mixed Metal - Small Ferrous | 11 | NA | Other (rare items < 1% each) | NA | 7% | NA |

## Table 3D. Material Characterization of Plastic Outflows

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Expanded Polystyrene #6 | 1 | Plastic | PS Expanded - Packaging | PL27 | 100% | NA |
| HDPE Mixed Bottle and Container | 2 | Plastic | HDPE Pigmented Single-Use Rigids | PL14 | 45% | 2% |
| HDPE Mixed Bottle and Container | 2 | Plastic | HDPE Clear Beverage Bottles - Non-CRV | PL09 | 44% | 0% |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| HDPE Mixed Bottle and Container | 2 | Plastic | HDPE Buckets: Non-Food | PL12 | 2% | 2% |
| HDPE Mixed Bottle and Container | 2 | Other | Mixed Material Single-Use | X11 | 1% | 1% |
| HDPE Mixed Bottle and Container | 2 | Plastic | PP Pigmented Single-Use Rigids | PL23 | 1% | 0% |
| HDPE Mixed Bottle and Container | 2 | Plastic | PP Clear Single-Use Rigids | PL22 | 1% | 1% |
| HDPE Mixed Bottle and Container | 2 | NA | Other (rare items < 1% each) | NA | 5% | NA |
| HDPE Natural Bottle and Container | 30 | Plastic | HDPE Clear Beverage Bottles - Non-CRV | PL09 | 56% | 23% |
| HDPE Natural Bottle and Container | 30 | Plastic | Other HDPE Clear Single-Use Rigids | PL13 | 24% | 12% |
| HDPE Natural Bottle and Container | 30 | Plastic | HDPE Pigmented Single-Use Rigids | PL14 | 9% | 18% |
| HDPE Natural Bottle and Container | 30 | Plastic | HDPE Clear Beverage Bottles - CRV | PL10 | 6% | 6% |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| HDPE Natural Bottle and Container | 30 | NA | Other (rare items < 1% each) | NA | 5% | NA |
| HDPE Pigmented Bottle and Container | 32 | Plastic | HDPE Pigmented Single-Use Rigids | PL14 | 76% | 16% |
| HDPE Pigmented Bottle and Container | 32 | Plastic | Other HDPE Clear Single-Use Rigids | PL13 | 12% | 12% |
| HDPE Pigmented Bottle and Container | 32 | Plastic | HDPE Clear Beverage Bottles - Non-CRV | PL09 | 2% | 3% |
| HDPE Pigmented Bottle and Container | 32 | NA | Other (rare items < 1% each) | NA | 10% | NA |
| Mixed Rigid Plastic | 38 | Plastic | Other HDPE Multi-Use Rigids | PL15 | 24% | 23% |
| Mixed Rigid Plastic | 38 | Plastic | Mixed Plastic Multi-Use | PL38 | 22% | 21% |
| Mixed Rigid Plastic | 38 | Plastic | HDPE Buckets: Non-Food | PL12 | 14% | 11% |
| Mixed Rigid Plastic | 38 | Plastic | PP Multi-Use | PL24 | 14% | 8% |
| Mixed Rigid Plastic | 38 | Plastic | HDPE Buckets: Food | PL11 | 4% | 6% |
| Mixed Rigid Plastic | 38 | Plastic | HDPE Pigmented Single-Use Rigids | PL14 | 3% | 4% |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Mixed Rigid Plastic | 38 | Plastic | PP Pigmented Single-Use Rigids | PL23 | 3% | 5% |
| Mixed Rigid Plastic | 38 | Other | Remainder/ Composite Mixed Material Multi-Use | X12 | 3% | 9% |
| Mixed Rigid Plastic | 38 | Plastic | Remainder/ Composite Plastic | PL39 | 3% | 7% |
| Mixed Rigid Plastic | 38 | Plastic | Unknown Plastic Type or Mixture of Multiple Plastic Resins (Single-Use) | PL37 | 3% | 5% |
| Mixed Rigid Plastic | 38 | Plastic | Other HDPE Clear Single-Use Rigids | PL13 | 2% | 5% |
| Mixed Rigid Plastic | 38 | Plastic | LDPE Multi-Use | PL21 | 1% | 4% |
| Mixed Rigid Plastic | 38 | NA | Other (rare items < 1% each) | NA | 5% | NA |
| PET Bottle | 12 | Plastic | PET Clear Beverage Bottles - CRV | PL02 | 55% | 12% |
| PET Bottle | 12 | Plastic | PET Clear Bottles - Non-CRV | PL01 | 23% | 6% |
| PET Bottle | 12 | Plastic | Other PET Clear Single-Use Rigids | PL06 | 6% | 5% |
| PET Bottle | 12 | Plastic | PET Thermoformed Clamshells and Containers | PL05 | 5% | 7% |
| PET Bottle | 12 | Plastic | PET Pigmented Beverage Bottles - CRV | PL04 | 3% | 1% |
| PET Bottle | 12 | Plastic | Remainder/ Composite Plastic | PL39 | 2% | 4% |
| PET Bottle | 12 | Plastic | PP Clear Single-Use Rigids | PL22 | 1% | 2% |
| PET Bottle | 12 | NA | Other (rare items < 1% each) | NA | 5% | NA |
| PET Bottle and Container | 41 | Plastic | PET Clear Beverage Bottles - CRV | PL02 | 48% | 15% |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| PET Bottle and Container | 41 | Plastic | PET Clear Bottles - Non-CRV | PL01 | 18% | 8% |
| PET Bottle and Container | 41 | Plastic | Other PET Clear Single-Use Rigids | PL06 | 10% | 7% |
| PET Bottle and Container | 41 | Plastic | PET Thermoformed Clamshells and Containers | PL05 | 10% | 14% |
| PET Bottle and Container | 41 | Plastic | Remainder/ Composite Plastic | PL39 | 3% | 8% |
| PET Bottle and Container | 41 | Plastic | PET Pigmented Beverage Bottles - CRV | PL04 | 3% | 2% |
| PET Bottle and Container | 41 | Plastic | PET Pigmented Bottles – Non-CRV | PL03 | 2% | 1% |
| PET Bottle and Container | 41 | NA | Other (rare items < 1% each) | NA | 7% | NA |
| PET Thermoform | 6 | Plastic | PET Thermoformed Clamshells and Containers | PL05 | 88% | 9% |
| PET Thermoform | 6 | Plastic | Unknown Plastic Type or Mixture of Multiple Plastic Resins (Single-Use) | PL37 | 5% | 5% |
| PET Thermoform | 6 | Plastic | Remainder/ Composite Plastic | PL39 | 4% | 4% |
| PET Thermoform | 6 | Plastic | Other PET Clear Single-Use Rigids | PL06 | 1% | 1% |
| PET Thermoform | 6 | NA | Other (rare items < 1% each) | NA | 2% | NA |
| Plastic #3-#7 | 9 | Plastic | PP Clear Single-Use Rigids | PL22 | 33% | 6% |
| Plastic #3-#7 | 9 | Plastic | PP Pigmented Single-Use Rigids | PL23 | 27% | 5% |
| Plastic #3-#7 | 9 | Plastic | Mixed Plastic Multi-Use | PL38 | 4% | 4% |
| Plastic #3-#7 | 9 | Plastic | Other HDPE Multi-Use Rigids | PL15 | 4% | 9% |
| Plastic #3-#7 | 9 | Plastic | PP Multi-Use | PL24 | 3% | 2% |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Plastic #3-#7 | 9 | Plastic | HDPE Pigmented Single-Use Rigids | PL14 | 3% | 2% |
| Plastic #3-#7 | 9 | Fiber | Other Mixed Paper | F07 | 2% | 1% |
| Plastic #3-#7 | 9 | Plastic | Other (7) Single-Use Rigids | PL30 | 2% | 1% |
| Plastic #3-#7 | 9 | Plastic | Other PET Clear Single-Use Rigids | PL06 | 2% | 2% |
| Plastic #3-#7 | 9 | Plastic | Films - Plastic Bags - Designed for Disposal | PL36 | 1% | 1% |
| Plastic #3-#7 | 9 | Plastic | PS Expanded - Packaging | PL27 | 1% | 3% |
| Plastic #3-#7 | 9 | Plastic | PET Thermoformed Clamshells and Containers | PL05 | 1% | 1% |
| Plastic #3-#7 | 9 | Plastic | PET Clear Beverage Bottles - CRV | PL02 | 1% | 1% |
| Plastic #3-#7 | 9 | Plastic | Unknown Plastic Type or Mixture of Multiple Plastic Resins (Single-Use) | PL37 | 1% | 1% |
| Plastic #3-#7 | 9 | Other | Mixed Material Single-Use | X11 | 1% | 2% |
| Plastic #3-#7 | 9 | Other | Green Material, Clean Wood, and Food Scraps | X10 | 1% | 2% |
| Plastic #3-#7 | 9 | Fiber | Folded Paper Containers and Other Paperboard Packaging | F06 | 1% | 1% |
| Plastic #3-#7 | 9 | NA | Other (rare items < 1% each) | NA | 11% | NA |
| Plastic Film | 2 | Plastic | Films - Plastic Non-Bags - Agricultural and Commercial | PL34 | 98% | 1% |
| Plastic Film | 2 | NA | Other (rare items < 1% each) | NA | 2% | NA |
| Plastic Film - Agricultural and Commercial | 1 | Plastic | Films - Plastic Non-Bags - Agricultural and Commercial | PL34 | 100% | NA |
| Plastic Film - Plastic Bags | 3 | Plastic | Films - Plastic Bags - Designed for Disposal | PL36 | 100% | 0% |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Polypropylene #5 | 24 | Plastic | PP Clear Single-Use Rigids | PL22 | 29% | 12% |
| Polypropylene #5 | 24 | Plastic | PP Pigmented Single-Use Rigids | PL23 | 25% | 14% |
| Polypropylene #5 | 24 | Plastic | Mixed Plastic Multi-Use | PL38 | 13% | 11% |
| Polypropylene #5 | 24 | Plastic | Unknown Plastic Type or Mixture of Multiple Plastic Resins (Single-Use) | PL37 | 5% | 3% |
| Polypropylene #5 | 24 | Plastic | Other (7) Single-Use Rigids | PL30 | 5% | 5% |
| Polypropylene #5 | 24 | Plastic | PP Multi-Use | PL24 | 4% | 6% |
| Polypropylene #5 | 24 | Plastic | HDPE Pigmented Single-Use Rigids | PL14 | 2% | 3% |
| Polypropylene #5 | 24 | Plastic | PET Thermoformed Clamshells and Containers | PL05 | 2% | 4% |
| Polypropylene #5 | 24 | Other | Remainder/ Composite Mixed Material Multi-Use | X12 | 1% | 3% |
| Polypropylene #5 | 24 | Plastic | PET Clear Beverage Bottles - CRV | PL02 | 1% | 1% |
| Polypropylene #5 | 24 | NA | Other (rare items < 1% each) | NA | 13% | NA |

## Table 3E. Material Characterization of Residuals

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Residuals | 44 | Fiber | Uncoated Corrugated Cardboard/ Old Corrugated Containers (OCC) | F01 | 10% | 9% |
| Residuals | 44 | Other | Fines and Residuals | X13 | 9% | 14% |
| Residuals | 44 | Other | Textiles and Clothing | T01 | 8% | 12% |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Residuals | 44 | Other | Remainder/ Composite Mixed Material Multi-Use | X12 | 6% | 10% |
| Residuals | 44 | Fiber | Other Mixed Paper | F07 | 6% | 5% |
| Residuals | 44 | Plastic | Films - Plastic Bags - Designed for Disposal | PL36 | 5% | 4% |
| Residuals | 44 | Other | Mixed Material Single-Use | X11 | 5% | 5% |
| Residuals | 44 | Fiber | Folded Paper Containers and Other Paperboard Packaging | F06 | 4% | 4% |
| Residuals | 44 | Other | Green Material, Clean Wood, and Food Scraps | X10 | 4% | 4% |
| Residuals | 44 | Other | Treated Wood | X09 | 3% | 7% |
| Residuals | 44 | Fiber | Magazines and Catalogs | F04 | 3% | 6% |
| Residuals | 44 | Plastic | Films - Plastic Non-Bags - Other Film | PL35 | 3% | 3% |
| Residuals | 44 | Fiber | Remainder/ Composite Fiber | F12 | 2% | 5% |
| Residuals | 44 | Plastic | Films - Plastic Non-Bags - Agricultural and Commercial | PL34 | 2% | 7% |
| Residuals | 44 | Fiber | Composite Food Service Paper and Packaging | F10 | 2% | 2% |
| Residuals | 44 | Fiber | White Office-Type Paper and Mail | F02 | 2% | 4% |
| Residuals | 44 | Plastic | Mixed Plastic Multi-Use | PL38 | 2% | 3% |
| Residuals | 44 | Fiber | Uncoated Soiled Fiber Products | F11 | 2% | 2% |
| Residuals | 44 | Plastic | PP Pigmented Single-Use Rigids | PL23 | 1% | 2% |
| Residuals | 44 | Plastic | PP Multi-Use | PL24 | 1% | 2% |
| Residuals | 44 | Fiber | Paper Bags and Kraft Paper | F05 | 1% | 2% |
| Residuals | 44 | Plastic | HDPE Pigmented Single-Use Rigids | PL14 | 1% | 1% |

| Outflow Name | Samples of Outflow | MT&F Class | Material Type and Form (MT&F) | MT&F Code | Percent of MT&F in Outflow (Mean) | Percent of MT&F in Outflow (SD) |
|---|---|---|---|---|---|---|
| Residuals | 44 | Plastic | PET Clear Beverage Bottles - CRV | PL02 | 1% | 1% |
| Residuals | 44 | Plastic | PP Clear Single-Use Rigids | PL22 | 1% | 1% |
| Residuals | 44 | Plastic | PET Thermoformed Clamshells and Containers | PL05 | 1% | 1% |
| Residuals | 44 | Fiber | Newspapers/ Newspaper Inserts | F03 | 1% | 1% |
| Residuals | 44 | NA | Other (rare items < 1% each) | NA | 13% | NA |

# Abbreviations and Acronyms

**AQPR:** Average Quarterly Potential Reuse

**BPC:** Business and Professions Code

**CalRecycle:** California Department of Resources Recycling and Recovery

**CRV:** California Redemption Value

**DOF:** Department of Finance

**HDPE:** High Density Polyethylene

**Lbs.:** Pounds

**LDPE:** Low Density Polyethylene

**LVTP:** Large Volume Transfer/Processing Facility

**MCS:** Material Characterization Study

**m:** Meters

**mm:** Millimeters

**MT&F:** Material Type and Form

**NA:** Not Applicable

**OCC:** Old Corrugated Containers

**ONP:** Old Newspaper

**PET:** Polyethylene Terephthalate

**PP:** Polypropylene

**PRC:** Public Resources Code

**PS:** Polystyrene

**PVC:** Polyvinyl Chloride

**RDRS:** Recycling and Disposal Reporting System

**SAP:** Subject to Another Program

**SB 343:** Senate Bill 343 (Allen, Chapter 507, Statutes of 2021)

**SD:** Standard Deviation

**SWIS:** Solid Waste Information System

# Glossary of Terms

**Average Quarterly Potential Reuse:** Based on self-reported data in the Recycling and Disposal Reporting System, the average of outflow tons sent per quarter in all of year 2022. Relevant entities included all reporting Transfer/Processors and Recycler/ Composters in California. Relevant material streams included End Use and Recycling/ Composting. Relevant outflow tons included Glass (all), Metal (all), Mixed (Mixed Recyclables), Mixed Residuals (Other: cardboard, Other: Metal, Processing Residuals), Other (Other Approved Material Type: Carton #52 (~ milk cartons, five end markets in USA), Paper (all), Plastic (all).

**Jurisdiction:** The same definition of jurisdiction was used as that used by California Department of Finance in its dataset entitled E-1 Cities, Counties, and the State Population and Housing Estimates with Annual Percent Change – January 1, 2022, and 2023. The 'Balance of County' included in the dataset encompasses the unincorporated areas of the California counties listed, which were also considered jurisdictions.

**Large Volume Transfer/Processing Facility:** From section 40200, a transfer or processing station includes those facilities utilized to receive solid wastes, temporarily store, separate, convert, or otherwise process the materials in the solid wastes, or to transfer the solid wastes directly from smaller to larger vehicles for transport, and those facilities utilized for transformation. A large volume transfer/processing facility transfers or processes greater than 100 tons per day of material greater than 100 tons per day of material.

# Bibliography


1. State of California, Department of Finance, E-4 Population Estimates for Cities, Counties, and the State, 2021-2024, with 2020 Census Benchmark. Sacramento, California, May 2024. https://dof.ca.gov/wp-content/uploads/sites/352/Forecasting/Demographics/Documents/E-4_2024_InternetVersion.xlsx
2. *"Local Recycling Information," CalRecycle, ND(?),* <Find Your Local Recycling Information - I Recycle Smart> (September 27, 2023).

# EXHIBIT K

# Accurate Recycling Labels

Many Californians rely on products' chasing arrows symbol to tell if it's recyclable. Until 2021, California did not set specific criteria to use chasing arrows recycling logo.

Lawmakers enacted SB 343 (Allen, Chapter 507, Statues of 2021), which prohibits use of the chasing arrows or any other indicator of recyclability on products and packaging unless certain criteria are met.

Increasing recycling in California first requires accurate labels on recyclables.

Labeling restrictions established by SB 343 apply to products and packaging manufactured after October 4, 2026 (18 months after publication of the Final Findings Report). Products and packaging manufactured before that date are not subject to the restrictions, regardless of when they are sold.

## Identifies What Gets Recycled

SB 343 directs CalRecycle to publish data about the types of materials actually recycled in California. Manufacturers and other interested parties must use that information as part of their assessment of whether products can be considered recyclable for labeling purposes. The law outlaws manufacturers and others from selling products or packaging labeled as recyclable unless the items are regularly collected and processed for recycling in the state. SB 343 neither authorizes nor directs CalRecycle to determine or report on the recyclability of particular products and packaging or the appropriate use of the chasing arrows or other indicators of recyclability. Parties evaluating whether a product is eligible to be labeled recyclable in California may utilize additional information not published by CalRecycle.

This will:

- Help vendors and consumers make informed decisions about products
- Provide an objective basis for holding manufacturers, distributors, and retailers responsible for misleading consumers about whether products get recycled

### Program News

- CalRecycle published an update to Table 2 of the SB 343 Final Findings Report on December 22, 2025 (Update Letter and Attachment 1). CalRecycle does not anticipate publishing a new version of the complete report until the required update in 2027.
- CalRecycle published SB 343 FAQ on August 13, 2025.
- CalRecycle published the SB 343 Material Characterization Study Final Findings – 2023/2024 on April 4, 2025.




## Steps to Identify What's Recyclable

Often referred to by industry stakeholders as the "Truth in Recycling" or "Truth in Labeling" law, SB 343 required CalRecycle to complete two major steps by January 1, 2024.




### Step 1. Study of What Gets Recycled (Material Characterization Studies)

- CalRecycle commissioned a statewide analysis at materials recovery facilities in 2023 and 2024 to identify which materials are commonly collected, sorted, sold, or transferred for recycling in California.
- CalRecycle awarded the contract for the 2023 Material Recovery Facility (MRF) Recyclable Material Study to Cascadia Consulting Group.
- CalRecycle published the SB 343 Material Characterization Study Final Findings – 2023/2024 (DRRR-2025-1750) on April 4, 2025.
- CalRecycle published an update to Table 2 of the SB 343 Final Findings Report on August 8, 2025 (Update Letter and Attachment 1).
- The law requires CalRecycle to revise the study in 2027 and every five years after that. CalRecycle will continuously improve its methodology and approach to support a broad look at recyclability of materials across the state.
- Future studies will be designed to better align with covered material categories for SB 54 (Allen, 2022).

### Step 2. New Reporting Requirements

CalRecycle updated regulations to require material management facilities and operations to report regularly through CalRecycle's Recycling and Disposal Reporting System:

- How materials are collected or processed in the state
- Which material types and forms facilities recover and don't consider contaminants

**This new reporting will commence in 2025.**

## Implementation of SB 343

### 2021

- Gov. Newsom signed SB 343 Into law

### 2022

- Developed methodology for study
- Request for proposals for material characterization study

### 2023

- Material characterization study contract awarded
- Contractor conducted fieldwork
- CalRecycle published preliminary findings on December 28, 2023

### 2024

- The recycling and disposal reporting regulations updated to require additional MRF reporting
- Public comments on preliminary findings received – February informational session
- Contractor conducted additional fieldwork
- CalRecycle conducting additional data collection on jurisdiction recycling programs
- CalRecycle published revised preliminary findings on December 31, 2024

### 2025

- CalRecycle hosted a public meeting on February 3, 2025
- Public comments on revised preliminary findings received
- CalRecycle published the SB 343 Material Characterization Study Final Findings – 2023/2024 on April 4, 2025

### 2026

- Recyclability criteria apply to products and packaging manufactured after the 18-month period following publication of the final findings report

### 2027

- Conduct and publish second material characterization study

### 2032

- Publish additional findings every 5 years

## Provides Information to Clarify Mislabeling

Although existing laws make it illegal to use deceptive labels on products, little credible information was available to define accurate and deceptive recycling labels.

SB 343 directs CalRecycle to:

- Research what is collected and processed for recycling in California and
- Publish this information so manufacturers can accurately label products that get recycled.

Local Jurisdictions and the California Attorney General may also use this information when filing civil suits and charging monetary penalties against companies who are not labeling their products accurately. Deceptive labeling is also subject to civil suits pursuant to the Business and Professions Code.

After CalRecycle publishes each new study, manufacturers will have 18 months to ensure the updated information supports the use of the chasing arrows recycling symbol on their products.

### For More Information

- For updates about SB 343 Material Characterization Study progress, subscribe to the Material Characterization Study Listserv.
- For SB 343 frequently asked questions, visit SB 343 FAQ.
- For more information on updates to the reporting requirements for materials management facilities and operations, visit the CalRecycle Recycling and Disposal Reporting System Regulations page.

### Contact

For non-media inquiries about the program to WasteChar@calrecycle.ca.gov.

For media inquiries OPA@calrecycle.ca.gov.



Copyright © 2026 State of California

Powered by: CAWeb Publishing Service

# EXHIBIT L

Donald R. Pepperman (Bar No. 109809)
dpepperman@waymakerlaw.com
Brian E. Klein (Bar No. 258486)
bklein@waymakerlaw.com
Sam S. Meehan (Bar No. 307934)
smeehan@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone: (424) 652-7800
Facsimile: (424) 652-7850

Cheryl L. Leahy (Bar No. 270665)
cherylleahylaw@gmail.com
Law Office of Cheryl Leahy
2215 Artesia Blvd., # 1185
Redondo Beach, California 90278
Telephone: (773) 259-7760

*Attorneys for Plaintiffs*

WAYMAKER

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

ARYOUT MICHAEL THOMAS BHOTIWIHOK, an individual; JEREMIAH CORNELIUS, an individual; RANDY PAUGH, an individual; AND ALL THOSE SIMILARLY SITUATED,

Plaintiffs,

v.

Case No.: 2:25-cv-1650-ODW-AGR

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, RESTITUTION, AND INJUNCTIVE RELIEF FOR VIOLATION OF: (1) BREACH OF EXPRESS WARRANTY; (2) FALSE ADVERTISING; (3) UNFAIR COMPETITION; (4) CONSUMER LEGAL REMEDIES ACT;**

| | |
|---|---|
| FAIRLIFE, LLC, an Illinois limited liability corporation; THE COCA-COLA COMPANY, a Delaware corporation; MIKE MCLOSKEY, an individual; SUE MCCLOSKEY, an individual; SELECT MILK PRODUCERS, INC., a New Mexico corporation; and DOES 1-10,<br><br>Defendants. | **(5) UNJUST ENRICHMENT; AND (6) AIDING AND ABETTING**<br><br>**(DEMAND FOR JURY TRIAL)** |

## I. NATURE OF THE ACTION

1. Defendants produce a "premiumized" line of milk and milk products under the brand name "fairlife." The price premium, growth and consolidation, and overall profitability of the brand is driven in large part by an advertising and marketing practice and scheme claiming high levels of animal care and environmental sustainability, both of which have been pillars of the brand's strategy and marketing practice since the brand's inception.

2. The fairlife brand has been phenomenally successful in terms of rapid growth and profitability, garnering a multibillion-dollar investment by Defendant Coca-Cola, which co-founded the fairlife brand and became its whole owner in 2020.

3. The animal care marketing practices that drive the fairlife brand include, but are not limited to: the "fairlife" name itself and cartoon calf logo, claims indicating industry-leading standards and auditing, promising better and great care for animals as a top priority at fairlife, touting their investments in animal care, zero tolerance for animal cruelty in their supply chain, and similar such claims, all communicating a message to consumers of high levels of care for the animals in the fairlife supply chain, including freedom from abusive and neglectful acts and practices.

4. The sustainability marketing practice that underpins and drives the fairlife brand include, but are not limited to: claims on renewable energy including for manure handling, claims their farms are top in the industry for environmental sustainability, and claims that their plastic packaging is recyclable.

5. The current animal care and sustainability claims are an escalation in strength, scale, and scope of earlier iterations of the brand's marketing, with the level of the current animal care and sustainability marketing claims at an all-time high for the brand.

6. In reality, however, the animal care and sustainability marketing scheme and practice are based on materially false, misleading, untrue, unfair, and/or unjust claims and omissions.

7. Video evidence from multiple undercover investigations conducted by the Animal Recovery Mission ("ARM") reveals systemic widespread egregious animal cruelty, cruel standard practices, and extreme neglect, including at the hands of and with the awareness of management. Following ARM's 2019 undercover investigations of fairlife suppliers in several locations, including but not limited to Windy Ridge, Windy Too, Natural Prairie, and Fair Oaks Farms, fairlife made public statements and settled a consumer class action false advertising lawsuit in a manner designed to communicate that improvements and solutions had been made, and later advertised that investments in animal care and oversight had been made, indicating to consumers that the animals in the fairlife supply chain were not in fact being abused or neglected and that they were being treated with higher levels of care. ARM's 2023 investigation further put Defendants on notice, revealing new and additional widespread and systemic cruelty and neglect at Windy Ridge and Windy Too, and Defendants' response was to falsely deny affiliation with these farms. Now comes two separate investigative initiatives, both of which show widespread cruelty. The February 2025 release of ARM's 2024 investigations into Arizona fairlife suppliers ("2024 Investigation" or "Arizona Investigation") shows the worst, most widespread, egregious, systemic, frequent, and extreme cruelty and neglect up to that point—by workers and management across multiple locations. Following the publicity of the Arizona investigation, fairlife and dairy co-operative United Dairymen of Arizona further falsely denied suspending these farms from their supply chain. The newest investigation is to be released in June 2025, conducted at a Select Milk farm in New Mexico ("2024-2025 Investigation" or "New Mexico Investigation") where 100% of the farm's milk goes to fairlife, revealing near-

constant torment and torture of cows as a daily practice at this facility, including in front of the owners.

8. ARM's 2024 Investigation reveals dumping of carcasses near waterways abutting a suburban subdivision and recreational park land outside of Phoenix, Arizona causing algae blooms indicating water pollution from the calf carcasses. ARM's investigations and other evidence make clear that fairlife suppliers are massively concentrated industrial farms with thousands of animals on them. Multiple farms have been cited for violations of environmental requirements, and fairlife is an outlier for the sheer size of its brand and farms, contributing an outsize amount to environmental impact. Fairlife's manure claims belie the negative environmental impact of the biogas digesters Defendants were pioneers in creating. With significant public funding, Defendants built and continue to build methane digesters, which pose significant environmental and safety risk, and omit the fact that they work through incentivizing further growth and consolidation, creating a higher negative environmental impact overall.

9. Fairlife's packaging is not in fact recyclable, despite its multiple claims of recyclability, both on and linked on the packaging. Fairlife's bottles are made from opaque pigmented PET/PETE plastic, which contains titanium dioxide ("TiO2"), which is a contaminant to the recycling process. It renders the bottles *non-recyclable* in fact and under applicable law, requiring the bottles to be sorted out from clear PET plastic in the recycling process and discarded and/or burned, and poses a contamination threat to the integrity of other plastic in the plastics recycling chain.

10. Defendants knew, or should have known, that their false, fraudulent, misleading, and/or reckless representation of these claims and material omissions to consumers, unlawfully and unfairly drove price premiums, sales and sales growth, profitability, and growth and consolidation.



WAYMAKER

11. Plaintiffs bring this putative civil class action to obtain injunctive relief to stop Defendants' deceptive and unlawful practices, to stop Defendants' cruel and unsustainable farming and packaging practices, and to recover monetary relief for the Plaintiffs and the members of the Class caused by reason of the Defendants' misconduct related to their false and misleading animal care claims and sustainability claims.

## II. PARTIES

12. Plaintiff Aryout Michael Thomas Bhotiwihok ("Bhotiwihok") is an individual residing in Los Angeles, California. Plaintiff is a consumer who purchased fairlife's milk products for himself and his children regularly from approximately 2019 through 2025. Plaintiff purchased these products in reliance on the message fairlife's advertising communicated, including through the name fairlife and the cartoon cow logo. Plaintiff's reasonable reliance and belief based on fairlife's advertising was that the company was fair and humane to the animals in the supply chain, free from cruelty and neglect, and adhered to high animal treatment and environmental sustainability practices and did not come from large highly concentrated farming operations. Plaintiff Bhotiwihok believed the plastic bottle was recyclable and would be converted into another product via the recycling process, and in fact placed the packaging in recycling bins for that reason. Plaintiff suffered economic injury in the form of paying a premium price for fairlife's products under the false and/or mistaken belief that their purchase supported humane animal and environmentally sustainable practices.

13. Plaintiff Jeremiah Cornelius ("Cornelius") is an individual residing in San Francisco, California. Plaintiff is a consumer who purchased fairlife's milk products regularly from May to December 2024, at which time he learned the representations on animal care and sustainability were untrue. Plaintiff Cornelius purchased these products from Target and elsewhere in reliance on Defendants'

representations that fairlife's products were produced in a manner consistent with high levels of care of animals and freedom from cruelty and neglect as well as environmental sustainability, including recyclable packaging. Plaintiff originally started purchasing fairlife's products after he became concerned about the human health risks associated with milk from animals who were not treated humanely from other sources. Cornelius considers himself to be an environmentally conscious consumer. Plaintiff conducted research prior to purchasing, including reviewing and relying upon the claims and advertising on fairlife's website regarding animal care and sustainability. Plaintiff specifically chose fairlife's products because of Defendants' advertisements and marketing claims that its cows were not treated cruelly or neglected, and its animal care practices adhered to high ethical standards, as well as the belief that fairlife products were produced in a sustainable manner, including that its packaging was recyclable. Plaintiff Cornelius would not have purchased fairlife's products, or would have paid less for them, had Plaintiff known the truth about Defendant's actual practices. As a result of Defendant's false, misleading, and/or deceptive marketing and misrepresentations, Plaintiff suffered economic injury in the form of paying a premium price for fairlife's products under the false belief that their purchase supported humane animal and environmentally sustainable practices.

14. Plaintiff Randy Paugh ("Paugh") is an individual residing in Sausalito, California. He purchased fairlife's Core Power milk products on a regular basis until early 2025 when he began to doubt the veracity of the representations made on fairlife's packaging and website based on social media discussions of the brand. Plaintiff Paugh purchased the products from Safeway grocery store and elsewhere on reliance on Defendants' representations of high levels of animal care and environmental sustainability. Plaintiff Paugh visited fairlife's website multiple times and relied upon the animal care and environmental sustainability claims made

WAYMAKER

therein, as well as the fairlife name and representations made on the plastic bottle, including, but not limited to, the "recycle me" bottle label. Plaintiff specifically continued to purchase the brand after reviewing and relying upon the claims made on the fairlife website and packaging under the reasonable belief that the animals were treated humanely and free from cruelty or neglect, and that the brand was environmentally sustainable. Had Plaintiff Paugh known the truth concerning Defendants' actual practices, he would not have purchased fairlife's products or would have paid less for them. As a result of the Defendants' false, misleading, and/or deceptive marketing and representations, Plaintiff has suffered economic injury in the form of paying a premium price for fairlife's products under the false or mistaken belief that their purchase supported humane animal and environmentally sustainable practices.

15. The true name and capacities, whether individual, corporate, associate, or otherwise, of Defendants Does 1 through 10, inclusive, are unknown to the representative Plaintiffs, who therefore sue said Defendants by such fictitious names. Plaintiffs will seek leave of the Court to amend this First Amended Complaint to insert their true names and capacities instead of the Doe Defendants when the same becomes known to the representative Plaintiffs.

16. Each of the Defendants is responsible in some manner for the violations of law, conduct, liabilities, harm, and/or damages alleged herein. Plaintiffs are further informed and believe, and based thereon, allege that all relevant times each of the Defendants acted in concert with and/or as the principal, agent, representative, employer, employee of each of the other Defendants, and within the purpose and scope of said relationships, and that each Defendant authorized, ratified, approved, and/or consented to the acts alleged herein of the other Defendants.

17. Defendant fairlife, LLC, sometimes spelled fa!rlife ("fairlife"), is a dairy company and consumer facing brand whose principal place of business is



WAYMAKER

Chicago, Illinois. Fairlife sells so-called "premiumized" milk and milk products at a higher price than traditional milk and milk products and milk alternatives such as almond and oat milk. Fairlife has two main product lines: its "filtered milk" line, which comes in 2%, whole, chocolate, and fat-free varieties in both large and small (14 oz.) bottles; and its Core Power line, which is higher in protein and comes in a variety of flavors and protein levels. Fairlife also produces other products, including ice cream. Fairlife is sold around the world and became a $1 billion brand in 2021 and has been growing rapidly since that time. In December of 2024, Coca-Cola's CEO cited Coca-Cola and fairlife as being the two brands that added the most retail sales in the U.S. Fairlife was created and continues to advertise to consumers its brand identity and practices as constituting high levels of animal care and sustainability, including, but not limited to recyclability of its packaging.

18. Defendant The Coca-Cola Company ("Coca-Cola") is the co-founder of fairlife, and acquired the remaining shares of fairlife in 2020, making fairlife currently wholly owned by Coca-Cola. Coca-Cola's final payment for the 2020 acquisition of fairlife will take place in 2025. Coca-Cola has been identified as the world's largest contributor to plastics pollution, holding the #1 spot for the 6th year in a row according to one evaluation in 2023. Coca-Cola has also publicly represented plastics recyclability goals and its near complete meeting of those goals.[1] Coca-Cola is a corporation incorporated under the laws of the State of Delaware, with its headquarters located in Atlanta, Georgia.

19. Defendant Mike McCloskey is the co-founder of fairlife and of Select Milk Producers (and is or was its CEO), Continental Dairy, and Fair Oaks Farms, among other corporate entities and brands. He is married to Defendant Sue

[1] https://www.breakfreefromplastic.org/2024/02/07/bffp-movement-unveils-2023-global-brand-audit-results/#:~:text=The%20Coca%2DCola%20Company%20maintains,company%20since%20the%20project's%20inception.

McCloskey. He was also formerly on the Board of Lake States Dairy Center, which does business as Fair Oaks Farms in Fair Oaks, Indiana.

20. Defendant Sue McCloskey (with Mike McCloskey, "the McCloskeys") is married to Defendant Mike McCloskey and is the co-founder of Select Milk Producers, Continental Dairy, fairlife, and Fair Oaks Farms, among other corporate entities and brands.

21. Defendant Select Milk Producers, Inc. ("Select Milk") is one of the largest dairy cooperatives in the United States. Select Milk is a corporation incorporated under the laws of the State of New Mexico, with its headquarters in Dallas, Texas. It was founded by and is owned by the McCloskeys. It was the co-founder of fairlife along with Coca Cola. While fairlife is now wholly owned by Coca-Cola, Select Milk still operates the dairy farming and supply function for fairlife along with United Dairymen of Arizona.

## III. JURISDICTION AND VENUE

22. The Court has personal jurisdiction over each of the Defendants because: a) fairlife markets, distributes, advertises, and sells fairlife products throughout the United States, including within this judicial District; b) Coca-Cola markets, distributes, advertises, and sells products throughout the United States, including within this judicial District, and because of its ownership of and significant oversight over fairlife; c) the McCloskeys are actively involved in the marketing, distribution and sales of fairlife products which affects and occurs within this judicial District; and d) Select Milk is the primary provider of milk products for fairlife which are marketed, distributed, and sold within this judicial District.

23. Each of the Defendants has sufficient minimum contacts with this District such that the exercise of personal jurisdiction over them does not offend traditional notions of fair play and substantial justice.

24. This Court also has subject matter jurisdiction over this putative civil class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, and the Defendants are citizens of a state different from that of at least one Class member.

25. Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because substantial parts of the events or omissions giving rise to the claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

26. The fairlife concept and brand was originally created to boost milk sales where milk prices and demand were dropping. The McCloskeys and Select Milk began to create a new milk product with a different nutritional profile and a brand identity of sustainability and high animal care in order to create a separate brand identity for their product, charge more for it, and grow production and demand from there. This product would ultimately become fairlife.

27. Select Milk partnered with Coca-Cola to start the fairlife brand as a joint venture, which was launched in 2014. Sandy Douglas, Coca-Cola's Senior Vice President and Global Chief Consumer Officer and President of Coca-Cola North America said at the time that fairlife was "basically the premiumization of milk" and explained the basis of that in terms of high animal care and sustainability, stating: "Our vision for the nutrition beverage business and the milk product that I showed you which is made on a sustainable dairy with fully sustainable high care processes with animals, has a proprietary milk filtering process that allows you to increase protein by 50%, take sugar down by 30%, and have no lactose, and a milk

that's premiumized and taste better and we'll charge twice as much for it as the milk we used to buying in a jug."[2]

28. In January of 2020, Coca-Cola announced that it had acquired the remaining shares of fairlife from its joint venture partner Select Milk, bringing its ownership stake to 100%, up from its previous 42.5% stake.[3]

29. On information and belief, Select Milk still retains most of the operational control of fairlife, executing on the supply of the product through its membership, contracts, and oversight, which includes specific requirements and guarantees it makes to consumers about the animal care and sustainability practices in its supplying farms.

30. In 2022, fairlife was reported as "a value-added success story in a category that has been in steady decline for years" after becoming a billion-dollar brand in 2021, and that as of 2022, fairlife was reaching a quarter of U.S. households.[4]

31. Coca-Cola CEO and Chairperson James Quincy reported in December of 2024, "If you look at the U.S. year-to-date, the two brands that have added most retail sales in the U.S. are Coca-Cola and Fairlife, like the number 1 and the number

---

[2] Seeking Alpha, The Coca-Cola Company's (KO) Presents at Morgan Stanley Global Consumer Conference (Transcript), Nov. 19, 2024 at https://seekingalpha.com/article/2695965-the-coca-cola-companys-ko-presents-at-morgan-stanley-global-consumer-conference-transcript (last visited Jan. 26, 2025).

[3] Coca-Cola Canada, Who Owns Fairlife, at https://www.coca-cola.com/ca/en/about-us/faq/who-owns-fairlife#:~:text=On%20January%203%2C%202020%2C%20The,from%20its%20previous%2042.5%25%20stake (last visited Jan 26, 2025).

[4] Elaine Wilson, 50% more protein, 50% less sugar: fairlife brand reaching a quarter of US households, says VP. 'Demand is at an all-time high' Food Navigator, Sep. 22, 2022 at https://www.foodnavigator-usa.com/Article/2022/09/22/50-more-protein-50-less-sugar-fairlife-brand-reaching-a-quarter-of-US-households-says-VP.-Demand-is-at-an-all-time-high/ (last visited Jan. 26, 2025).

2. So you've got the like one of the oldest brands and one of the youngest brands driving the retail sales growth."[5]

32. When a consumer picks up a bottle of fairlife, the first thing they are struck by is the suggestive name – "fairlife" which communicates a message of a life of fairness for the cows. The definition of "fair" is "reasonable, right, and just."[6]

33. The name "fairlife" is paired with the iconic logo of a cartoon calf, drawn in a way that evokes pathos and compassion, further indicating to consumers that the brand is centered around a caring ethos for the cows.

fairlife's logo.

---

[5] Seeking Alpha, The Coca-Cola Company (KO) Morgan Stanley Global Consumer & Retail Conference (Transcript), Dec. 3, 2024, at https://seekingalpha.com/article/4741828-the-coca-cola-company-ko-morgan-stanley-global-consumer-and-retail-conference-transcript (last visited Jan 26, 2025).

[6] *See* Collins Dictionary, "fair," https://www.collinsdictionary.com/us/dictionary/english/fair (last visited Jan 10, 2025).

34. If a consumer is buying the "filtered milk" line of products in 2025 or bought it in the last few years, they are directed to a QR code which takes them to a Smart Label landing page[7] or directly to URLs printed on the bottle, fairlife.com and fairlife.com/ultra-filtered-milk, each of which links them to fairlife's mission page at https://fairlife.com/our-mission/.

35. If a consumer is buying the "core power" fairlife line in 2025 or bought it in the last few years, he or she is invited to follow the URLs on the bottle, corepower.com or corepower.com/great-taste, which take the consumer to the same fairlife mission page at https://fairlife.com/our-mission/ ("mission page").

36. Fairlife has three pillars listed on its mission page, under the banner "we believe in better." The mission page is structured into three sections, for their belief in "better care for" people, animals, and the planet. The page states "our purpose extends beyond what's in our bottles. We go the extra mile to provide better care for the people we nourish, animals that provide us with milk, and the planet we live on."

37. With respect to animal care claims, on the mission page, it asserts "great care for the animals… will always be a top priority at fairlife", a component of which is "partnering with like-minded supplying farms that share fairlife's commitment to well cared-for cows."

[7] *E.g.*, For the 2% filtered milk line, the Smart Label site https://smartlabel-nutrition.fairlife.com/?fairlife-two-percent-ultra-filtered-milk-14-fl-oz&upc=811620020879#company (last visited Jan 7, 2025).

38. The animal's section of the mission page is accompanied by an image of a woman reaching her hand out to a cow who is sniffing the woman's hand, as depicted here:




39. The consumer clicks "learn more" on the mission page as shown above and is taken to a dedicated animal care page ("animal care page").[8] This page begins with a large heading, "we believe in better care for animals." It then lays out details about its animal welfare program. This program can be summarized as processes, policies, and expenditures. Fairlife touts the $40 million-plus monetary investment in animal welfare since 2019, its audits, its on-site vet, and the fairlife Animal Welfare Advisory Council.

[8] "We Believe in Better Care for Animals," fairlife, https://fairlife.com/our-mission/fairlife-cow-care-and-animal-welfare-standards/ (last visited Jan 7, 2025).

40. Images of fairlife's animal care page:






## Industry Leading Animal Welfare Standards

Our goal is that all cows and calves are provided with the best care possible. As a dairy processor that doesn't own farms or cows, we rely on the partnership of industry experts, advisors and our network of supplying farms to help us achieve this goal. We are committed to continuously evaluating our animal welfare program for areas of opportunity.




**100%**
of supplying farms passed critical care standards in 2022

**Regular Audits**
performed at all supplying dairies each year

**Leading Certification**
such as National Dairy FARM program and Validus is required at all supplying farms.

## Investing in Animal Care

From growing our internal animal welfare team, to leveraging industry expertise and exploring innovations in animal care, we work closely with supplying farms to ensure great care for the cows that provide us with milk.



**$40M+ Investment**
in our animal welfare program since 2019

**Full-time Staff Veterinarian**
with more than 12 years of specialized experience in cow care

**fairlife Animal Welfare Advisory Council**
includes 6 of the leading experts in the dairy and animal health industry

## Strong Farm Partnerships

Working with suppliers that share our commitment to great animal care and sustainable farming is critical to our program. Equally as important is staying up to date on industry research, innovative technologies and on-farm protocols and resources to help advance our efforts and help our programs succeed.

### Supplier Selection

We only work with farms committed to delivering the highest quality milk. This starts with meeting our strict quality standards, which is a reflection of animal health and hygiene, on-farm cleaning procedures and employee training. Additionally, we require farms to chill their milk immediately after harvest to preserve the quality.





### Standards and Oversight

fairlife has a robust set of animal welfare standards and requirements for supplying farms. Beyond care, they also include requirements for on-farm worker care, biosecurity and environmental standards.

### Audit Cadence

Supplying farms to fairlife are audited more frequently than the cadence required by industry standards.

### Addressing Issues

More frequent audits help to identify any issues and quickly take corrective action, when needed. Additionally, it helps reinforce a culture of transparency among supplying farms and their employees.

### Leveraging Technology

We work with our partners to invest in camera monitoring and scaling AI technology for additional oversight. We believe in the future of on-farm camera monitoring, as it can move beyond the cow-human interaction to help farmers in other areas such as feed management, health surveillance and milking parlor analytics.

41. Collectively, these claims are referred to herein as the "Animal Care Claims."

WAYMAKER

42. When touting these processes, policies, and expenditures, fairlife omits the context in which they were created. It was only following a 2019 ARM investigation and a subsequent consumer fraud/false advertising class action lawsuit that ultimately settled for $21 million and a detailed stipulated injunction covering policy and oversight changes but without any admission of wrongdoing that fairlife spent so much money and time to develop the processes and policies it put into place.

43. Despite the process-based nature of the animal welfare program, fairlife has carefully curated the content on this page to make outcome-based claims and representations to the consumer, which has the clear intent and effect of communicating to the consumer that the animals are cared for well, and certainly not abused or neglected. These claims may or may not be literally true but are nonetheless misleading. For example, it states: “we work closely with supplying farms to ensure great care for the cows that provide us with milk,” indicating an outcome of care for the cows at a high level, certainly far above criminal cruelty, neglect, and even standard industry level animal welfare.

44. Some of its claims also include “industry leading standards,” “regular audits, strong oversight.” In fact, the industry standards and auditing fairlife purports to be “industry leading” are FARM and Validus.

45. FARM is the Farmers Assuring Responsible Management program. This is an industry-created program, created by the National Milk Producers Federation and Dairy Management, Inc. The National Milk Producers Federation is a Washington, D.C.-area based dairy lobby group, with 25 member cooperatives, representing two-thirds of commercial dairy farmers in the United States[9] Dairy

[9] May 1, 2023 letter from Nicole Hancock, attorney for National Milk Producers Federation to Bruce Summers, Administrator, Agricultural Marketing Service, United States Department of Agriculture, available at

Management, Inc. is a dairy trade association which gets its primary funding from the U.S. Dairy Promotion Program, which is funded by federally required checkoff fees and taxpayer dollars for federal promotion and marketing of dairy products. More importantly, the FARM animal care program itself touts its membership at 98% of the dairy industry[10]

46. Fairlife's advertising does not disclose that Defendants Mike and Sue McCloskey are both listed as staff on the "Meet the Team" page of the FARM website,[11] nor the conflict of interest that position presents.

47. On information and belief, Mike McCloskey and Sue McCloskey have both been employed by FARM in some capacity for at least several years.

48. Validus is an auditing company whose mission statement is "helping the world feel good about farming."[12] It has a wide reach in the dairy industry with many major dairies participating and is often used by large agribusiness industries to conduct audits.

49. Fairlife communicates to consumers a message of superiority, indicating better care for the animals than is standard in the industry. Not only are

---

https://www.ams.usda.gov/sites/default/files/media/NMPFNationalHearingPetition050223.pdf (last visited Jan 7, 2025).

[10] FARM, Dairy Farmers, Animal Care, https://nationaldairyfarm.com/dairy-farmers/ (last visited Jan 7, 2025).

[11] FARM, Meet the Team, Mike McCloskey, at https://nationaldairyfarm.com/staff/mike-mccloskey/#:~:text=Mike%20McCloskey%20is%20Co%2DFounder,attraction%20located%20in%20Northwest%20Indiana (last visited Jan. 11, 2025) and Meet the Team, Sue McCloskey, at https://nationaldairyfarm.com/staff/sue-mccloskey/ (last visited April 22, 2025).

[12] Validus, https://www.validusservices.com/ (last visited Jan 7, 2025).

these not “industry leading” standards representing “better care” for the animals, they in fact represent the industry itself, and its most powerful lobby for mega dairy companies like fairlife itself.

50. Defendants’ purpose in creating the fairlife brand was to communicate to consumers that it was distinct from and greater than the industry standard.

51. In the earliest statements from the Defendants about fairlife’s founding, it is clear that the brand and related brands like Fair Oaks Farms were created to preempt and provide a counter narrative to the advocates for animals and the environment who raised concerns about the industrialization of the dairy industry. For example: “The farm was founded out of necessity to counter the very loud, very well-funded, and often, very misleading voices against modern farming and animal agriculture in particular,” said [defendant] Sue McCloskey in an interview with Food & Wine in 2018. “Having come from a non-generational farming background”—that’s another way of saying she doesn’t come from a family of farmers— “and growing up in the consumer-centric East Coast, I knew the ploy of these organizations.”[13]

52. Fairlife’s current animal care page claims to have a “robust animal welfare program,” says that and touts its “full time staff veterinarian with more than 12 years of specialized experience in cow care,” and says its “animal welfare advisory council consists of 6 of the top experts in the dairy and animal health industry. Together this group works with fairlife to review on-going animal welfare programs and guide advancement and improvement to our animal welfare program based on new research and learnings.” It also states that “regular audits [are] performed at all supplying dairies each year” and that their supplying dairies are

[13] Monte Reel, “The Dairy Farm of Your Imagination is Disappearing,” Bloomberg, Feb. 28, 2020, at https://www.bloomberg.com/news/features/2020-02-28/the-dairy-farm-of-your-imagination-is-disappearing?embedded-checkout=true&leadSource=uverify%20wall (last visited Jan 7, 2025).

required to have a "zero tolerance policy for animal abuse." Most unequivocally, fairlife represents that "100% of supplying farms passed critical care standards in 2022." These claims and similar ones indicate to the consumer not only that the process of oversight and review is in place, but that this process in fact ensures the outcomes of higher care and prevention of animal abuse and neglect.

53. In actuality, ARM's evidence from a confidential informant witness indicates, for example, that Windy Ridge and Windy Too only had one single veterinary visit this employee witnessed in approximately 15 years. On information and belief, both Windy Ridge and Windy Too where widespread rampant abuse was documented in 2023 had passed its fairlife critical care standards audit mere months before the video was shot.

54. As described below, new ARM evidence makes it clear that the reality is that animals are being abused and neglected in the fairlife supply chain in a frequent, widespread, standard, and egregious manner.

55. Despite industry bias and identity, lack of rigor and scope, and low bar to meeting FARM and Validus standards, ARM's 2023, 2024, and 2024-2025 Investigations yielded video/film footage of fairlife supplying farms shows widespread, frequent, standard, and egregious violations even of FARM and Validus standards.

56. Defendants also publicly touted fairlife's purported commitment to phasing out the cruel industry standard of cow dehorning in the fairlife supply chain, a practice which causes extreme pain and suffering. The practice has *not* been phased out, as shown in ARM's 2024 Butterfield investigation discussed below.

57. The intent and effect of the message communicated to consumers by the fairlife mission page, the animal care page, the brand's other advertisement, the statements and representations made by Defendants, and even the name and logo of

the brand is that fairlife cows are treated humanely, in a way superior to industry standards, and without abuse or neglect.

58. This messaging as described above is false and misleading to consumers in a material way.

59. ARM conducted an additional investigation in 2023 of Windy Ridge and Windy Too in Indiana, two of the twelve farms on or near the Fair Oaks Farms facility that they had investigated in 2019 ("2023 Investigation").

60. Windy Ridge and Windy Too are owned by Steve Bos and his wife. Bos is the Principal Officer and President of the Board of Lake States Dairy Center, Inc, which does business as Fair Oaks Farms.

61. In its 2023 Investigation, ARM documented multiple instances of animal abuse and neglect, including, but not limited to:

i) Egregious and frequent violent animal cruelty as part of the business operating practices;

ii) Animals kicked, beaten, and punched daily by employees;

iii) Cows flogged and repeatedly whipped with heavy ropes, beaten with sawn-off golf clubs, and slammed with sharp shanks, knives, and screwdrivers;

iv) Cows slammed into and dragged by tractors and heavy machinery, clearly conscious and in distress;

v) Employees intentionally breaking cows' tails, including by management;

vi) Use of excessive force when moving the cows;

vii) Head manager shooting cows with .22 shotguns, in botched and improper attempts at euthanasia, including in one instance of shooting a cow and she lived another day with a bullet hole in her head;

viii) Cows trampled to death as part of milking process;

ix) Neglect, abandonment, and denial of access to food and water, veterinary care, and/or clean and sanitary living conditions;

x) Animals too sick or injured to stand ("downers") dumped and abandoned in small enclosed "death pens" along with other sick, injured, dying, and dead animals;

xi) Denial of veterinary care for critical infected wounds, including abscesses on their knees that immobilized the animals, where the animals were showing clear signs of pain, swelling, and distress. Managers and workers acknowledged these wounds but left the animals untreated;

xii) Newborn calves abandoned and left to die slowly in dark corners of barns and in piles of filth and feces;

xiii) Cows forced to live in overcrowded, unsanitary conditions, including in and around deep piles of feces, and among pungent and noxious odors;

xiv) Cows deprived of clean drinking water and forced to drink sludge-covered water; and

xv) Approximately half of the dairy cows had lameness causing them to walk with limps.

62. Select images from the 2023 ARM Investigation include:




Cow dragged by tractor, being lifted by the tail ("tailing up"), and cow is tied by her face to her leg.




Tractor lifting a cow off the ground by its front legs.

WAYMAKER



Cow lifted in tractor bucket upside-down, approximately 10-15 feet into the air.



Cow dragged by her leg by a tractor.




Cow hoisted by her feet and a tractor hook.

63. In one instance, after a manager shoots a cow in the head with a gun, the ARM investigator asks the manager, “Do you feel remorse for killing her?” and the manager replies, “No! It’s why I live in this country, so I can kill these asshole cows:




WAYMAKER

64. An instance of an employee deliberately breaking the tail of a cow by cracking it in his hands:




65. The acts and omissions documented in the ARM 2023 Investigation constitute criminal level animal cruelty, violate the voluntary industry standards such as FARM and Validus, and render fairlife's representations of the quality of its animal care and sustainability practices to be false and misleading.

66. From July to December 2024, ARM conducted two new investigations, only made public for the first time in February 2025 ("2024 Investigations"). These investigations took place at Rainbow Valley Dairy, LLC in Buckeye, Arizona, aka North Farm ("Rainbow Valley") and Butterfield Dairy, LLC, also in Buckeye, Arizona ("Butterfield"). Both/all are owned and managed by Thomas De Jong individually and in his capacity as trustee of the Tom and Susan De Jong Family Trust.

67. Rainbow Valley and Butterfield are suppliers of fairlife. Rainbow Valley's milk is trucked to the fairlife processing plant in Goodyear, Arizona via

United Dairymen of Arizona, a co-op which the DeJongs and their dairies are members of.

68. Butterfield is a calf ranch that is a supplier to multiple area dairy farms which ultimately truck their milk to the fairlife processing plant in Goodyear, Arizona.

69. In its 2024 Rainbow Valley dairy farm investigation, ARM documented multiple instances of abuse and neglect, including, but not limited to:

i) Egregious and frequent violent animal cruelty as part of the business operating practices;

ii) Animals hit in the face, genitals, and other sensitive areas with knives, screwdrivers, and shards of metal;

iii) Employees, including management, kicking animals, including downed cows and calves too sick or weak to stand, and in sensitive areas like an injured leg repeatedly;

iv) Animals dragged by chains across concrete floors by a tractor, hoisted by the neck over a wall;

v) Downed cows pushed and scooped into tractor buckets, sometimes over long periods of time, including by the top manager of the dairy driving the tractor, resulting in death of multiple cows. In some instances, dirt is shoveled on or near the cow with the tractor bucket, including burying the head, suffocating the animal and effectively burying her alive;

vi) Cows shot with .22 rifle in the back of the neck in botched attempts to kill them, often causing pain and suffering. Every cow shot is shot in this manner;

vii) Excessive use of electric prod, including numerous instances where head manager electrically shocked downed cow in labor





WAYMAKER

over 70 times, including while tailing up, including inside the mouth and genitals, causing bellowing and other indications of distress;

viii) Cows hoisted off the ground by the hips with a hip clamp chained to a tractor and dragged;

ix) Whipping and beating animals multiple times a day to get them into the milking area, including dozens of instances of hard whipping;

x) Multiple workers intentionally and frequently breaking tails of the cows on dozens of occasions as apparent "discipline" by snapping them in half and holding it in that folded fashion, and crushing them with their hands or yanking them until they crack. In multiple instances, this is done until another worker gets the milker attached to the cow's udder. The pain of the broken tail and folding causes the cow to shake and freeze, unable to move or escape, which apparently makes it more convenient to attach the milking device to the udder;

xi) Hard plastic ankle strap ID tags attached together a few at a time to create whipping devices, which are given to employees and approved by management to beat the animals;

xii) Newborn calves dragged by their legs, either by hand, with leg chains, by the ears, or a rope around the neck. In one instance, a calf struggles while dragged by leg chains thousands of feet across dirt and concrete while an adult cow looks on and vocalizes. In another instance, a newborn calf is dragged by a rope around the neck across the dirt while an adult cow,

presumably the mother, chases after and is shooed away by the workers;

xiii) During the dragging of the newborn calves by chains, multiple instances of workers intentionally twisting the calves' legs to inflict pain and injury, often breaking the bones in the legs;

xiv) The chains and ropes used to drag and hoist cows and calves are formed like nooses, exacerbating the pain and injury via tightening around the necks, legs, or other body parts as the dragging or hoisting is done;

xv) Calves carried upside down by the legs or by the tail and ear, including by every manager;

xvi) Shoving, throwing, flipping calves into transport trucks;

xvii) Force-feeding calves by pinning them and shoving a sharp tube down their throat, in such a manner to purposefully inflict pain. In some cases, botched use of this feeding tube resulted in death of the calves;

xviii) Neglect, abandonment, and denial of access to food and water, veterinary care, and/or clean and sanitary living conditions;

xix) Some calves kept in conditions without shade in weather up to 115 degrees;

xx) Large numbers of dead calves and cows; and

xxi) The majority of cows exhibiting lameness. Straight blades used by workers on hooves without pain medication while animals showed severe signs of distress.

70. Every worker at the Rainbow Valley 2024 Investigation committed acts of cruelty and abuse. The head manager often participated in the cruelty itself or was standing by observing while the cruelty was taking place.

71. Select images from the 2024 Rainbow Valley dairy investigation include:



Employee hitting a cow in the face with a metal object.



Cow being hoisted by the neck over a wall after being dragged across the floor by a chain attached to a tractor.



Downed cow being pushed by a tractor bucket.



The same cow after being hit again with the tractor bucket and being pushed onto her back.

WAYMAKER



Cow hoisted and dragged by hip clamp chained to tractor.



Employee has wrapped tail around bar before he holds onto it and yanks backward with his body weight to break it.



Worker bending tail backward to break it with his hands as apparent "discipline."



Calf force feeding.

72. In its 2024 Butterfield dairy farm investigation, ARM documented multiple instances of abuse and neglect, including, but not limited to:

i) Egregious abuse such as throwing calves into trucks on multiple occasions;

ii) Evidence of calves having been subjected to cruel and unnecessary suffering through the standard practice of dehorning, some via manual cutting and some by caustic paste;

iii) Neglect, abandonment, and denial of access to food and water, veterinary care, and/or adequately spacious, safe, or clean and sanitary living conditions;

iv) Calves in individual calf crates so small they cannot turn around or lie down comfortably. In some cases, they grow so large they can barely move. They are often kept in crates designed for newborn animals approximately 5 x 2 feet, up to the age of four months;

v) In some cases, crates packed with two calves;

vi) Stuck animals, sometimes so entangled in the crates they die that way;

vii) Live calves being put into crates with decomposing corpses of calves;

viii) Bar biting in the calf crates, which is an indicator of extreme frustration and stress; and

ix) Temperatures over 130 degrees with some animals denied access to shade for multiple hours of the day, in some cases causing death.

73. Select images from the 2024 Butterfield investigation include:



Calf having recently been manually dehorned with clippers and then thrown back into the crate with no pain relief, marked by a strip of paint to indicate having been dehorned.



Three-month-old calves in crates having grown so large they can barely move. Note some have no access to shade and some are bar biting.




Calf unable to turn around in crate and got stuck, alive.

74. The above abuse documented in the 2024 Investigation of Butterfield and Rainbow Valley dairies violated Arizona's criminal animal cruelty law, A.R.S. ¶§ 13-2910, which prohibits acts and omissions that constitute cruelty defined as, among other things, subjecting any animal under the person's custody or control to cruel neglect or abandonment with or without resulting in serious physical injury, failing to provide medical attention necessary to prevent protracted suffering, and inflicting unnecessary physical injury or cruel mistreatment. It also violates the voluntary industry standards such as FARM and Validus, and renders fairlife's representations of the quality of its animal care and sustainability practices to be false and misleading.

75. ARM's most recent investigation was conducted from December 4, 2024 through March 6, 2025 at Woodcrest Dairy in Roswell, New Mexico. ("2024-2025 Investigation") which is a Select Milk Producers farm. 100% of the milk produced at this farm goes to fairlife. The farm is listed as owned as a general partnership by Gertrude Verhoeven, Gary Verhoeven, Denise Vander Meulen, and Randy (Randall) Vander Meulen; and on information and belief, is also owned or managed by Jake (Jacob) Meulen.

76. In its 2024-2025 Investigation, ARM documented multiple instances of abuse and neglect, including but not limited to:

i) Repeatedly kicking animals, including cows too sick or weak to stand;

ii) Dragging and crushing animals with tractor buckets and hoisting them up via tractor chained to metal hip clamps;

iii) Repeated kicking and hitting animals in the face and body with fists, a shovel, plumbers wrench, or solid steel metal rod while the animals are restrained in a small metal cage called a head gate, the purpose of which is to lock the animal in, so they are unable to move

away from blows. In one case, a worker can be seen adopting a boxing stance while doing this;

iv) Inserting metal rings through the nostrils of the cows while the animals are restrained in this small metal "head gate" cage unable to move, then yanking on or dropping body weight into a rope attached to the nose ring repeatedly to inflict pain. In some instances, the workers add multiple blows to the face while yanking on the nose ring rope. Cows can be heard bellowing loudly during this abuse;

v) Multiple instances of violently shoving a steel tube called a pill gun down the throat of cows restrained in the metal head gate cage, and/or hitting them in the face or eyes with the steel pill gun, often repeatedly, while the animals make futile attempts to move away from the blows. In some cases, this practice is so violent it causes gashes and bleeding from the throat and back of the mouth. This is despite the ease and lack of pain with which the pill gun could and should have been utilized;

vi) Attaching a chain to the fetus of animals in labor and workers jumping up and down on the chain with their full body weight, often before the mothers or calves were ready. The employees jump so hard that their weight ins bringing the calves' bodies down so violently they are slammed on the cement, which in some instances causes death apparently by blunt force trauma to the skull – leaving blood stains behind on the cement. In other cases, this jumping on the chains breaks the calves' legs, leaving them unable to walk;

vii) Dragging, throwing, and slapping newborn calves;

viii) Kicking, electric shocking, whipping, dragging, hitting with shovels, pipes, and chains of cows confined to the milking area;

psychological torture including using Coca-Cola bottles filled with coins shaken in the animals' faces to startle then into moving faster. Workers used careless and excessive force during milking, striking cows in the face, body, and genitals with wrenches and other tools;

ix) Breaking tails of cows in the milking area with their hands, a practice committed by three different people. Some cows in the milking area had their bones broken and were left hemorrhaging. Nose rings were yanked using ropes and chains to force compliance;

x) Neglect and failure to provide veterinary care, including leaving animals to suffer in freezing winter conditions, exposing them to snow and sleet for days; high mortality rates, with regular discarding of carcasses next to a manure pile; denying injured or sick animals veterinary care, including leaving some untreated for days, which led to worsening of their conditions or death; and

xi) Tying cows' back legs together.

77. Select images from the Woodcrest Dairy investigation include:



Tightly confined cow in head gate with nose ring on rope being yanked and jerked.



Tightly confined cow in head gate being kicked in the face.



Tightly confined cow in head gate being rapid-fire kicked in the face.



Employee kicking downed cow.



Cow hoisted by a hip clamp and dragged with a tractor.



Downed cow pushed by a tractor in her head and neck area.

WAYMAKER



Cow abused in the milker including intentional tail breaking by hand.



Newborn calf dragged by leg chains.



Cow with her back legs tied.

WAYMAKER

78. The above practices took place throughout the day and night every day or nearly every day, including in front of the owners, the Meulen family. The Meulen family actively operates the dairy. They and their managers knew of these abusive practices, permitted and/or participated in them, and failed to take steps to deter or prevent the continuation of the abuse.

79. ARM's investigation revealed all of the animals confined in the head gate were abused in the way or ways described above. This was done out of apparent frustration, punishment, enjoyment for the perpetrators, and torment of the cows. This abuse was carried out apparently by any and all staff in the head gate "medical" area of the facility.

80. During the time ARM's investigator was employed at Woodcrest Dairy in New Mexico, ARM's 2024 Investigations were made public and garnered widespread media as well as acknowledgement and a statement by fairlife. However, no mention of the investigation was made at Woodcrest Dairy, nor was

any additional attention or training, oversight or review provided of animal handling or environmental sustainability practices during the remainder of the investigator's employment.

81. Woodcrest Dairy is overseen by animal welfare entities including through Defendants' oversight structure, such as through animal welfare committees and veterinary personnel through Coca-Cola, Select Milk, and fairlife processes and procedures (purportedly including regular audits and video monitoring). All Defendants therefore knew, or should have known, of this animal abuse and neglect, including its extreme, prolonged, widespread, and repeated nature.

82. The above abuse documented in the 2024-2025 Investigation violates New Mexico's animal cruelty statute, NM Stat § 30-18-1, constituting both animal cruelty and extreme (felony-level) animal cruelty under that statute. It also violates the voluntary industry standards such as FARM and Validus, and render fairlife's representations of the quality of its animal care and sustainability practices to be false and misleading.

83. The 2023, 2024, and 2024-2025 Investigations contain factual similarities, despite taking place in different states and having different corporate identities, regarding the kinds of cruel practices and patterns that have commonalities in their type, level of frequency, and extreme nature. This includes, but is not limited to, the practice of breaking cows' tails in and around the milking equipment and the use of noose-like equipment to drag or hoist animals. This is evidence of a possible common enterprise, knowledge, collusion, and conspiracy to commit animal cruelty.

84. When a consumer buys fairlife products, he or she has a number of indications of its environmental sustainability, including the name fairlife and the cartoon calf logo, manure sustainability claim, top farm sustainability claim, and recyclability claims. (collectively "Sustainability Claims").



WAYMAKER

85. If a consumer is buying the "filtered milk" line of fairlife products in 2025 or bought it in the last few years, they are directed to URLs printed on the bottle, fairlife.com and fairlife.com/ultra-filtered-milk, or a QR code which takes them to a Smart Label landing page[14] each of which links them to fairlife's mission page at https://fairlife.com/our-mission/.

86. If a consumer is buying the "core power" fairlife line in 2025 or bought it in the last few years, he or she is invited to follow the URLs on the bottle, corepower.com/great-taste or corepower.com, which take them to the same fairlife mission page at https://fairlife.com/our-mission/ ("mission page").

87. Fairlife has three pillars listed on its mission page, under the banner "we believe in better." The mission page is structured into three sections, for their belief in "better care for" people, animals, and the planet. The page states "our purpose extends beyond what's in our bottles. We go the extra mile to provide better care for the people we nourish, animals that provide us with milk, and the planet we live on."

88. On the "planet" section of the mission page, fairlife advertises that they have "sustainable farming efforts [that] focus on several opportunity areas, including using renewable energy on farms, cow feed, and manure handling."

89. This manure sustainability claim indicates a false and misleading message to consumers about the environmental sustainability and benefits of biogas–methane digesters Defendants pioneered and continue to build and grow, discussed below.

[14] *E.g.*, For the 2% filtered milk line, the Smart Label site https://smartlabel-nutrition.fairlife.com/?fairlife-two-percent-ultra-filtered-milk-14-fl-oz&upc=811620020879#company (last visited Jan 7, 2025).



WAYMAKER

90. Also, on the "planet" section of the mission page, fairlife advertises that it has: "Completed life cycle analysis at supplying farms and validated that they are among the most sustainable in the country for environmental footprint."

91. This top farm sustainability claim communicates a false and misleading message to consumers that fairlife-supplying farms are objectively less polluting and resource consumptive than is standard in the industry. It also communicates the false and misleading message to consumers that the life cycle analysis and validation process yields an outcome of increased sustainability and lower environmental footprint. In addition, it materially omits the issue of fairlife's growth and consolidation, and all of the actions and strategies it has taken to accelerate that growth and consolidation, some of which are illegal and form the basis of this First Amended Complaint, while having the intent and effect of becoming an outlier in the industry with rapid growth, consolidation, and record profits while other dairies in the industry continue to fold or be consolidated into massive conglomerates like fairlife and other Defendants, with disproportionately negative impact on small family dairies and non-dairy alternative companies.

92. The 2024 Investigation also revealed large amounts of animal waste discharged into nearby wildlife areas near waterways and groundwater and open disposal of animal carcasses on or near adjacent recreational lands, rendering the top farm sustainability claim additionally false and misleading.

93. Also, on the "planet" section of the mission page, until very recently, fairlife advertised the concrete "100% recyclable packaging commitment by 2025." On nearly all fairlife bottles, the chasing arrow symbol is stamped, indicating recyclability. Some of the large filtered milk line bottles and some of the Core Power bottles are also stamped with a "1" which indicates recyclability to consumers. The Core Power bottles also say "Recycle Me" on the label. Each of

these is independently a recyclability claim and also together indicate recyclability of the packaging, including all of the fairlife bottles.

94. Fairlife's recyclability claims communicate a message to consumers that its packaging is recyclable. Its website recyclability claims specifically indicated 100% of its bottles are in fact recyclable, now that it is 2025. It also communicates the message that far greater than 0% of the packaging was recyclable prior to 2025.

95. Coca-Cola has made specific representations about its commitment to recyclability of its bottles[15], including a progress report in 2023 that reported a 90% recyclability rate across its products[16] and has reported even higher percentages elsewhere.

96. In addition to the website recyclability claim and the other sustainability claims, fairlife consumers are directed in other ways by fairlife's bottles to the conclusion that they are recyclable.

97. Many fairlife bottles are stamped with the "1" and "PETE" on the bottle. The "1" indicates the bottle is PET or PETE plastic, which is known widely by consumers and industry alike to be the most commonly recycled and recyclable plastic, and most of these additionally have, or recently had, the chasing arrows symbol, which also indicates recyclability.

---

[15] https://www.coca-colacompany.com/sustainability/packaging/united-states-recycling#:~:text=Coca%E2%80%91Cola%20North%20America%20has,offer%20sustainable%20solutions%20at%20scale.

[16] https://www.coca-colacompany.com/content/dam/company/us/en/reports/2023-environmental-update/2023-environmental-update.pdf p. 5

98. Even the industry trade group the Association of Plastic Recyclers ("APR"), of which Coca-Cola is a member,[17] lists #1 in its guidelines as recyclable in most communities.[18]

99. On information and belief, most large fairlife bottles have been stamped with "1" from 2023-present and some of the small bottles are currently stamped with a 1. Currently other fairlife bottles are stamped with the "7" apparently they are a composite of different substances. Some of the bottle types that now bear 1s formerly bore 7s.

100. APR does not list "7" on its list of recyclable plastic.

101. On information and belief, the large fairlife bottles have a nylon liner, which would render the bottle ineligible to be stamped with the "1" and would make the "7" the correct designation.

102. On information and belief, some fairlife bottles were changed from the 7 to the 1 to knowingly and falsely indicate recyclability to consumers.

103. Most of the Core Power line and some of the filtered milk line bottles are marked as a 7 on the bottom of the bottle. The 7 is the "other" category and includes mixed plastics, which can contain PET or PETE but is usually not recyclable.

104. The smaller Core Power line of fairlife products explicitly say on the bottle "Recycle Me."

105. All of these fairlife bottles are pigmented opaque PET or PETE containing plastic, with white or brown pigment.

[17] Association of Plastic Recyclers, About APR, APR Member Sampling, at https://plasticsrecycling.org/about-apr/ (last visited Jan. 17, 2025).

[18] https://plasticsrecycling.org/how-recycling-works/the-plastic-recycling-process/

106. Nearly all of the fairlife bottles also have the chasing arrows symbol stamped on them, also indicating recyclability.

107. Coca-Cola also touts its commitment to recyclability, including by claiming PET is the most valuable type of plastic for its recyclability, saying "Plastic, especially PET, is among the most highly valued recyclable materials because it can be remade to make new bottles. No new plastic (PET) is used in the creation of bottles made from 100% recycled plastic* (rPET)–all thanks to consumers who recycle, thus contributing to the circular economy of plastic and reducing waste."[19]

108. Separately and together, the above indications constitute recyclability claims and communicate a clear message of recyclability to consumers.

109. In reality, 0% of fairlife's bottles are recyclable.

110. Fairlife bottles are all wholly or partially PET or PETE opaque plastic.

111. In order to create opaque plastic, titanium dioxide is used in the construction of the plastic. Titanium dioxide (TiO2) is also used to create a specific sheen for the plastic. If TiO2 is present in the plastic, it renders the plastic *not* recyclable by current available means, called mechanical recycling.

112. Fairlife used bottles that are sent to be recycled are ultimately pulled out and discarded and/or burned, and *not* recycled into a new product.

113. In addition, where there are attempts to recycle the plastic used to create fairlife bottles, it not only does not succeed, the intermixing of the fairlife bottles with the clear PET bottles contaminates the supply of plastic recycling from other brands and companies, damaging the integrity of the plastic products the recycling process is intended to create and frustrating the purpose of recycling

[19] Coca-Cola, Recycling in the United States, https://www.coca-colacompany.com/sustainability/packaging/united-states-recycling (last visited Jan 17, 2025).

altogether. Put another way, fairlife's recycling fraud is not only harming consumers and the environment vis-à-vis fairlife's bottles, but also a scourge to the institution of plastic recycling and the very concept of it.

114. Even industry trade group APR, of which Coca-Cola is a member, publishes a design guide which classifies white or opaque pigmented plastic as "detrimental to recycling" because of the TiO2.[20]

115. Coca-Cola is a member of another trade group as part of the Ellen MacArthur Foundation ("EMF") U.S. Plastics Pact. APR and the EMF Group U.S. Plastics Pact ("Plastics Pact") are perpetuating false and misleading information to communicate to the consuming public greater recyclability and commitment to recycling of plastics than is actually the case.

116. Even so, fairlife's packaging violates even the low AMF and EMF standards.

117. The Plastic Pact set forth specific targets. The first was to define a list of problematic or unnecessary packaging by 2021 and take steps to eliminate the items on the list by 2025. The second target was to make 100% of plastic packaging recyclable, compostable, or reusable by 2025.[21] The problematic and unnecessary materials list includes "Opaque or Pigmented PET–Polyethylene Terephthalate bottles (any color other than transparent blue or green)."[22]

---

[20] APR Design Guide, "The Authority on Recyclable Plastic Packaging Design," PET Rigid, Color, at https://plasticsrecycling.org/apr-design-hub/apr-design-guide/pet-rigid/, direct link at https://plasticsrecycling.org/apr-design-hub/apr-design-guide/pet-rigid#color-opaquewhite, (last visited Jan 17, 2025).

[21] U.S. Plastics Pact, U.S. Pact 2023-2024 Impact Report, at https://usplasticspact.org/2023-24-Impact-Report/ (last visited Jan. 17, 2025).

[22] U.S. Plastics Pact, U.S. Plastics Pact Problematic and Unnecessary Materials Report, at https://usplasticspact.org/problematic-materials/ (last visited Jan. 17, 2025).

118. The bottles, which contain TiO2 for opaque colored pigment and sheen, are deceptively advertised as recyclable, containing component(s) that eliminate and/or significantly limit the ability to recycle the items.

119. The recyclability claims related to fairlife products are in violation of the FTC Green Guides, which sets forth standards for such advertising, as well as the state laws that adopt the Green Guides, including California.

120. Fairlife is the only brand that uses opaque pigmented plastic drink containers. Its competitors use clear PET bottles or similar packaging.

121. As fairlife grows, the damage to consumers and the environment from the recycling fraud and contamination is accelerated and exacerbated.

122. Fairlife knowingly perpetuates this fraud and deception, and it is aware that its packaging is not recyclable. It is also aware that its packaging contaminates plastic recycling more broadly. It has made admissions that "clear PET … better supports recyclability and material circularity."

123. Defendants also know, or should know, that consumers do in fact put these bottles in to be recycled, have the expectation that they will be recycled, and Defendants know that in reality at least some of the plastic used to make them makes it into the recycling processing chain such that they contaminate the recyclability of other plastics.

124. In or before 2021, fairlife conducted market research and testing on clear PET bottles because that "better supports recyclability." It also made the claim that "we are getting closer to our long-term goal of 100% recyclable packaging." This statement is false and deceptive because it has not launched clear PET bottles. They also set a false and misleading 2022 goal of "launch[ing] additional products in 100% recyclable clear PET material."

125. There are no operating recycling facilities that would consider opaque plastic PET bottles–including fairlife bottles–to be recyclable.[23]

126. On information and belief, at some recycling facilities, the process does not (fully) sort out the white or opaque PET plastic used in fairlife bottles from the clear PET, so some of them do get into the stream and cannot be recycled themselves and contaminate the clear recyclable plastic.

127. There is no end market able or willing to purchase the fairlife plastic bottles and recycle them into new products or for use in new products.

128. On information and belief, fairlife plastic bottles actually contaminate the plastic recycling stream, causing structural damage and destruction of the recycled product. In response, multimillion dollar insurance payments have been made to settle claims for the damage to other companies for harm that can be traced back to fairlife bottles.

129. There is no reasonable basis for Defendants' recyclability claims and they cannot be substantiated.

130. The material recyclability claims are false and misleading to consumers, both because the product packaging is not in fact recyclable and because Defendants belie the greater harmful effect of the contamination the fairlife packaging causes to the plastics recycling supply chain more broadly. Both types of harm are further aggravated by the growth of the brand, driven by the false, misleading, and fraudulent practices alleged herein as a whole.

131. Defendants also regularly tout their sustainability practices in the context of the biogas anerobic manure digesters via their manure sustainability claim. Defendants are pioneers in the biogas industry. Referring to their biogas

[23] https://plasticsrecycling.org/how-recycling-works/the-plastic-recycling-process/

digester system, Sue McCloskey has said "it's the ultimate in recyclability" and touted the system as the way Defendants exceeded dairy industry climate change goals.[24] About fairlife, she has said, "We have created a renewable biofuel… we displace 2 million gallons of diesel from having to be mined from the earth every year."[25]

132. In reality, dairy biogas digesters are profit centers for highly industrialized and consolidated dairy companies. The success of their business model relies upon increasing consolidation and growth of the number of animals confined in these industrial farms.

133. Biogas digesters also present their own environmental damage risks and hazards. For example, they can leak methane, and one such leak resulted in a fine from the Marion County, Indiana Department of Environmental Management against the McCloskeys' Prairies Edge Dairy Farms in 2017.[26] Biogas digesters can also present an explosion risk.

134. While advertising fairlife as a sustainable brand and touting its practices such as biogas as climate change solutions, Defendants were all the while fighting the characterization of dairy as a contributor to climate change and the regulation of greenhouse gases via the dairy checkoff program.

---

[24] Christine Kopaczewski, "Meet 2017 Awesome Women Awards Honoree, Sue McCloskey," Good Housekeeping, August 17, 2017, available at https://www.goodhousekeeping.com/life/inspirational-stories/a45431/awesome-women-awards-sue-mccloskey/ (last visited Jan 11, 2025).

[25] The Innovation of Milk, Sue McCloskey, May 18, 2018, Tedx Talks https://www.youtube.com/watch?v=IhZwSu394D8.

[26] *State of Indiana County of Marion Commissioner of the Department of Environmental Management v. Prairies Edge Dairy Farms LLC*, Case No. 2017-24978-A (2017).

135. In touting their sustainability–even recyclability–of the biogas component of their operations, Defendants mislead consumers by mischaracterizing these systems as a means to reduce the carbon footprint of the dairy industry and their role in it. In reality, even if these biogas systems reduce the per-animal carbon footprint, their very structure and purpose is to accelerate the growth of the number of animals and concentration of animals so rapidly that the Defendants' ultimate contribution to environmental degradation is exacerbated by its biogas digesters, not alleviated by them.

136. Select Milk and fairlife were focused on rapid growth, consolidation, and profit creation. Central to that strategy was the "story" of environmental sustainability and high levels of care for the cows.[27] As alleged herein, that story was and continues to be false and misleading. Defendants continued to grow, consolidate, and concentrate more and more animals while the typical "family" dairy farmer lost profits and went out of business. Politico called Mike McCloskey the "closest thing to a rock star in the industry."[28] Defendants' growth both relied upon the false and misleading representations about sustainability and animal care and also caused the harms to the environment and to animals to be immeasurably worse.

---

[27] In one germane example, fairlife, LLC and Continental successfully lobbied for taxpayer funding of a pipeline for their family of large dairies to the Continental/fairlife Coopersville, Michigan plant. Defendants lobbied for this money based on a representation that fairlife is "dedication to animal care and comfort, and a commitment to agricultural sustainability." Michigan Strategic Fund Board Meeting Packet, December 2019, pp. 67 and 113. Available at https://www.michiganbusiness.org/4a8352/globalassets/documents/msf-board/msf-board-packets/december-2019_msf-board-packet_final_redacted.pdf (last visited Jan 11, 2025).

[28] David Rogers, "GOP, Industry Rift Spills Over," Politico, Dec. 30, 2012, available at https://www.politico.com/story/2012/12/gop-industry-rifts-bring-milk-imbroglio-to-a-head-085589 (last visited Jan 11, 2025).

137. In addition, Defendants' sustainability claims also communicate a false and misleading message of high animal care to consumers. The evidence of mistreatment of animals as described above also renders any representation of sustainability false and misleading.

138. Fairlife's brand was built and grown on false and misleading animal care and sustainability messaging from the brand's inception. In actuality, this was a fiction meant to drive profit through growth, consolidation, and artificially increasing prices and the number of purchases. That growth further exacerbated–and continues to exacerbate–the harms caused by their false and misleading advertising.

139. In the early 2000's, consumer demand for milk was naturally declining in favor of other products, and milk prices were dropping. Select Milk and fairlife co-founder Sue McCloskey has described the initial creation of Select Milk and growth of the brand through the creation of a "story" of high animal care and sustainability:

> "[Mike McCloskey] came home from that cooperative meeting and… Mike challenged us to do something better [than the existing cooperative structure at the time], so we got out a map around our farm and we drew a big circle and within the 300 mile radius circle, we started identifying milk buyers and processors. And then we started knocking on and what we told these milk buyers was that because of the incredible care we were able to give our cows, we were able to create this incredibly high-quality milk. We emphasized to them that we had a story to tell that their consumers were really looking for. One milk buyer company got it… they saw the big picture of how having this higher quality milk and having this story behind it was not only going to be beneficial to their bottom line, but also to their consumers. So we invited them to come out to the farm…Because of our belief in quality and transparency, we actually–together with a bunch of like-minded dairy farmers–created our own dairy cooperative, Select Milk Producers. Today, Select Milk Producers is one of the largest dairy co-ops in the country…As big as we are today, really it's all about the same values that we had at that small little 300-cow dairy farm in California. It's about making sure that our girls are extremely well taken care of, comfortable, have wonderful fresh air. It's about making

> the higher quality milk for our consumers and it's about creating continuous improvement practices so that our farms can continue to become more and more sustainable."[29]

140. This kind of sustainability and animal care messaging has continued and gotten more egregiously false and misleading over time, continuing to the present day.

141. A central part of the fairlife brand's development, strategy, and focus is to anticipate the (legitimate) animal welfare and sustainability concerns of the consuming public and the nonprofit organizations that represent those public values. The strategy to address this included spinning a false and misleading story of high animal care, and the creation of Fair Oaks Farms, discussed in more detail below.

142. Sue McCloskey commented on a "mommy blogger" page about the impetus behind the creation of the high animal care brand identity and claims, including the creation of Fair Oaks Farms, saying "It's funny that you mention PETA because they, along with a number of other acronym-named organizations, were exactly the catalyst that prompted us to open our doors. I think we all know that they have a vegan agenda and are willing to perpetuate myth or emotions to the fact level. There's not much we can do to change their minds other than what we're doing, which is trying to have an honest discussion."[30]

143. Dismissing potential critics as perpetuating myths and emotions while framing the presentation of their "story" as "transparent" and "honest" became and continues to be hallmark of the fairlife brand, all the while knowing these were false, misleading, and disparaging.

---

[29] The Innovation of Milk, Sue McCloskey, May 18, 2018, Tedx Talks https://www.youtube.com/watch?v=IhZwSu394D8 (last visited Jan 21, 2025).

[30] Mommy Shorts, Our Big Trip to Fair Oaks Farms, 2016, Comment Section https://www.mommyshorts.com/2016/07/big-trip-farm.html (last visited Jan 21, 2025).

144. A particularly nefarious aspect of this was Defendants attempted–and in many ways successful–capture of animal advocacy and environmental leaders to praise the brand and further the lie of high animal care and sustainability. Survey data shows public opinion opposing animal cruelty is near universal, at well over 90%, and most of that population is concerned about factory farming practices.

145. Defendants were aware of the negative public critiques of factory farming on animal treatment and environmental grounds and specifically chose to craft their story to prevent and diminish the impact of such criticism from being directed at them.

146. One such component of their strategy was the creation–and continued operation–of Fair Oaks Farms, discussed below.

147. Another component was the use of specific animal protection and environmental charity leadership to neutralize and co-opt these groups to actively praise fairlife, which Defendants used in promoting the brand to consumers. It was also a preemptive strategy to discredit and minimize any criticism or inquiry that might arise, including from undercover investigations, such as the ones ARM conducted.

148. The Humane Society of the United States ("HSUS") (now called Humane World for Animals) is one of the nation's largest animal protection nonprofit organizations. Its mission is to create a better world for all animals. Its most recently published IRS Form 990 in 2023, which shows assets over $414 million and contributions of over $157 million. HSUS has represented its membership and constituency level at 11 million, or "1 in 28" Americans. It is also well known for its campaigns against factory farming, including undercover investigations showing animal cruelty and inhumane conditions and practices. In 2012, Mike McCloskey invited HSUS' then-President and CEO, Wayne Pacelle, to tour Fair Oaks Farms and presented the same false and misleading narrative about

animal care and sustainability to him. In response, Pacelle publicly praised the operation, calling McCloskey "innovative" and "charismatic," praising both the animal care–saying he "didn't see the animals exhibiting any lameness" and "I celebrate his steps toward more humane treatment"–and the environmental sustainability in the form of the biogas digesters, calling them "innovations in manure management and energy production." [31] The McCloskeys then quoted these positive statements in promoting fairlife,[32] co-opting the goodwill of HSUS, using it as a mouthpiece to communicate false and misleading advertising to consumers, and

---

[31] "It's a mega-dairy for sure, but the charismatic owner of this farm, Michael McCloskey, has been an innovator within the industry. For years, he's been a dissenter when it comes to the once-standard practice of tail docking, and every one of the cows on his farm has a tail, as she was meant to have. The cows bed on sand, which is more comfortable for the animals than concrete, and I didn't see the animals exhibiting any lameness as they walked back and forth between their living area and the milking facility.

The cows are milked by machine on an automated rotary, and the whole enterprise bears little resemblance to the images of a family dairy. But I celebrate his steps toward more humane treatment, as well as innovations in manure management and energy production (he's developed digesters to transform the manure into energy and to fuel the entire complex and his fleet of 18- wheelers that haul the milk to pasteurizing plants and then to market)." Wayne Pacelle, Humane Nation Blog, "Moving Forward for Pets and Farm Animals in the Heartland," Aug. 17, 2012, found in web archive at https://web.archive.org/web/20180613055645/https://blog.humanesociety.org/2012/08/farm-shelter-tour.html on Jan 5, 2025.

[32] *See, e.g.*, from the same mommy blog comment that indicates PETA and similar groups were the driving force behind the creation of Fair Oaks, Sue McCloskey says "You might find the following link an interesting read; http://blog.humanesociety.org/wayne/2012/08/farm-shelter-tour.html. In it, Wayne Pacelle, CEO of the USHS, talks about his visit to Fair Oaks Farms. It's pretty positive about what we are doing…" Mommy Shorts, Our Big Trip to Fair Oaks Farms, 2016, Comment Section https://www.mommyshorts.com/2016/07/big-trip-farm.html (last visited Jan 21, 2025).

further insulating its brand from criticism and driving sales and prices up based on false and misleading representations of animal care.

149. People for the Ethical Treatment of Animals ("PETA") is a well-known large animal rights organization, touting 9 million members and supporters and calling itself the largest animal rights organization in the world. Among other anti-factory farming campaigns, PETA has been conducting undercover investigations of factory farms for decades revealing abuse and inhumane conditions, and criticizing the meat, dairy, and egg industries, encouraging consumers to boycott them by going vegan. Defendants were able to get even PETA to make a positive statement about fairlife, praising its public commitment to phase out dehorning of calves. This commitment never came to fruition, as evidenced by the 2024 Investigation of Butterfield by ARM. The false and misleading nature of this empty phase-out commitment was compounded by co-opting and deactivating potential critique by PETA, perhaps the most notorious anti-factory farming voice for consumers in the world.

150. In 2019, the McCloskeys were made aware that ARM had conducted an undercover investigation of fairlife suppliers before the video was made public. Mike McCloskey reached out to ARM's founder and lead investigator Richard Couto in an attempt to align himself with ARM in exchange for ARM agreeing to cancel its impending public release. This effort was not successful.

151. The World Wildlife Fund ("WWF") touts itself as the world's leading conservation organization, with a worldwide reputation for environmental sustainability and wildlife protection. Its 2023 IRS Form 990 lists over $355 million in contributions. WWF has a number of campaigns, including a major one on plastics pollution. WWF is a leading member of the U.S. Plastics Pact, indicating to consumers the legitimacy of the program and its commitments. Defendant Coca-Cola is also a member of the U.S. Plastics Pact and sits on its board. Recyclability

WAYMAKER

claims of fairlife are further given a false boost by the co-opting of the public goodwill and trust in the WWF.

152. From the early days of crafting the high animal care and sustainability "story" around Select Milk and then Fair Oaks and the fairlife brand, using it to boost its growth and profitability, Defendants knew, or should have known, the "story" was false and misleading to consumers. Defendants were fully aware of and even cited consumer concern over animal care and environmental destruction by consolidated dairies like theirs as an impetus to craft the story.

153. At the time they were crafting the high animal care and sustainability "story," Defendants specifically knew of and were driven by the undercover investigations of other dairies and industrial animal agriculture conducted by HSUS and PETA and saw the negative consequences of the revelation of the truth of industrial animal farming. Creation of this "story" of animal care and sustainability must have been done with the knowledge and intent of the animal care and sustainability claims being false and misleading to consumers, as a contrast to the damage the exposure of the truth would have caused the brand.

154. Defendants also knew that some of the practices their farms engaged in were cruel and unnecessary for business purposes, such as dehorning. Fairlife made public statements regarding their intent to phase out dehorning and other cruel and publicly unpopular standard practices, and then later reneged, continuing these practices to this day. This appears to have been done specifically to deceive and mislead.

155. Following ARM's 2019 investigation, the *mea culpa* public response by McCloskey, fairlife, and other Defendants, there was no longer any plausible deniability that the animal care representations were false and misleading to consumers. The response was to make public commitments to making changes, although they never legally admitted any wrongdoing.

156. The changes Defendants committed to making in the wake of the ARM 2019 Investigation and the ensuing consumer protection class action lawsuit were aimed at communicating to consumers an outcome of high levels of animal care, including absence of cruelty and neglect. In reality, these were merely policy and process commitments that the Defendants knew were set up to fail to prevent animal abuse and neglect. Their true purpose and effect were to falsely alleviate the concerns of the consumers while attempting to distance Defendants from potential future liability, and ultimately to tout these so-called changes as a way to further increase profits and growth.

157. On information and belief, the changes Defendants purported to make in the wake of the 2019 Investigation regarding firing offenders and cutting ties with offending entities were not genuine. For example, Defendants merely moved some of the worst offending employees and managers from the Indiana farms to a more out-of-sight location at fairlife's Puerto Rico facilities/suppliers.

158. The 2023 ARM Investigation revealed widespread animal cruelty and neglect, and removed any doubt about Defendants' knowledge that its animal care claims were false and misleading, and eliminated the ability for Defendants to credibly use the same strategy of issuing a public *mea culpa* paired with a promise to do better in the future.

159. Instead, Defendants' response to the 2023 ARM Investigation was to discredit ARM's claims by denying their veracity, falsely distancing themselves from what could not be denied, and threatening ARM with a defamation lawsuit if they did not cease their public allegations. All of this had the intent and effect of shutting down the media attention on the story, which yielded almost no publicity, and successfully shielded Defendants from what could have been widespread bad publicity. What cannot be denied, however, is that the 2023 ARM investigation caused Defendants to have both actual and constructive knowledge of extreme and

WAYMAKER

widespread animal cruelty, and therefore the falsity and misleading nature of their animal care claims.

160. The most recent 2024 and 2024-2025 ARM Investigations reveal animal cruelty at a frequency, scale, and scope across the fairlife supply chain that is unprecedented. In addition, multiple high-level managers and employees are directly implicated in criminal-level cruelty across different locations and supplier types. Individual and corporate defendants are legally liable for this cruelty.

161. Today, the misleading nature, level of falsity, and fraud of the fairlife animal care and sustainability claims are all at an all-time high. The claims themselves are more egregious and robust, while the evidence of animal cruelty and environmental degradation has never been so extreme and widespread, nor so clearly linked to the higher-ups and corporate levels.

162. Fair Oaks Farms is an umbrella name for a number of operations that take place at or near a Fair Oaks, Indiana compound. This includes but is not limited to Fair Oaks Farms, which is a d/b/a for Lake States Dairy Center and is also referred to as Fair Oaks Dairy Adventure. It includes working dairies, a small portion of which are visible to the public via tours, as part of the "Dairy Adventure," as well as a "Pig Adventure" which as a pork producing facility, and a "Crop Adventure" which includes attractions like U-Pick.

163. The Fair Oaks Farms Dairy Adventure includes the Dairy Adventure Museum, tours on a cow-spotted and pig-snout painted tour bus, tours that show milking, and the birthing barn where guests can see cows giving birth. It is particularly targeted at children and families, including school tour groups. It includes displays with fiberglass cartoon cows representing their diva-like care.

164. Fair Oaks Farms holds representations of high animal care and environmental sustainability as central to its brand, messaging, and purpose. The Fair Oaks Farms website describes the Dairy Adventure Museum as 15,000 square

foot experiential learning space, saying, "Have fun learning about cow comfort, manure management, milk production, and the many other aspects of sustainable dairy farming that help feed the world!" and "meet the farmers who provide dairy to the world, and realize just how much goes into sustainably producing dairy."[33]

165. Fair Oaks Farms exists to promote the fairlife brand. The fairlife brand is advertised and sold throughout the facility, and Fair Oaks Farms represents to its customers that the milk produced on site is bottled as fairlife milk and other fairlife products.

166. As discussed throughout this First Amended Complaint, representations of high animal care and sustainability regarding fairlife are in fact false and misleading.

167. A central feature of the origin and continued operation of Fair Oaks Farms is the promotion of sale and growth of the fairlife brand on the basis of high animal care and sustainability claims while also being a mechanism in anticipation of criticism of those very issues, in order to discredit and mislead consumers and consumer-facing leaders about fairlife's practices.

168. In the 1990's, Defendant Select Milk became aware of the threat the industry faced from undercover investigations that animal protection organizations such as PETA and HSUS were conducting, as discussed above. Select Milk commissioned a White Paper to assess the threat from such groups and decided to preemptively create a high animal care narrative.

169. The center of this strategy was the creation of Fair Oaks Farms for this purpose. Select Milk hired Gary Corbett to launch Fair Oaks Farms, who told Pacific Standard in 2019 that the White Paper Select Milk commissioned in the 1990's on so-called "anti-agriculture" activists found "these groups tend to be very

[33] Fair Oaks Farms, Planning your Adventure at Fair Oaks Farms, "The Dairy Adventure Museum" at https://fofarms.com/activities/ (last visited Jan 24, 2025).

committed to their cause, very articulate, very well-funded, and passionate," and referred to himself as one of the "founding fathers" of Fair Oaks Farms.[34]

170. As Pacific Standard reported:

> "With fewer farms and fewer farmers to sway consumers toward their side, the co-op worried that city folks, whom Corbett calls their "urban brethren," could fall prey to PETA's messaging. "Our initial reaction was that we've got to go on the offense," Corbett says. There was only one solution: Win the public over before it could turn on them. Prominent reformers in the industry, like celebrated animal scientist Temple Grandin, had already suggested that farms turn the metaphorical "high walls of industrial agriculture" into glass. Why not be literal about it? "We thought maybe the best credibility builder is if we invite people into our home," Corbett says."[35]

171. The inception of Fair Oaks farms came from the desire to combat the perceived threat of criticism and exposure by animal advocates. Specifically, the threat was defined as the threat of undercover investigation by animal advocates. Undercover investigations, by their very nature, reveal the truth of an operation. The focus on transparency or "inviting people into our home" in the form of Fair Oaks Farms, which began as a central concept and continues to be so today, is definitionally distinct from Defendants' point of view from the literal truth as revealed by undercover investigations. This indicates both that Defendants knew, or should have known, that their animal care representations were false and misleading–and in fact created them to be so–and that animal abuse, neglect, or

[34] Emily Moon, Dairy Disneyland: One Farm's Quest to Save Industrial Agriculture, Pacific Standard, March 19, 2019, at https://psmag.com/environment/dairy-disneyland-one-farms-quest-to-save-industrial-agriculture/ (last visited Jan. 24, 2025).

[35] *Id.*

other mistreatment was occurring. ARM's 2019 and 2023 Investigations only served to remove any doubt of that knowledge or intent.

172. Further, the Fair Oaks Farms animal care concept and messaging (later to include environmental sustainability, particularly as the biogas elements of Defendants business model were implemented) was refined and developed via research into other museums and improving the appeal of Fair Oaks Farms based on that, the use of an outside advertising agency, and collaboration with government agencies in a way that resulted in checkoff funds being used to fund Fair Oaks Farms.

173. Fair Oaks Farms is a successful instrument of the fairlife brand's false advertising and the animal cruelty taking place in its supply chain. Currently it's considered the number one agritourism destination in the Midwest.[36]

174. Fair Oaks Farms has 12 farms on or near its campus. Two of these farms are Windy Ridge and Windy Too, owned by Steve Bos.

175. Fair Oaks Farms sells milk and milk products at its retail stores from its on-site farms. These products are labeled and advertised as fairlife products.

176. Windy Ridge and Windy Too were investigated by ARM in 2019. Subsequent to the investigation and confirmed as part of the ensuing 2022 class action litigation settlement, fairlife claimed to have Windy Ridge and Windy Too out of its supply chain and made public representations to that effect.

177. In 2023, ARM conducted a new investigation of Windy Ridge and Windy Too. During the course of that investigation, ARM found evidence of truck routes transporting milk from Windy Ridge to the Coopersville, Michigan plant.

[36] Austin Frerick, Barons: Money, Power, and the Corruption of America's Food Industry 70 (2024).

178. In the publicization of the investigation, ARM represented that fairlife was still being supplied by Windy Ridge and Windy Too, which was reported in at least one media outlet.

179. On information and belief, in response, fairlife and Coca-Cola communicated with media outlets denying that they sourced any of their milk from Fair Oaks Farms, including Windy Ridge or Windy Too, which are two of the farms on or near the Fair Oaks Farms compound.

180. No additional media covered the ARM investigation, or the connection ARM alleged between Fair Oaks Farms / Windy Ridge and Windy Too and the Coopersville fairlife plant following fairlife and Coca-Cola's denial.

181. Around the same time as ARM's 2023 public release and this denial, fairlife and Coca-Cola privately sent ARM a cease-and-desist letter from a law firm in Ohio, followed by a voicemail message to the same effect. In this letter and voicemail, fairlife and Coca-Cola denied the sourcing from Fair Oaks Farms, insisted that ARM cease making those statements, and threatened a defamation lawsuit.

182. Steve Bos also denied any connection between his farms Windy Ridge and Windy too and Fair Oaks Farms or fairlife in 2023 following the ARM investigation[37], telling the Chicago Tribune, "I would like to make it clear that I do not sell milk to [f]airlife, I am not one of the dairies of Fair Oaks Farms, and [Fair Oaks Farms owners] Sue and Mike McCloskey do not have ownership in Windy Ridge Farm."

183. However, Bos and McCloskey were listed as officers in the 2022 IRS Form 990 for Lake States Dairy Center Inc. in Fair Oaks, Indiana, with Bos listed as

---

[37] https://plasticsrecycling.org/how-recycling-works/the-plastic-recycling-process/.



WAYMAKER

the Principal Officer and President and Board member, and McCloskey listed as Secretary and Board member. Steve Bos is listed as the Principal Officer and board member for Lake States Dairy Center in the 2023 IRS Form 990. The 990s also list the website as fairoaksdairyadventure.com. Fair Oaks Farms is a d/b/a for Lake States Dairy Center.

184. In response to the denial and the cease-and-desist letter and voicemail, ARM issued a statement saying it had evidence of a truckload of milk driven by a Ruhan trucker going from Windy Ridge to Coopersville on September 11, 2023, to be sold as fairlife milk.

185. In response to this statement by ARM, fairlife and Coca-Cola admitted a singular truckload did in fact go from Windy Ridge to the Coopersville fairlife plant on September 11, 2023 but stated that it was a test run and subsequently dumped.

186. Shortly after this admission, ARM realized that the date it had cited in its response was in error. In reality, their evidence shows a shipment on September 10, 2023.

187. In December of 2024, a milk truck was followed from Windy Ridge to Coopersville, and the truck was documented entering the Continental Dairy entrance to the plant.

188. Continental Dairy and fairlife products are manufactured at the same Coopersville plant. Continental Dairy and fairlife share infrastructure at the Coopersville plant, which is considered one stationary source by the Michigan Department of Environment, Great Lakes, and Energy Air Quality Division.

189. Raw milk that enters the Coopersville plant is stored together in a storage silo. It is then divided into Continental Dairy products, which are powdered milk, and fairlife products, which remain liquid. Any milk that enters the

Coopersville plant is mixed together, and the Continental and fairlife-destined milk are not kept separate. Any given truckload will supply at least some fairlife milk.

190. On information and belief, Windy Ridge and Windy Too have been supplying and continue to supply fairlife since at least 2019.

191. Following the 2024 Investigations being made public in February of 2025, fairlife and United Dairymen of Arizona (UDA) both made public statements indicating that the ARM video contained unacceptable animal abuse and that they had suspended operations with the farms, i.e., Rainbow Valley and Butterfield dairies.

192. UDA and fairlife are closely connected entities. The entities and membership of UDA along with Select Milk conduct much of fairlife's operations. The partnership UDA has with fairlife has been made public since the time fairlife created Arizona-based operations, with UDA handling much of the fairlife business in the region. In the 2024 Investigations, Rainbow Valley and Butterfield dairies were UDA members. In addition, ARM found that UDA drivers would cross off the UDA logo on transport records and hand write a given dairy when the trucks were going directly to fairlife, indicating a direct agency relationship in addition to the partnership and contract structure UDA and fairlife already have in place. UDA's connection to fairlife and the other defendants predates the Arizona fairlife facility's opening by more than a decade. The late Arie De Jong served on the board of directors of UDA for more than 24 years, including as its vice president and on the executive committee. Arie De Jong is related to both Thomas De Jong (owner of Rainbow Valley and Butterfield dairies) and Donald De Jong, who is on the fairlife board, owner of one of the farms ARM investigated and found cruelty in 2019, and the Chair of Select Milk Producers. Arie De Jong's company purchased a former auto parts plant in 2008 in Coopersville, Michigan to become the Coopersville, Michigan Contintental/fairlife plant.

193. Following the publicity of the ARM 2024 Investigations, fairlife's public statement read:

> "The mistreatment of animals depicted in the recent videos is unacceptable. Effective immediately, our supplier, United Dairymen of Arizona (UDA), has suspended delivery of milk from these facilities to all UDA customers, and together we are looking into the circumstances surrounding these videos. We have zero tolerance for animal abuse. Although we operate as milk processors and do not own farms or cows, we mandate that all our milk suppliers adhere to stringent animal welfare standards, and we expect nothing less."

Notably, fairlife speaks for UDA as well as itself in this statement, further indicating control and collusion.

194. UDA's statement added "we are shocked and saddened by the behavior depicted in the recently released videos… there is no place within our cooperative, or in our society, for mistreatment of animals." UDA condemned the conduct in the video and referred to it as "horrific." It also stated:

> "To ensure the highest standards of animal care across UDA member dairies, each farm participates in the Farmers Assuring Responsible Management (FARM) program, a national initiative designed to bring uniformity and assurance to the realm of animal welfare in dairy farming. Additionally, UDA invests substantial resources to provide the DairyKind training platform for all UDA member dairies. This platform equips dairy employees with the necessary skills and knowledge to ensure that every animal in their care receives proper, compassionate treatment," the statement continued.
>
> "There is no place within our cooperative, or in our society, for mistreatment of animals. While we look into the circumstances surrounding these videos, UDA has suspended delivery of milk from these facilities to all UDA customers."

195. In reality, neither UDA nor fairlife has suspended operations from Rainbow Valley and Butterfield Dairies. Instead, these farms appear to have at least



WAYMAKER

predominantly switched from day-time truck transport of milk (as was the practice during the ARM 2024 investigation) to transporting milk late at night while it is dark and the roads are relatively empty. During these routes, (unrefrigerated) trucks load up with milk at Rainbow Valley and Butterfield Dairies. All of the trucks observed over the course of multiple nights then go to the UDA processing plant. Once there, on information and belief, the raw milk is then pumped into a silo, comingling it with raw milk from whatever other locations where milk is being trucked into the facility. Some of these trucks take a circuitous route to the UDA facility, taking early exits and inefficient paths. Subsequently, raw milk is pumped from UDA, likely from those comingled silos into trucks which then regularly transport the milk to the fairlife plant.

196. ARM's 2024 Investigation also found that fairlife has a practice of using the milk silos at UDA to store excess milk from the fairlife plant for fairlife milk, another indication UDA silos may still contain fairlife milk.

197. This practice of taking milk from farms fairlife purports to have been eliminated or suspended from its supply chain and then mixing the milk in a silo before sending it back into the fairlife supply chain constitutes a pattern. Following both the 2024 Arizona Investigations and the 2019 Investigations, fairlife publicly committed to cutting the offending farms from its supply chain and then was found to be sending truckloads of milk ultimately to fairlife processing plants in this way. This is also similar to the 2023 pattern described above. In all instances, this pattern and practice also involved fairlife and UDA either directly or through its connections with Arie De Jong.

198. At the very least, this conduct constitutes bad faith, collusion, deception, and fraud.

## V. CLASS ACTION ALLEGATIONS

199. **Class Definition:** Plaintiffs Cornelius, Bhotiwihok, and Paugh bring this civil putative class action on behalf of themselves individually, and on behalf of all others similarly situated, as a class action pursuant to Rules 23(b)(2), (b)(3), and, as applicable, (c)(4) of the Federal Rules of Civil Procedure. The "Class" that Plaintiffs seek to represent are composed of, and defined as follows:

"All persons residing in California who purchased Defendants' fairlife Products during the relevant time period (February 26, 2021 thought the present)."

200. Excluded from the above Class are Defendants, any entity in which Defendants have a controlling interest or that has a controlling interest in Defendants, and Defendants' legal representatives, assignees, and successors. Also excluded are those who purchased the fairlife products for resale; all persons who make a timely election to be excluded from the Class; and the judicial officers and staff to whom this case is assigned and any immediate family members thereof.

201. Plaintiffs reserve the right to modify the definition of the proposed Class (or add one or more subclasses) should it be necessary and/or after further investigation or discovery.

202. This action may be properly brought and maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. As alleged below, this class action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements.

203. Upon application by Plaintiffs' counsel for certification of the Plaintiff Class(es), the Court may also be requested to utilize and certify subclasses in the interests of manageability, adequacy, predominance, and/or superiority requirements.

204. **Numerosity:** The number of persons within the Class is substantial, estimated to be in excess of 100,000 persons dispersed throughout California. It is, therefore, impractical to join each member of the Class as a named Plaintiff. Accordingly, the utilization of the class action mechanism pursuant to Rule 23 is the most economically feasible means of determining and adjudicating the merits of this litigation and is in the interests of judicial economy. It is estimated that Defendants have sold millions of units of the fairlife products to Class members in California.

205. **Commonality and Predominance:** This civil action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

i) whether the representations alleged herein that Defendants made about the fairlife products were or are true, misleading, or likely to deceive a reasonable consumer;

ii) whether Defendants took adequate steps to ensure that the representations they made concerning the treatment of animals, sustainability, and recyclability were true, or whether they intended to make such false and misleading representations, and whether they knew, or should have known, that such representations were false and misleading to consumers;

iii) whether the representations alleged herein concerning fairlife Products were material to a reasonable consumer's purchasing decision;

iv) whether Defendants engaged in false or misleading advertising;

v) whether Defendants' conduct constitutes violations of the laws asserted herein;

vi) whether Plaintiffs and the other Class members have been economically injured and the proper measure of their losses or restitution as a result of those injuries; and

vii) whether Plaintiffs and the other Class members are entitled to injunctive, declaratory, or other equitable relief.

206. **Typicality:** The claims of the named Plaintiffs are generally the same or typical of the claims of the members of the Class, and the named Plaintiffs' interests are consistent with, and not antagonistic to, those of the other Class members they seek to represent. The named Plaintiffs and all members of the Class have been injured by and/or sustained actual economic loss, and face continuing harm arising out of, Defendants' continuing uniform unlawful conduct as alleged herein.

207. **Adequacy**: The Plaintiff Class representatives have no interests that are adverse to, or which conflict with, the interests of the absent members of the Class and are able to fairly and adequately represent and protect the interests of such a Class. Plaintiffs have raised viable statutory and common law claims of the type reasonably expected to be raised by members of the Class and will vigorously pursue those claims. If necessary, Plaintiffs may seek leave of this Court to amend this First Amended Complaint to include additional Class representatives to represent the Class as may be appropriate.

208. **Competency of Class Counsel**: Plaintiffs have retained and are represented by experienced, qualified and competent counsel who are committed to prosecuting this class action. Class counsel have significant experience in consumer protection, product liability, animal protection rights, and/or complex civil class action litigation.

209. **Superiority**: Class actions serve an important function in the judicial system by providing a vehicle whereby the claims of many individuals can be resolved at the same time. The class action procedure both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress. A class action is superior to other viable methods for the fair and efficient

adjudication of this controversy since individual litigation of the claims of all Class members is impracticable. Even if every Class member could afford to pursue individual litigation, the court system could not. It would be unduly burdensome and unwieldy to the courts in which individual litigation of numerous cases would proceed. Individualized and piece meal litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual and legal issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues raised herein, presents few management difficulties, provides comprehensive supervision by a single court, and conserves the resources of the parties and the court system and protects the rights and interests of each member of the Class. Plaintiffs do not anticipate any unusual difficulties in the management of this civil action as a class action.

210. Additionally, the prosecution of separate actions by individual Class members may create a risk of multiple adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to such adjudications or that would substantially impair or impede the ability of such nonparty Class members to protect their interests. The prosecution of individual actions by Class members could establish inconsistent or contradictory results and result in establishing incompatible standards of conduct for the Defendants.

WAYMAKER

## VI. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Breach of Express Warranty

*(All Plaintiffs Against Defendants fairlife and Coca-Cola)*

211. Plaintiffs reassert the allegations set forth in Paragraphs 1 through 210 above and incorporate such allegations in full by reference herein.

212. Express warranties by sellers of consumer goods are created when an affirmation of fact or promise is made by the seller to the buyer, which relates to the goods and becomes the basis of the bargain. Such warranties can also be created based upon descriptions of the goods which are made as part of the basis of the bargain that the goods shall conform to the description. *See, e.g.*, Cal. Com. Code § 2313(1)(a)-(b).

213. Each of the Plaintiffs formed a contract with Defendants fairlife and Coca-Cola —by virtue of their joint venture in creating fairlife and Coca-Cola's ownership. The terms of that contract include the promises and affirmations of fact that Defendants make on the fairlife products' packaging and through marketing and advertising, including the animal care claims and the sustainability and recyclability claims. The marketing and advertising constitute express warranties and became part of the basis of the bargain, and they are part of the standardized contracts between Plaintiffs and Class members on the one hand, and these Defendants, on the other.

214. In addition, or in the alternative, to the formation of an express contract, Defendants made each of their above-described representations, including the animal care claims and the sustainability and recyclability claims to induce Plaintiffs and Class members to rely on such representations.

215. Defendants' animal care, sustainability, and recyclability claims were material, and Plaintiffs and members of the Class did rely and were reasonable in relying upon such representations in making their purchases of the fairlife products.

216. Defendants have breached their express warranties about the fairlife products because the representations set forth herein, including their animal care, sustainability, including the recyclability claims and express representations concerning how Defendants ensure the humane treatment of animals in the fairlife supply chain, as well as environmental sustainability in the supply chain and on the packaging, are false and misleading. They are false and misleading because Defendants could not, and in fact do not, live up to the promises made by the very name of the products themselves, "fairlife," or the promises of "caring for animals is a top priority at fairlife" and "our goal is that all cows and calves are provided with the best care possible that the supplying dairy farms are required to have a "zero tolerance policy for animal abuse," that they have "industry-leading animal welfare standards," and that "100% of supplying farms passed critical care standards in 2022," among other animal care claims made on, or linked to by, each and every label of the fairlife products.

217. Nor do Defendants live up to the promises made by the sustainability claims, including fairlife's claim of "100% recyclable packaging commitment by 2025," the "Recycle Me" and chasing arrows symbol on the products indicating recyclability when in fact they are not, among other sustainability claims.

218. Defendants knew, or should have known, of the false and misleading nature of these claims from the very inception of the brand, which was created to increase sales and pricing via sustainability and animal care claims. This was motivated by watching the negative consequence of animal protection organizations conducting undercover investigations revealing the truth of industrial farming

operations like theirs and responded by creating false and misleading representations on animal care.

219. Defendants gained actual knowledge of the falsity and misleading nature of the animal care claims at least from the 2019 ARM Investigation, which they responded to by publicly promising to do better to consumers, and in reality, failed to take adequate steps to correct, making further–and worse–false and misleading animal care claims in response. Defendants then gained actual knowledge of the false and misleading nature of the specific animal care claims at issue and the failure of their remedial efforts at least through the 2023 ARM Investigation and continued with making the false and misleading animal care claims and denied, threatened, and attempted to contain the negative publicity from the 2023 ARM Investigation instead.

220. The 2024 and 2025 ARM Investigations shows the continuation, expansion, and worsening of animal cruelty and neglect. With respect to the sustainability claims, Defendants knew, or should have known, of the false and misleading nature of those claims as well. All of the sustainability claims were a mechanism to drive growth of an inherently high-resource consuming and polluting product over less resource consuming and polluting alternatives. This omission and misleading and false characterization of the sustainability claims was the Defendants' intent and effect on consumers. The sustainability claims around biogas were knowingly false and misleading because they have known risks such as methane production and explosions, and because they incentivize and drive greater growth and consolidation which is inherently polluting and resource intensive. Defendants also knew, or should have known, the sustainability claims around recyclability are false and misleading because Coca-Cola has been part of multiple industry groups acknowledging the problematic nature of opaque PET and the lack

of recycling facilities which would recycle opaque PET or number 7 plastic, and the fact that fairlife tested clear PET bottles.

221. Defendants both knowingly enabled and contributed to the false and misleading nature of the animal care claims and sustainability claims and failed to ensure that the material representations and omissions they were making to consumers were true. As a result of the systemic acts and omissions through intentional, knowing, or reckless acts and failure of oversight to ensure the truthfulness of the representations of every fairlife product label and linked advertisement, consumers purchased fairlife products from a company that sourced dairy from farms that mistreated their cows and calves and caused environmental degradation in violation of the express agreement that it created with its consumers.

222. Defendants could not legitimately make animal care claims and sustainability claims to consumers because they could not operate a brand in a way that comported with the animal care claims and sustainability claims and/or they could not verify whether those promises were accurate and because they knew, or should have known, those claims were false and misleading. Nor did they enforce these promises through adequate oversight, even where a given claim may not have been impossible or clearly false. Accordingly, Defendants charged consumers a price premium for express—but empty—promises.

223. Defendants breached their express warranties about the fairlife products because the representations, as set forth herein, were false and misleading.

224. Plaintiffs and the Class members expected, and would have been reasonable in expecting, that Defendants ensured the statements on the products' labels were truthful such that cows and calves were treated humanely, and the product packaging was recyclable and not otherwise environmentally destructive when purchasing fairlife products. Accordingly, Plaintiffs and the members of the Classy did not receive the benefit of their bargain when they discovered that at least

some of Defendants' cows and calves were abused, neglected, and treated in a cruel and inhumane manner and that the packaging is not in fact recyclable and Defendants' practices are also not environmentally sustainable.

225. Defendants had actual notice of the breaches set forth herein via multiple investigations by ARM, prior litigation, as well as public pressure against biogas and plastic waste pollution and recyclability fraud.

226. By reason of, and as a proximate result of, Defendants' breaches of their express warranties, Plaintiffs and the Class members have been damaged in the amount of the price they purchased for the fairlife products, or in an amount equal to the price premium that they paid when they purchased the products, in an amount to be proven at trial.

227. Therefore, Plaintiffs on behalf of themselves and the members of the Class, pray for the relief as set forth below.

## SECOND CLAIM FOR RELIEF

**Violations of California's False Advertising Law**
**Cal. Bus. & Prof. Code § 17500, *et seq.***
*(All Plaintiffs Against Defendants fairlife and Coca-Cola)*

228. Plaintiffs reassert the allegations set forth in Paragraphs 1 through 210 above and incorporate such allegations in full by reference herein.

229. Plaintiffs bring this claim against Defendants for violations of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* ("FAL").

230. California's FAL makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public. . . in any advertising device. . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services professional or

otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

231. Defendants have intentionally represented and continue to represent to the public, including Plaintiffs and members of the Class, through Defendants' deceptive packaging and marketing in making the animal care claims and sustainability claims, including recyclability, that the fairlife products are made with milk from animals treated with high levels of care and not abused or neglected and that production methods are environmentally sustainable, including that the packaging is recyclable. Defendants' representations are untrue, misleading, and/or deceptive and Defendants know, or should know, they are untrue, misleading and/or deceptive, because the products do not contain milk from animals treated with high levels of care and not abused or neglected and production methods are not environmentally sustainable, including the fact that the fairlife supplying farms are not among the most sustainable in the country for environmental footprint, their manure handling is not environmentally sustainable, and the packaging is not recyclable. Because Defendants have disseminated false and misleading information regarding the products, and Defendants know, knew, or should have known, through the exercise of reasonable care that these material representations are, and continue to be, false and misleading, Defendants have violated the FAL.

232. Defendants' conduct is also misleading because they fail to disclose material information about the fairlife products, such as the fact that, in spite of explicit representations and marketing, the products have been created using cows and calves that have been abused and mistreated and that the production methods are not environmentally sustainable, including plastic packaging that is not recyclable.

233. Defendants also failed to disclose material information regarding their explicit representations and marketing, such as Mike and Sue McCloskey's employment with animal welfare certifier/auditor FARM, that the FARM standards are not industry leading but in fact representative of the dairy industry generally with nearly all dairies being FARM members, the cruelty and neglect revealed in the 2023 ARM Investigation, that the reasoning behind changes like the $40 million-plus investment in animal care and increased auditing was due to ARM's 2019 Investigation and the ensuing legal action, that Defendants' business model and marketing strategy was one of extreme growth and consolidation in a way that exacerbates environmental destruction in spite of its environmental sustainability claims, and that the animal care and sustainability claims were part of a long-running brand strategy to avoid losing consumers if the truth regarding animal care and sustainability were revealed via an undercover investigation by an animal protection organization, which ultimately did in fact happen with ARM's investigations.

234. Cal. Bus. & Prof. Code § 17580 specifically addresses environmental representations, including recyclability.

a) 17580. A person who represents in advertising or on the label or container of a consumer good that the consumer good that it manufactures or distributes is not harmful to, or is beneficial to, the natural environment, through the use of such terms as "environmental choice," "ecologically friendly," "earth friendly," "environmentally friendly," "ecologically sound," "environmentally sound," "environmentally safe," "ecologically safe," "environmentally lite," "green product," or any other like term, or through the use of a chasing arrows symbol or by otherwise directing a consumer to recycle the consumer good, shall maintain in written form in its

records all of the following information and documentation supporting the validity of the representation:

1) The reasons the person believes the representation to be true.

2) Any significant adverse environmental impacts directly associated with the production, distribution, use, and disposal of the consumer good.

3) Any measures that are taken by the person to reduce the environmental impacts directly associated with the production, distribution, and disposal of the consumer good.

4) Violations of any federal, state, or local permits directly associated with the production or distribution of the consumer good.

5) Whether, if applicable, the consumer good conforms with the uniform standards contained in the Federal Trade Commission Guidelines for Environmental Marketing Claims for the use of the terms "recycled," "recyclable," "biodegradable," "photodegradable," or "ozone friendly."

6) If the person uses the term "recyclable," uses a chasing arrows symbol, or otherwise directs a consumer to recycle the consumer good, whether the consumer good meets all of the criteria for statewide recyclability pursuant to subdivision (d) of Section 42355.51 of the Public Resources Code.

b) Information and documentation maintained pursuant to this section shall be furnished to any member of the public upon request…. (emphasis added)38

235. The California Public Resources Code section incorporated by Cal. Bus. & Prof. Code § 17580 regarding recyclability claims is Public Resources Code - PRC § 42355.51 which states:

a) A person shall not offer for sale, sell, distribute, or import into the state any product or packaging for which a deceptive or misleading claim about the recyclability of the product or packaging is made.

b) (1) Subject to paragraph (2), a product or packaging that displays a chasing arrows symbol, a chasing arrows symbol surrounding a resin identification code, or any other symbol or statement indicating the product or packaging is recyclable, or otherwise directing the consumer to recycle the product or packaging, is deemed to be a deceptive or misleading claim pursuant to this section and Section 17580.5 of the Business and Professions Code unless the product or packaging is considered recyclable in the state pursuant to subdivision (d) and is of a material type and form that routinely becomes feedstock used in the production of new products or packaging.

3) …for a product or packaging that is not considered to be recyclable in the state pursuant to subdivision (d), all of the following apply:

---

[38] Cal. Bus. & Prof. Code § 17580(e)(2) excludes from the scope of misleading recycling directions to consumers "beverage container[s] subject to the California Beverage Container Recycling and Litter Reduction Act." That Act excludes milk from its definition of "beverage" so does not apply to the fairlife packaging.

WAYMAKER

(A) Displaying a chasing arrows symbol or any other statement indicating the product is recyclable directly on the product shall be deemed to be deceptive or misleading pursuant to this section and Section 17580.5 of the Business and Professions Code.

(B) If a product or packaging has multiple material types, a chasing arrows symbol or statement indicating recyclability may be displayed on the external packaging that is considered to be recyclable in the state pursuant to subdivision (d) if the chasing arrows symbol or statement makes clear in the same or greater font, font size, or symbol size which other components of the product or packaging are not recyclable.

(C) Displaying a chasing arrows symbol or any other statement indicating recyclability on packaging containing a consumable product shall, for purposes of this section, be deemed to refer only to the packaging. For purposes of this subparagraph, "consumable product" means a commodity that is intended to be used and not disposed of.

…

2) Subject to paragraph (3), a product or packaging is considered recyclable in the state if, based on information published by the department pursuant to subparagraph (B) of paragraph (1), the product or packaging is of a material type and form that meets both of the following requirements:

(A) The material type and form is collected for recycling by recycling programs for jurisdictions that collectively encompass at least 60 percent of the population of the state.

(B) (i) The material type and form is sorted into defined streams for recycling processes by large volume transfer or processing facilities, as defined in regulations adopted pursuant to Section 43020, that process materials and collectively serve at least 60 percent of recycling programs statewide, with the defined streams sent to and reclaimed at a reclaiming facility consistent with the requirements of the Basel Convention.

(ii) The department may adopt regulations modifying this requirement to encompass transfer or processing facilities other than large volume transfer or processing facilities, as the department deems appropriate for achieving the purposes of this section.

3) A product or packaging shall not be considered recyclable in the state unless the product or packaging meets all of the following criteria, as applicable:

(A) For plastic packaging, the plastic packaging is designed to not include any components, inks, adhesives, or labels that prevent the recyclability of the packaging according to the

APR Design® Guide published by the Association of Plastic Recyclers.

(B) For plastic products and non-plastic products and packaging, the product or packaging is designed to ensure recyclability and does not include any components, inks, adhesives, or labels that prevent the recyclability of the product or packaging.

(C) The product or packaging does not contain an intentionally added chemical identified pursuant to the regulations implementing subparagraph (4) of subdivision (g) of Section 42370.2.

…

4) Notwithstanding paragraphs (2) and (3), a product or packaging is recyclable in the state if the product or packaging has a demonstrated recycling rate of at least 75 percent, meaning that not less than 75 percent of the product or packaging sorted and aggregated in the state is reprocessed into new products or packaging.

5) (A) Before January 1, 2030, notwithstanding paragraphs (2) and (3), a product or packaging not collected pursuant to a curbside collection program is recyclable in the state if the non-curbside collection program recovers at least 60 percent of the product or packaging in the program and the material has sufficient commercial value to be marketed for recycling and be transported

> at the end of its useful life to a transfer, processing, or recycling facility to be sorted and aggregated into defined streams by material type and form….

236. Cal. Bus. & Prof. Code § 17580.5 additionally prohibits untruthful or deceptive environmental marketing claims: "It is unlawful for a person to make an untruthful, deceptive, or misleading environmental marketing claim, whether explicit or implied. For the purpose of this section, "environmental marketing claim" shall include any claim contained in the "Guides for the Use of Environmental Marketing Claims" published by the Federal Trade Commission ("FTC"). Cal. Bus. & Prof. Code § 17580.5(a). These Guides are also known as the FTC Green Guides.

237. Defendants' recyclability claims are covered in the FTC Green Guides, which govern both general environmental claims and specific strict requirements for recyclability claims, including but not limited to available recycling facilities for a substantial majority of consumers or communities where the product is sold, requirements for qualifications and disclosures to be made and to be clear, classifying as deceptive unqualified recycling claims where the presence of an incidental component significantly limits the ability to recycle the product, and overstatement directly or by implication an environmental attribute or benefit such as the claim of recyclability where the material is unlikely to be used again for another purpose. Section 260.12 of the Guides states: "Recyclable claims. (a) It is deceptive to misrepresent, directly or by implication, that a product or package is recyclable. A product or package should not be marketed as recyclable unless it can be collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item. (b) Marketers should clearly and prominently qualify recyclable

claims to the extent necessary to avoid deception about the availability of recycling programs and collection sites to consumers."

238. Defendants' recyclability claims are deceptive under Cal. Bus. & Prof. Code §§ 17580, 17580.5 and Public Resources Code - PRC § 42355.51, as well as the FTC Green Guides. Fairlife advertises "100% recyclable packaging commitment by 2025," uses the chasing arrows symbol on all of its products, uses a "1" code on its large filtered milk line bottles, the Core Power line bottles marked "7" with the chasing arrows or a 1 symbol and all Core Power bottles additionally say "Recycle Me." All of these, separately and together, constitute recyclability claims which are all are false and deceptive to consumers because in fact none of this fairlife packaging is recyclable.

239. Fairlife bottles are all opaque PET/PETE, which is made opaque by a TiO2-based pigment, rendering the bottles nonrecyclable.

240. Fairlife has not disclosed any clarifying information pursuant to California Business & Professions Code § 17580 or 17580.5 including the fact that its environmental marketing claims do not comply with the FTC Green Guides, 16 CFR Part 260, Guides for the Use of Environmental Marketing Claims. Defendants have also not disclosed the significant adverse environmental impacts of the production of their Products. The recyclability claims are also deceptive and misleading under the California Public Resources Code - PRC § 42355.51, since the packaging is not considered recyclable under the California standards referenced herein and does not routinely become feedstock used in the production of new products or packaging.

241. Fairlife packaging is not sorted into defined streams for recycling or sent to and reclaimed at a recycling facility. It also includes components and/or labels that prevent the recyclability of the packaging according to the APR Design Guide and in fact includes components and/or labels that prevent the recyclability of

the packaging. Fairlife plastic bottles also have no sufficient commercial value to be sorted for recycling.

242. Defendants' advertising and fairlife product labels give consumers the false impression that Defendants' oversight would ensure that their products are not, nor have they been, created using dairy cows and calves that were mistreated, nor using practices that were environmentally damaging, including packaging that is 100% recyclable–or even that any percentage of its packaging is recyclable.

243. As a result of Defendants' false advertising, Defendants have fraudulently obtained and continue to fraudulently and deceptively obtain money from Plaintiffs and the members of the Class.

244. Plaintiffs request that this Court cause Defendants to restore this fraudulently obtained money to Plaintiffs and the members of the Class, to disgorge the profits the Defendants made on these transactions, and to permanently enjoin Defendants from violating the FAL or violating it in the same fashion in the future as discussed herein. Plaintiffs and the members of the Class may be irreparably harmed and/or denied an effective and complete remedy if the Court does not grant such an Order.

245. Therefore, Plaintiffs on behalf of themselves and the members of the Class, pray for the relief as set forth below.

**<u>THIRD CLAIM FOR RELIEF</u>**

**Violation of California's Unfair Competition Law**

**Cal. Bus. & Prof. Code § 17200, *et seq.***

*(All Plaintiffs Against Defendants fairlife and Coca-Cola)*

246. Plaintiffs reassert the allegations set forth in Paragraphs 1 through 245 above and incorporate such allegations in full by reference herein.

247. Plaintiffs bring this claim against these Defendants alleging violations of California's Unfair Competition Law. Cal. Bus. & Prof. Code § 17200, *et seq*. ("UCL").

248. The UCL provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. The intent and purpose of the UCL is to protect consumers and competition by promoting fair competition in commercial markets for goods and services. The coverage of section 17200 is broad and intended to enjoin ongoing wrongful business in whatever context such activity might occur. The UCL is written in the disjunctive and each of its prongs is a separate and distinct theory of liability and provide an independent basis for relief. Defendants' wrongful conduct satisfies all three prongs of the UCL.

249. Each of the named Plaintiffs is a "person" within the meaning of California Business & Professions Code section 17201. Each of the Plaintiffs and the members of the Class are residents of California.

250. Under the UCL, a business act or practice is "unlawful" if it violates any established federal, state, statutory, regulatory, or court-made or local law.

251. Defendants' false and misleading advertising of the fairlife products was and continues to be "unlawful" conduct because it violates the FAL, sections 17580 and 17580.5 of the California Business & Professions Code, section 42355.51 of the California Public Resources Code, the FTC Green Guides, and other applicable laws and statutes as described herein.

252. As a result of Defendants' unlawful business acts and practices, Defendants have unlawfully obtained money from Plaintiffs and the members of the Class by reason of their purchases of fairlife products.

253. Under the UCL, a business act or practice is "unfair" if the defendants' conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the benefits for committing such acts or practices are outweighed by the gravity of the harm to the alleged victims.

254. Defendants' conduct was and continues to be of no benefit to purchasers of the fairlife products, as it is misleading, unfair, unlawful, offends public policy, is immoral, unethical, oppressive, unscrupulous, and is substantially injurious to consumers who rely on the fairlife products' packaging and marketing. Creating consumer confusion and a carefully curated false understanding as to the recyclability of the packaging, welfare of the animals and the environmentally impactful acts and practices used to derive the products is of no benefit to consumers. Therefore, Defendants' conduct was and continues to be "unfair."

255. As a result of Defendants' unfair business acts and practices, Defendants have unfairly obtained and continue to unfairly obtain money from Plaintiffs and the members of the Class from their purchases of fairlife products.

256. Under the UCL, a business act or practice is "fraudulent" if it actually deceives or has the capacity, likelihood, or tendency to deceive a reasonable consumer and the consuming public.

257. Defendants' conduct here was, and continues to be, fraudulent because it has the effect of deceiving consumers into believing that Defendants have methods to ensure the ethical and treatment of the animals from which they source dairy for the fairlife products at a high level of care. In reality, if Defendants were willing or able to ensure that their animal care claims were truthful and accurate, multiple undercover investigations would not have revealed systematic abuse and cruel and neglectful practices at its facilities.

258. Defendants' conduct here is also fraudulent because its acts and omissions in their sustainability claims have the effect of deceiving consumers into believing the acts and practices that go into the production of fairlife Products are environmentally sustainable, including, but not limited to its plastic packaging being 100% recyclable. In fact, Defendants' farms are highly growth- and consolidation-oriented which causes and exacerbates environmental destruction, such as with pollution from large amounts of manure, which Defendants then contribute additionally to environmental destruction with its (growing) biogas manure digester systems which cause environmental pollution and hazards; and fairlife packaging is in fact not recyclable and poses a contamination hazard to plastics that are recyclable.

259. Because Defendants intentionally misled and deceived Plaintiffs and the members of the Class, Defendants' conduct was "fraudulent."

260. As a direct and proximate result of Defendants' fraudulent business acts and practices, Defendants have fraudulently obtained and continue to fraudulently obtain money from Plaintiffs and the members of the Class.

261. By reason of, and as a direct and proximate result of, the Defendants' unfair, unlawful, and/or fraudulent business practices and conduct, Plaintiffs have suffered economic harm. Accordingly, pursuant to the provisions of the UCL (section 17203), Plaintiffs and the Class members are entitled to restitution from the Defendants for their economic injuries.

262. Redress and relief under the UCL are necessary because Plaintiffs have no adequate remedy at law.

263. Whether a business practice is unfair, unlawful, and/or fraudulent is a question of fact for the finder of fact to determine.

264. The UCL is a strict liability statute, and it is not necessary to show Defendants intended to injure or harm the Plaintiffs. Moreover, a business practice may violate the UCL even if it affects only one victim.

265. Pursuant to sections 17203 and 17535 of the California Business & Professions Code, the entry of permanent and mandatory relief against the Defendants is necessary and warranted to enjoin their ongoing unfair business conduct.

266. Therefore, Plaintiffs on behalf of themselves and the members of the Class, pray for restitutionary and injunctive relief.

**FOURTH CLAIM FOR RELIEF**

**Violation of California's Consumers Legal Remedies Act**
**Cal. Civ. Code § 1750, *et seq.***

*(All Plaintiffs Against Defendants fairlife and Coca-Cola)*

267. Plaintiffs reassert the allegations set forth in Paragraphs 1 through 266 and incorporate such allegations in full by reference herein.

268. Plaintiffs bring this claim against Defendants fairlife and Coca-Cola alleging violations of California's Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq*. ("CLRA").

269. The fairlife products are "goods" within the meaning of California Civil Code section 1761(a), and the purchases of such products by Plaintiffs and the members of the Class "transactions" within the meaning of California Civil Code section 1761(e).

270. California Civil Code section 1770(a)(2) prohibits "misrepresenting the source, sponsorship, approval, or certification of goods or services." By marketing the fairlife products with the animal care claims and sustainability and recyclability claims, Defendants have represented and continue to represent that the products are derived from cows treated with high animal care and without cruelty and neglect, as

well as environmentally sustainable practices including recyclability of packaging, none of which is truthful. Accordingly, Defendants have violated section 1770(a)(2) of the CLRA.

271. California Civil Code section 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have." By marketing the fairlife products with the animal care claims and sustainability and recyclability claims, Defendants have represented and continue to represent that the products have characteristics (are derived from cows treated with high levels of care and not cruelly treated or neglected and products produced in a sustainable manner including recyclable packaging) that they do not have. Accordingly, Defendants have violated section 1770(a)(5) of the CLRA.

272. California Civil Code section 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." By marketing the products with the animal care claims and sustainability and recyclability claims, Defendants have represented and continue to represent that the products are of a particular standard or quality (from cows treated with high levels of care and not cruelly treated or neglected and products produced in a sustainable manner including recyclable packaging) when they are not. Therefore, Defendants have violated section 1770(a)(7) of the CLRA.

273. California Civil Code section 1770(a)(9) prohibits: "[a]dvertising goods or services with intent not to sell them as advertised." By marketing the fairlife products with the animal care claims and sustainability and recyclability claims, where they knew, or should have known, that such representations were untruthful and also by not ensuring the truthfulness of the representations, Defendants have violated section 1770(a)(9) of the CLRA.

274. Defendants have also violated the CLRA by intentionally failing to disclose material information about the products, such as the fact that Defendants' promises regarding the treatment of dairy cows and calves and other animal care, sustainability, and recyclability claims are empty, not genuine, not enforced or in some cases not enforceable, and that products have been derived from cows and calves that are or have previously been systematically abused and mistreated, and environmentally destructive practices including packaging that is not in fact recyclable.

275. All of these failures to disclose constitute a fraudulent omission under the CLRA because they are contrary to representations made by the Defendants, and they are facts Defendants were obligated to disclose.

276. At all relevant times, Defendants have known, or reasonably should have known, that their animal care claims and sustainability claims were inaccurate; consumers purchased the fairlife products based upon guarantees that the cows and calves in Defendants' supply were treated in accordance with the animal care and sustainability claims including that they lived a "fair" life–and not being treated in violation of criminal cruelty laws–and based upon guarantees of environmental impact and practices consistent with Defendants' sustainability claims, including 100% recyclable packaging. Consumers justifiably relied upon Defendants' promises based upon the packaging on and linked to the products themselves, and Defendants made those promises because they would drive sales and increase the price of the products.

277. Accordingly, the promises and representations are material, because reasonable consumers would rely upon them when making purchases of the products. Because of the materiality of the representations, reliance may be inferred on behalf of the Class members.

278. Plaintiffs and the members of the Class have suffered and continue to suffer injuries caused by Defendants because they would not have purchased the fairlife products or would have paid significantly less for the products had they known that Defendants' conduct was misleading and fraudulent.

279. Pursuant section 1782(a) of the California Civil Code, on April 11, 2025, counsel for Plaintiffs sent to each defense counsel (via certified mail and email), a Correction Demand Notice identifying the Defendants' alleged wrongful and unlawful conduct and requesting that they cease such conduct which is violative of the CLRA. More than 30 days have now elapsed since that notice was provided to Defendants. Consequently, Plaintiffs hereby amend their CLRA claim for relief to add a claim for damages against Defendants fairlife and Coca-Cola.

280. Under California Civil Code section 1780(a), Plaintiffs and the members of the Class seek injunctive relief pursuant to the CLRA, prohibiting Defendants fairlife and Coca-Cola from further wrongful acts and unfair and unlawful business practices.

281. Therefore, Plaintiffs for themselves and the members of the Class pray for the relief set forth below.

## <u>FIFTH CLAIM FOR RELIEF</u>

### Common Law Unjust Enrichment

*(All Plaintiffs Against Defendants fairlife and Coca-Cola)*

282. Plaintiffs reassert the allegations set forth in paragraphs 1 through 281 above and incorporate such allegations in full by reference herein.

283. Plaintiffs bring this common law claim for unjust enrichment against Defendants, in the alternative, to their breach of express warranty claim.

284. Plaintiffs and the Class members conferred benefits on Defendants by purchasing the fairlife products, including by paying a price premium for the products.

285. Defendants have been unjustly enriched by retaining the revenues derived from Plaintiffs and the Class members' purchases of the fairlife products. Retention of the monies under these circumstances is unjust and inequitable because Defendants' labeling of the products was misleading to consumers, which caused injuries to Plaintiffs and the Class members because they would not have purchased or would have paid less for the products if they had known the true facts.

286. Defendant Coca-Cola retained a benefit despite not exercising adequate oversight over operations and processes that source dairy and packaging for the fairlife products.

287. Defendant fairlife retained a benefit through the profits it retained in spite of and because of its failure to ensure that dairy cows are treated with high animal care in sourcing milk products and its lack of oversight over and knowing or reckless participation in environmentally damaging practices. Fairlife was also unjustly enriched by reason of its misrepresentations concerning environmental sustainability including the recyclability of its plastic bottles and labels.

288. Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiffs and the Class members is unjust and inequitable, Plaintiffs and the Class members seek restitution of all monies Defendants acquired from their unlawful conduct, including disgorgement of all profits and establishment of a constructive trust.

289. Therefore, Plaintiffs on behalf of themselves and the members of the Class pray for the relief as set forth below.

**SIXTH CLAIM FOR RELIEF**

**Aiding and Abetting**

*(All Plaintiffs Against Defendants Select Milk and the McCloskeys)*

290. Plaintiffs reassert the allegations set forth in paragraphs 1 through 289 above and incorporate such allegations in full by reference herein.

291. Plaintiffs bring this claim for aiding and abetting against Defendants Select Milk and the McCloskeys. These Defendants have aided and abetted Defendants fairlife and Coca-Cola's false advertising, unfair competition (injunctive relief only), and CLRA violations (injunctive relief only), as set forth in Plaintiffs' Second, Third, and Fourth Claims for Relief above.

292. These Defendants substantially aided and/or encouraged Defendants fairlife and Coca-Cola' unlawful and wrongful false advertising and unfair competition conduct and practices.

293. These Defendants had accrual knowledge of the purpose and unlawful practices of Defendants fairlife and Coca-Cola.

294. Defendants' aiding and abetting has caused economic harm to the Plaintiffs and the members of the Class.

295. Therefore, Plaintiffs on behalf of themselves and the members of the Class, pray for the relief as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the members of the Class alleged and identified in this First Amended Complaint, respectfully request the Court enter an Order:

1. Certifying the proposed Class under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), and, in the alternative, (c)(4) as set forth above;

2. Declaring that Defendants are financially responsible for providing sufficient notice to the Class members of the pendency of this lawsuit;

3. Declaring that Defendants have committed the violations of law alleged herein;

4. Ordering and overseeing any and all injunctive relief the Court deems appropriate, which includes permanently enjoining Defendants from engaging in false and misleading marketing, promotion, and advertising of fairlife products and their containers;

5. Awarding statutory damages in the maximum amount for which the law provides;

6. Awarding restitution, monetary damages, including, but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

7. Providing for any and all equitable monetary or other relief the Court deems appropriate;

8. Awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

9. Appointing Plaintiffs' counsel of record as Class Counsel;

10. Awarding Plaintiffs' counsel their reasonable costs and expenses of suit, including attorneys' fees;

11. Awarding pre- and post-judgment interest to the extent the law allows; and

12. Providing such further relief as this Court may deem just and proper.

DATED: May 29, 2025 WAYMAKER LLP

By: */s/ Donald R. Pepperman*
DONALD R. PEPPERMAN
BRIAN E. KLEIN
SAM S. MEEHAN

LAW OFFICE OF CHERYL LEAHY
CHERYL L. LEAHY

*Attorneys for Plaintiffs*

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, and Local Rule 38-1, Plaintiffs hereby demand a trial by jury on all claims and/or issues so triable.

DATED: May 29, 2025 WAYMAKER LLP

By: */s/ Donald R. Pepperman*

DONALD R. PEPPERMAN
BRIAN E. KLEIN
SAM S. MEEHAN

LAW OFFICE OF CHERYL LEAHY
CHERYL L. LEAHY

*Attorneys for Plaintiffs*